UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL WILLIAMS, </br></br>Plaintiff, </br></br>v. </br></br>HASSAN M. AHMED, STEPHEN J. NILL, EDWARD T. ANDERSON, PAUL J. FERRI, and PAUL J. SEVERINO, </br></br>Defendants, </br></br>and </br></br>SONUS NETWORKS, INC., </br></br>Nominal Defendant. | Case No. </br></br>04 CV 10359 DPW </br>Shareholder Derivative Complaint </br>MAGISTRATE JUDGE Bowler </br></br>RECEIPT #_____ </br>AMOUNT $ 150 ___ </br>SUMMONS ISSUED ___ </br>LOCAL RULE 4.1_____ </br>WAIVER FORM ___ </br>MCF ISSUED_____ </br>BY DPTY. CL. Demand for Jury Trial </br>DATE_____ </br>2/23/04 |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, Daniel Williams ("Williams" or "Plaintiff") derivatively on behalf of Nominal Defendant Sonus Networks, Inc. ("Sonus" or the "Company") for his complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, a review of Sonus' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and concerning Sonus and information readily available on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right and for the benefit of Nominal Defendant Sonus against Defendants for their breaches of fiduciary duties, abuse of control, gross mismanagement, and other violations of law during the Relevant Period, April 9, 2003 through February 12, 2004.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, defendants maintain their chief executive offices and principal place of business within this District.

4. This action is not a collusive one designed to confer jurisdiction on a court which it would not otherwise have.

## PARTIES

5. Plaintiff Daniel Williams is a resident of the state of Tennessee and is currently a holder of Sonus common stock as set forth in the Verification attached hereto and incorporated by reference herein.

6. Nominal Defendant Sonus Networks, Inc. is a leading provider of packet voice infrastructure products and maintains its principal executive offices at 5 Carlisle Road, Westford, Massachusetts 01886.

7. Defendant Hassan M. Ahmed ("Ahmed") is a resident of the state of Massachusetts. Ahmed served as Sonus' President and Chief Executive Officer at all relevant times. Defendant Ahmed made statements to investors in and approved Sonus' materially false and misleading press releases. He also signed the Company's quarterly reports on Form 10-Q filed with the SEC.

8. Defendant Stephen J. Nill ("Nill") is a resident of the state of Massachusetts. Nill served as Sonus' Chief Financial Officer, Vice President of Finance and Administration and Treasurer at all relevant times. Defendant Nill approved Sonus' materially false and misleading press releases and signed the quarterly reports on Form 10-Q filed with the SEC during the Class Period.

9. Defendant Edward T. Anderson ("Anderson") is a resident of the state of Massachusetts. Anderson has been a member of Sonus' Board of Directors since November 1997, and is a member of the Board's Audit Committee.

10. Defendant Paul J. Ferri ("Ferri") is a resident of the state of Massachusetts. Ferri has been a member of Sonus' Board of Directors since November 1997, and is a member of the Board's Audit Committee.

11. Defendant Paul J. Severino ("Severino") is a resident of the state of Massachusetts. Severino has been a member of Sonus' Board of Directors since March 1999, and is a member of the Board's Audit Committee.

12. Defendants Ahmed, Nill, Anderson, Ferri and Severino are referred to herein collectively as the Defendants.

13. By reason of their positions with the Company, the Defendants had access to internal documents, reports and other information, including adverse nonpublic

information concerning the Company's business and financial condition, and attended management and/or board of director meetings. As a result of the foregoing, they were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

14. The Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information with respect to and to promptly correct any public statements issued by or on behalf of the Company that had become false and misleading.

15. Each defendant knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit.

## SUBSTANTIVE ALLEGATIONS

16. Sonus purports to be a leading provider of packet voice infrastructure solutions for wireline and wireless service providers. The Company's products include media gateways, softswitches and network management systems, which are deployed in service provider networks worldwide. Sonus was founded in 1997. The Company's products are a new generation of carrier-class switching equipment and software that enables voice services to be delivered over packet-based networks. These packet-based networks transport traffic in small bundles ("packets"), thereby creating a more efficient and cost-effective means of providing communications services. By enabling voice traffic to be carried over packed-based networks, the Company's products will

accelerate the convergence of voice and data into the new public network. Sonus' primary customers are communications service providers, including long distance carriers, local exchange carriers, Internet service providers, wireless operators, cable operators, international telephone companies and carriers that provide services to other carriers.

17.  Sonus sells its products primarily through direct sales forces. In some markets, however, the Company may also sell its products through distributors and resellers.

18.  Throughout the Relevant Period, Sonus touted its strong financial performance and consecutive quarter-over-quarter revenue growth. In reality, however, the Company's revenues and certain other financial statement accounts were misstated as a direct result of the Company's improper revenue recognition and certain other improper practices.

19.  On April 9, 2003, after the market closed, the Company issued a press release announcing Sonus' financial results for the first quarter ended Mach 31, 2003 (the "April 9th Press Release"), explicitly stating that its financial statements were prepared "in accordance with Generally Accepted Accounting Principles (GAAP)." Specifically, the Company reported total revenue for the quarter of $16.0 million and a net loss and loss per share of $4.4 million and $0.02 per share, respectively. In the April 9th Press Release, Defendant Ahmed boasted:

> Our financial results for the first quarter reflected good progress toward our business objectives. We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family.

20. As a result of Sonus' positive statements contained in the April 9th Press Release, Sonus' common stock rose from a closing price on April 9, 2003 of $2.20 to close at $2.72 on April 10, 2003, an increase of $0.52, or 23.6%.

21. On April 22, 2003, the Company issued a press release announcing that it had completed a public offering of twenty million shares of its common stock at a per share price of $3.05, made under an effective registration statement filed with the SEC. Defendant Ahmed was quoted as saying:

> Enhancing our financial strength has been an important component of our strategy as we seek to expand our partnerships with some of the world's largest service providers. The financial transaction announced today bolsters our balance sheet, and positions us to build on our success in providing the next-generation, carrierclass solutions that enable voice services to be delivered over packet-based networks.

22. On May 9, 2003, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2003 (the "First Quarter 10-Q"). The First Quarter 10-Q repeated the same materially false and misleading financial information contained in the April 9th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC) and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.

\* \* \*

> **(e) Revenue Recognition**
> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is

probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the First Quarter 10-Q.

23. On July 10, 2003, after market close, the Company issued a press release announcing Sonus' financial results for the second quarter and six months ended June 30, 2003 (the "July 10th Press Release") explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)." Specifically, the Company reported total revenue for the second quarter and six months of $21.4 million and $37.4 million, respectively, a net loss of $3.2 million and $7.6 million, respectively, and a loss per share of $0.01 and $0.04 per share, respectively, for the same period. In addition, Defendant Ahmed highlighted the Company's quarter- overquarter revenue growth, stating:

> We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth. We executed across all areas of the business broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability.
>
> * * *
>
> Our revenue growth, coupled with premier customer wins like Verizon Communications underscores our belief that the packet voice market is entering a new phase. Incumbent carriers are now adopting packet voice solutions and Sonus Networks is proud to be at the forefront of this transition.

24. As a result of Sonus' positive statements contained in the July 10th Press Release, Sonus' common stock soared from a closing price on July 10, 2003 of $5.72 to close at $7.10 on July 11, 2003, an increase of $1.38, or 24.1%.

25. On August 14, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2003 (the "Second Quarter 10Q"). The Second Quarter 10-Q repeated the same materially false and misleading financial information contained in the July 10th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.
>
> * * *
>
> **(e) Revenue Recognition**
> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Second Quarter 10-Q.

- 9 -

26. On September 23, 2003, the Company issued a press release announcing that it had completed a public offering of seventeen million shares of its common stock at a per share price of $7.75 less underwriter discounts, made under an effective registration statement filed with the SEC. Defendant Ahmed was quoted as saying:

> Strengthening our balance sheet has been an important objective for Sonus as we continue to develop relationships with some of the world's largest service providers. The financial transaction announced today enhances our position as we enter the next phase of the migration from circuit to packet voice networks.

27. On October 8, 2003, after the close of the market, the Company issued a press release announcing Sonus' financial results for the third quarter and nine months ended September 30, 2003 (the "October 8th Press Release") explicitly stating that its financial statements were prepared "in accordance with U.S. generally accepted accounting principles (GAAP)." Specifically, the Company reported total revenue for the third quarter and nine months of $28.6 million and $66.0 million, respectively. The Company also reported net income of $1.2 million and earnings per diluted share of $0.01 for the third quarter and a net loss and loss per diluted share of $6.4 million and $0.03, respectively, for the nine months. In the October 8th Press Release, defendant Ahmed commended the Company for attaining four quarters of consecutive growth:

> This was a strong quarter for Sonus Networks, our fourth consecutive quarter of revenue growth. Our revenues grew 34% sequentially to $28.6 million, reflecting increased market demand for packet telephony and the expanding number of customers who have adopted Sonus' solutions. We achieved an important milestone in reporting our first quarterly profit on a GAAP basis. Additionally, we bolstered our balance sheet to capitalize on the opportunity ahead, adding $126 million to our cash and marketable securities through a common stock offering in September.

28.  As a result of Sonus' positive statements contained in the October 8th Press Release, Sonus' common stock rose from a closing price on October 8, 2003 of $8.30 to close at $8.80 on October 9, 2003, an increase of $0.50, or 6%.

29.  On November 10, 2003, Sonus filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2003 (the "Third Quarter 10Q"). The Third Quarter 10-Q repeated the same materially false and misleading financial information contained in the October 8th Press Release. In addition, the defendants represented that:

> The accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods. The unaudited condensed consolidated financial statements have been prepared in accordance with the regulations of the Securities and Exchange Commission (SEC), and omit or condense certain information and footnote disclosures pursuant to existing SEC rules and regulations.
>
> \* \* \*
>
> **(d) Revenue Recognition**
> Sonus recognizes revenues from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenues when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenues are recognized as the services are provided. Revenues from maintenance and support arrangements are recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenues. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

Defendants Ahmed and Nill signed the Third Quarter 10-Q.

30.     Defendants artificially inflated the price of Sonus' common stock by publicly issuing materially false and misleading statements and omitting to disclose material facts necessary to make defendants' statements not false and misleading. The statements were each materially false and misleading when made because:

   a. Defendants knowingly or recklessly artificially inflated the Company's revenues, net income/(loss) and earnings/(loss) per share by causing revenue to be recognized in violation of SOP 97-2 and Company policy;

   b. Defendants knowingly or recklessly artificially inflated the Company's accounts receivable and total assets by recording revenue before it was earned;

   c. Defendants knowingly or reckless understated the Company's deferred revenue and total liabilities by recording unearned revenue as earned;

   d. The Company's financial statements were not prepared in accordance with GAAP and the Company's financial statements were not fair statements of results for the interim periods presented; and

   e. Defendants knowingly or recklessly violated the Company's own internal revenue recognition policy.

31.     On January 20, 2004, after the market closed, Sonus issued a press release announcing that it would delay the release of its fourth quarter and year-end financial results for the fiscal year-ended December 31, 2003 because the Company needed more time to complete its year-end audit. The following day, the stock price declined $.98 per share, or 9.9%, to close at $8.93.

32.     After the close of market on February 11, 2004, Sonus issued a press release announcing a so-called "update" on the status of its fourth quarter and year-end 2003 financial results. As Bill Mann, an analyst for Motley Fool.com described, "[t]his isn't some 'reaffirming guidance' kind of communiqué – it was a bombshell."

33. Indeed, the Company announced that, in connection with the year-end audit, its auditors had uncovered certain improper revenue recognition practices and other issues relating to both the timing of revenue recognized and other financial statement accounts. The Company further revealed that as a result of these improper practices, it may have to restate at least its 2003 financial statements and possibly prior periods as well. The Company tried to soften the blow by reassuring investors that certain employees responsible for the improper conduct had been terminated.

34. Upon the wake of this announcement, Sonus' common stock dropped $1.05, or 15% in extended trading that day. The following day, the stock continued to plummet, closing at $5.39 per share, down $1.30 per share, or 19.4% from the previous day's close. In total, the stock price has declined an astounding $2.11, or 28% since the February 11, 2004 Announcement, on volume of ninety-six million shares, nearly fifteen times that of the three-month average volume.

35. Since the Company announced the delay of its fourth quarter and year-end 2003 earnings on January 20, 2004, it has shed 46% of its market capitalization, or $1.2 billion and its shares have fallen nearly 50%.

36. Wall Street analysts were outraged by the Company's disclosure of its improper accounting practices. Goldman Sachs, Smith Barney and Legg Mason all downgraded the Company's rating within a day of the February 11, 2004 Announcement, citing the potential restatement as the primary reason. Goldman Sachs, who downgraded the Company to "underperform," stated that "the uncertainty around the audit outweighs the health of the business." Similarly, both Smith Barney and Legg Mason cut Sonus' rating from "buy" to "hold."

37. In addition, Bill Mann, in a February 12, 2994 article for Motley Fool.com entitled *Sonus: Not Buying It* stated:

> There are a number of problems with this story. First and foremost, the news of the findings came out after yesterday's close, and yet the stock began tanking with huge volume at around 11 a.m. – several hours before any official comments by the company. That smells an awful lot like the news was leaked before it was released to the public.
>
> * * *
>
> Second, the whole "non-executive" firing thing sounds a heck of a lot like scapegoating. The company claims the problem is with revenue recognition for certain accounts. It says the equipment in question has been bought and already deployed. That's certainly better than some of the alternatives, like someone was throwing equipment off the back of the truck and declaring it sold. But given the company's business model, it's still extremely troubling.
>
> According to its (now suspect) mid-year 2003 filing, Sonus generates 70% of its revenue from equipment sales, and about 30% from back-end services. It sells either directly to end customers, or to a distribution network. Its services are accounted for on an "as-provided" basis, which is conservative accounting. So, since the equipment in question has already been delivered to the end customer, as stated by the company, it would mean that **Sonus was booking revenues for services that it *never provided* to customers**. Worse, management noted that these improper revenues occurred 2003, and possibly went back to previous years.
>
> *That's* a disaster, because companies are either providing services, or they are not. **For management to have missed such activity for an extended period of time is inexcusable**. So while it may be great that it has identified and eliminated wrongdoers, this sounds like a much deeper problem.

(Emphasis added.)

38. The Company further disclosed that it was currently reassessing the proper periods in which revenue should be recognized for those transactions and that revenue or deferred revenue in periods previously reported could be affected as a result of this "reassessment." Meanwhile, the Company tried to reassure investors that the responsible employees had been terminated.

39. Defendant Ahmed commented on the revelation:

> We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting.

40. The Company's stock plunged $2.11 per share, or 28% the day after this shocking revelation, to close at $5.39 per share, on trading volume nearly fifteen times that of the three-month average.

41. Defendants were motivated to artificially inflate the Company's stock in order to complete two separate stock offerings and to allow for certain insiders to sell a significant amount of Company stock.

*Multiple Stock Offerings*

42. The first offering, consisting of 20 million shares of stock issued at $3.05 per share, was completed on April 22, 2003, with the Company reaping total proceeds of approximately $61.0 million. This offering occurred only two weeks after the Company announced strong financial results with a 26% increase in revenue quarter-over-quarter.

43. The second offering, consisting of 17 million shares of stock issued at $7.75 per share, was completed on September 23, 2003, with the Company reaping total proceeds of approximately $126 million, net of underwriter discounts.

*Insider Selling*

44. Numerous insiders also profited from the Company's artificially inflated stock price resulting from defendants' false and misleading statements by engaging in improper insider selling. Specifically, certain insiders reaped proceeds of more than $2 million from the sale of more than 250,000 shares of their own, personal stock, as illustrated in the chart below:

- 15 -

| Name | Position | No. of Shares | Proceeds |
|---|---|---|---|
| John M. O'Hara | Vice President | 13,750 | $489,000 |
| Paul R. Jones | Vice President | 55,000 | $381,000 |
| Edward Anderson | Vice President | 65,584 | $449,000 |
| Edward Harris | Vice President | 30,000 | $204,570 |
| **Total** | | **264,334** | **$2,000,070** |

*GAAP Violations*

45. The Company's false and misleading financial statements and press releases identified above were materially false and misleading when made. The Company expects to restate its financial results reported during the Relevant Period because, contrary to its earlier statements, those results did not comply with GAAP.

46. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

47. The Defendants caused Sonus to falsify its reported financial results through its improper revenue recognition where Sonus prematurely booked revenues on certain transactions with customers.

48.  GAAP, as set forth in SOP 97-2, *Accounting for Software Revenue Recognition*, prohibits revenue recognition unless the following four criteria are met: (i) persuasive evidence of an arrangement exists; (ii) the product has been delivered; (iii) the vendor's fee is fixed or determinable; and (iv) it is probable that the revenue will be collected.

49.  Contrary to these representations and contrary to GAAP and SEC rules, Defendants improperly recognized revenue that, according to the information they had at the time the revenue was recognized, the Company had not earned. Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, including the following fundamental accounting principles:

a.  The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

e.  The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise

performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

f.  The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

g.  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

h.  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

i.  The principle that a conservative approach be taken providing early recognition of unfavorable events and minimizing the amount of income reported. (See Statement No. 4 of the Accounting Principles Board ("APB Nos.") at 4 ¶¶ 28, 35, 171);

j.  The principle that the financial information presented should be complete. (See APB No. 4, ¶¶ 28, 35, 88, 171);

k.  The principle of fair presentation ("presents fairly"). (See APB No. 4, ¶¶ 109, 138, 189);

l.  The principle of adequacy and fairness of disclosure. (See APB No. 4, ¶¶ 81, 106, 189, 199);

m.  the principle of materiality concerning information that is significant enough to affect evaluations or decisions. (See APB No. 4, ¶¶ 25, 128);

n.  the principle that the substance of transactions rather than form should be reflected. (See APB No. 4, ¶¶ 25, 35, 127);

o.  the principle that the financial statements contain and disclose relevant, understandable, and timely information for the economic decisions of the user. (See APB No. 4, ¶¶ 23, 88, 89, 92);

p. the principle that the financial statements provide reliable financial information about the enterprise for the economic decisions of the user. (See APB No. 4, ¶¶ 77, 78, 107, 108); and

q. the principle that accounts receivable must be reported in the financial statements at net realizable value (See, e.g., ARB-43, Chapter 3A; FASB No. 5, Accounting for Contingencies.)

49. The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEMAND EXCUSED ALLEGATIONS

50. Plaintiff is an owner of Sonus common stock and was an owner of Sonus common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein through the present.

51. Sonus' Board of Directors is currently composed of five (5) directors – Hassan M. Ahmed, Edward T. Anderson ("Anderson"), Paul J. Ferri ("Ferri"), Paul J. Severino ("Severino") and Rubin Gruber ("Gruber"). Ahmed, Anderson, Ferri and Severino have been named as Defendants herein.

52. Defendant Ahmed, as a director, owed a duty to Sonus and its shareholders to be reasonably informed about the business and operations of the Company. As CEO and President, Ahmed also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. However, Ahmed breached these duties by actively participating in, encouraging,