# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | **Case No. 1-04-CV-10359 DPW** |
| Consolidated Cases: 1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | **CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**PART 1 OF 2 (PAGES 1 –29)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | **Case No. 1-04-CV-10359 DPW** |
| Consolidated Cases: 1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | **CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiffs, by their undersigned attorneys, for their shareholder derivative complaint, allege upon information and belief, except as to allegations about themselves, which are based upon personal knowledge, as follows:

## NATURE OF ACTION

1.    This is a consolidated shareholders' derivative action brought on behalf of nominal defendant Sonus Networks, Inc. ("Sonus" or "the Company"), a publicly traded Delaware corporation with headquarters and principal place of business in Chelmsford, Massachusetts. Sonus provides voice over IP (VoIP) infrastructure solutions for wireline and wireless service providers. In this action, plaintiffs, on behalf of Sonus, allege that defendants, who are current or former officers and/or directors of the Company, damaged Sonus by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements to the market regarding the Company's earnings and revenues; (iii) exposing the Company to massive liability for violations of the federal securities

1

laws; (iv) damaging the Company's reputation: (v) unjustly obtaining incentive based compensation from the Company; and (vi) trading Sonus shares while in possession of material, non-public information regarding the true financial condition of the Company.

2.      On February 11, 2004, defendants caused Sonus to announce that several issues, practices and actions of certain employees had been identified relating to the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, and that the U.S. Securities & Exchange Commission ("SEC") had been notified of these developments.  Defendants further reported that each of these issues might affect the Company's publicly reported 2003 financial results, and possibly financial statements for prior periods. On March 15, 2004, the Company announced that it would file for an extension of time to file with the SEC its audited financial statements for fiscal year 2003. On March 29, 2004, defendants announced a further delay in that filing, and that the anticipated restatement would extend to include fiscal year 2002. On June 24, 2004, defendants disclosed that fiscal year 2001 would also have to be restated. And on June 29, 2004, the Company disclosed that it had become the subject of a formal order of private investigation by the SEC.

3.      Finally, on July 28, 2004, Sonus announced a huge restatement of financial results, including the Company's financial statements for all of fiscal years 2001, 2002 and the first nine months of 2003. The restatement was extensive in scope and magnitude, and included material adjustments to the Company's accounting for revenue, deferred revenue, purchase accounting, impairments, accrued expenses and deferred compensation. As detailed herein, the restatement included large swings in reported results for revenue, deferred revenue, and expenses throughout the subject periods. Furthermore, earnings per share figures for each of fiscal year 2002 and the first nine months of fiscal year 2003 were restated downwards. For example, for the first nine months of 2003, revenues were restated downwards by almost a third, from $68 million to $46 million, deferred revenues were increased by $50 million to $85.2 million, expenses were restated to $17.5 million from $32.9 million, and loss per share more than tripled to $.10.

4.      In connection with this restatement, the Company also admitted that "significant internal control matters" constituting "material weaknesses" had been identified, including

2

"insufficient contract review and documentation; inadequate supervision and review within the finance and accounting department; inadequate segregation of duties; insufficient supporting documentation for and review of account reconciliations; lack of adequate controls over cash receipts; lack of adequate technical accounting expertise; insufficient equity review procedures and documentation; flawed foundations for accounting estimates; and inadequate quarterly and year-end financial statement close and review procedures." The Company stated that, throughout the subject periods, its "disclosure controls and procedures were inadequate." According to the Company, these problems were so severe that the inability to remedy them "could have a material adverse effect on our business, results of operations and financial condition, as well as impair our ability to meet our quarterly and annual reporting requirements in a timely manner."

5.    During the period in which defendants were causing the Company to issue materially false and misleading financial results, and to operate with admittedly flawed or nonexistent internal procedures and controls, several of the Company's officers and directors collectively sold over 364,000 shares of Sonus stock while in possession of material adverse inside information regarding these matters, for illegal proceeds exceeding $2.2 million. Furthermore, several of the Company's officers and directors were unjustly awarded substantial incentive-based cash compensation, bonus and stock option awards by the board's Compensation Committee, based on the Company's inflated earnings performance.

6.    Defendants' conduct was undertaken in bad faith, and constituted breaches of their fiduciary duties to the Company. By making Sonus appear more successful than it actually was, defendants secured their positions as officers and/or directors of a public company, as well as their continued lucrative employment and incentive-based cash and stock compensation. Defendants were also motivated by the desire to sell their personal holdings of Sonus stock and increase and maintain the value of their substantial personal holdings of Sonus shares.

7.    Defendants' conduct has severely damaged the Company. Defendants have exposed the Company to liability for violations of the federal securities laws asserted in a series of class action complaints filed in this Court ("the Class Actions"), as well as to significant legal and other professional costs for investigation and the Company's defense. The Company has also

been harmed by its exposure to civil fines or other penalties in connection with the formal investigation of the Company recently announced by the SEC, and its reputation in the securities markets has been severely tarnished, hampering its ability to secure additional funding. Furthermore, the Company has admitted that the state of its financial controls was so deficient that the failure to deal with these issues could materially impact the Company's business.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction over this action pursuant to pursuant to 28 U.S.C. Section 1332. This Court also has subject matter jurisdiction over plaintiffs' claims asserted under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C. §7243.

9.     Venue is proper in this Judicial District because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

## PARTIES

10.     Plaintiff Michelle P. Berk held Sonus shares at relevant times, and continues to hold Sonus shares. Plaintiff is a citizen of Ontario, Canada.

11.     Plaintiff Michael Pisnoy held shares at relevant times and continues to hold Sonus shares. Plaintiff is a citizen of Florida.

12.     Plaintiff Daniel Williams held Sonus shares at relevant times, and continues to hold Sonus shares. Plaintiff is a citizen of Tennessee.

13.     Nominal Defendant Sonus is a Delaware corporation and maintains its principal executive offices at 250 Apollo Drive in Chelmsford, Massachusetts. According to its public statements, Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. Sonus trades on the NASDAQ National Market System with 246.5 million shares outstanding.

4

14.    Defendant Hassan Ahmed ("Ahmed") was at all relevant times the president, CEO and a director of the Company, positions he has held since 1998. Ahmed beneficially owns 8.8 million shares of the Company's common stock, or 3.6%. For fiscal year 2001, Ahmed was paid $175,000 in salary, $75,000 in bonus, and $38,000 in other compensation, and was awarded options to purchase 640,000 shares of Sonus stock. For fiscal year 2002, Ahmed was paid $113,021 in salary, $48,400 in bonus, and $7,917 in other compensation. For fiscal year 2003, Ahmed was paid $153,125 in salary, $75,000 in bonus, and options to purchase 2,000,000 shares of Sonus stock. During fiscal years 2002 and 2003, Ahmed disposed of over 300,000 shares of Sonus stock by gift, for value exceeding $967,561. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003, Ahmed twice violated Section 16(a) reporting requirements in matters regarding Sonus stock. Ahmed is a citizen of Massachusetts.

15.    Defendant Edward T. Anderson ("Anderson") has been a director of the Company since 1997. Anderson served on the Audit Committee of the board throughout the relevant period. Anderson beneficially owns over 435,000 shares of the Company's common stock. Anderson is a venture capitalist and currently a partner with North Bridge Venture Partners. Anderson has extensive business ties with defendant Ferri, as alleged herein. During fiscal year 2003, Anderson sold over 65,000 shares of Sonus stock for over $448,000 in proceeds while in possession of material adverse inside information regarding the Company's financial results. During fiscal year 2002, Anderson gifted 100,000 Sonus shares for value of $37,000. Anderson is a citizen of Massachusetts.

16.    Defendant Albert A. Notini ("Notini") has been a director of the Company since 2003, and was made CFO in April 2004. Notini served on the Audit Committee prior to becoming CFO. Notini beneficially owns 16,667 shares of Sonus stock. Notini has served in various executive capacities with several companies, most recently as CFO of Manufacturers Services Limited. Prior to 1994, Notini was a senior partner with Hale & Dorr, LLP, the same law firm Notini and the Audit Committee hired to investigate the accounting manipulations at issue herein. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003,

Notini violated Section 16(a) reporting requirements in matters regarding Sonus stock. Notini is a citizen of Massachusetts.

17.    Defendant Paul J. Ferri ("Ferri") has been a director of the Company since 1997. Ferri is a venture capitalist and currently a partner with Matrix Partners. Ferri served on the Audit and Compensation Committees of the board throughout the relevant period. Ferri has extensive business ties with Anderson, as alleged herein. Ferri owns 165,000 shares of the Company's common stock. Ferri is a citizen of Massachusetts.

18.    Defendant Rubin Gruber ("Gruber") is one of the founders of Sonus. He has been a director of the Company since 1997 and served as Chairman of the Board from 1998 to early 2004, when he was designated "Chairman Emeritus." He also served as President of the Company from 1997 to 1998. Gruber beneficially owns 4.3 million shares of the Company. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003 Gruber violated Section 16(a) reporting requirements in matters regarding Sonus stock. In December 2003, Gruber gifted 130,000 shares of Sonus stock for value exceeding $826,000. Gruber is a citizen of Massachusetts.

19.    Defendant Paul Severino ("Severino") has been a director of the Company since 1999. Severino is a "private investor." Severino served on the Audit and Compensation Committees of the board throughout the relevant period. Severino beneficially owns over 571,000 shares of the Company's common stock. Severino is a citizen of Massachusetts.

20.    Defendants Ahmed, Anderson, Notini, Ferri, Gruber and Severino are sometimes collectively referred to as the "Director Defendants." The Director Defendants comprised a majority (six of seven) of the directors serving at the time this action was filed.

21.    As members of the Sonus board of directors, the Director Defendants had a duty to review the Company's accounting policies and internal controls to ensure that the Company was operating lawfully and in the best interests of its shareholders. Each of the Director Defendants, due to his extensive prior experience in financial and business matters, knew that accounting controls were of critical importance to a public company like Sonus.

6

22.    Defendant John Michael O'Hara ("O'Hara") has served as Vice President of Marketing since 2002. According to the Company's 2003 Form 14 Proxy Statement, during fiscal year 2002, O'Hara violated Section 16(a) reporting requirements regarding transactions in Sonus stock. O'Hara was awarded options to purchase 220,000 shares in fiscal year 2002. During the relevant period, O'Hara sold 68,500 shares of stock for over $480,000 while in possession of material adverse inside information regarding the Company's financial results. O'Hara is a citizen of Massachusetts.

23.    Defendant Edward N. Harris ("Harris") has served as Vice President of Manufacturing since 2002. During the relevant period, Harris sold 30,000 shares of stock for over $204,000 while in possession of material adverse inside information regarding the Company's financial results.  Harris is a citizen of Massachusetts.

24.    Defendant Stephen Nill ("Nill") served as CFO and Vice President of Finance and Administration of the Company throughout the relevant period. In July 2004, Nill was "requested" to resign from the Company.  According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003 Nill violated Section 16(a) reporting requirements regarding transactions in Sonus stock. Nill is a citizen of Massachusetts.

25.    Defendant Paul R. Jones ("Jones") has served as Vice President of Engineering since 2000. Jones beneficially owns 568,000 shares of the Company's common stock. During the relevant period, Jones sold 100,000 shares of stock for over $857,000 while in possession of material adverse inside information regarding the Company's financial results. Jones is a citizen of Massachusetts.

26.    Defendants Anderson, O'Hara, Harris, and Jones are sometimes collectively referred to as the "Insider Trading Defendants."

27.    The Director Defendants and defendants O'Hara, Harris, Nill and Jones are sometimes collectively referred to as "the Individual Defendants."

28.    Each of the Individual Defendants, by virtue of his management and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. As corporate fiduciaries, the Individual

7

Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of Sonus.

29.    The Individual Defendants were required to supervise the preparation of Sonus' SEC filings and approve any reports concerning the company's financial condition and results of operations, including to assure that the Company complied with Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants likewise had a duty of loyalty to the company to act in the best interests of the company and its shareholders. Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing and/or disseminating the statements alleged herein,

30.    Because of each of the Individual Defendants' positions with Sonus, each knew and had access to non-public information about the business of Sonus, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents (including Sonus' operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided to him in connection therewith.

31.    The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Sonus or to abstain from trading Sonus shares on such information.

## IMPROPER STATEMENTS

**Fiscal Year 2001**

32.    On January 16, 2002, defendants caused Sonus to issue a press release disclosing financial results for fiscal year 2001. According to the press release:

> Revenues for fiscal year 2001 were $173.2 million compared with $51.8 million for fiscal year 2000. Adjusted net loss for fiscal year 2001 was $17.8 million or $0.10 per share, excluding restructuring

8

charges of $25.8 million, write-off of goodwill and purchased intangibles of $374.7 million, amortization of goodwill and purchased intangibles of $107.8 million, stock-based compensation of $75.5 million and an in-process research and development charge of $43.8 million, compared with adjusted net loss for fiscal year 2000 of $23.3 million or $0.17 per share, excluding stock-based compensation of $26.7 million.

Actual net loss for fiscal 2001 was $645.4 million or $3.74 per share, including restructuring charges, write-off of goodwill and purchased intangibles, amortization of goodwill and purchased intangibles, stock-based compensation and an in-process research and development charge, compared with an actual net loss for fiscal 2000 of $50.0 million or $0.52 per share, including stock-based compensation.

33.     Defendant Ahmed commented as follows of fiscal year 2001 results:

Q4 marked another good quarter of progress in product development, customer deployments and international expansion, all of which further our market leadership. We are well positioned to weather the difficult climate our industry faces today, and we will continue to take the steps necessary to build our financial strength and expand our leadership as the telecom industry emerges from its current economic downturn.

While these are challenging times for the telecom industry, we are excited about Sonus' prospects in the year ahead," continued Ahmed. "Packet voice technologies from Sonus are vital to our customers' businesses, and the interest in our products is strong. We will continue our focus on delivering the most innovative solutions in the industry, and are driving to expand our business into new geographies and market segments as we further our position as the premier franchise in next-generation voice."

34.     The financial results reported for fiscal year 2001 were repeated in the Company's filing on Form 10-K for fiscal year 2001, filed with the SEC on or about March 28, 2002. The Form 10-K represented that the financial statements therein complied with Generally Accepted Accounting Principles ("GAAP"). The Form 10-K was signed by defendants Ahmed, Nill, Gruber, Anderson, Ferri and Severino.

35.    With respect to revenue recognition in particular, the notes to the consolidated financial statements represented as follows:

> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

36.    During fiscal year 2001, defendants caused the Company to issue and file quarterly reports on Form 10-Q for each of the first three quarters of fiscal year 2001. These Form 10-Qs were filed on April 20, 2001, August 7, 2001, and November 14, 2001. Each Form 10-Q was signed by defendant Nill, and represented that it had been prepared in accordance with SEC rules and regulations and represented fairly the Company's financial condition.

37.    The financial results and statements regarding the Company's purported compliance with accounting standards reported for fiscal year 2001 were materially false and misleading. As alleged herein, on July 28, 2004, the Company announced that all of its financial results for fiscal year 2001 would have to be restated, and it was disclosed that the Company's internal accounting controls were "inadequate" as of December 31, 2003.

**Fiscal Year 2002**

38.    On January 22, 2003, defendants caused Sonus to issue a press release disclosing financial results for fiscal year 2002. According to the press release:

> Revenues for fiscal year 2002 were $62.6 million compared with $173.2 million for fiscal year 2001.

Net loss for fiscal year 2002 was $68.5 million or $0.36 per share compared with a net loss for fiscal year 2001 of $645.4 million or $3.74 per share.

39.    Defendant Ahmed commented as follows on fiscal year 2002 results, emphasizing that the Company was on a path towards profitability:

> We made considerable progress in building our business fundamentals in Q4. <u>We reported a sequential increase in revenues and a reduced net loss compared to the third quarter, and our cash balance increased as well</u>. The gains made in the quarter are reflective of progress with our customers and our continued focus on Sonus' financial metrics.
>
> Looking ahead, our 2003 priorities are clear. We are focused on building our customer base, expanding into new target markets, and continuing to deliver the product innovations that have set us apart in the market. <u>Additionally, we will continue to manage our business with precision, driving toward profitability</u>.
> [emphasis supplied].

40.    These financial results were repeated in the Company's filing on Form 10-K for fiscal year 2002, filed with the SEC on or about March 19, 2003. The Form 10-K represented that the financial statements therein complied with GAAP. The Form 10-K was signed by defendants Ahmed, Nill, Gruber, Anderson, Ferri and Severino.

41.    With respect to revenue recognition in particular, the notes to the consolidated financial statements represented as follows:

> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over

11

the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

42.    According to the Form 10-K for fiscal year 2002, defendants Ahmed and Nill "have reviewed and evaluated the effectiveness of Sonus' disclosure controls and procedures . . . as of a date within ninety days before the filing of this annual report," and "based on that evaluation, [Ahmed and Nill] have concluded that Sonus' current disclosure controls and procedures are effective to ensure that information required to be disclosed by Sonus in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms."

43.    The Form 10-K also included certifications under Section 302 of Sarbanes-Oxley ("Section 302 Certifications") by defendants Ahmed and Nill stating the following:

> 1.  I have reviewed this annual report on Form 10-K for the year ended December 31, 2002 ("Annual Report") of Sonus Networks, Inc. (the "Registrant");
>
> 2.  Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report;
>
> 3.  Based on my knowledge, the financial statements, and other financial information included in this Annual Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Annual Report;
>
> 4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and have:
>
> (a) Designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within

those entities, particularly during the period in which this Annual
Report is being prepared;

(b) Evaluated the effectiveness of the Registrant's disclosure
controls and procedures as of a date within 90 days prior to the
filing date of this Annual Report (the "Evaluation Date"); and

(c) Presented in this Annual Report our conclusions about the
effectiveness of the disclosure controls and procedures based on
our evaluation as of the Evaluation Date;

5.  The Registrant's other certifying officer and I have disclosed,
based on our most recent evaluation, to the Registrant's auditors
and the audit committee of Registrant's board of directors:

(a) All significant deficiencies in the design or operation of
internal controls which could adversely affect the Registrant's
ability to record, process, summarize and report financial data and
have identified for the Registrant's auditors any material
weaknesses in internal controls; and

(b) Any fraud, whether or not material, that involves management
or other employees who have a significant role in the Registrant's
internal controls; and

6.  The Registrant's other certifying officer and I have indicated in
this Annual Report whether there were significant changes in
internal controls or in other factors that could significantly affect
internal controls subsequent to the date of our most recent
evaluation, including any corrective actions with regard to
significant deficiencies and material weaknesses.
[emphasis supplied].

        44.    During fiscal year 2002, defendants caused the Company to issue and file

quarterly reports on Form 10-Q for each of the first three quarters of fiscal year 2002. These

Form 10-Qs were filed on April 10, 2002, August 14, 2002, and November 13, 2002. The April

10, 2002 10-Q was signed by defendant Nill, and represented that it had been prepared in

accordance with SEC rules and regulations. The August 14, 2002 10-Q contained Sarbanes-

Oxley certifications by defendants Nill and Ahmed under Section 906 ("Section 906

Certifications"), stating that the Company's financial results complied with SEC reporting

requirements and represented fairly the financial condition of the Company. The November 13, 2002 10-Q contained both Section 302 Certifications and Section 906 Certifications signed by defendants Nill and Ahmed.

45.    The financial results and statements regarding the Company's purported compliance with accounting standards reported for fiscal year 2002 were materially false and misleading. As alleged herein, on July 28, 2004, the Company's financial results for all of fiscal year 2002 were restated, and it was disclosed that the Company's internal accounting controls were "inadequate" as of December 31, 2003.

**First Nine Months Of Fiscal Year 2003**

46.    In early January 2003, Sonus stock was trading near $1.00 per share. During the first nine months of fiscal year 2003, defendants sought to communicate to shareholders and the market that the Company would finally be achieving profitability in fiscal year 2003.

47.    For example, on April 9, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the first quarter of 2003. According to the press release, Sonus reported revenues of $16.0 million and a net loss of $4.4 million or $0.02 per share. Defendant Ahmed stated:

> Our financial results for the first quarter reflected good progress toward our business objectives. We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family.
> [emphasis supplied].

48.    On April 10, 2003, Sonus stock closed at approximately $2.70 per share.

49.    On April 22, 2003, the Individual Defendants caused the Company to issue a press release entitled stating that the Company had sold 20 million shares of stock at $3.05 per share for total proceeds of $61 million.

50.    On July 10, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the second quarter of 2003, again emphasizing the "drive

14

to profitability." Defendants reported revenues of $21.4 million and a net loss of $3.2 million, or

$0.01 per share. According to defendant Ahmed:

> We are pleased with the progress that we made in the second
> quarter, particularly with our 33% sequential revenue growth. We
> executed across all areas of the business - broadening and
> strengthening our customer base, expanding our leading product
> offering, bolstering our balance sheet and advancing our drive to
> profitability. [emphasis supplied].

51.    On July 11, 2003, Sonus stock closed at approximately $7.10 per share.

52.    On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward

Profitability,' Chief Executive Says." The press release stated in relevant part:

> Sonus Networks Inc., a telecommunications-equipment maker, is
> trying to become profitable, Chief Executive Officer Hassan
> Ahmed said.
>
> "We're definitely driving toward profitability as fast as we can,"
> Ahmed said in a televised interview with Bloomberg News. He
> said he hasn't given guidance on the third quarter and whether
> Sonus would post a profit.

53.    With the stock price rising in response to these announcements, defendant

Anderson sold 65,000 shares for proceeds of over $448,000. Anderson had not sold any Sonus

stock in the prior two years. Defendant O'Hara sold 55,000 shares for proceeds exceeding

$381,000. Defendant Harris sold 30,000 shares for proceeds of over $204,000. Neither O'Hara

nor Harris had ever sold Sonus stock before.

54.    On September 23, 2004 defendants announced the sale by the Company of 17,000

more shares at $7.75 per share, for proceeds of approximately $126 million.

55.    Finally, on October 8, 2003, defendants caused the Company to issue a press

release announcing Sonus' financial results for the third quarter of 2003, with a headline

"Company achieves Quarterly Profit." Sonus reported revenues of $28.6 million and net income

of $1.2 million, or $0.01 per diluted share – purportedly its first quarterly profit. According to

defendant Ahmed:

15

This was a strong quarter for Sonus Networks, our fourth
consecutive quarter of revenue growth. Our revenues grew 34%
sequentially to $28.6 million, reflecting increased market demand
for packet telephony and the expanding number of customers who
have adopted Sonus' solutions. <u>We achieved an important
milestone in reporting our first quarterly profit on a GAAP basis</u>.
[emphasis supplied].

56.    On October 9, 2004, Sonus stock closed at $8.80 per share.

57.    Following the October 8, 2003 announcement, substantial additional insider

trading occurred, as the share price was buoyed by the Company's disclosure of the Company's

purported quarterly profit. Jones sold 100,000 shares for proceeds of $857,000, and O'Hara sold

an additional 13,750 shares for proceeds exceeding $108,000. Furthermore, defendant Gruber

gifted 130,000 shares of Sonus stock, and defendant Ahmed gifted 101,000 shares.

58.    On May 9, 2003, August 14, 2003, and November 10, 2003 defendants caused the

Company to issue and file quarterly reports on Form 10-Q for the first three quarters of fiscal

year 2003, respectively. The May 9, 2003 Form 10-Q contained Section 906 Certifications

signed by defendants Nill and Ahmed. The August 14, 2003 and November 10, 2003 Form 10-

Qs contained both Section 302 Certifications and Section 906 Certifications signed by

defendants Nill and Ahmed.

59.    The financial results and statements regarding the Company's purported

compliance with accounting standards reported for the first nine months of fiscal year 2003 were

materially false and misleading. As alleged herein, on July 28, 2004, the Company's financial

results for all of fiscal year 2003 were restated, and it was disclosed that the Company's internal

accounting controls were "inadequate" as of December 31, 2003.

## THE TRUTH BEGINS TO EMERGE

60.    On January 20, 2004, Sonus' stock closed at $9.91 per share, representing a two-

year high.  In fact, Sonus shares had jumped over 800% in the preceding year, based in large part

upon the Company's purported return to profitability.

16

61.    However, on that same day, prior to the announcement of fourth quarter and full fiscal year 2003 results, defendants revealed that the Company would have to postpone the conference call scheduled to release these results pending the completion of its 2003 audit, and that upon completion of the audit, the Company would reschedule the conference call and provide further details.

62.    On February 11, 2004, more than 20 days after postponing release of its fourth quarter and full year results, after the close of regular trading, defendants made the following shocking announcement:

> In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.

> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.

> In response to the issues identified, the Company has taken the following steps:

> -- The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.

> -- The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.

> -- The Company has terminated certain non-executive employees.

-- Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.

"<u>We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting</u>," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.
[emphasis supplied].

63.    On this shocking news, the Company's market value declined precipitously, as the share price eventually closed at $5.39 on February 12, 2004 on extremely heavy trading of over 96 million shares.

64.    Defendants' February 11, 2004 announcement was the first of several announcements during the course of a lengthy investigation into defendants' false and misleading financial reporting and internal control practices. On March 15, 2004, defendants reported that Sonus would be unable to comply with the filing deadline for audited financial statements for fiscal year 2003.

Sonus Networks (Nasdaq: SONS) announced that it intends to file its 2003 Annual Report on Form 10-K for the year ended December 31, 2003 today, excluding its audited financial statements and other related financial information. The Company also announced that it plans to file a Form 12b-25 (Notification of Late Filing) with the Securities and Exchange Commission (SEC) today requesting a 15-day extension to file the audited financial statements and other related financial information for its 2003 Annual Report on Form 10-K.

The delay in filing the financial statements is the result of the
Company's previously announced detailed review of certain
revenue timing issues and practices and of certain other financial
statement accounts. The Company has made considerable progress
towards the completion of its review and intends to report its
financial results for its fourth quarter and fiscal year ended
December 31, 2003 upon completing the process. The Company
will make every effort to amend its Form 10-K to include the
financial statements and other omitted information by the 15th day
following the original due date for the 10-K, or by March 30, 2004.

"Over the past two months, we have put a great deal of effort
toward completing the review of our financials and establishing
new practices and controls," said Hassan Ahmed, president and
CEO, Sonus Networks. "At the same time, we have maintained
strong focus and momentum in the business. We look forward to
completing this process as quickly as possible."
[emphasis supplied].

65.    On March 29, 2004, defendants announced that the Company would be unable to

comply after all with filing of audited financial statements for fiscal year 2003, that the review

could be expanded, and that the Company was subject to delisting by NASDAQ:

Sonus Networks (Nasdaq: SONS), a leading provider of voice over
IP (VoIP) infrastructure solutions, today announced that the filing
of its amended Annual Report on Form 10-K/A for the fiscal year
ended December 31, 2003 will be delayed. The Company, having
made substantial progress towards the completion of its review of
2003 and 2002 financial results, is now considering whether to
expand the review to include additional prior periods. Sonus
Networks' independent auditor, Ernst and Young LLP, was not the
auditor of record for periods prior to 2002. Therefore, in the event
that the Company determines its review should be expanded to
include periods prior to 2002, such review and accompanying audit
could be lengthy.

Sonus Networks is performing a detailed review of the timing of
revenue recognized from customer transactions and of other
financial statement accounts. The revenue issues under
examination relate to the proper timing of revenue recognition and
not whether the sales could ultimately be recorded as revenue. For
the customer transactions under review, the products have been
delivered and Sonus Networks has either received payment or is
receiving payment for the products in the ordinary course.

19

At this time, the Company expects that its review will lead to a restatement of historical financial statements for the fiscal year ended December 31, 2002 and for the first three quarters of fiscal year 2003. As a result, existing financial statements for those periods should not be relied upon.

* * *

As a result of the Company's delay in filing its Form 10-K for 2003, Sonus Networks expects to receive notification from Nasdaq that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities could be subject to delisting from the Nasdaq National Market.
[emphasis supplied].

66.    On March 30, 2004, the Boston Herald reported as follows regarding the Company's March 29, 2004 announcement:

Hassan Ahmed's problems at Sonus Networks Inc. appeared to worsen yesterday as the chief executive said the networking-systems maker faces delisting from the Nasdaq stock market as it tries to resolve misreported sales.

Sonus could be delisted because it missed a recent deadline for filing financial reports with federal regulators as it continued an internal accounting probe. Yesterday, the Chelmsford company said it would have to restate revenue for all of 2002 and the first three quarters of last year.

Ahmed also said that Sonus, which equips communications firms, may review its books for years before 2002 - further back than expected.

Sonus has already fired some employees who "violated our code of conduct and potentially compromised the integrity of our financial reporting," Ahmed said in a morning conference call. Sonus' shares fell 64 cents, or 14 percent, to $3.92 yesterday, and have lost 60 percent of their value since Sonus surprised investors on Jan. 20 by delaying its fourth-quarter and year-end financial reports.

"Investors are waiting for the other shoe to drop," said Joe Noel, an analyst with Pacific Growth Equities in San Francisco. "I think most investors find it very difficult to believe that upper

<u>management did not know what was going on</u>."

\* \* \*

"<u>The original expectation here was that this would all be cleaned
up fairly quickly</u>," said Eric Buck, a Janco Partners analyst. "<u>(But)
this is likely going to take significantly longer than was hoped for
and expected</u>." [emphasis supplied].

67.    On March 30, 2004, the Boston Globe reported as follows in an article captioned
"Sonus shares tumble 14%, may face NASDAQ delisting":

> Lehman Brothers telecommunications stock analyst Steven Levy,
> whose firm helped Sonus stage a rocket-ride initial public stock
> offering in 2000, said each successive disclosure of financial
> problems in the last nine weeks "is more troubling than the last. <u>As
> much as I would like to believe that the underlying business is not
> being affected by this, at some point it has to become at least a
> distraction, a significant extra cost or just troubling for the closing
> of new business.</u>" [emphasis supplied].

68.    On April 6, 2004, defendants announced that defendant Nill would "transition"
from his CFO position to a new role as vice president for the Company, to be replaced on an
interim basis by defendant Notini, and that defendant Gruber had been relieved of his duties as
Chairman and designated "Chairman Emeritus" reporting to defendant Ahmed. It was separately
reported that the Company's internal review would extend to periods prior to fiscal year 2002.

69.    On April 7, 2004, the Boston Herald reported as follows in an article captioned
"Sonus says 'so long' to CFO":

> Sonus Networks Inc. pushed aside its chief financial officer
> yesterday amid an internal probe into accounting problems while
> confirming its audit will be more extensive than previously
> expected.
>
> Sonus replaced Stephen Nill, CFO since 1999, with Albert Notini,
> a former CFO at Manufacturers' Services Ltd., who also was
> named president and chief operating officer.
>
> Separately, Chief Executive Hassan Ahmed added the chairman's
> role to his duties, replacing Sonus founder Rubin Gruber, who
> remains involved in business development.

21

Analysts said Nill was moved to vice president of business operations to placate investors, who watched the firm's shares drop by 60 percent since the probe became public.

"It's clearly a signal that something happened on his watch (and) maybe he wasn't as diligent as he should have been," said Advest analyst Herbert Tinger.

The Chelmsford telecommunications equipment maker said the probe is focused on 2001 revenue, and possibly previous years, as well as results for 2002 and 2003.

Sonus fired an unspecified number of workers after it discovered in January that revenue wasn't recorded properly. Sonus has said its sales levels won't change, but offered few details.

"We're working to get this done as fast as we can," Michael O'Hara, Sonus' vice president of marketing, said of the probe. "(But) we anticipate this could be lengthy." [emphasis supplied].

70.    On April 12, 2004, Mass High Tech reported as follows in an article captioned "Sonus accounting problems claim chief financial officer as probe widens:"

Sonus Networks replaced its chief financial officer last week, as the Chelmsford-based softswitch maker struggles to end speculation about accounting troubles that have given a black eye to the once highflying company.

Stephen Nill, who had been Sonus' CFO since the company went public four years ago, was demoted to vice president of business operations. His replacement is Bert Notini, formerly chief fiscal officer of Manufacturing Services Ltd. in Concord. Notini will serve as chief operating officer and oversee financial reporting until a permanent CFO is hired.

Investors exasperated with Sonus' revenue woes may welcome the management reshuffle, but it was not in time to stop a class-action lawsuit announced April 1. The suit alleges that Sonus misrepresented itself and engaged in accounting improprieties, causing investors in its common stock to suffer "substantial losses."

Sonus had its own bad news to deliver: It has broadened the scope

of its investigation into improperly booked revenues.  Sonus  was
already reviewing revenue figures for fiscal 2003 and 2002, and
now says it will scrutinize "additional prior periods."

The company did not say how far back its probe will reach.

Sonus  has reeled since January, when it announced that it could
not present revenues for 2003 because several employees had
booked sales in the wrong reporting periods. Since then the
company has stressed that it is investigating only when revenues
were booked and that all sales can be recorded as revenue.

Sonus  has not said when it will be able to wrap up its investigation
and restate revenues correctly. Meanwhile, several low-level
employees were fired and the stock - which soared from $2 to $10
last year, among New England's best performers in 2003 - now
hovers around $4.

* * *

Kevin Mitchell, an analyst with Infonetics Research, did lament
that "each successive revelation from  Sonus  is more and more
damaging." He wonders whether the bad publicity will steer
potential new customers away from  Sonus,  even as the much-
hyped Internet telephony industry finally has legitimacy with
telecommunications carriers.
[emphasis supplied].

71.     On April 27, 2004, defendants announced that the Company was continuing its

review of revenue recognition and "other financial statement accounts" for fiscal years 2002 and

2003.  On April 28, 2004, the Boston Herald reported in an article captioned "Sonus numbers

soft amid internal probe":

Sonus  Networks Inc. offered investors only a few promising clues
about its first- and fourth-quarter performance yesterday, delaying
more detailed financial reports once again pending the outcome of
an internal accounting probe.

"Clearly, it's disappointing," said Joseph Noel, an analyst at Pacific
Growth Equities.

"I think people were looking for more solid numbers and some
comments about how the audit is going."

23

<u>The Chelmsford telecommunications-quipment maker is months overdue in reporting some results</u>.

Hassan Ahmed,  Sonus' chief executive, tried to reassure analysts in a conference call late yesterday. He said  Sonus' cash position and quarterly shipments improved in the past three months, and the firm added about 40 jobs, bringing its work force to 438.

Sonus  doesn't plan on providing updated earnings and revenue figures until the accounting probe is completed. The firm recently missed a filing deadline, prompting Nasdaq market regulators to warn that its shares could be delisted.

<u>The probe likely will prompt revenue restatements for 2002 and most of last year, possibly more.  Sonus' shares have plunged in the past two months because of the uncertainty</u>.
[emphasis supplied].

72.     On May 24, 2004, defendants announced that the Company had received correspondence from NASDAQ stating that the Company was in violation of filing requirements for continued listing because it had failed to timely file its Form 10-Q for the first quarter of fiscal year 2004.

73.     On June 29, 2004, defendants reported that the SEC had stepped up its inquiry into the Company and issued a formal order of investigation of the Company's financial reporting.

74.     On July 19, 2004, defendants finally disclosed that the internal review was complete, revealing that the restatement had extended to a variety of accounting matters well beyond merely revenue recognition items:

Sonus Networks, Inc. (Nasdaq: SONSE), a leading supplier of voice over IP (VoIP) infrastructure solutions to service providers, today provided an update on its previously announced financial review.  Sonus Networks has completed the detailed review of its financial statements for fiscal years 2003, 2002 and 2001. Additionally, the Audit Committee of Sonus' Board of Directors has completed its internal investigation.

<u>As a result of the financial review, Sonus will restate its consolidated financial results for fiscal 2001 and 2002, and the first three quarters of fiscal 2003.  As previously reported, the primary</u>

impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the revenue has been deferred and recognized in subsequent periods. In addition, other material restatements include adjustments to purchase accounting, impairments, accruals and deferred compensation. [emphasis supplied].

## THE RESTATEMENT

75.    On July 28, 2004, defendants announced the completion of the restatement:

Sonus Networks, Inc. (Nasdaq: SONSE), a leading supplier of service provider voice over IP (VoIP) infrastructure solutions, today reported its financial results for the fourth quarter and fiscal year ended December 31, 2003, and for its first quarter ended March 31, 2004. Sonus has restated its consolidated financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal 2003 in its Form 10-K/A filed with the Securities and Exchange Commission (SEC) on July 28, 2004. Sonus today also filed its Form 10-Q for the first quarter of 2004 with the SEC. Sonus will hold a conference call to review its financial results at 8:15 am Eastern time, Thursday, July 29, 2004.

* * *

**Restatement of Consolidated Financial Statements**
As a result of the financial review, Sonus has restated its consolidated financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal 2003 as embodied in its Form 10-K/A. As previously reported, the primary impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the revenue has been deferred and recognized in subsequent periods. In addition, other material restatements include adjustments to purchase accounting, impairments, accruals and deferred compensation.

An overview of adjustments by period is as follows:

2003 – Restated revenues for the first nine months of 2003 were $46.8 million compared with $66.0 million as initially reported. Restated deferred revenues as of September 30, 2003 were $85.2 million compared with $34.0 million as initially reported. Accrued

25

expenses as of September 30, 2003 were $17.5 million compared with $32.9 million as initially reported. <u>Restated net loss was $22.0 million, or $0.10 per share, compared with $6.4 million, or $0.03 per share, as initially reported.</u>

2002 – Restated revenues for fiscal 2002 were $93.9 million compared with $62.6 million as initially reported.  Restated deferred revenues as of December 31, 2002 were $59.8 million compared with $29.2 million as initially reported.  Accrued expenses as of December 31, 2002 were $16.5 million compared with $33.4 million as initially reported.  <u>Restated net loss was $73.8 million, or $0.39 per share, compared with $68.5 million, or $0.36 per share, as initially reported.</u>

2001 - Restated revenues for fiscal 2001 were $128.8 million compared with $173.2 million as initially reported.  Restated deferred revenues as of December 31, 2001 were $60.4 million compared with $13.3 million as initially reported.  Accrued expenses as of December 31, 2001 were $18.4 million compared with $27.7 million as initially reported.  Restated net loss was $635.6 million, or $3.68 per share compared with $645.4 million, or $3.74 per share, as initially reported.

* * *

<u>Sonus also reported that Stephen J. Nill, its vice president of business operations and former chief financial officer, has resigned at the request of the Company.</u> [emphasis supplied].

76.     On July 28, 2004, defendants filed a Form 10K/A containing the results of the restatement. The restatement revealed that the Company had violated accounting standards in a wide variety of categories. According to the Form 10-K/A, the restatement required adjustments to improper accounting for revenues (including issues related to deferred revenues, maintenance revenues, product delivery and customer acceptance, and other "errors"), expenses (including accrued and restructuring expenses and benefits), valuation of intangibles in connection with certain corporate acquisitions in 2001, asset impairment, stock-based compensation, and inventory reserves. The restatement further revealed the need for adjustments to the Company's balance sheet and statement of operations.

26

77.    The Form 10-K/A also disclosed that, throughout the relevant period, the

Company's internal controls and procedures had been decrepit and totally inadequate for a

publicly traded company like Sonus. Although defendants Ahmed and Nill had repeatedly

executed Section 302 Certifications under Sarbanes-Oxley certifying that the Company's internal

controls were sufficient to ensure the proper reporting of financial information, in reality the

Company's internal controls were in a woeful state:

> Our current management, with the participation of our principal
> executive officer and co-principal financial officers, has evaluated
> the effectiveness of our disclosure controls and procedures (as
> defined in Rules 240.13a-15(e) and 240.15d-15(e) of the Securities
> Exchange Act of 1934) as of December 31, 2003, which included
> an evaluation of disclosure controls and procedures applicable to
> the period covered by the filing of this periodic report. <u>As noted
> below, we have identified material weaknesses in our internal
> controls and procedures, as they existed as of December 31, 2003.</u>
>
> * * *
>
> <u>In connection with our restatement, we and Ernst & Young LLP,
> our independent auditors, identified and reported to our audit
> committee significant internal control matters that collectively
> constitute "material weaknesses." These internal control matters,
> any one or more of which may individually or together constitute a
> material weakness, include: insufficient contract review and
> documentation; inadequate supervision and review within the
> finance and accounting department; inadequate segregation of
> duties; insufficient supporting documentation for and review of
> account reconciliations; lack of adequate controls over cash
> receipts; lack of adequate technical accounting expertise;
> insufficient equity review procedures and documentation; flawed
> foundations for accounting estimates; and inadequate quarterly and
> year-end financial statement close and review procedures.</u>
> [emphasis supplied].

78.    The Form 10-K/A also disclosed that, notwithstanding that the Company's

internal controls were totally deficient throughout the relevant period, and that an enormous and

costly restatement of financial results was required which has damaged the Company and

severely harmed shareholder value, the Compensation Committee of the board awarded

substantial cash and stock compensation for fiscal year 2003 to several of the Company's senior

officers and directors – the very individuals who were responsible for ensuring the implementation of adequate internal controls and procedures but utterly failed to do so.

79.    In particular, defendant Ahmed was awarded $75,000 in cash and options to purchase 2,000,000 shares of Sonus stock, valued at up to $14 million based on a 10% rate of appreciation of Sonus stock over the term of the options. Defendant Gruber was awarded options to purchase 430,000 shares of Sonus stock, valued at over $3 million, notwithstanding that he has now been demoted to "Chairman Emeritus." Defendant Jones was awarded options to purchase 540,000 shares of Sonus stock, valued at over $3.7 million. Defendant O'Hara was awarded options to purchase 100,000 shares of Sonus stock, valued at over $700,000.

80.    Furthermore, defendant Notini, who served on the Audit Committee during most of fiscal year 2003 and who therefore shares responsibility for the Company's horrid internal controls, was hired as CFO, receiving an employment contract with a salary of $325,000, a potential bonus of 85% of his base salary, and a whopping award of options to purchase 2,450,000 shares of Sonus stock.

81.    In a New York Times article "Why Not Restate Bonuses?" dated April 25, 2004, the Company's compensation practices had already been questioned:

> SANJAY KUMAR lost two prestigious posts when he resigned last week as chairman and chief executive of Computer Associates International amid its escalating accounting scandal. But he still has the mountain of money that the Computer Associates board has given him over the years.
>
> Now seems as good a time as any for Computer Associates shareholders to ask their directors whether any of this money will be returned to the company.
>
> The fact is, compensation committees of corporate boards take pains to devise performance goals upon which they claim to base the pay of top management. So why shouldn't corporate officials who receive bonuses or other incentive compensation based on financial results be required to return part or all of that pay if those results turn out to have been misstated?

* * *

28

Sonus Networks, a maker of products for voice and data networks, also disclosed this month that it would make a restatement. During 2002 and the first three quarters of 2003, some sales may have been recognized in the wrong periods, Sonus said. The company is also examining sales in earlier years.

In May 2002, three audit committee members received options to buy 10,000 shares of Sonus stock at $2.51 a share. They were Edward T. Anderson, managing general partner at North Bridge Venture Partners in Waltham, Mass.; Paul J. Ferri, general partner of Matrix Partners, a venture capital firm in Waltham, Mass.; and Paul J. Severino, a private investor and a director of MCK Communications Inc. in Needham, Mass.

Last May, Sonus again granted the three directors options on another 10,000 shares, this time at $3.31 each.

Sonus's stock is no longer the highflier it was in the bubble. But the stock reached $10 earlier this year and closed at $4.68 on Friday. The options, with a 10-year life, are quite valuable.

Given that Sonus's audit committee should have been on the alert for accounting improprieties, will the three members who received the options return them after the restatement? "I haven't thought about it," Mr. Severino said. "If it's appropriate for us to do, we will do it. It's nothing that's high on our list right now. We're just trying to do what we need to do to meet all our requirements."

Mr. Anderson and Mr. Ferri did not return phone calls seeking comment.

While the Sarbanes-Oxley law addresses the concept of clawing back compensation, the law states rather vaguely that chief executives and chief financial officers may have to forfeit bonuses when they have certified their companies' financial results and willful misconduct was involved. That leaves lots of wiggle room and says nothing about other executives whose pay is also based on financial hurdles.

* * *

In 2002, when the Enron and WorldCom scandals were fresh, President Bush said in a speech: "Responsible leaders do not collect huge bonus packages when the value of their company dramatically declines."