UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | **Case No. 1-04-CV-10359 DPW** |
| Consolidated Cases: 1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | **CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**PART 1 OF 2 (PAGES 30 –52)**

Sad to say, Mr. President, but across corporate America these days,
"responsible leader" is fast becoming an oxymoron.
[emphasis supplied].

## DEFENDANTS' DISCLOSURES VIOLATED GAAP

82.    GAAP are those principles recognized by the accounting profession as the
conventions, rules and procedures necessary to define accepted accounting practice at a
particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed
with the SEC which are not prepared in compliance with GAAP are presumed to be misleading
and inaccurate. Regulation S-X requires that interim financial statements must also comply with
GAAP, with the exception that interim financial statements need not include disclosure which
would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R.
§210.10-01(a).

83.    Defendants implicitly represented that the financial results they reported for the
Company during the relevant period were prepared in accordance with GAAP, and explicitly
represented that the reported results reflected all adjustments, consisting of normal recurring
accruals, necessary for a fair presentation thereof. As specified above, however, defendants'
representations concerning the Company's financial results during the relevant period were false
and misleading in numerous material respects:

(a)    Defendants falsely stated that the Company's financial statements fairly
presented the Company's financial condition;

(b)    Defendants failed to disclose that the Company's internal controls were
grossly inadequate and, as a result, the Company's ability to record, process, summarize, and
report financial data in its financial statements was seriously deficient;

(c)    Defendants violated the principle that financial reporting should provide
information that is useful to present to potential investors and creditors and other users in making
rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

30

      (d)    Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

      (e)    Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  That principle is particularly significant in the context of publicly-traded entities such as Sonus. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

      (f)    Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

      (g)    Defendants violated the principle that financial reporting should be reliable and represent what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

      (h)    Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

      (i)    Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).

84.    Further, the undisclosed adverse information concealed by defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

85.    Under GAAP, restatement of previously issued financial statements is the most serious step, reserved only for situations in which no lesser remedy is available. Statement of Financial Accounting Standard No. 16, *Prior Period Adjustments*, and Accounting Principles Board Opinion No. 20, *Accounting Changes*, provide that restatements are only permitted -- and are required -- for *material accounting errors or irregularities that existed at the time the financial statements were prepared.* Specifically, these financial reports materially misstated the Company's income during the subject periods and materially misstated that each of the financial reports for fiscal years 2001, 2002 and first nine months of 2003 had been prepared in accordance with GAAP. The restatement constitutes an admission that the financial reports were not prepared in accordance with GAAP, and an admission of both the falsity and the materiality of the misstatements.

## THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

86.    All of the Director Defendants had the responsibility to ensure that there existed at Sonus sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendants Anderson, Ferri, Severino and Notini, in particular, all of whom served on the Audit Committee during part or all of the relevant period, had the responsibility to ensure that Sonus had sufficient accounting controls to insure the accuracy of its reported financial results. According to the Company's audit committee charter, attached to its Form 14A Proxy Statement for fiscal year 2003:

> The primary purpose of the Audit Committee (the "Committee") is to assist the Board of Directors of the Corporation (the "Board") in

32

fulfilling its oversight responsibilities to its stockholders and to the investment community by reviewing:

-the financial reports and other financial information provided by the Corporation to its stockholders, to any governmental body or to the public;

-the Corporation's systems of internal accounting and financial controls and disclosure controls and procedures;

-the Corporation's auditing, accounting and financial reporting processes generally;

-the independence, qualifications and performance of the Corporation's independent auditor; and

-any legal compliance and ethics programs established by management and/or the Board.

87.     Furthermore, as members of the Audit Committee, defendants Anderson, Ferri, Severino and Notini were charged, according to Appendix D to Statement on Auditing Standards No. 55, <u>Consideration of the Internal Control Structure in a Financial Statement Audit</u> ("SAS 55"), with objectives such as (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

88.     As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements.  The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. <u>Moreover, public ownership of such an entity customarily requires a sophisticated internal</u>

control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

89.    According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [emphasis supplied].

90.    When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements . . . may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, Communications of Internal Control Structure Related Matters Noted in an Audit ("SAS 60"), as a "material weakness" in the company's internal control structure.

## INSIDER TRADING ALLEGATIONS

91.    As a result of defendants' false and misleading statements, Sonus' stock traded at artificially inflated levels through the relevant period. The Insider Trading Defendants knew or recklessly disregarded that revenues were being inflated through improper accounting, and that the Company's financial reporting was not based upon sound internal controls.  Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold Sonus shares at artificially

inflated prices while in possession of material, nonpublic information. The insider trading during the relevant period is summarized below:

| Name | Date | No. Shares Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| Edward T. Anderson | 7/18/03 | 32,378 | $6.85 | $221,789 |
| | 7/18/03 | 33,206 | $6.84 | $227,129 |
| | | 65,584 | | $448,918 |
| John Michael O'Hara | 7/22/03 | 15,000 | $6.95 | $104,250 |
| | 7/22/03 | 15,000 | $7.03 | $105,450 |
| | 7/22/03 | 15,000 | $6.82 | $102,300 |
| | 7/22/03 | 10,000 | $6.92 | $69,200 |
| | 10/22/03 | 5,000 | $7.90 | $39,500 |
| | 10/22/03 | 5,000 | $7.85 | $39,250 |
| | 10/22/03 | 3,750 | $7.91 | $29,662 |
| | | 68,750 | | $489,612 |
| Paul Jones | 10/10/03 | 100,000 | $8.57 | $857,000 |
| Edward Harris | 7/18/03 | 30,000 | $6.81 | $204,300 |
| Totals | | 364,334 | | $2,277,830 |

92.    Notably, all of these inside trades were made after the Company's July and October 2003 statements that it would soon be achieving profitability, which statements caused the Company's share price to rise from approximately $1 in January 2003 to approximately $9 by October 2003 and $10 in early January 2004, prior to the announcement of the restatement. Three of the four defendants had never traded Sonus stock, and defendant Anderson had not traded in two years.

## **DERIVATIVE ACTION ALLEGATIONS**

93.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Sonus to enforce the claims of Sonus against the Individual Defendants, which may properly be asserted by Sonus and which Sonus has failed to enforce.

94.     The wrongs complained of herein occurred during the time in which plaintiffs were Sonus shareholders. Plaintiffs continue to hold shares in Sonus. Hence, plaintiffs have standing to bring this derivative action on behalf of Sonus to recover damages for all of the conduct described in this complaint.

95.     Plaintiffs will fairly and adequately protect the interests of Sonus and its shareholders in enforcing the rights of Sonus against the Individual Defendants. Plaintiffs' attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of Sonus to insure the rights of the Sonus. Plaintiffs have no interests adverse to Sonus.

## THE INDIVIDUAL DEFENDANTS HAVE DAMAGED SONUS

96.     By reason of their positions as fiduciaries of Sonus and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to Sonus fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each defendant owed to Sonus a fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of good faith and fair dealing.

97.     In addition, as officers and/or directors of a public company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, services, management, projections and forecasts so that the market price of the Company's common stock would be based, at all pertinent times, on truthful and accurate information.

98.     The Individual Defendants either directly participated in the decisions to release the false and misleading press releases and SEC filings complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature, or knew or were reckless in not knowing that

such violations were occurring, and took no action to prevent or remedy the situation. Defendants' conduct is underscored by their devastating admission in the Form 10K/A for fiscal year 2003 that the Company's internal controls were totally inadequate going back for years, although ensuring the existence of such controls is among their most important duties.

99.    Defendants caused Sonus to engage in a course of conduct which was designed to and did artificially inflate the market price of Sonus' securities and deceive the investing public regarding Sonus' financial reporting and business prospects. Defendants undertook this scheme to prolong the appearance of good fortune at Sonus, profit personally by trading while in possession of material, non-public information concerning the true financial condition of the Company, and maximize the value of their substantial personal holdings of Sonus stock.

100.   Defendants either knew or were reckless in not knowing that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Sonus' securities and would artificially inflate the prices of those securities. Sonus' stock reached $10 per share in early 2004, yet traded as low as $2 to $3 per share after the truth regarding the Company's false financial statements was finally disclosed, and currently trades at approximately $5 per share.

101.   Sonus has been damaged by its exposure to multi-million dollar damages claims by the members of the classes in the Class Actions, as well as to the substantial legal and other professional expenses to be incurred in connection with the Class Actions, let alone professional fees and investigation costs incurred in connection the SEC investigation, the Audit Committee's internal inquiry, and the NASDAQ delisting process. With respect to restatement auditing costs alone, the Company has spent at least $4.8 million on auditor fees.

102.   Defendants have admitted the extent to which they have damaged the Company. According to the Company:

> We have been named as a defendant in a number of securities class
> action and derivative lawsuits and are the subject of a formal
> investigation initiated by the SEC. We are generally obliged, to the
> extent permitted by law, to indemnify our current and former
> directors and officers who are named as defendants in some of
> these lawsuits. Defending against existing and potential litigation

relating to the restatement of our consolidated financial statements
will likely require significant attention and resources of
management. Regardless of the outcome, such litigation and
investigation will result in significant legal expenses and may also
negatively affect our relationships with our customers and our
employees. If our defenses are ultimately unsuccessful, or if we are
unable to achieve a favorable settlement, we could be liable for
large damage awards that could have a material adverse effect on
our business, results of operations and financial condition.

103.    The Company further reported as follows regarding costs associated with

increased premiums for insurance coverage and the damaging impact upon the Company's

ability to attract management:

The facts underlying the lawsuits and SEC investigation have
made director and officer liability insurance extremely expensive
for us, and may make this insurance coverage unavailable for us in
the future. Increased premiums could materially harm our financial
results in future periods. The inability to obtain this coverage due
to its unavailability or prohibitively expensive premiums would
make it more difficult to retain and attract officers and directors
and expose us to potentially self-funding any potential future
liabilities ordinarily mitigated by director and officer liability
insurance.

104.    The Company also stated that it will incur distraction and substantial costs in

connection with the SEC investigation:

We have received a formal order of private investigation from the
SEC. Our management will spend considerable time and effort
cooperating with the SEC in its investigation. The significant time
and effort expected to be spent on this SEC investigation may
adversely affect our business, results of operations and financial
condition. We may incur substantial costs in connection with the
investigation including fines and significant legal expenses.

105.    With respect to the SEC investigation, in an article dated July 29, 2004,

Thestreet.com reported:

The company's audit may be over, but it has lingering legal issues,
including an investigation by the Securities and Exchange
Commission.

> Because Sonus executives offered very little insight about the
> outlook for the company, many analysts were left to ponder the
> potential costs of the book-cleansing process.
>
> "We know that Sonus has been paying millions more in
> administrative expenses per quarter in extra legal, accounting, and
> consulting fees and that these expenses are not likely to diminish
> anytime soon," wrote Lehman Brothers analyst Steve Levy in a
> research note Thursday. Levy has a sell rating on the stock.

106.    The Company further reported disruption which would be created in connection

with seeking new executive management, and that a new CFO would be required to rebuild the

Company's relationship with the investment community:

> Since April 2004, we have made significant changes in our senior
> management team. We have hired a President and Chief Operating
> Officer and a new Vice President of Finance, Corporate Controller
> and Chief Accounting Officer. We presently are in the process of
> recruiting a new Chief Financial Officer. Because of these recent
> changes, our management team may not be able to work together
> effectively to successfully develop and implement our business
> strategies and financial operations. In addition, management will
> need to devote significant attention and resources to preserve and
> strengthen relationships with employees, customers and the
> investor community. If our new management team is unable to
> achieve these goals, our ability to grow our business and
> successfully meet operational challenges could be impaired.

107.    The Company reported that it internal controls were so bad that the inability to fix

them would impact the Company's ability to make required filings:

> Management and our independent auditors have concluded that our
> controls and procedures had material weaknesses as of
> December 31, 2003. We have commenced the design and
> implementation of new and enhanced controls and procedures to
> address those material weaknesses. Our inability to remedy such
> material weaknesses promptly and effectively could have a
> material adverse effect on our business, results of operations and
> financial condition, as well as impair our ability to meet our
> quarterly and annual reporting requirements in a timely manner.
> While we are completing the design and implementation of our
> controls environment, there remains risk that the transitional
> controls on which we currently rely will fail to be sufficiently

effective. In addition, even if we are successful in strengthening
our controls and procedures, such controls and procedures may not
be adequate to prevent or identify irregularities or ensure the
accuracy of our financial statements or SEC reporting.

Pursuant to new SEC rules under the Sarbanes-Oxley Act of 2002,
we are required to include in our future Form 10-K filings a report
by our management as to the effectiveness of our internal control
over financial reporting. Beginning with our Form 10-K for 2004,
our independent auditors will be required to attest to and report on
the evaluation by management. We have implemented a number of
changes designed to improve our internal control over financial
reporting, and we anticipate making further changes to improve
them, some of which may result in higher future operating
expenses and capital expenditures. If we fail to strengthen our
internal control over financial reporting, or receive an adverse
opinion from our auditors as to the adequacy of our internal control
over financial reporting, our ability to manage our business may be
impaired, errors may occur or fail to be identified, and our
financial condition could be harmed.

108.    The Company even admitted that its ability to raise additional funds could be

adversely affected, if not completely foreclosed:

Furthermore, additional financings may not be available on terms
favorable to us, or at all. A failure to obtain additional funding
could prevent us from making expenditures that may be required to
grow or maintain our operations.

109.    Defendants have thus admittedly caused substantial damages to Sonus' valuable

franchise.

## DEMAND IS EXCUSED FOR FUTILITY

110.    Demand on Sonus to bring this action has not been made and is not necessary

because such demand would be futile. Sonus is controlled by its board of directors. As described

herein, the Director Defendants, comprising a majority, were actively involved in, knew or

recklessly disregarded the adverse non-public material facts regarding Sonus alleged herein,

and/or illegally profited from the misconduct. The Director Defendants, due to their participation

in the wrongful acts alleged and their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether Sonus should prosecute this action. As a result, demand on Sonus and its board of directors is futile and therefore excused.

111.    Among the facts demonstrating the futility of demand are the following:

(a)    Defendant Ahmed was the CEO during a three year period in which his company issued false financial statements. He was actively involved in the day-to-day management of Sonus and was directly responsible for the acts and omissions described herein, including but not limited to the false and misleading statements and omissions of material facts made in Sonus' public filings and statements. Ahmed repeatedly certified under Sarbanes-Oxley that the Company's financial statements were accurate, and that its internal controls were sufficient. Yet in the Form 10K/A filed in connection with the restatement, Ahmed has now admitted that all of his certifications for fiscal year 2001 through 2003 were false. Contrary to his certifications, the Company's financial statements were materially inaccurate, and its internal controls were totally deficient. Violation of Sarbanes-Oxley can lead to significant regulatory penalties, and even criminal prosecution. A February 19, 2004 article in the Boston Globe reported as follows:

> "Regardless, chief executive Hassan Ahmed and chief financial officer Stephen Nill have a big problem. Both personally signed off on the numbers quarter after quarter, in filings to the Securities and Exchange Commission as Sarbanes Oxley requires. Executives sign certification forms that swear to the numbers "based on my knowledge." It remains to be seen how aggressively the SEC will pursue executives when their numbers go bad."

Under these circumstances, it is inconceivable that Ahmed would vote to assert the Company's claims, where to do so would require him to authorize claims which may implicate him in conduct for which he may be held accountable to federal authorities. He is also a primary defendant in the Class Action, and would never vote to pursue claims which may compromise his defense in those cases. Furthermore, defendant Ahmed received substantial cash and stock option awards for incentive based pay during fiscal years 2002 and 2003, during which time the

Company's financial results were overstated. Ahmed would never authorize litigation which could result in him being deprived of these substantial sums.

(b)     Defendant Gruber was Chairman of the board throughout the subject periods. On April 6, 2004, in connection with a management shake-up at the Company, Gruber was relieved of his duties as Chairman and designated as "Chairman Emeritus" reporting to defendant Ahmed. As Chairman during fiscal years 2001, 2002 and 2003, Gruber presided over what has now been revealed to be a corporation with seriously deficient internal controls, which issued dozens of false and misleading press releases and SEC filings to shareholders and investors, in violation of SEC rules and regulations and the federal securities law. Gruber's tenure as Chairman is now defined by an accounting disaster and breakdown in the board's oversight duties, as implicitly acknowledged by his reassignment to a position in which he reports to another director, although he is a founder of the Company and spent six years as Chairman. It is inconceivable that he would vote to sue to enforce claims given his primary responsibility for the Company's operations as Chairman during the subject periods. Furthermore, Gruber received substantial incentive based compensation for fiscal year 2003, notwithstanding the accounting scandal which unfolded on his watch. He would never vote to pursue claims which could jeopardize these substantial sums.

(c)     Defendant Anderson sold thousands of shares of Sonus stock while in possession of material adverse inside information that the Company had engaged in improper revenue recognition practices, that the Company's internal controls were a sham, and that the price of Sonus stock was therefore artificially inflated. Anderson was aware of this information as a result of his service on the Audit Committee, which has primary responsibility for the Company's financial reporting practices. Anderson is also highly knowledgeable regarding the Company's operations and financial results as his venture capital firm is one of the Company's substantial investors. Andersen had not sold Sonus stock since 2001, and traded only after the price of Sonus shares had risen based upon defendants' representations that the Company would purportedly turn the corner to profitability in fiscal year 2003. Thus, Anderson benefited from the artificial inflation his misconduct had created, in breach of his fiduciary duties of loyalty to

42

Sonus and its shareholders. This defendant received substantial personal benefits from these transactions. Anderson would never vote to investigate his own misconduct or to sue himself for breach of fiduciary duty.

(d)    None of the other Director Defendants did anything to prevent the insider trading engaged in by defendant Anderson, or the substantial insider trading engaged in by defendants O'Hara, Harris and Jones. These directors had a duty to ensure that policies against illegal insider trading existed at the Company, and to ensure that such policies would be enforced. These directors knew of the unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of the duty of loyalty. These directors would never sue themselves or their colleagues to recover said insider trading proceeds.

(e)    During fiscal years 2001 and 2002, the Company's Audit Committee consisted of defendants Anderson, Ferri and Severino. During most of fiscal year 2003, the Audit Committee consisted of Anderson, Notini and Severino. Thus, four of the Director Defendants, comprising a majority of the board, served on the Audit Committee during the relevant period. The Audit Committee should properly have been the keystone of Sonus' corporate governance and finance. Instead, the Director Defendants, and defendants Anderson, Ferri, Severino and Notini in particular, utterly failed to ensure that Sonus' Audit Committee was an informed, vigilant and effective overseer of the Company's financial reporting process and its internal control systems, as confirmed by defendants' startling admission in the restatement that virtually all of the Company's internal controls were inadequate. As defendants have now admitted:

> In connection with our restatement, we and Ernst & Young LLP, our independent auditors, identified and reported to our audit committee significant internal control matters that collectively constitute "material weaknesses." These internal control matters, any one or more of which may individually or together constitute a material weakness, include: insufficient contract review and documentation; inadequate supervision and review within the finance and accounting department; inadequate segregation of duties; insufficient supporting documentation for and review of account reconciliations; lack of adequate controls over cash receipts; lack of adequate technical accounting expertise; insufficient equity review procedures and documentation; flawed

foundations for accounting estimates; and inadequate quarterly and
year-end financial statement close and review procedures.

All of this was the Audit Committee's primary responsibility. As alleged herein, these
defendants either knew that Sonus lacked an adequate system of internal controls or recklessly
failed to implement one. The service on the Audit Committee by defendants Anderson, Ferri,
Severino and Notini was a sham in that they took no action whatsoever to assure that a system of
internal controls was in place, as demonstrated by the scope and extent of the July 28, 2004
restatement. These defendants violated the Company's Audit Committee Charter. Thus, these
defendants cannot exercise independent objective judgment in deciding whether to bring this
action or whether to vigorously prosecute this action because they are interested personally in the
outcome.

     (f)    The Audit Committee's purported investigation of the accounting irregularities
announced on February 11, 2004 was a sham in that defendants Anderson, Severino and Notini
were investigating themselves and their own failure to properly oversee and implement proper
accounting controls. Notably, although the investigation is now complete, the Company has not
asserted any claims against these directors notwithstanding that their wrongdoing was the
proximate cause of the restatement. It defies logic that the Audit Committee members could
perform an objective investigation of their own misconduct, or that of their friends and
colleagues in the Company. The absence of internal controls directly contributed to the false
financial disclosures alleged herein, and was the proximate cause of Sonus' exposure to massive
liability for violation of federal securities laws.

     (g)    Sonus is and was controlled by its board and as described herein, the Director
Defendants are ultimately responsible for the Company's financial reporting, and were all
involved in the wrongs alleged. These wrongs have given rise to the Class Actions, in which
open market purchasers of Sonus stock have sued the Company and certain of the directors
and/or officers asserting claims under the federal securities laws. None of the Director
Defendants is in a position to exercise independent business judgment with respect to the claims

44

alleged herein due to his participation in and responsibility for the conduct giving rise to the Class Actions, which have damaged and will continue to damage Sonus. All of the Director Defendants except Notini signed false and misleading SEC filings.

(h)    The Compensation Committee of the board establishes and implements compensation policies for the Company's senior executives. Defendants Ferri and Severino serve on the Compensation Committee of the board. Notably, these defendants also served on the Audit Committee, so they were aware of the Company's rampant internal control deficiencies and financial reporting problems. These defendants awarded substantial incentive based compensation to several of the Company's officers and directors, including defendants Ahmed and Gruber, based upon false and inflated financial results, as alleged herein. In particular, these defendants awarded substantial cash and millions of stock options for fiscal years 2002 and 2003. This was unjustified and a waste of corporate assets. These defendants would never vote to pursue claim which would expose them to personal liability for wasting the corporation's assets. Furthermore, the principal occupations of defendants Ahmed and Gruber are with Sonus. Defendants Ferri and Severino, as members of the Compensation Committee, exert control over all compensation awarded to Ahmed and Gruber. Ahmed and Gruber can not act independently of Ferri and Severino and would never vote to sue Ferri and Severino.

(i)    The other Director Defendants would never vote to sue defendant Ahmed, who has long held the most powerful executive positions with the Company. Indeed, Ahmed has now been elevated to Chairman of the board. In November 2001, Ferri was quoted as saying that Ahmed "made all the difference in the world" to Sonus. With respect to Sonus' hiring of defendant Ahmed, Gruber was quoted as saying: "There were 50 companies on I-495, and all 50 of them wanted Hassan." Likewise, the Director Defendants would never vote to sue defendant Gruber, one of the Company's founders, upon whom they have now bestowed the apparently honorary title of "Chairman Emeritus." Defendants Ferri, Anderson, Notini and Severino could not and will not act independently of Ahmed or Gruber.

(j)    Sonus has agreed to indemnify its directors and officers against liability for acts and omissions occurring in the performance of their duties as directors and officers and

45

maintains insurance policies to cover the costs of such indemnification. Under the terms of those insurance policies, however, claims against directors which are brought by the Company, or other directors, are excluded from coverage. Therefore, Sonus' board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Individual Defendants because to do so would result in the loss of their insurance coverage.

(k)     The Director Defendants have extensive personal and business relationships which compromise their independence. In order to bring this action for breaches of fiduciary duty, the members of the board would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company. This they will not do. Five of the six Director Defendants have worked closely on the Board together for at least five years, and would never take a position antagonistic to one another, particularly in light of the Class Actions and the formal SEC investigation which are now threatening them.

(l)     The venture capital firms of defendants Anderson and Ferri were substantial investors in Sonus, and frequently invest in the same companies, including Sycamore Networks, Inc., Silverback Technologies, Crossbeam Systems, Cadia Networks, Cascade Communications (where defendant Ahmed once served as an executive), Equipe Communications, AppIQ, Blue Dolphin Group, Argon Networks, Arris Networks, Arrowpoint Communications, Firstsense Software, Redstone Communications, Appian Communications, Terrapulse, and Nauticus Networks, to name but a few. One 2001 article described Ferri and Anderson as a "tag-team" who "travel as a pair" with respect to their common venture capital investments. Indeed, both Anderson and Ferri point to Sonus as a portfolio company on their venture capital firms' websites. These defendants would never vote to investigate or sue each other, or compromise the business or reputation of their respective venture capital firms by voting to investigate or sue the officers and directors of a corporation in which both have invested.

(m)     In addition to the close business relationship that exists between Ferri and Anderson, defendants Ahmed, Gruber and Severino also have a history of interlocking business relationships among each other and Ferri and Anderson. For example, Ahmed and Ferri serve

together on the board of a Company named Airvana. Ahmed and Ferri also served together on the board of a company named Winphoria Networks, in which defendant Anderson's venture capital firm invested. Ahmed and Severino serve together on the board of a company named PhotonEx Corp, in which defendant Anderson's venture capital firm invested. Gruber and Ahmed have invested together in a company named Narad Networks. Severino and Ahmed serve together on the board of the Massachusetts Telecommunications Council. On his venture capital firm's website, defendant Anderson has posted the praise of defendant Severino, with whom Anderson worked in connection with Wellfleet Communications:

> Ed Anderson was in all respects a co-founder of Wellfleet Communications. He was involved with us from the concept to $500M revenues. He is strategic as well as operational and he brings an intensity of focus to the important challenges we all face in building a successful enterprise.

On his venture capital firm's website, defendant Ferri has posted the praise of defendant Gruber:

> I've raised capital from numerous VCs, but the people at Matrix truly collaborate as partners with their portfolio companies. Their solid perspective supports start-up every step of the way.

These relationships demonstrate the unusual closeness and extent of the Director Defendants' intertwined business relationships, which they would never jeopardize by voting to sue one another. The Director Defendants would therefore not initiate such litigation.

## FIRST CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

112.    Plaintiffs incorporate by reference the allegations set forth above.

113.    In violation of their fiduciary duties to Sonus and its shareholders, defendants issued false and misleading statements to Sonus' shareholders and the investing public regarding the Company's results and business prospects throughout the relevant period. By reason of this conduct, defendants have exposed Sonus to potential liability in the Class Actions and the SEC investigation and the cost of defending such litigation.

114.    In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

115.    Consequently, Sonus has been and is being further damaged by defendants' conduct in breach of their fiduciary duties.

## SECOND CAUSE OF ACTION
## GROSS NEGLIGENCE

116.    Plaintiffs incorporate by reference the allegations set forth above.

117.    The preparation and dissemination of quarterly and annual financial statements that were materially false and inaccurate and not in accordance with GAAP represents a sustained and systematic failure by the Individual Defendants to assure the existence within Sonus of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting. Indeed, defendants have admitted that the the Company's financial controls were grossly inadequate.

118.    The breach by defendants of their duty to act with reasonable care was grossly negligent, reckless, and lacked a good faith effort by defendants to perform their fiduciary responsibilities.

119.    Sonus has been damaged by defendants' gross negligence and reckless disregard of their duties.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT

120.    Plaintiffs incorporate by reference the allegations set forth above.

121.    In consideration of the substantial compensation and professional enhancement and prestige, which each of the defendants received as directors and/or officers of Sonus, each of those defendants contracted with Sonus to act in the best interest of Sonus and to cause Sonus to operate lawfully and properly.

48

122.    Each defendant named as a Sonus officer had an express agreement with Sonus which he breached by his actions, as set forth herein. Each of the Director Defendants also had an express agreement to serve as a director of the corporation in exchange for compensation, which each Director Defendant breached by his actions herein.

123.    By their actions and omissions set forth herein those defendants reached their contractual obligations and commitments to Sonus by not acting in the best interests of Sonus and causing or permitting Sonus to act in unlawful and improper ways.

124.    Sonus has been damaged by defendants' breach of their contracts.

## FOURTH CAUSE OF ACTION

## BREACH OF DUTY OF LOYALTY-INSIDER TRADING-AGAINST THE INSIDER TRADING DEFENDANTS

125.    Plaintiffs incorporate by reference the allegations set forth above.

126.    By reason of their positions as directors and/or officers of Sonus during the relevant period, at the time the Insider Trading Defendants sold their Sonus shares, each had access to and knew highly material information regarding Sonus, and knew or should have known that the public disclosure of this information would adversely affect the market price of Sonus stock.

127.    In selling their Sonus stock, as set forth above, the Insider Trading Defendants used Sonus' material, non-public information for personal gain, in breach of their fiduciary duties to Sonus and its shareholders.

128.    By reason of the aforesaid insider sales, the Insider Trading Defendants profited through their fiduciary positions. Defendants are obliged to disgorge these unlawful profits for the benefit of Sonus.

## FIFTH CAUSE OF ACTION

## WASTE OF CORPORATE ASSETS AGAINST DEFENDANTS FERRI AND SEVERINO

129.    Plaintiffs incorporate by reference the allegations set forth above.

130.    Defendants Ferri and Severino have caused Sonus to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its officers and directors based on false financial statements, which incentive based compensation was not earned and should never have been paid.

131.    As a result of the waste of corporate assets, these defendants are liable to the Company.

## SIXTH CAUSE OF ACTION
## FOR UNJUST ENRICHMENT

132.    Plaintiffs incorporate by reference the allegations set forth above.

133.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sonus.

134.    Plaintiff, as a shareholder and representative of Sonus, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## SEVENTH CAUSE OF ACTION
## FOR DISGORGEMENT UNDER SARBANES-OXLEY

135.    Plaintiffs incorporate by reference the allegations set forth above.

136.    During the relevant period, based substantially upon false and misleading representations concerning the financial and operational condition of the Company, certain of the Individual Defendants received millions in unearned, performance based compensation, in the form salary, cash bonuses and option awards, as alleged in detail herein.

137.    These defendants should be required to disgorge the gains they have unjustly obtained at the expense of Sonus and its shareholders, and a constructive trust for the benefit of Sonus and its shareholders should be imposed upon them as contemplated by the disgorgement provisions of Section 304 of Sarbanes-Oxley.

50

## EIGHTH CAUSE OF ACTION

## FOR ABUSE OF CONTROL

138.    Plaintiffs incorporate by reference the allegations set forth above.

139.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sonus, for which they are legally responsible.

140.    As a direct and proximate result of the Individual Defendants' abuse of control, Sonus has sustained significant damages.

141.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiffs, on behalf of Sonus, demands judgment against defendants, and each of them jointly and severally as follows:

A.    determining that this suit is a proper derivative action and certifying plaintiffs as appropriate representatives of Sonus for said action.

B.    declaring that each of the Individual Defendants breached his fiduciary duty to Sonus;

C.    determining and awarding Sonus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.    awarding plaintiffs the costs and disbursements of this action, including reasonable fees and costs to plaintiff's attorneys, accountants and experts;

E.    granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: October 12, 2004

By: /s/ John C. Martland

JOHN C. MARTLAND BBO NO. 332980
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850

Liaison Counsel

ROBERT C. SCHUBERT  BBO NO. 562242
JUDEN JUSTICE REED
WILLEM F. JONCKHEER
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California  94111
Telephone: (415) 788-4220

Lead Counsel

GREGORY M. NESPOLE
WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP
270 Madison Avenue, 9th Floor
New York, New York 10016
Telephone (212) 545-4600

PAUL WARNER
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX  77027
Telephone: (713) 622-7271

WILLIAM FEDERMAN
FEDERMAN & SHERWOOD
120 N. Robinson
Oklahoma City, OK 73102
Telephone (405) 235-1560

Derivative Counsel