## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION _____ Consolidated Cases: 1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | **Case No. 1-04-CV-10359 DPW** **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

SUMMARY OF FACTS ..................................................................................................... 3

THE FEDERAL COMPLAINT ALLEGES MANY NEW AND MORE DETAILED FACTS

    THAN THE STATE COMPLAINT ........................................................................ 7

ARGUMENT ...................................................................................................................... 8

    A.   Collateral Estoppel Does Not Apply............................................................... 8

    B.   Demand Is Excused......................................................................................... 10

         1.   Plaintiffs' "Caremark" Allegations Excuse Demand........................... 12

         2.   Plaintiffs' Insider Trading Claims Support Demand Futility. ............. 16

         3.   Demand Is Excused Where The Board Participates In Misleading Shareholders. 17

         4.   This Board Cannot Act Impartially or Objectively................................ 19

CONCLUSION.................................................................................................................... 20

TABLE OF AUTHORITIES

**Cases**

Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984) ........................................................ 11, 12, 17

Bazata v. Nat'l Ins. Co. of Wash., 400 A.2d 313 (D.C. 1979) ..................................................... 10

Cramer v. Gen. Tel. and Elec. Corp., 582 F.2d 259 (3d Cir. 1978)........................................... 9, 10

Dollens v. Zionts, No. C 01 2826, 2002 U.S. Dist LEXIS 13511 (July 24, 2002)....................... 16

Dresdner v. Goldman Sachs Trading Corp., 269 N.Y.S. 360 (N.Y. 1934).................................... 9

Faigin v. Kelly, 184 F.3d 67 (1st Cir. 1999)................................................................................... 9

Grable v. Warren Hawkins Post of Am. Legion, 592 S.E. 2d 502 (Ga. 2003)............................. 10

Grobow v. Perot, 539 A.2d 180 (Del. 1988).................................................................................. 11

Guttman v. Huang, 823 A. 2d 492 (Del. Ch. 2003) ....................................................................... 15

In re Caremark Int'l, Inc., 698 A.2d 959 (Del. Ch. 1996) ............................................................. 12

In re Cendant Derivative Litig., 189 F.R.D. 117 (D.N.J. 1999) .................................................... 18

In re General Instrument Corp .Sec Litig., 23 F. Supp. 2d 867 (E.D. Ill. 1998).......................... 16

In re Kauffman Mutual Fund, 479 F.2d 257 (1st Cir. 1973) .......................................................... 10

In re Oracle Corp. Deriv. Litig., 824 A.2d 917 (Del. Ch. 2003).................................................... 19

In re Oxford Health Plans, Inc., Sec. Litig., 192 F.R.D. 111 (S.D.N.Y. 2000) .......... 13, 14, 16, 17

In re Storage Technology Sec. Litig., 804 F. Supp. 1368 (D. Colo. 1992) ................................... 18

In re Strangie, 192 F.3d 192 (1st Cir. 1999) ................................................................................... 8

Johnson v. Hui, 752 F. Supp. 909 (N.D. Cal. 1990)...................................................................... 16

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) ............................................................... 10

McCall v. Scott, 239 F.3d 808 (6th Cir. 2001) .............................................................. 11, 14, 17

Nathan v. Rowan, 651 F.2d 1223 (6th Cir. 1981)........................................................................... 10

New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326 (1st Cir. 1995)............. 8

Parklane Hosiery Co., Inc., v. Shore, 439 U.S. 322 (1979) ............................................................ 8

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ...................................................................... 11, 12

Rankin v. Frebank Co. 47 Cal.App.3d 75 (1975) ........................................................................ 9

Schneider v. Colegio De Abogados De Puerto Rico, 546 F. Supp. 1251 (D.P.R. 1982) .............. 8

Schnitzer v. O'Connor, 653 N.E.2d 825 (Ill. App. Ct. 1995) ......................................................... 10

Shallal v. Elson, No. 98-8739, 1999 U.S. Dist. LEXIS 23368 (S.D. Fla. April 12, 1999) ............... 10

Strougo v. Carroll, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,815 (Del. Ch. 1991) . 16

**Statutes**

15 U.S.C. §7241 ................................................................................................................... 7

15 U.S.C. §7243(a) ............................................................................................................... 2

18 U.S.C. §1350 .................................................................................................................. 7

8 Del. Code § 102(b)(7) ...................................................................................................... 16

Federal Rule of Civil Procedure 23.1 ................................................................................... 10

**Treatises**

*Moore's Federal Practice*  (3d. ed. 2004) ................................................................................. 8

## INTRODUCTION

This is a consolidated shareholders' derivative action brought on behalf of nominal defendant Sonus Networks, Inc. ("Sonus" or "the Company"), a Delaware corporation. The defendants are several of the Company's current or former officers and directors.

On July 28, 2004, a huge restatement of the Company's financial results was announced, including financial statements for all of fiscal years 2001, 2002 and the first nine months of 2003. The restatement was extensive in scope and magnitude, and included material adjustments to the Company's accounting for revenue, deferred revenue, purchase accounting, impairments, accrued expenses and deferred compensation. The restatement resulted in large swings in reported results for revenue, deferred revenue and expenses throughout the subject periods, as well as admissions by defendants that "significant internal control matters" constituting "material weaknesses" existed at the Company, including, but not limited to, "lack of adequate technical accounting expertise," "flawed foundations for accounting estimates" and "inadequate quarterly and year-end financial statement close and review procedures."

During the reporting periods in which defendants were causing Sonus to materially misrepresent its financial results, several of the Company's officers and directors collectively sold over 364,000 shares of Sonus stock at inflated prices while in possession of material adverse inside information regarding these matters, for proceeds of over $2.2 million. Furthermore, in addition to their substantial salaries, several officers and directors were awarded incentive-based cash compensation, bonus and stock option awards by the Compensation Committee of the board of directors based on the Company's inflated earnings performance. When the truth was finally revealed, the Company's share price collapsed. As defendants have now admitted, the restatement has damaged the Company by exposing it to massive liability in a series of securities

class action lawsuits and a formal SEC investigation and related costs, and has harmed the Company's reputation with the financial and business communities and among customers.

To remedy these harms, plaintiffs assert claims on behalf of Sonus for breach of fiduciary duty, gross negligence, breach of contract, breach of the duty of loyalty and insider trading, waste of corporate assets, unjust enrichment, disgorgement under Sarbanes-Oxley 15 U.S.C. §7243(a), and abuse of control. Plaintiffs further allege that demand on the Company's board of directors to assert these claims on the Company's behalf is excused for futility.

Defendants do not move to dismiss the substantive claims, but make two principal arguments related to demand futility. First, they claim that Judge Van Gestel's order granting defendants' motion to dismiss in the Massachusetts Superior Court action <u>In re Sonus Networks, Inc. Derivative Litigation</u>, 04-0753-BLS, precludes plaintiffs in this action from litigating the demand futility issue. Alternatively, they argue that even if collateral estoppel does not apply, the federal complaint is not sufficiently particularized to excuse demand under Rule 23.1 and Delaware law.  These arguments must be rejected.

First, defendants have failed to establish the stringent requirements of collateral estoppel. Contrary to the superficial "comparison" between the state and federal complaints made by defendants in the chart they attach to their brief, defendants cannot escape that the federal complaint contains many important facts which were not alleged in the state complaint, and which are dispositive in plaintiffs' favor on demand futility. Under these circumstances, collateral estoppel does not apply. Second, defendants' own admissions regarding the deplorable state of the Company's internal controls demonstrate the directors' bad faith and, together with additional facts regarding the composition and performance of the board, provide all the particularity that is needed to establish the futility of demand under applicable law.

## SUMMARY OF FACTS

Sonus is a Delaware corporation located in Chelmsford, Massachusetts. According to its public statements, Sonus provides internet voice infrastructure solutions. Sonus trades on the NASDAQ National Market System with 246.5 million shares outstanding. ¶13.[1]  Named as defendants are six of the seven board members serving at the time the first of the consolidated derivative actions was filed: Hassan Ahmed, Edward T. Anderson, Albert A. Notini, Paul J. Ferri, Rubin Gruber, and Paul Severino, collectively the "Director Defendants." Also named are four officers: John O'Hara, Edward Harris, Stephen Nill and Paul Jones.

Defendants publicly reported financial results for fiscal years 2001 and 2002 on January 16, 2002 and January 23, 2003, respectively. ¶¶32-77, 38-45.  Defendants publicly reported financial results for the first three quarters of fiscal year 2003 on April 9, 2003, July 10, 2003, and October 8, 2003, respectively. ¶¶47, 50, 55, 58. According to defendants, the third quarter of fiscal year 2003 was the Company's "first quarterly profit on a GAAP basis." ¶55.

In response to defendants' announcements of progressively increasing 2003 quarterly earnings, the price of Sonus stock rose from approximately $1.00 per share in January 2003 to nearly $10 per share in January of 2004. ¶¶46, 60. As the price of Sonus shares was rising from its January 2003 price of $1.00 per share, defendants Anderson, O'Hara, Jones and Harris sold 364,334 shares of Sonus stock for proceeds of $2.27 million. ¶¶91-92.

For each reporting period, defendants represented in SEC filings that the reported financial results complied with Generally Accepted Accounting Principles ("GAAP"), and in particular with applicable revenue recognition rules. Furthermore, beginning in fiscal year 2002, the Company's SEC filings contained certifications signed by defendants Ahmed and Nill under Sarbanes-Oxley attesting to the accuracy of the Company's financial results, as well as to the

---

[1] All paragraph ("¶") references are to the Consolidated Shareholder Derivative Complaint.

integrity of the Company's internal controls, including representations that the internal controls had been properly "designed" and "evaluated" for deficiencies. ¶¶43, 44, 58.

On January 20, 2004, prior to the announcement of fourth quarter and full fiscal year 2003 results, defendants revealed that the Company would postpone its earnings release pending the completion of the 2003 audit. ¶61.  On February 11, 2004, defendants announced that the "integrity" of the Company's financial statement had been "compromised" and that certain individuals had been "terminated." ¶62. On March 15, 2004, defendants announced that the Company would seek an extension to file year-end financial statements for fiscal year 2003 with the SEC, and that defendants were "establishing new practices and controls." ¶64. On March 29, 2004, defendants announced that the investigation would be expanded to include "additional prior periods." ¶65. On April 27, 2004, defendants announced they were continuing the review of revenue recognition and "other financial statement accounts" for 2002 and 2003. ¶71.

On June 29, 2004, defendants reported that the SEC had stepped up its inquiry and had issued a formal order of investigation of the Company's financial reporting. ¶73.

The restatement of fiscal years 2001, 2002 and the first nine months of 2003 was announced in a press release on July 28, 2004. ¶75. It was also reported that defendant Nill, the Company's CFO, "resigned at the request of the Company." ¶75.

In a Form 10-K filed on the same date, defendants admitted that the Company's internal controls had been totally inadequate and suffered from material weaknesses throughout the relevant period. ¶77. Although defendants Ahmed and Nill had repeatedly executed Section 302 Certifications under Sarbanes-Oxley certifying that the Company's internal controls were sufficient to ensure the proper reporting of financial information, in reality the Company's internal controls were in a woeful state, and suffered from such basic failures as:

- insufficient contract review and documentation;

- inadequate supervision and review within the finance and accounting department;

- inadequate segregation of duties;

- insufficient supporting documentation for and review of account reconciliations;

- lack of adequate controls over cash receipts;

- lack of adequate technical accounting expertise;

- insufficient equity review procedures and documentation;

- flawed foundations for accounting estimates; and

- inadequate quarterly and year-end financial statement close and review procedures.

All of the Director Defendants had the responsibility to ensure that there existed at Sonus sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendants Anderson, Ferri, Severino and Notini, in particular, all of whom served on the Audit Committee of the board during part or all of the relevant period, had the responsibility to ensure that Sonus had sufficient accounting controls to insure the accuracy of its reported financial results, but knowingly or recklessly failed to do so. ¶¶86-90, 98-100.

In the Form 10-K announcing the restatement, defendants admitted the harm suffered by the Company as a result of the restatement. ¶¶96-109. Damages include $4.8 million spent on auditor fees for the restatement; exposure to liability in class action litigation and fines from the SEC inquiry, as well as related investigation, defense and indemnification costs; extremely expensive D&O insurance rates; risks to viability of business and financial strategies and operations; exposure to further risk as a result of the Company's lack of internal controls and the potential inability to timely implement new ones; and prohibitively expensive financing. Id.

The Form 10-K also disclosed that, notwithstanding the restatement which has damaged the Company and severely harmed shareholder value, the Compensation Committee of the board,

consisting of defendants Ferri and Severino, awarded substantial cash and stock compensation for fiscal year 2003 to several of the Company's senior officers and directors – the very individuals who were responsible for ensuring the implementation of adequate internal controls and procedures but utterly, and admittedly, failed to do so. ¶¶79-80.

Subsequent developments demonstrate that the board is beholden to defendant Ahmed. Although he was the Company's principal executive officer during the restated periods, Ahmed was actually <u>elevated</u> to chairman of the board in April 2004, a clear indication of his control. ¶69. Also in April 2004, Gruber, one of the Company's founders and chairman of the board during the period of falsification, was given the honorary title "Chairman Emeritus," notwithstanding the huge accounting scandal that occurred on his watch. ¶18.

These new positions for defendants Ahmed and Gruber were cemented with substantial incentive-based compensation awards granted by their friends on the Compensation Committee of the board. As revealed in the very same Form 10-K that detailed the restatement, for 2003 defendant Ahmed was awarded incentive based compensation of $75,000 in cash and options to purchase 2,000,000 shares of Sonus stock, valued at up to $14 million based on a 10% rate of appreciation of Sonus stock over the term of the options. "Chairman Emeritus" Gruber was awarded options to purchase 430,000 shares of Sonus stock, valued at over $3 million. ¶79.

The enormous awards given to Ahmed on the heels of the accounting scandal are consistent with Ahmed's control of the board. Indeed, other board members have openly communicated their allegiance to Ahmed. ¶¶111.

In addition, the board members have extensive business relationships which demonstrate that they are more of a club than an aggressive, independent entity focused on corporate management. Anderson and Ferri, who during fiscal years 2001 and 2002 comprised a majority of the Audit Committee, are Boston venture capitalists who have invested in at least a dozen of

the same companies, and are known in the community as a "tag-team" who "travel as a pair." Furthermore, Anderson, Ferri, Ahmed, Gruber and Severino have many common investments among them, and their business and professional relationships are extensive. ¶111.

## THE FEDERAL COMPLAINT ALLEGES MANY NEW AND MORE DETAILED FACTS THAN THE STATE COMPLAINT

According to Judge Van Gestel's order at page 2, the derivative complaint he dismissed for failure to allege demand futility was filed on February 20, 2004. This is <u>five months</u> before the restatement was announced on July 28, 2004. The full details of the restatement have been alleged in the federal complaint, which was not filed until October 10, 2004.

Therefore, in ruling on demand futility, Judge Van Gestel could not and did not consider (1) the scope and extent of the restatement, which covered almost <u>three full fiscal years</u> and involved a wide variety of financial reporting matters which were the responsibility of all of the Director Defendants; (2) defendants' <u>admissions</u> that the Company's internal controls, which are the responsibility of the board, were deficient throughout the relevant period and constituted "material" weaknesses; (3) defendant Ahmed's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, 15 U.S.C. §7241 and 18 U.S.C. §1350, which have now proven to be false; (4) the existence of a <u>formal</u> SEC probe into the Company's financial reporting; (5) defendants' <u>admissions</u> regarding losses suffered by the Company; and (6) facts bearing on the board's deference to defendants Ahmed and Gruber, including their new positions on the board and huge incentive based compensation awards. Indeed, ¶¶64-81 and ¶111 of the federal complaint contain many allegations that post-date the filing of the state derivative complaints.

Furthermore, the federal complaint contains an exclusively federal claim for disgorgement under Section 304 of Sarbanes Oxley, premised on the improper receipt of

compensation, as well as a breach of contract claim. Therefore, the state and federal complaints are fundamentally different, with the federal complaint containing far more detailed allegations as well as a claim under federal law. Of course, defendants' chart glosses over these differences.

## ARGUMENT

### A.    Collateral Estoppel Does Not Apply.

State law controls whether a federal court may afford the judgment of a state court collateral estoppel effect. New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995). Under Massachusetts law, the moving party bears the burden of showing that (1) the issue sought to be precluded from re-litigation is identical to that decided in a former proceeding; (2) the issue was actually litigated; (3) it was decided on the merits; and (4) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding.   In re Strangie, 192 F.3d 192, 194 (1st Cir. 1999). All reasonable doubts are resolved against issue preclusion. Schneider v. Colegio De Abogados De Puerto Rico, 546 F. Supp. 1251, 1271 (D.P.R. 1982). "The requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." Parklane Hosiery Co., Inc., v. Shore, 439 U.S. 322, 328 (1979).

Whether a party is estopped from litigating an issue is a highly fact specific inquiry. "[I]ssue preclusion applies only if the issue in the prior litigation is identical to the issue in subsequent litigation, [and] . . . a difference in pertinent facts, sufficient to substantially change the issue renders the doctrine of issue preclusion inapplicable." *See Moore's Federal Practice* § 132.02[2][e] (3d. ed. 2004)(emphasis added). Likewise, the First Circuit has ruled that identical issues must be presented. "It is common ground that the reach of collateral estoppel must be

confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999).

Under the foregoing principles, collateral estoppel does not apply here. The parties to the state action did not litigate the issues asserted in this action to the extent necessary or on a complete record essential to trigger issue preclusion. As summarized above, the federal plaintiffs allege a multitude of additional facts regarding the nature of the defendants' conduct, which allegations bear directly on demand futility. These allegations totally change the landscape of the derivative claims and make them much more powerful. The state complaints were filed before the restatement was concluded, and before the material weaknesses in the Company's internal controls were disclosed. The state plaintiffs relied on the announcement of a restatement – the federal plaintiffs rely on detailed facts revealed in the restatement. ¶¶64-81, 111.

Indeed, the denial of a party's right to fully litigate its case has long been a concern in representative actions. See Dresdner v. Goldman Sachs Trading Corp., 269 N.Y.S. 360, 367-68 (N.Y. 1934) ("the first action brought by a stockholder furnishes no adequate security that other shareholders will be assured of a complete remedy. The one first in the field may not be possessed of all the facts. He may omit from his complaint material allegations of facts which have been discovered by another more vigilant and industrious."); See also Cramer v. Gen. Tel. and Elec. Corp., 582 F.2d 259, 269 (3d Cir. 1978) (non-party shareholders may be bound by a judgment in a prior derivative suit only if the representation of the shareholders' interests was adequate); Rankin v. Frebank Co. 47 Cal.App.3d 75, 94 (1975) (collateral estoppel should not be applied mechanically in derivative context.).

Defendants cite several cases for the proposition that a plaintiff only gets "one opportunity" to litigate demand futility. But defendants' cases merely present situations in which a plaintiff whose prior complaint was dismissed was prevented from filing another complaint in

the same court.  See In re Kauffman Mutual Fund, 479 F.2d 257 (1st Cir. 1973); Bazata v. Nat'l Ins. Co. of Wash., 400 A.2d 313, 314 (D.C. 1979); Grable v. Warren Hawkins Post of Am. Legion, 592 S.E. 2d 502, 503 (Ga. 2003). These cases have no bearing on the issue of whether a different plaintiff armed with different and much stronger facts asserting more comprehensive claims in a different forum may litigate demand futility.

In every other case cited by defendants, collateral estoppel was only applied where subsequent cases alleged identical claims. For example, in Nathan v. Rowan, 651 F.2d 1223, 1226 (6th Cir. 1981), plaintiff's case was dismissed where he filed suit after a prior derivative claim had been barred by the statute of limitations. In Cramer, the court dismissed a suit based upon the same special litigation committee report that had formed the basis of the allegations in two previously dismissed derivative suits. In Shallal v. Elson, No. 98-8739, 1999 U.S. Dist. LEXIS 23368, at *22 (S.D. Fla. April 12, 1999), the court dismissed a later filed action under the Colorado River doctrine where "there are two identical claims on the same operative facts asserting the same legal claims." In Schnitzer v. O'Connor, 653 N.E.2d 825, 833 (Ill. App. Ct. 1995), the court dismissed the action based on an Illinois statute permitting dismissal of claims where there is "another action pending between the same parties for the same cause."

Defendants cite no case in which a determination in one case on the sufficiency of demand futility pleading has served as a basis for collateral estoppel in a case filed by another shareholder pleading more and different facts.

**B.    Demand Is Excused.**

Motions to dismiss a derivative complaint for failure to make a pre-litigation demand are considered pursuant to Federal Rule of Civil Procedure 23.1 and the substantive law of the state of incorporation, here Delaware. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-99 (1991). Rule  23.1 requires that a shareholder seeking to file a derivative action allege that he or she

made a pre-suit demand on the corporation's board of directors, or allege facts showing why such a demand would have been futile. The complaint must "allege with particularity" the efforts made to obtain the action the plaintiff desires from the directors, or the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Under Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984), where shareholders file a derivative suit on behalf of a corporation without making pre-litigation demand, the Court must consider whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Aronson, 473 A.2d at 814. Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application because the absence of board action makes it impossible to perform the essential inquiry contemplated by Aronson. Thus, where allegations involve board inaction, only the first prong of the Aronson test will apply. Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993).

Under Rales, the court must determine "whether or not the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. To establish reasonable doubt, plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility. Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988). Nor are plaintiffs required to demonstrate a reasonable probability of success on the merits. Rales, 634 A.2d at 934. Whether plaintiffs have alleged facts sufficient to create a reasonable doubt must be determined from the "accumulation" of all facts. McCall v. Scott, 239 F.3d 808, 816 (6th Cir. 2001).

Under Rales, a director is considered interested when, for example, he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or

when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. Rales, 634 A.2d at 936. While the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the allegations in the complaint present "a substantial likelihood" of liability on the part of a director. See Rales, 634 A.2d at 936 (quoting Aronson, 473 A.2d at 815).

### 1.    Plaintiffs' "Caremark" Allegations Excuse Demand.

Nonfeasance by directors of their fiduciary duty to discharge supervisory and monitoring responsibilities constitutes a breach of the fiduciary duty of care and creates a reasonable doubt excusing demand. Under the standards established in In re Caremark Int'l, Inc., 698 A.2d 959 (Del. Ch. 1996), director liability "may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." 698 A. 2d at 967. The court held that "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation," a "sustained or systematic failure of the board to exercise oversight - such as an utter failure to attempt to assure a reasonable information and reporting system exists - will establish the lack of good faith that is a necessary condition to liability." Id. at 971. [emphasis supplied].

The case at hand presents a compelling argument for demand futility under Caremark. In connection with the restatement, defendants have admitted the very type of "sustained or systematic failure of the board to exercise oversight" required by Caremark to support allegations of bad faith, and therefore a "substantial likelihood of liability." Their laundry list of admissions regarding the failure of the Company's internal controls provides all the particularization that is required to demonstrate bad faith in performance of their oversight duties. ¶77. Although it was a publicly traded company, it is apparent that no "reasonable

information and reporting system" existed at Sonus. The Company's terrible control environment was undeniably the responsibility of the Director Defendants.

Plaintiffs' <u>Caremark</u> allegations are particularly powerful with respect to the Audit Committee of the board, upon which four of the directors (a majority) served during some or all of the relevant period. Indeed, in SEC filings, defendants reported to shareholders that the Audit Committee performed a series of detailed functions, including "review of financial reports" and other information provided to shareholders and the public, review of the Company's "systems of internal accounting and financial controls and disclosure controls and procedures," and review of "the Corporation's auditing, accounting and financial reporting processes generally." ¶86. These representations were false – given the nature of the admissions regarding the Company's internal controls, defendants could not have done any of these, at least not in good faith.

In <u>In re Oxford Health Plans, Inc., Sec. Litig.</u>, 192 F.R.D. 111 (S.D.N.Y. 2000), the court analyzed plaintiff's allegations of accounting misconduct under <u>Caremark</u> and found that nonfeasance excused demand. The allegations in Oxford were very similar to those presented here. Defendants in that case were alleged to have permitted Oxford to issue false statements regarding the company's deficient computer systems and deteriorating business condition. In particular, "despite their knowledge of these facts [defendants] intentionally caused Oxford to continue its rapid and aggressive campaign of growth without reasonably insuring themselves that fundamental measures were undertaken and controls put in place to ensure the company was accurately keeping account of and reporting its financial results, and otherwise complying with its legal and regulatory obligations." <u>Oxford</u>, 192 F.R.D. at 115.

According to the court:

> Insofar as concerns the nonfeasance by the Directors, that is to say their violation of their fiduciary duty to discharge their supervisory

and monitoring responsibilities, reasonable doubt as to futility has
been established in accordance with the standard of <u>Rales</u>. <u>See also</u>
<u>In Re Caremark  International, Inc.</u>, 698 A.2d 959, 972 (Del. Ch.
1996) (holding that a violation of fiduciary duty exists if the
directors "either lack good faith in the exercise of their monitoring
responsibilities or permitted a known violation of law by the
corporation to occur.")

A lack of good faith, according to the <u>Caremark</u> case can be
established by showing a sustained or systematic failure to exercise
oversight and assure adequate record keeping. In numerous cases
where liability is based upon a failure to supervise and monitor,
and to keep adequate supervisory controls in place, demand futility
is ordinarily found, especially where the failure involves a scheme
of significant magnitude and duration which went undiscovered by
the directors. See <u>Miller v. Schreyer</u>, 200 A.D.2d 492, 606
N.Y.S.2d 642 (1st Dept. 1994) and 257 A.D.2d 358, 683 N.Y.S.2d
51, 55 (1st Dept. 1999)(applying Delaware law).

This Complaint alleges with particularity the reckless failure of
these defendants upon whom demand to sue would have to be
made, in supervising or monitoring the affairs of the company . . . .
To the extent that a Defendant violated his or her fiduciary duty by
allowing others to make materially false or misleading statements
about Oxford's financial matters, the rule of <u>Rales</u> applies, and, as
previously discussed, demand is excused.

*Id*. at 117.

<u>See also</u> <u>McCall</u>, 239 F. 3d at 824 (demand excused under <u>Caremark</u> theory where plaintiffs pled

a "substantial likelihood" of liability for "intentional or reckless breach of fiduciary duty.")

As in <u>Oxford</u>, here, too, a scheme of "significant magnitude and duration" existed which,

at an absolute minimum, went "undiscovered" by the board and the Audit Committee. The

pervasive accounting problems here are fundamental, and they occurred over a period spanning

<u>eleven consecutive fiscal quarters</u>. Significantly, in <u>Oxford</u>, the court held demand futile under a

nonfeasance theory even where the allegations did not involve a restatement. Furthermore, the

court found each director interested under <u>Caremark</u> even though five of them were "outside"

directors, *i.e.* directors who did not hold executive positions with the company.

At pages 12-13 and 17 of their brief, defendants seek to deflect <u>Caremark</u> liability by claiming that they did not have "actual or constructive" notice of the Company's internal control problems, and that no "red flags" are alleged suggesting a "culpable" failure of oversight. It would be ironic, to say the least, if defendants could claim as a defense their ignorance of deficiencies in the Company's most fundamental internal controls, where designing and implementing such controls is their core responsibility as directors. Under <u>Caremark</u>, "a sustained or systematic failure of the board to exercise oversight" is enough to demonstrate a "lack of good faith." Those allegations are contained in the complaint.

Defendants erroneously claim that plaintiffs' <u>Caremark</u> allegations are insufficient, relying on <u>Guttman v. Huang</u>, 823 A. 2d 492 (Del. Ch. 2003). There, plaintiffs argued that demand was futile under <u>Caremark</u> in connection with a restatement of financial results. The court remarked that examples of a <u>Caremark</u> claim might include allegations that the company "lacked an audit committee," or that the audit committee "devoted patently inadequate time to its work," or that the audit committee "had clear notice of serious accounting irregularities and simply chose to ignore them" or "to encourage their continuation." 823 A. 2d at 506-07.

The court rejected plaintiff's <u>Caremark</u> argument because "from the complaint, it is impossible to tell anything about the financial compliance systems in place at [the company] during the Contested Period." <u>Id</u>. In contrast, here a great deal is alleged about the Company's "financial compliance systems" during relevant times.  Unlike in <u>Guttman</u>, plaintiffs are not merely pointing to a restatement and alleging that since financials are being restated, there must have been something wrong with the internal controls. Instead, plaintiffs allege with particularity that specific internal controls in several core accounting and financial reporting categories were in shambles throughout the relevant period, that such internal controls were the responsibility of

the board and its Audit Committee, and that the directors failed in their duties to be vigilant and effective overseers of the Company's financial reporting process. ¶¶77, 86-90.

Defendants seem to suggest that plaintiffs' <u>Caremark</u> claims are mere breach of the duty of care claims for which directors may be exculpated under 8 Del. Code § 102(b)(7). Section 102(b)(7) operates to extinguish liability of corporate directors found to have breached only the duty of care. Relying on <u>Guttman</u>, defendants argue that since plaintiffs allege at most a duty of care claim, there can be no "substantial likelihood of liability" under the facts alleged to support demand futility. Defendants are wrong. As discussed above, plaintiffs' claims are based on well-pled allegations of bad faith. Section 102(b)(7) therefore is inapplicable. <u>See</u> Section 102(b)(7) (personal liability shall remain "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law.")

### 2. Plaintiffs' Insider Trading Claims Support Demand Futility.

Plaintiffs' insider trading claims also support demand futility. <u>See</u> <u>Oxford</u>, 111 F.R.D. at 116 ("the entire course of action and inaction followed by the Defendants must be considered, including but not limited to the insider trading which accompanied the alleged nonfeasance.") Many cases hold that insider trading claims render directors interested for breach of the duty of loyalty. <u>In re General Instrument Corp .Sec Litig.</u>, 23 F. Supp. 2d 867, 874 (E.D. Ill. 1998); <u>Johnson v. Hui</u>, 752 F. Supp. 909, 913 (N.D. Cal. 1990) (same); <u>Strougo v. Carroll</u>, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,815 (Del. Ch. 1991) (same); <u>Dollens v. Zionts</u>, No. C 01 2826, 2002 U.S. Dist LEXIS 13511 (July 24, 2002)(same).

Here, plaintiffs allege that defendant Anderson, a member of the Audit Committee, sold shares of Sonus while in possession of inside information regarding the Company's terrible internal controls. Plaintiffs allege that Anderson <u>had not sold in two years</u>, and that his sales were timed over a limited period to obtain the benefit of the rise in the Company's share price in 2003

caused by statements that the Company would soon be achieving profitability, which were false. ¶¶52, 91-92. Soon after, the truth was revealed. These allegations are sufficiently particularized and render Anderson interested. Defendants' reliance on McCall is unavailing, as there the court rejected generalized allegations of trading over a two year period. 239 F.3d at 825-26.

Plaintiffs' allegations that the other directors did nothing to stop the insider trading of Anderson and the others are also probative of demand futility. In Oxford at 117-118, the court concluded that insider trading allegations are sufficient to disqualify directors who did not trade. According to the court, "participation in insider trading during the relevant period would create a reasonable doubt concerning the disinterestedness of any Director, and knowledge of or participation in the actions of a friend and colleague in doing so . . . would bear adversely on the independence or disinterestedness of most or all of the Directors." Here, it is a reasonable inference that all of the directors were aware of the trading and did nothing to prevent it, as four defendants sold substantial holdings for $2.2 million immediately following the false financial reporting for the second and third quarters of 2003.

### 3. Demand Is Excused Where The Board Participates In Misleading Shareholders.

Demand is also futile because the board was instrumental in a scheme to mislead the shareholders. For example, in Oxford, as an alternative basis for demand futility, plaintiffs alleged that the directors "knowingly or recklessly misrepresent[ed] Oxford's financial results to its shareholders and the public.'" Id. Analyzing such alleged misconduct under Aronson, the court held that demand is excused where the Company issues false financial statements:

> A portion of the Complaint arises out of allegations of misconduct in connection with the knowing or reckless issuance of materially false statements concerning financial results and operations of the company. Here, since the same persons who claim entitlement to pre-suit demand are the very same persons who acted, pre-suit

demand is ordinarily excused. Such knowledgeable or reckless conduct may be inferred from contrasting the actual facts with the public statements claimed to be misleading.

The <u>Aronson</u> case teaches violations of the law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment, and therefore protected from a demand futility allegation by the case law. 473 A.2d 805.

*Id.* at 117 [emphasis supplied].

<u>See also</u> <u>In re Cendant Derivative Litig.</u>, 189 F.R.D. 117, 127-130 (D.N.J. 1999) (complaint satisfies <u>Aronson</u> where plaintiffs pled "that each of the Director Defendants signed, approved, and published" false statements, ten directors engaged in insider trading, eight received "special compensation packages," and all were defendants in class action litigation.); <u>In re Storage Technology Sec. Litig.</u>, 804 F. Supp. 1368, 1375-1376 (D. Colo. 1992) (demand excused under Delaware law where directors, *inter alia*, "disseminated the misleading statements and participated in a conspiracy to conceal the true, adverse information" and "by concealing the true information and issuing misleading statements . . . caused Storage Technology to violate the securities laws and exposed the corporation to significant liability.")

Likewise, plaintiffs allege that each defendant participated in the issuance of false financial statements to shareholders, caused the Company to violate applicable accounting standards, and did so to profit by trading while in possession of material, non-public information concerning the true financial condition of the Company, or to maximize the value of their personal holdings of the Company's stock, or to maximize incentive-based compensation. ¶¶82-85, 98-101. Indeed, a majority of the Director Defendants signed the false and misleading 10-Ks for fiscal year 2001 and 2002. Several defendants are alleged to have profited by engaging in insider trading, as well as by receiving improper incentive based compensation. ¶¶91-92, 78-80. This goes far beyond mere "approval of Sonus' financials," as defendants suggest.

Indeed, defendant Ahmed, the Company's principal executive officer, not only made statements and signed SEC filings, but signed certifications under Sarbanes-Oxley attesting to the Company's financial results and the adequacy of its internal controls. These certifications were false, in violation of federal law. His potential exposure to civil fines or worse for violation of Sarbanes-Oxley, as well as disgorgement, renders him interested under the cases cited.

### 4.    This Board Cannot Act Impartially or Objectively.

The Delaware test for directorial independence "focuses on whether the directors, for any substantial reason, cannot act with only the best interests of the corporation in mind." In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 937-938 (Del. Ch. 2003). "That is, the Supreme Court cases ultimately focus on impartiality and objectivity." Oracle, 824 A.2d at 938. According to the court, to require a showing of "domination and control" by an interested party over other board members "would serve only to fetishize much-parroted language, at the cost of denuding the independence inquiry of its intellectual integrity." Id. at 937. In Oracle, the court found members of a special litigation committee could not show they were independent, not because they were "dominated" by other board members, but because they all had close ties to the same university.

Defendants argue that plaintiffs must show that the directors are "beholden" to an interested party. Instead, as in Oracle, this Court should focus on the extensive ties between Ferri, Anderson, Gruber, Ahmed and Severino to conclude that the directors lack independence. To focus on just one of the many relationships alleged in the complaint, Anderson and Ferri are venture capitalists who together invested in Sonus, and both point to Sonus as a portfolio company on their venture capital firms' websites. They have a reputation of investing together in dozens of companies – a reputation they would never jeopardize by suing a firm's management, or by suing each other for breach of fiduciary duty or insider trading. ¶111.

As further alleged in the complaint, the directors' public praise of each other demonstrates strong allegiances. According to Severino, Anderson "is strategic as well as operational and he brings an intensity of focus to the important challenges we all face in building a successful enterprise." ¶111. According to Gruber, the people at Ferri's venture capital firm "truly collaborate as partners with their portfolio companies." <u>Id</u>. According to Ferri, Ahmed has "made all the difference in the world" to Sonus. <u>Id</u>. With respect to Ahmed, Gruber stated that "50" companies in the Boston area "wanted Hassan." <u>Id</u>. Given the accumulation of these statements, together with business ties alleged, common sense dictates that no member of this board would have "impartiality and objectivity" in connection with a shareholder demand.

In any event, even under the analysis urged by defendants, the board has demonstrated that it is "beholden" to Ahmed, the central figure in the case. For example, notwithstanding the Company's publicly admitted accounting and reporting deficiencies, Ferri and Severino, as members of the Compensation Committee, granted Ahmed a stock option package valued at up to $14 million for fiscal year 2003. See ¶¶79-81. Even after the restatement, the other directors <u>elevated</u> Ahmed to chairman of the board. The same is true with respect to Gruber. Gruber is a co-founder of the Company and throughout the restated periods served as chairman of the board. For his part in the accounting scandal, Gruber was anointed "Chairman Emeritus," granted a stock option award worth up to $3 million for fiscal year 2003 by Ferri and Severino, and remains with the Company in business development. ¶69. It is apparent that the director defendants cannot act impartially with respect to Gruber either.

## <u>CONCLUSION</u>

For the foregoing reasons, the motion to dismiss should be denied. If it is granted in any respect, plaintiffs request leave to amend.

DATED: February 4, 2005

By:   /s/ John Martland

JOHN MARTLAND, BBO NO. 332980
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850

Liaison Counsel

ROBERT C. SCHUBERT, BBO NO. 562242
JUDEN JUSTICE REED
WILLEM F. JONCKHEER
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California  94111
Telephone: (415) 788-4220

Lead Counsel

GREGORY M. NESPOLE
WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP
270 Madison Avenue, 9th Floor
New York, New York 10016
Telephone (212) 545-4600

PAUL WARNER
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX  77027
Telephone: (713) 622-7271

LAW OFFICES OF BRUCE G. MURPHY
Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, Florida 32963
(772) 231-4202

Derivative Counsel