**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) )    Case No. 04-10359-DPW |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**
**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................. 1

I.  Plaintiffs Cannot Avoid The Collateral Estoppel Effect Of
    Judge van Gestel's Decision ........................................................................... 1

    A.  Plaintiffs Concede They Are In Privity With The Plaintiffs In The
        State Actions ............................................................................................ 2

    B.  Plaintiffs' Purported "New" Facts Do Not Create A New Issue ............. 3

II.  Demand Is Not Excused ................................................................................ 6

    A.  Plaintiffs Have Not Pleaded A <u>Caremark</u> Claim ................................... 6

    B.  Plaintiffs' Conclusory Insider Trading Allegations Do Not Excuse
        Demand ................................................................................................. 11

    C.  Plaintiffs Have Alleged No Facts Suggesting Board Involvement
        In Accounting Irregularities................................................................. 12

    D.  Plaintiffs Do Not Plead Lack Of Independence ................................... 13

CONCLUSION ....................................................................................................... 16

# TABLE OF AUTHORITIES

### Federal Cases

Amalgamated Bank v. Yost,
No. Civ.A.04-0972, 2005 WL 226117 (E.D. Pa. Jan. 31, 2005)...................................................6

In re Cendant Deriv. Litig.,
189 F.R.D. 117 (D.N.J. 1999).......................................................................................................13

Cramer v. Gen. Tel. & Elec. Corp.,
582 F.2d 259 (3d Cir. 1978) ...........................................................................................................2

DeCosta v. Viacom Int'l, Inc.,
981 F.2d 602 (1st Cir. 1992)...........................................................................................................5

Dollens v. Zionts,
No. 01 C02826, 2002 U.S. DIST. LEXIS 13511 (N.D. Ill. July 24, 2002)...............................11

In re Focus Enhancements, Inc. Sec. Litig.,
309 F. Supp. 2d 134 (D. Mass. 2001) ............................................................................................7

In re General Instrument Corp. Sec. Litig.,
23 F. Supp. 2d 867 (E.D. Ill. 1998) .............................................................................................11

Grossman v. Johnson,
674 F.2d 115 (1st Cir. 1982)...........................................................................................................5

Johnson v. Hui,
752 F. Supp. 909 (N.D. Cal. 1990) ..............................................................................................11

Landy v. D'Alessandro,
316 F. Supp. 2d 49 (D. Mass. 2004) ...............................................................................6, 11, 12

McCall v. Scott,
239 F.3d 808 (6th Cir. 2001) ....................................................................................................9, 10

Pignons S.A. de Mecanique v. Polaroid Corp.,
701 F.2d 1 (1st Cir. 1983)...............................................................................................................5

Mitzner v. Hastings,
No. C 04-3310 FMS, 2005 WL 88966 (N.D. Cal. Jan. 14, 2005).................................................7

Nat'l Wildlife Fed'n v. Gorsuch,
744 F.2d 963 (3d Cir. 1983) ...........................................................................................................2

In re Oxford Health Plans, Inc. Sec. Litig.,
187 F.R.D. 133 (S.D.N.Y. 1999) ...................................................................................................8

In re Oxford Health Plans, Inc. Sec. Litig.,
    192 F.R.D. 111 (S.D.N.Y. 2000) ...............................................................5, 8, 12

In re Peritus Software Servs., Inc. Sec. Litig.,
    52 F. Supp. 2d 211 (D. Mass. 1999) ..................................................................7

In re Sagent Tech., Inc., Deriv. Litig.,
    278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...........................................................11

Spector v. Sidhu,
    No. Civ.3:03-CV-0841-H, 2004 WL 350682 (N.D. Tex. Jan. 26, 2004) .................12


                                    State Cases

Beam v. Stewart,
    845 A.2d 1040 (Del. 2000) ...............................................................................14

In re Citigroup Inc. S'holders Litig.,
    No. 19827, 2003 WL 21384599 (Del. Ch. June 5, 2003) ....................................7

Guttman v. Huang,
    823 A.2d 492 (Del. Ch. 2003) ........................................................................6, 7

Natal v. City of New Bedford,
    No. 99-00396, 2001 WL 950893 (Mass. Super. Ct. Aug. 6, 2001) .......................5

Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,
    No. Civ.A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004).....................10

In re Oracle Corp. Deriv. Litig.,
    824 A.2d 917 (Del. Ch. 2003) ..............................................................13, 14, 15

In re Oracle Corp. Deriv. Litig,
    ___A.2d___, 2004 WL 3176478 (Del. Ch. 2004) ..............................................11

Rattner v. Bidzos,
    No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003).......................10, 11

Strougo v. Carroll,
    Civ. A. No. 8040, 1991 WL 9978 (Del. Ch. Jan. 29, 1991) ...............................11

                                  Federal Statutes

15 U.S.C. § 7241.........................................................................................................4

**ARGUMENT**

Pre-suit demand on the board of directors is a prerequisite to derivative litigation, and Judge van Gestel has already determined that such demand was not excused.  Hoping for "another bite at the apple," Plaintiffs claim their Complaint presents different facts than the ones already considered and rejected with prejudice.  Plaintiffs, however, overstate the "newness" of their purportedly "new" factual allegations, which, in any event, are legally insufficient to avoid the preclusive effect of Judge van Gestel's decision.    Even if this Court were to duplicate Judge van Gestel's efforts by re-evaluating from scratch the demand futility issue, the same conclusion follows: Plaintiffs have not shown any reason to wrest a fundamental corporate decision, i.e., the decision to commit the corporation to litigation, from Sonus' Board of Directors (5 of 7 of whom were outsiders at the time the original complaint was filed).

**I.      Plaintiffs Cannot Avoid The Collateral Estoppel Effect Of Judge van Gestel's Decision**

In their opening memorandum, Defendants demonstrated that Plaintiffs are legally estopped from relitigating the demand futility issue because Judge van Gestel has already decided this issue in the state court litigation brought by other Sonus shareholders on the Company's behalf. See Def. Mem. at  4-8.  Plaintiffs essentially concede that they are in privity with the plaintiffs in the State Actions, and argue only that they should not be estopped from relitigating demand futility because they claim to have alleged "new and more detailed facts."  Opp. at 7.  This attempt to avoid the collateral estoppel effect of the decision in the State Actions fails both because the purported "new" facts were explicitly or implicitly before Judge van Gestel when he made his decision, and because the First Circuit has firmly instructed that merely presenting more evidence to support a claim is not sufficient to avoid the collateral estoppel effect of a prior adverse ruling.

**A.      Plaintiffs Concede They Are In Privity With The Plaintiffs In The State Actions**

Plaintiffs do not dispute that they are in privity with the plaintiffs in the State Actions. <u>Compare</u> Def. Mem. at 7-8 (explaining that plaintiffs in the Federal and State Actions are in privity because they both sue on behalf of Sonus) <u>with</u> Opp. at 8-10 (acknowledging but not contesting the privity element).  As the Plaintiffs' own authority suggests, privity supports binding the Plaintiffs here with the findings in the State Actions.  <u>See</u> <u>Cramer v. Gen. Tel. & Elecs. Corp.</u>, 582 F.2d 259 (3d Cir. 1978).  In <u>Cramer</u>, the district court ruled that the plaintiff's claims under sections 13(a) and 14(a) of the Securities and Exchange Act were barred by res judicata due to the previous dismissal of those claims in a case brought by Limmer, another shareholder.  <u>See</u> <u>id</u>. at 262.   The Third Circuit affirmed the res judicata decision on the section 14(a) claim, because Limmer's 14(a) claim had been dismissed for failure to state a claim and "[a]lthough different shareholders brought the two actions, the actual plaintiff on whose behalf the claims were brought is the identical corporation."  <u>Id</u>. at 266-68.  In contrast, the Third Circuit reversed the res judicata ruling on the 13(a) claim because the claim had been voluntarily dismissed (without notice to other shareholders) thereby raising concerns about adequate representation.  <u>See</u> <u>id</u>. at 268-69.   Here, the State Action plaintiffs did not voluntarily dismiss those actions, but rather vigorously opposed dismissal.  Under the reasoning of <u>Cramer</u>, that dismissal precludes relitigation of demand futility.[1]

Plaintiffs' apparent concession that they stand in the same shoes as the plaintiffs in the State Actions undercuts their attempt to dismiss the First Circuit's decision in <u>In re Kaufmann</u> and

---

[1]      It bears noting that Plaintiffs were well aware of the State Actions and that defendants and the Court were looking to Judge van Gestel's decision on the motion to dismiss filed in those cases.  <u>See</u> Def. Mem. at 3-4.  To the extent Plaintiffs believed the plaintiffs in the State Actions were not adequately representing the Company's interests, they could have sought to intervene.  <u>See</u> <u>Nat'l Wildlife Fed'n v. Gorsuch</u>, 744 F.2d 963, 971-72 (3d Cir. 1983) (collateral estoppel properly invoked against plaintiffs who, though not parties to an earlier action, bypassed an opportunity to intervene in the earlier action).

other relevant authority as having "no bearing" on the collateral estoppel issue.  <u>See</u> Opp. at 9-10.  As Plaintiffs acknowledge, <u>In re Kaufmann</u>, <u>Bazata</u> and <u>Grable</u> prevent a plaintiff from re-litigating the demand futility issue.  <u>See</u> Opp. at 9-10.  As a matter of law, these Plaintiffs and the State Action plaintiffs are the same for the purposes of collateral estoppel.  Because the State Action plaintiffs may not relitigate demand futility, neither may the Plaintiffs here.

**B.      Plaintiffs' Purported "New" Facts Do Not Create A New Issue**

Because their shared legal identity with the State Action plaintiffs renders them bound by Judge van Gestel's decision, Plaintiffs seek to avoid the preclusive effect of that judgment by claiming that they have pleaded new or additional facts that make the demand futility issue here different than the issue litigated before Judge van Gestel.  <u>See</u> Opp. at 7-10.

Plaintiffs' claimed "new" facts, however, are not "new" at all.  For example, one of Plaintiffs' "new" facts is "the existence of a <u>formal</u> SEC probe into the Company's financial reporting."  Opp. at 7.   The State Action plaintiffs, however, already filed a supplemental brief notifying Judge van Gestel before his decision that the SEC's investigation had become "formal" and argued the effect of that change on the demand futility issue.  <u>See</u> Plaintiffs' Supplemental Memorandum of Law In Opposition To Defendants' Motion To Dismiss, <u>In re Sonus Networks, Inc. Deriv. Litig.</u>, 04-0753-BLS (Mass. Super. Ct. July 20, 2004) (attached as Exhibit A).  Next, Plaintiffs advance "the scope and extent of the restatement" as new.  Opp. at 7.  Again, however, the State Action plaintiffs have already attempted to mine this "fact" in their failed effort to avoid dismissal.  In the State Actions, the plaintiffs attached as an exhibit to their brief opposing dismissal a Form 8K filed by Sonus with the SEC on March 29, 2004 announcing that the Company expected to restate its financials results for the first three quarters of 2003 and the year 2002, that "existing financial statements for those periods should not be relied upon," and that the Company's review might expand into earlier periods.  <u>See</u> Plaintiffs' Joint Memorandum of

3

Law In Opposition To Defendants' Motion To Dismiss, Palma v. Ahmed, et al., 04-0753-BLS, at 1 (Mass. Super. Ct. Apr. 7, 2004) (attached as Exhibit B).[2]

The State Action plaintiffs also put the issue of deficient internal controls before Judge van Gestel. See Exhibit B at 13-14 (arguing that directors' alleged "utter abdication" of duty to implement internal controls excused demand).[3] Likewise, Plaintiffs' argument about losses suffered by the Company is not new. The losses identified by the Plaintiffs in paragraphs 101-09 of the Complaint (defending against securities class actions, increased insurance premiums, distraction and costs in cooperating with the SEC's investigation, reputational issues in the investment community, concerns over the ability to timely file periodic SEC reports, difficulty in raising funds) are the same types of losses identified by the plaintiffs in the State Actions. See State Complaint ¶¶ 66-67 (alleging costs to defend securities class actions, costs related to investigations, damage to reputation and goodwill in the investment community, inability to raise capital); Exhibit B at 1-2 (pointing out Company's disclosure about possible "de-listing of Sonus stock by NASDAQ"). Finally, with the announcement of Sonus' intent to restate its financials for several prior quarters, the Plaintiffs' last purportedly "new" fact, i.e., the accuracy of certifications under Sarbanes-Oxley necessarily became obvious.[4] Plainly, Plaintiffs are wrong

---

[2]    The State Action plaintiffs argued that the alleged "magnitude and duration of the scheme" demonstrated the futility of demand, so Judge van Gestel was able to consider the merits of (and reject) this argument. See Exhibit B at 14.

[3]    The details of the restatement, including the list of material weaknesses in internal controls, were made publicly available when the Company filed its Form 10-K/A on July 28, 2004, months before Judge van Gestel issued his decision. If the additional details made any material difference to the strength of the demand futility allegations, they would have been submitted to Judge van Gestel as was done when the SEC investigation became formal. As demonstrated below, those details have little bearing on the demand futility issue because they identify only the controls that were found to be deficient, and say nothing about the boards' knowledge of any deficiencies, or what the board did or did not do designing the Company's controls. See infra at 6-11.

[4]    Sarbanes-Oxley requires the principal executive officer to certify that "based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer." 15 U.S.C. § 7241. Sonus' announcement that it would restate its financials, while insufficient to show that such certification was false (because of the knowledge element), would necessarily raise speculation about Sarbanes-Oxley certifications.

that Judge van Gestel "could not and did not consider" these facts.  See Opp. at 7.  In short, there are no factual issues presented here that are "fundamentally different" than those decided by Judge van Gestel.[5]

More importantly, even if these facts were deemed "new," they are not sufficient to prevent the application of collateral estoppel.[6]   The First Circuit has made it clear that merely presenting more evidence to support a claim is not sufficient to avoid the collateral estoppel effect of a prior adverse ruling.  Specifically, in DeCosta v. Viacom Int'l, Inc., 981 F.2d 602 (1st Cir. 1992), the First Circuit considered whether different facts would prevent application of collateral estoppel, and reversed a jury verdict in plaintiff's favor because he should not have been allowed to relitigate the issue that had previously been decided against him.  In DeCosta, the plaintiff had sued for trademark infringement and lost, based on a finding that there had been no consumer confusion.  Years later, the plaintiff sued again and argued that he was not estopped from relitigating the confusion issue because the relevant facts had changed.  More specifically, he submitted significant additional evidence of confusion.  The First Circuit was unpersuaded:

> This evidence does not help DeCosta, however, because, in context, it seems designed to prove the same ultimate fact --"confusion"-- that he failed to prove before.  As the Restatement of Judgments points out, when a party has litigated such an "ultimate fact," and failed, "new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact."

---

[5]      The subsequent changes in Sonus' management structure and compensation decisions are irrelevant as a matter of law to the demand futility issues, which, as Plaintiffs' own authority recognizes, must be assessed at the time that the first derivative complaint was filed.  See In re Oxford Health Plans, Inc. Sec. Litig. 192 F.R.D. 111, 114 n.1 (S.D.N.Y. 2000) ("under Delaware law, demand futility must be 'gauged by the circumstances existing at the time of [the filing of the] derivative suit'. . . . The first derivative complaint was filed on December 22, 1997, thus limiting an analysis of demand futility to events occurring before that date."); see also Grossman v. Johnson, 674 F.2d 115, 123  (1st Cir. 1982) ("The futility of making the demand required by Rule 23.1 must be gauged at the time the derivative action is commenced, not afterward with the benefit of hindsight.").

[6]      Plaintiffs' reliance on the presence in their Complaint of a breach of contract claim and Sarbanes-Oxley claim ignores that  "the doctrine of collateral estoppel makes a determination of fact conclusive in a subsequent proceeding between the parties, whether on the same or a different claim."  Natal v. City of New Bedford, No. 99-00396, 2001 WL 950893, at *5 (Mass. Super. Ct. Aug. 6, 2001) (rejecting plaintiff's argument seeking to avoid collateral estoppell because "her federal civil rights claim in the District Court is a different cause of action from her state wrongful death claim" because such argument "misses the point").

DeCosta, 981 F.2d at 611; see also Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 2

(1st Cir. 1983) (holding that plaintiff could not avoid collateral estoppel by offering "new

theories, evidence, and arguments" because "[o]nce a plaintiff has had a chance to prove a fact,

he cannot reopen the matter simply by stating that he wishes to introduce more or better

evidence").

    Here, Plaintiffs merely purport to offer additional evidence in support of the same asserted

reasons for demand futility that were insufficient when litigated in the State Actions.  Under

DeCosta and Pignons, this so-called new evidence is irrelevant.   The "ultimate fact" of demand

futility is no different than the one decided by Judge van Gestel, and, accordingly, the Plaintiffs

are estopped from relitigating it now.

## II.    Demand Is Not Excused

### A.    Plaintiffs Have Not Pleaded A Caremark Claim

    Plaintiffs' assertion that their "Caremark allegations excuse demand" is incorrect for a

simple reason -- they do not plead the type of particularized facts needed to demonstrate demand

futility based on a Caremark claim.  Instead, they misconstrue the legal standard for a Caremark

claim and exaggerate the import of their sparse factual allegations.

    Plaintiffs misconstrue the legal standard by asserting that they need not plead that the

directors were on notice of internal controls issues.  See Opp. at 15 (arguing that defendants

cannot "deflect Caremark liability" by not having notice of internal controls deficiencies).

Caremark , however,  "premises liability on a showing that the directors were conscious of the

fact that they were not doing their jobs."  Landy v. D'Alessandro, 316 F. Supp. 2d 49, 74 (D.

Mass. 2004) (quoting Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003)).  Accordingly, as

courts have recognized in case after case arguing demand futility based on purported Caremark

violations, Plaintiffs must plead that the directors were aware of or recklessly disregarded purported internal controls deficiencies. See Amalgamated Bank v. Yost, No. Civ.A.04-0972, 2005 WL 226117, at *14 (E.D. Pa. Jan. 31, 2005) ("complaint fails to allege facts that show that defendants are disabled by their risk of liability for oversight" where "no specific allegations that suggest that ABC's directors should have known about the company's illegal conduct"); Mitzner v. Hastings, No. C 04-3310 FMS, 2005 WL 88966, at *6 (N.D. Cal. Jan. 14, 2005) (complaint failed to show that directors "face a substantial likelihood of liability under a *Caremark* claim theory" where "nothing alleged with particularity that reasonably raises the inference that the director defendants were aware of any possible manipulation of the financial results"); In re Citigroup Inc. S'holders Litig., No. 19827, 2003 WL 21384599, at *2 (Del. Ch. June 5, 2003) (demand not excused where no allegations "that the directors either knew or should have known that there were material inadequacies in the corporation's internal controls"). In other words, Plaintiffs must plead that the directors ignored "red flags" relating to the Company's financial controls. See Guttman, 823 A.2d at 507 (rejecting inadequately pled Caremark claim as basis to excuse demand).

Plaintiffs plead no such facts in their Complaint. Instead, they premise their Caremark claim entirely on Sonus' disclosure that in connection with the restatement it had identified material weaknesses in the Company's internal controls. See Opp. at 12-16. This disclosure, however, by its terms related to facts that were discovered during the Company's detailed review of its historical accounting, and without further well-pleaded factual allegations does not give rise to any inference that the directors were aware of such deficiencies at an earlier time. See In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 160 (D. Mass. 2001) ("clearly insufficient" for plaintiffs to allege "that because of the announced restatement, the defendants

must have known of the problems at the time they occurred"); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("after-the-fact accounting admissions . . . do not by themselves suffice to show that the misstatements occurred knowingly or recklessly).[7]

Plaintiffs' own authorities demonstrate the type of particularized factual allegations that are missing here but needed to show a substantial likelihood of liability for a Caremark violation. In Oxford, as is obvious from Plaintiff's Opposition, the plaintiffs pleaded defendants' "knowledge of the[] [adverse] facts" and "the reckless failure" of the defendants to supervise the affairs of the company. See Opp. at 13-14 (quoting In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111 (S.D.N.Y. 2000)). More specifically, the plaintiffs in Oxford pleaded detailed facts demonstrating that the defendants were aware of the nature and magnitude of the Oxford's computer problems and that its financial statements were based on inherently unreliable data, including that (i) the CEO/Chairman was told by the chief information officer that the planned computer conversion could not be done reliably; (ii) defendants received a report from an outside consultant hired to evaluate the failed computer conversion informing them that the computer system was deficient; (iii) defendants had access to a state insurance department report indicating that the company's internal controls and accounting practices were deficient; and (iv) defendants knew that the computer system could not age the premiums receivable or unpaid claims. See In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 139 (S.D.N.Y. 1999).[8] Here, in

---

[7]     Although these cases were decided in the context of the scienter inquiry in securities cases, the principle is exactly the same – earlier knowledge or recklessness cannot be inferred simply from a later disclosure of problems.

[8]     These allegations were contained in the securities fraud complaint filed against Oxford and its officers and directors. The opinion cited by Plaintiffs in the accompanying derivative litigation references and relies on those allegations. See Oxford, 192 F.R.D. at 114 ("Plaintiffs bring this lawsuit derivatively on behalf of nominal defendant Oxford, alleging that the Oxford Officers and Directors' conduct as set forth in the Oxford Securities Litigation amounted to a breach of the duty of care and loyalty, gross mismanagement and corporate waste;" "The Complaint, read in context with the Oxford Securities Litigation, states a claim for breach of fiduciary duty, gross mismanagement and waste. No purpose will be served in describing the claims pleaded in any greater detail at the time.").

contrast, Plaintiffs merely allege knowledge or recklessness, see Def. Mem. at 12 n. 18, without

pleading any facts in support of their conclusory assertions.

Similarly, in McCall, the plaintiffs pleaded "particularized facts . . . present[ing] a

substantial likelihood of director liability for intentional or reckless breach of the duty of care."

McCall v. Scott, 239 F.3d 808, 824 (6th Cir. 2001).  Among other things, the complaint in

McCall alleged that (i) the audit committee's earlier internal audits had uncovered specific facts

showing that improper practices were being employed throughout the company, such as

discrepancies between cost reports submitted to the government and secret reserve reports,

improper inclusion of money spent on physician recruitment, marketing, and advertisement with

claims for patient care reimbursement, improper shifting of costs from inpatient to outpatient

services to get higher reimbursement rates, and extra fees paid to referring physicians; (ii)

defendants were aware of a previously-filed Qui Tam action brought by a doctor under the False

Claims Act alleging that the company violated federal laws; and (iii) a nonpublic, two-year

nationwide federal investigation that resulted in federal agents executing a search warrant on the

company's office. See McCall, 239 F.3d at 819-24.

Even if one incorrectly reads out of Caremark any requirement for prior consciousness or

recklessness on the part of the director defendants (as the Plaintiffs do here), the Complaint still

does not allege sufficient facts of a "sustained or systematic failure of the board to exercise

oversight – such as an utter failure to attempt to assure a reasonable information and reporting

system exists."   Opp. at 12 (quoting Caremark).  The controlling consideration is the boards'

action or inaction, not merely the fact of internal control deficiencies.  Nowhere in the Complaint

do Plaintiffs allege facts showing what the board did or did not do in its "attempt to assure a

reasonable information and reporting system exist[ed]."  Plaintiffs do not describe what internal

controls were in place at the Company, what the Audit Committee did to review the Company's

financial statements, or how these procedures compared to a reasonable system of internal

controls. [9]  For example, Plaintiffs point to the disclosure of "insufficient contract review,"

Compl. ¶77, but do not allege what procedures were in place for contract review or what role the

board played in designing or approving those procedures. [10]  In the absence of these basic

allegations, Plaintiffs' claim of a "sustained or systematic failure of the board to exercise

oversight" amounts to mere conjecture. [11]  Indeed, all that is established by these few facts is that

the Company had an audit committee designed to oversee the Company's internal controls and

that those controls were later determined to be inadequate.  See Compl. ¶¶ 77, 86.  Under

Plaintiffs' own authority, such allegations are insufficient.  See McCall, 239 F.3d at 820 n. 11

("While the audit procedures failed to prevent the alleged fraud, the Board assured that

nationwide audits, internal and external, were undertaken with attention to areas that could have

legal ramifications for Columbia.  As a result, we agree with the district court that there is not a

---

[9]     Plaintiffs' attempt to distinguish Guttman, see Opp. at 15, fails because the focus in that case is on whether plaintiffs have alleged with particularity what steps the audit committee took to ensure reasonable controls were in place, not simply whether those controls were enough.

[10]    Such facts – whether good or bad – are likely to reside in Sonus' book and records reflecting what meetings were held by and presentations made to the Audit Committee about internal controls, the committee's involvement in the establishment and/or monitoring of such controls, and how the controls were structured and intended to operate.  But, in not even attempting to conduct a pre-suit investigation into any of these matters in order to plead particularized facts, Plaintiffs have ignored the "repeated admonitions of the Delaware Supreme Court … for derivative plaintiffs to proceed deliberately and use the books and records device to gather the materials necessary to prepare a solid complaint."  Guttman, 823 A.2d at 504.

[11]    Without such allegations, Plaintiffs not only fail to plead the "lack of good faith that is a necessary condition to liability" under Caremark, see Opp. at 12, but they even fail to plead gross negligence.  See Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *12-13 (Del. Ch. Oct. 7, 2003) (complaint did not "plead[] with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence" where "conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee").  Of course, Defendants cannot be personally liable for gross negligence due to the exculpation clause in the Company's charter, so such allegations would in any event be insufficient to excuse demand.  See Def. Mem. at 16-18; see also Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ.A. 20228-NC, 2004 WL 1949290, at *12 (Del. Ch. Aug. 24, 2004) ("it is important to highlight yet again that the standard moves beyond gross negligence.  To survive a motion to dismiss based on this standard, where the charter contains a § 102(b)(7) provision, a plaintiff must plead facts that, if true, would imply that a Board 'consciously and intentionally disregarded [its] responsibilities.'").

substantial likelihood of liability based upon a failure to assure that reasonable reporting systems existed.").

**B. Plaintiffs' Conclusory Insider Trading Allegations Do Not Excuse Demand**

One director, Mr. Anderson, is alleged to have made a small sale of his stock (13%; he retained 87%) during the relevant period.[12] Yet, the Complaint utterly fails to allege with particularity that Mr. Anderson had any knowledge of specific accounting or internal controls issues at the time he sold the stock. See Def. Mem. at 14-15. In response to this obvious deficiency, the Opposition conclusorily argues that Anderson "sold shares of Sonus while in possession of inside information regarding the Company's terrible internal controls," but still fails to cite any allegation of fact in the Complaint or identify what specific information allegedly formed the basis for the trade or when or how such knowledge was acquired. See Opp. at 16.[13] Consequently, the deficiency remains.

Likewise, other sales by non-director defendants do not render non-selling director defendants interested. Just last year, Judge Keeton rejected this very argument in a derivative

---

12 As Defendants pointed out in their opening brief, the stock sold was owned not by Mr. Anderson personally, but by a trust in which his children are beneficiaries. Def. Mem at 15 n. 24. Plaintiffs have not even alleged that Mr. Anderson was the trustee of that trust (which he was not), or any other facts showing he had any connection with the trust's investment decisions.

13 Plaintiffs' authority for the proposition that insider trading claims make directors interested is inapposite because, unlike here, those cases involved coordinated selling by a majority of the board. See In re Gen. Instrument Corp. Sec. Litig., 23 F. Supp. 2d 867, 874 (E.D. Ill. 1998) (complaint contained "specific allegations" supporting a conspiracy to profit from selling stock at inflated value and seven directors, making up a majority of the board, benefited from stock sales, 97% of which were during single week); Johnson v. Hui, 752 F. Supp. 909, 913 (N.D. Cal. 1990) (six of the eight defendant directors accused of profiting from insider trading); Strougo v. Carroll, Civ. A. No. 8040, 1991 WL 9978, at *4 (Del. Ch. Jan. 29, 1991) (eleven of the directors on Katy's fourteen member board allegedly engaged in insider trading within a matter of weeks); Dollens v. Zionts, No. 01 C02826, 2002 U.S. DIST LEXIS 13511, at *20-21 (N.D. Ill. July 24, 2002) (five of eight directors sold stock during a ten day period). Moreover, to the extent those authorities suggest that directors' sales render them interested regardless of particularized allegations of improper use of inside information, defendants respectfully suggest they are incorrect and contrary to the weight of authority. See Def. Mem. at 14 and cases cited; Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *10 (Del. Ch. Oct. 7, 2003); Landy v. D'Alessandro, 316 F. Supp. 2d 49, 73 (D. Mass. 2004); In re Sagent Tech., Inc., Deriv. Litig., 278 F. Supp. 2d 1079, 1088-89 (N.D. Cal. 2003); see also In re Oracle Corp. Deriv. Litig., --- A.2d ----, 2004 WL 3176478 (Del. Ch. 2004) (rejecting plaintiffs' argument that insider trading should be treated as self-dealing under Delaware law, and granting summary judgment on insider trading claims where "plaintiffs have failed to turn up evidence that supports a rational inference that [defendants] abused their positions of trust at Oracle by exploiting material, adverse financial information in order to sell their stock at artificially inflated prices. Absent such evidence, the plaintiffs have no triable claim").

case.  See Landy, 316 F. Supp. 2d at 73-75.  In Landy, as here, the plaintiffs alleged that

directors were interested because they failed to prevent trading by another defendant.  The court

held, however, that "[o]ne purchase by one director . . . does not create inappropriate interest on

the part of the entire board."  Landy, 316 F. Supp. 2d at 73; see also Spector v. Sidhu, No.

Civ.3:03-CV-0841-H, 2004 WL 350682, at *5 (N.D. Tex. Jan. 26, 2004) ("the mere allegation of

insider trading by one insider Director is not sufficient to excuse demand on the entire Board").

Even under Plaintiffs' own authority, they would need to plead that non-selling directors had

"knowledge of or participation in" another defendant's selling.  See Opp. at 27 (quoting Oxford,

192 F.R.D. at 117-18).  Conceding the absence of a specifically alleged particular fact in the

Complaint, the Plaintiffs here vainly assert "it is a reasonable inference that all of the directors

were aware of the trading and did nothing to prevent it." Opp. at 17.  Yet, there is not a single

fact alleged showing that any particular director defendant ever became aware of these trades,

when or how they may have become aware of any such trades, what non-public material

information the selling defendants purportedly possessed at the time of the trades, [14] or that the

director defendants had any knowledge that the trades were made based on such non-public

material information.

### C.    Plaintiffs Have Alleged No Facts Suggesting Board Involvement In Accounting Irregularities

The absence of facts demonstrating a substantial likelihood of liability for a majority of the

directors is fatal to the Plaintiffs' claim of demand futility based on purported director

misconduct.  See Def. Mem. at 11-13.  Mere empty conclusions about participation and

---

[14]    The three non-director defendants who are alleged to have sold stock (Messrs. O'Hara, Jones and Harris)
worked outside the finance department (marketing, engineering and manufacturing) and are not alleged to have had
any involvement with accounting or internal controls. See Compl. ¶ 22, 23, 25.  There is absolutely no pleaded basis
to infer that their sales were improperly based on inside information about accounting or controls issues, and the
directors cannot face a substantial risk of liability for failing to prevent such innocent sales.

knowledge of the sort on which the Complaint and Opposition rely are insufficient.  Plaintiffs'

own authorities, in fact, demonstrate plainly the type of particularized factual allegation needed

to show a substantial likelihood of liability but which are missing here.  In <u>Oxford</u>, the plaintiffs

pleaded detailed facts demonstrating that the defendants represented that the company's financial

statements complied with GAAP when they knew they were based on inherently unreliable data.

<u>See</u> <u>supra</u> at 8 (describing the factual allegations in <u>Oxford</u>).  Similarly, in <u>Cendant</u>, the plaintiffs

alleged, *inter alia*, that the audit committee was specifically informed that income was overstated

by in excess of $23 million and could not be reconciled, that the accounting irregularities were so

basic that they were discovered after one day of investigation, and that the officers and directors

were told that in excess of $100 million of income was non-recurring and that more than $200

million in adjustments were necessary in order meet budget.  <u>See</u> <u>In re Cendant Deriv. Litig.</u>, 189

F.R.D. 117, 124-25 (D.N.J. 1999).[15]  Plaintiffs' factual allegations in this case nowhere come

close to pleading this type of board responsibility for accounting irregularities that would raise a

substantial likelihood of liability and excuse demand.

### D.    Plaintiffs Do Not Plead Lack Of Independence

Personal and business relationships of the type alleged here do not show that any director

lacked independence.  <u>See</u> Def. Mem. at 18-20.  For a number of reasons, the <u>Oracle</u> case, which

the Opposition greatly overstates, does not suggest otherwise. <u>See</u> Opp. at 19-20.[16]

---

[15]    Moreover, all of the Cendant directors were defendants in class action litigation.  <u>See</u> Opp. at 18.  By contrast, here six of the seven Sonus directors face no risk of liability in the pending, parallel securities litigation because they are not even named as defendants.  Therefore, this super majority of directors would have been free to consider demand without fear that any facts possibly uncovered in litigation commenced by Sonus might somehow be used against them in such securities litigation.

[16]    As an initial matter, Plaintiffs do not dispute that a director's lack of independence only excuses demand where he lacks independence from an interested party.  <u>Compare</u> Def. Mem. at 18 <u>with</u> Opp. at 19-20.  Here, where none of the directors are interested (because none face a substantial risk of liability), the independence question is irrelevant.

First, Oracle did not involve the question presented here -- whether Plaintiffs have fulfilled their burden to plead particularized facts sufficient to overcome the presumption of director independence.  See In re Oracle Corp. Deriv. Litig., 824 A.2d 917 (Del. Ch. 2003).  Instead Oracle involved the independence of a special litigation committee after demand had already been deemed futile, a situation where the burden of showing independence rested with defendants, not on plaintiffs as it does here.  See id. at 937.  In its most recent decision interpreting the independence requirement in a purported demand futility case, the Delaware Supreme Court, in commenting on this lower court decision, went out of its way to stress (in a section of its opinion entitled "A Word About the Oracle Case") that "th[is] procedural distinction relating to the diametrically-opposed burdens" may be "outcome determinative on the issue of independence."  See Beam v. Stewart, 845 A.2d 1040, 1055 (Del. 2000).

Second, Plaintiffs incorrectly suggest that Oracle lowered their pleading burden by not requiring a showing that a director was "beholden" to another to lack independence.  See Opp. at 19.  Again, the Delaware Supreme Court's subsequent decision in Beam refutes any such assertion, as it reiterated previous case law holding that " [i]n order to show lack of independence" plaintiffs must show that a director is "so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'"  Beam, 845 A.2d at 1055.  Moreover, the court reiterated that "[a]llegations of . . . mere outside business relationship" are insufficient to show a lack of independence unless the complaint "states with particularity facts indicating that a relationship. . . is so close that the director's independence may *reasonably* be doubted." Id. at 1051.

Third, Oracle involved particularized facts showing pecuniary links between the members of the SLC and the director/defendants that are well beyond the routine business relationships

14

alleged by plaintiff here, such as: (i) one defendant had made a $50,000 donation to Stanford in appreciation for an SLC member giving a speech, half of which the SLC member received for his research; (ii) an SLC member was a steering committee member and senior fellow of a Stanford research institute to which a defendant had contributed almost a half-million dollars and was Chair of its Advisory Board, and to which another defendant had considered donating $170 million for a scholarship program; (iii) a defendant was Chairman of a foundation that had donated in excess of ten million dollars to Stanford; and (iv) another defendant was sole director of a foundation that had donated nearly ten million dollars to Stanford. See Oracle, 824 A.2d at 942-47.[17]  In contrast, the Complaint here merely asserts that two defendants have been described in one unidentified article as investing in some of the same start-up companies, and that certain defendants have said nice things about each other (or their venture capital companies). See Compl. ¶ 111. Plaintiffs cite no authority suggesting that these types of relationships overcome the presumption of director independence.

Finally, there is nothing in the Complaint demonstrating that a majority of the board members are so connected to, or more appropriately "beholden to," an interested party that the majority cannot act independently of that interested party. The fact that Mr. Ahmed was made Chairman of the board and awarded stock options[18] does not give rise to any inference that the board is beholden to him, and Plaintiffs do not cite any authority otherwise. Furthermore, it is utterly disingenuous for Plaintiffs to argue that the board is beholden to Mr. Gruber because they

---

[17]    In addition to these pecuniary relationships, one of the defendant/directors was fellow Stanford professor with SLC members and a defendant/director was former teacher of SLC member. See Oracle, 824 A.2d at 942-47.

[18]    Plaintiffs attempt to make Mr. Ahmed's stock option award seem excessive by arguing that the option would be worth up to $14 million. See Opp. at 20. Plaintiffs' Complaint and the SEC filing it relies on, however, makes clear that this hypothetical value is "based on a 10% rate of appreciation of Sonus stock" over the ten year term of the options. Compl. ¶ 79; 10K/A filed July 28, 2004 at 51 (attached as Exhibit C). Of course, this is pure speculation. In fact, if Sonus shareholders see the price of their stock increase 10% for each of the next ten years, defendants respectfully suggest that Mr. Ahmed will have earned every penny.

"anointed" him Chairman Emeritus, Opp. at 20, when they originally allege in the Complaint that Mr. Gruber was "demoted" to that position.  <u>See</u> Compl. ¶ 79.

## CONCLUSION

For the reasons set forth above and in their opening memorandum, the Defendants respectfully request that the Court dismiss the Complaint, in its entirety, with prejudice.

Respectfully submitted,

<u>/s/ Daniel H. Gold</u>
Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Daniel H. Gold (BBO #654909)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000
*Attorneys for Defendants Edward T. Anderson,*
*Paul J. Ferri, Albert A. Notini, Paul J. Severino*
*and Nominal Defendant Sonus Networks, Inc.*

<u>/s/ John R. Baraniak, Jr.</u>
Robert S. Frank, Jr. (BBO #177240)
John R. Baraniak, Jr. (BBO #552259)
Choate Hall & Stewart
Exchange Place Building
53 State Street
Boston, Massachusetts 02109
Tel:  (617) 248-5000
Fax:  (617) 248-4000
*Attorneys for Defendant Hassan M. Ahmed*

16

/s/ Matthew J. Matule
Thomas J. Dougherty (BBO #132300)
Matthew J. Matule (BBO #632075)
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts 02108
Tel:  (617) 573-4800
Fax: (617) 573-4822
*Attorneys for Defendant Stephen J. Nill*


/s/ John D. Hughes
John D. Hughes (BBO #243660)
Edwards & Angell LLP
101 Federal Street
Boston, Massachusetts 02110
Tel:  (617) 439-4444
Fax:  (617) 439-4170
*Attorneys for Defendants Paul R. Jones, Edward
N. Harris, J. Michael O'Hara and Rubin Gruber*


Dated:     February 25, 2005