# Exhibit B

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT                                          SUFFOLK, ss
DEPARTMENT                                 BUSINESS LITIGATION SESSION

---

STEVEN PALMA, Derivatively on Behalf of    )
SONUS NETWORKS, INC.,                       )
                                            )
                                            )    Civil Action No. 04-0753-BLS
                    Plaintiffs,             )
                                            )
        vs.                                 )    **DERIVATIVE ACTION**
                                            )
HASSAN M. AHMED, RUBIN GRUBER,              )    Judge Allan Van Gestel
EDWARD T. ANDERSON, PAUL J. FERRI,          )
ALBERT A. NOTINI, PAUL J. SEVERINO,         )
PAUL R. JONES, EDWARD N. HARRIS, J.         )
MICHAEL O'HARA and STEVEN J. NILL,          )
                                            )
                    Defendants,             )
                                            )
        -and-                               )
                                            )
SONUS NETWORK, INC., a Delaware             )
corporation,                                )
                                            )
                    Nominal Defendant.      )
                                            )
                                            )

---

### PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANTS' MOTION TO DISMISS

Dated:    Boston, Massachusetts,
          April 7, 2004

                                       SEGAL ROITMAN & COLEMAN
                                       Mary T. Sullivan, Esq. BBO#487130
                                       11 Beacon Street, Suite 500
                                       Boston, MA 02108
                                       Telephone: (617) 742-0208
                                       Facsimile: (617) 742-2187

FARUQI & FARUQI, LLP                   ROBBINS UMEDA & FINK
Nadeem Faruqi, Esq.                    Brian J. Robbins, Esq.
Shane Rowley, Esq.                     Jeffrey P. Fink, Esq.
David H. Leventhal, Esq.               1010 Second Ave., Suite 2360
320 East 39th Street                   San Diego, CA 92101
New York, NY 10016                     Telephone: (619) 525-3990
Telephone: (212) 983-9330              Facsimile: (619) 525-3991
Facsimile: (212) 983-9331

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. False Public Announcements of Revenue Growth
       Fueling the Company's First Profitable Quarter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C. Fraudulent Revenue Recognition Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. The Court Must Deny Defendants' Motion to Dismiss
       Pursuant to Rule 23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       1. Legal Standards Applicable to the Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . 6

       2. Applicable Legal Standards for Evaluating Demand Futility . . . . . . . . . . . . . . . . . 7

       3. Demand Is Excused Pursuant to Either *Rales*
          or the First Prong of *Aronson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       4. Demand Futility is Further Demonstrated by Defendants'
          Utter Abdication of Their Duties to the Company . . . . . . . . . . . . . . . . . . . . . . . . . 13

       5. The Exculpatory Provision in Sonus' Certificate of
          Incorporation Does Not Exempt Defendants From Liability . . . . . . . . . . . . . . . . . . 15

       6. The Complaint Properly States a Claim for Damages . . . . . . . . . . . . . . . . . . . . . . 17

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

**Cases**                                                                                              Page(s)

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ............................................... 7, 9, 10, 15

*Balsavich v. Local 170, Int'l Bhd. of Teamsters,*
    356 N.E.2d 1217 (1976) ...................................................... 6

*Bartlett v. New York, N. H. & H. R. Co.,*
    109 N.E. 452 (1915) ........................................................ 7

*Beneville v. York,*
    769 A.2d 80 (Del. Ch. 2000) ............................................... 10

*Brehm v. Eisner,*
    745 A.2d 244 (Del. 2000) ................................................. 7, 8

*Charbonnier v. Amico,*
    324 N.E.2d 895 (1975) ...................................................... 6

*Conley v. Gibson,*
    355 U.S. 41 (1957) ......................................................... 6

*Desert Equities v. Morgan Stanley Leveraged,*
    624 A.2d 1199 (Del. 1993) ................................................ 17

*Druker v. Roland Wm. Jutras Assocs., Inc.,*
    348 N.E.2d 763 (1976) ...................................................... 6

*Emerald Partners v. Berlin,*
    726 A.2d 1215 (Del. 1999) .............................................. 15-17

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) .................................................. 8

*Harbor Fin. Partners v. Huizenga,*
    751 A.2d 879 (Del. Ch. 1999) ............................................ 9, 11

*Harhen v. Brown,*
    730 N.E.2d 859 (2000) .................................................. 1, 6, 7

*Harris v. Carter,*
    582 A.2d 222 (Del. Ch. 1990) ............................................. 10

*In re Caremark Intern. Inc. Derivative Litig.,*
    698 A.2d 959 (Del. Ch. 1996) ........................................... 13, 16

*In re Cendant Corp. Derivative Litig.,*
    189 F.R.D. 117 (D.N.J. 1999) ............................................. 18

*In re Cooper Co., Inc.,*
    No. 12584, 2000 WL 1664167 (Del. Ch. Oct. 31, 2000) ....................... 11

*In re Lernout & Hauspie Sec. Litig.,*
    286 B.R. 33 (D. Mass 2002) ............................................... 12

*In re Limited, Inc.,*
    No. 17148–NC, 2002 WL 537592 (Del. Ch. Mar. 27, 2002) .................... 10

Page(s)

*In re New Valley Corp.*,
    No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ...................... 9, 11, 12

*In re Oxford Health Plans, Inc.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) ......................................... 14

*In re Polymedica Corp.*,
    No. 01-3446, 2002 WL 1809095 (Mass. July 16, 2002) ...................... 7

*In re Symbol Techs. Sec. Litigation*,
    762 F. Supp. 510 (E.D.N.Y. 1991) ...................................... 18

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
    No. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) ..................... 9, 12

*Iotex Communications, Inc. v. Defries*,
    No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998) ..................... 14

*Kahn v. Roberts*,
    No. 12324, 1994 WL 70118 (Del. Ch. Feb. 28, 1994) ...................... 17

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) .................................................... 7

*Kerbs v. Ca. E. Airways, Inc.*,
    90 A.2d 652 (Del. 1952) .............................................. 15

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) ............................................... 15

*McCall v. Scott*,
    239 F.3d 808 (6th Cir. 2001), *amended by*, 250 F.3d 997 (6th Cir. 2001) ........... 16

*Miller v. Schreyer*,
    200 A.D.2d 492 (1st Dep't 1994) .................................... 14, 15

*Mizel v. Connelly*,
    No. 16638, 1999 WL550396 (Del. Ch. July 22, 1999) ...................... 9

*Moran v. Household Int'l, Inc.*,
    500 A.2d 1346 (Del. 1985) ............................................ 15

*Nader v. Citron*,
    360 N.E.2d 870 (1977) ............................................... 6, 7

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) ............................................. 9

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ........................................... 8-11

*Sanders v. Wang*,
    No. 16640,1999 WL 1044880 (Del. Ch. Nov. 8, 1999) ..................... 17

*Solash v. Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988) ................................ 16

*Steiner v. Meyerson*,
    No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995) ................... 11, 15

Page(s)

**Statutes**

8 Del. C. §102(b)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

**Other Authorities**

*Ballotti & Finkelstein Del. Corps. & Bus. Orgs.,*
   (3d ed. Supp. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Dennis J. Block, Nancy E. Barton, Stephen A. Radin, *The Business Judgment Rule: Fiduciary
Duties of Corporate Directors,*
   (5th ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# I. **INTRODUCTION**

After the close of the market on January 20, 2004, defendants[1] surprised the investing public by postponing the announcement of Sonus Networks, Inc.'s ("Sonus" or the "Company") fourth quarter 2003 and year end financial results. ¶3.[2] They then further shocked the market on February 11, 2004, when they revealed for the first time that the Company had identified improper revenue recognition practices which would force the restatement of its 2003 financial statements and possibly other periods as well. ¶4.[3] These startling revelations caused the price of Sonus stock to plummet, erasing half of the Company's market capitalization and leading to a downgrade by every analyst that covered Sonus stock. ¶¶5-7. Even during the pendency of this action, Defendants continued to stun the market by announcing that the improper revenue recognition practices were so pervasive that in addition to restating financial results for the first three quarters of 2003, Sonus would be forced to restate all of 2002 and that an investigation of revenue practices was ongoing for previous years. *See* Sonus Form 8-K, filed March 29, 2004, attached hereto as Exhibit A.[4] Defendants recognized

---

[1] The individual defendants are Hassan M. Ahmed, Rubin Gruber, Edward T. Anderson, Paul J. Ferri ("Ferri"), Albert A. Notini ("Notini"), Paul J. Severino ("Severino"), Paul R. Jones ("Jones"), Edward N. Harris ("Harris"), J. Michael O'Hara ("O'Hara"), and Steven J. Nill ("Nill"). Except where specifically noted, these individuals will be collectively referred to herein as "Defendants."

[2] All paragraph ("¶__" or "¶¶__") references are to the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets and Unjust Enrichment in *Palma v. Ahmed, et al.* (the "Complaint") unless otherwise stated.

[3] A parallel action titled *Tillman v. Ahmed, et al.*, 04-0754 BLS, was filed on February 20, 2004. Plaintiffs are concurrently moving to have the two actions consolidated. Plaintiffs Tillman and Palma ("Plaintiffs") are jointly filing this opposition to Defendants' motion to dismiss both actions.

[4] Defendants have disputed the number of directors alleged in the Complaint. Under Massachusetts law, the Court may only consider matters outside the complaint to the extent that they are publicly filed and are referenced in the Complaint. *Harhen v. Brown*, 730 N.E.2d 859, 862-63 (2000). The Form 3 for which Defendants seek judicial notice is never referenced in the Complaint, nor an integral part of Plaintiffs' claims and should not be considered by the Court. If the Court considers the Form 3 Plaintiffs ask that the Court also take judicial notice of Sonus' Form 8-K filed March 29, 2004, a true and correct copy of which is attached hereto as Exhibit A. Furthermore, to
(continued...)

1

the severe repercussions these announcements would have on the Company, acknowledging that they could lead to the de-listing of Sonus stock by NASDAQ. *Id.* These revelations have also destroyed over half of the Company's market capitalization – well over one billion dollars. ¶6.

This derivative action was brought on behalf of nominal defendant Sonus against certain officers and directors of the Company to recover the substantial damages caused by this long standing and pervasive scheme to inflate revenues through improper revenue recognition. The Complaint details each director defendants' interests and wrongdoing, rendering them unable or unwilling to bring an action against themselves, including insider selling, interlocking directorates, domination and complete abdication of their obligation to oversee the Company's financial reporting. ¶¶15-24, 60-67.

Confronted by a well-pled, comprehensive Complaint, Defendants' request for dismissal is premised on ignoring their own actions - including manipulating or turning a blind eye to Sonus' fraudulent revenue recognition practices for years, disseminating misleading and inaccurate information about the Company to the public while selling over $2 million dollars worth of their own Company stock, and failing to enforce or put in place internal controls to assure accurate financial reporting. *Id.* A plain reading of the Complaint as a whole reveals that any demand on the board to sue themselves would have been a futile act and as such excused under governing law. Accordingly, Defendants' Motion to Dismiss should be denied in its entirety.

---

[4](...continued)
the extent the Court considers matters outside the Complaint, plaintiffs seek leave to amend to allege futility of demand with regard to H. Brian Thompson as a defendant, who apparently was appointed by the director defendants without shareholder approval in late October 2003, shortly before the announcement of the false revenue recognition practices.

## II.  **STATEMENT OF FACTS**

### A.    **The Parties**

The Complaint names an overwhelming majority – six out of seven – of the members of the Board of Directors as defendants, including: Ahmed, President and Chief Executive Officer ¶15; Gruber, founder and Chairman of the Board ¶16; Anderson, director and member of the Board's Audit Committee designed, *inter alia*, to monitor revenue recognition practices ¶17; Ferri, director and member of the Audit Committee ¶18; Notini, director ¶19; and Severino, director and member of the Audit Committee.  ¶20.

Contrary to Defendants' arguments, however, the Complaint does not merely assert blanket claims of interest on behalf of each director to establish demand futility, but rather provides copious detail with regard to each of the director defendants.  These detailed facts are not mere innuendo as the Defendants would have the Court believe, rather they are a portrait of a Board of Directors where each of the directors share close business and personal ties along with personal interests in the transactions. These business and personal relationships make each of the director defendants unable to impartially evaluate any demand that could possibly be submitted, rendering demand a futile act in this action.

As more fully discussed below, Ferri and Anderson are managing partners of Matrix Partners and North Bridge Partners, respectively, venture capital firms that made what proved to be highly profitable investments in Sonus and were appointed to the board to oversee their firms' investment. ¶¶17, 19. Curiously, these personally interested venture-capitalist bankers were selected to comprise a majority of the Audit Committee. Moreover, Ferri shared an interlocking directorship with Ahmed on the Winphoria Networks' board – another telecommunications start up funded by Matrix and North Bridge.  ¶¶17, 19.  Moreover, while the trading price of Sonus stock was artificially inflated by the revenue recognition practices that Anderson, as an Audit Committee member was charged with monitoring, Anderson sold $448,918.34 worth of his own personal Sonus stock holdings.  ¶17.

3

Similarly unable to evaluate any demand in a disinterested fashion are Ahmed and Gruber, both inside directors who are longstanding business associates sharing common investments who received and were reliant upon the significant compensation they received as Company executives, compensation that was determined by their fellow director defendants on the Compensation Committee. ¶¶15, 16. As noted above Ahmed further shares an interlocking directorate with Ferri, as well as Severino at PhotonEx Corp. ¶15. In a further curious relationship, defendant Notini is a former senior partner at Hale & Dorr, LLP, the law firm retained to conduct the very investigation into Sonus' revenue recognition practices, and a leading firm in the region for venture capital transactions. ¶18. Moreover, in a further twist, Hale & Dorr, LLP, is also representing the director defendants in this litigation.

The Complaint further names as defendants Sonus Vice Presidents Jones , ¶23; Harris, ¶21; and O'Hara, who each sold substantial personal holding of Sonus stock during the Relevant Period, as well as Chief Financial Officer Nill. ¶24.

**B.      False Public Announcements of Revenue Growth**
       <u>**Fueling the Company's First Profitable Quarter**</u>

Sonus manufactures switches and software that enable voice services to be delivered over packet based networks designed for the transmission of data. ¶2. Throughout the Relevant Period[5] Defendants issued a stream of false positive public announcements proclaiming the success of their products and business model. On April 9, 2003, Defendants issued a press release announcing first quarter 2003 financial results, prepared "in accordance with U.S. Generally Accepted Accounting Principals ("GAAP")", heralding 27% growth in revenues and a narrowing of the Company's net loss to just $0.02. ¶35. In that release, defendant Ahmed boasted "We grew our revenues 27 percent over the last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1 we also continued to add new customers around the globe and made

---

[5] For the purposes of the Complaint, the Relevant Period was defined as April 9, 2003 through February 11, 2004. ¶1.

4

important additions to our product family." ¶35. Using this growth, Sonus announced the sale of 20 million additional shares of Company stock on April 22, 2003. ¶36.

On July 10, 2003, Defendants reported second quarter 2003 financial results again heralding dramatically increased revenues and a reduction of the net loss to just $0.01 per share. ¶38. Based on these results, defendant Ahmed boasted that "we are definitely driving toward profitability as fast as we can." ¶39. On the heels of these false financial statements and deceptive good news, Defendants Harris and O'Hara together sold 85,000 shares of their personal Sonus stock holdings at inflated prices, receiving over $500,000 in proceeds. ¶¶41-42.

On October 8, 2003, Defendants proclaimed the Company's first purported profit, announcing revenue growth of "285% Over Previous Year," as well as the Company's first quarterly profit of $1,209,000. ¶43. In an interview with , *Bloomberg*, Ahmed boasted that the Company was able to "consistently grow our top line, our revenues...." claiming that this combined with "managing our expenses very carefully and all that's led to a profit." ¶44. Ahmed further announced that the Company would "continu[e] to grow the top line in our company and, obviously as a result of that, grow the bottom line." *Id*. Consequently, Ahmed forecast continued profits and quarterly growth of 10 to 15 percent. *Id*. While the market was flooded with this false positive news, Defendants Johnson, Anderson and O'Hara sold over 179,000 shares of their own Sonus stock holdings for proceeds of nearly $1.5 million. ¶¶45-47.

## C.    <u>Fraudulent Revenue Recognition Practices</u>

In fact, however, the Company's steady increase in revenues and reduction in operating loss – and ultimate profit – were not the product of precise management, new customers or innovative products as proclaimed throughout the Relevant Period, but instead were the direct result of Defendants' long standing mismanagement and systemic failure to control or uncover the fraudulent revenue recognition practices ongoing at the Company. Thus, less than two months after Defendants announced the Company's first purported profit and insiders unloaded $1.5 million in their personal stock, Defendants surprised the market on January 20, 2004 by postponing the announcement of

5

Sonus' fourth quarter and year end financial results, without explanation, pending the completion of the year end audit. ¶26. They then further shocked the market on February 11, 2004, when they revealed for the first time that the Company had identified improper revenue recognition practices which would force the restatement of its 2003 financial statements and possibly other periods as well. ¶28.   In a transparent attempt to avoid blame, Defendants fired several non-executive employees of the Company, blaming them for the practices. *Id.* Analysts, however, were not convinced, with one noting that it "sounds a lot like scapegoating." ¶33.

These startling revelations caused the price of Sonus stock to plummet, erasing over $1 billion of the Company's market capitalization. ¶¶27, 29, 30. Immediately on the heels of this announcement, Sonus stock was downgraded or suspended from coverage by every analyst that followed the Company. ¶32.

## III.  ARGUMENT

**A.    The Court Must Deny Defendants' Motion to Dismiss Pursuant to Rule 23.1**

### 1.    Legal Standards Applicable to the Motion to Dismiss

In derivative actions, as in all other case, on a motion to dismiss the "court accepts as true allegations of complaint." *Harhen*, 730 N.E.2d at 862 (2000) (citing *Nader v. Citron*, 360 N.E.2d 870, 872 (1977)). It is also well settled that "the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs' favor, are to be taken as true." *Nader,* 360 N.E.2d at 872 (citing *Balsavich v. Local 170, Int'l Bhd. of Teamsters*, 356 N.E.2d 1217 (1976); *Druker v. Roland Wm. Jutras Assocs., Inc.*, 348 N.E.2d 763, 765 (1976); *Charbonnier v. Amico*, 324 N.E.2d 895, 899 (1975)). The Massachusetts Supreme Court in *Nader* further expressly adopted the standard for evaluating the validity of claims enunciated by the United States Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), holding that:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim ***unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.***

6

*Nader*, 360 N.E.2d at 872 (emphasis added). Moreover, for purposes of a motion to dismiss, the Court may only consider documents outside the complaint only if they are referred to in the plaintiffs' complaint without converting the motion to dismiss into a motion for summary judgment. *Harhen*, 730 N.E.2d at 862.[6]

### 2. Applicable Legal Standards For Evaluating Demand Futility

Sonus is incorporated in Delaware, and therefore Delaware law governs the Court's demand futility analysis. *See, e.g., Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991); *Bartlett v. New York, N. H. & H. R. Co.*, 109 N.E. 452, 456 (1915) ("It is not a technical rule of pleading, but one of substantive right."); *In re Polymedica Corp.*, No. 01-3446, 2002 WL 1809095 (Mass. July 16, 2002).

Under Delaware law, the Court:

> [M]ust decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Hence, the Court ... must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof. As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint. As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board.

*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled in part on other grounds sub nom.*, *Brehm v. Eisner*, 745 A.2d 244 (Del. 2000).

_____

[6] As discussed earlier Plaintiffs did not name H. Brian Thompson as a defendant. Apparently Thompson was only appointed by the director defendants (and without shareholder approval) in late October 2003, shortly before the announcement of the improper revenue recognition practices. Defendants have disputed his exclusion and therefore the Board's composition and while Plaintiffs assert that the Court may only consider matters outside the Complaint to the extent that they are publicly filed and referenced in the Complaint, should the Court consider the Form 3 as requested by Defendants, Plaintiffs seek leave to amend the Complaint to allege demand futility with regard to Thompson.

Under the "reasonable doubt" standard, contrary to Defendants' arguments, plaintiffs are not obliged to prove at the pleading stage that the directors were interested or the transaction was not shielded by the business judgment rule. Instead, plaintiffs must allege, with particularity, facts that would give a reasonable shareholder reason to doubt the ability of the Board to consider disinterestedly a demand. *Id. Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (endorsing reasonable doubt standard); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled in part on other grounds sub nom., Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

This reasonable doubt standard promotes a strong public policy, since "the derivative suit ... [is a] potent tool[ ] to redress the conduct of a torpid and unfaithful management." *Rales*, 634 A.2d at 933. It is further particularly appropriate in derivative suits, because plaintiffs typically has not had the benefit of discovery. *Id.* at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery"). The reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here,] the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes,* 673 A.2d at 1217. Thus, plaintiffs' burden here is not to prove wrongdoing or demonstrate that they are likely to win on the merits; rather, plaintiffs' burden at the pleading stage is only to allege particularized facts which, if true, would give a reasonable shareholder reason to doubt the ability of the Board to consider a demand. Plaintiffs amply meet that burden.

Where the Complaint does not challenge a specific action of the Board, but rather the Board's failure to properly monitor and implement appropriate controls, Delaware courts have collapsed the test into a single prong. Under those circumstances:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales*, 634 A.2d at 935.

With regard to either the *Rales* test or the first prong of the *Aronson* test:

[A] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.

*Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Such "extraneous considerations or influences" may include, *inter alia*: (i) a director's position as an employee of the corporation;[7] (ii) "current or past business, personal, and employment relationships with each other and the entities involved";[8] (iii) "a clear pattern of mutual advantage" between the directors;[9] or (iv) where the director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[10] Moreover, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, in combination the totality of plaintiffs' allegations may be sufficient to do so. *Int'l Equity*, 1997 WL 208955, at *5 ("In combination, however, I find the plaintiff has alleged particular facts that support a reasonable doubt as to [defendant]'s independence.")

---

[7] *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"). *See also Mizel v. Connelly,* No. 16638, 1999 WL 550396 at *3 (Del. Ch. July 22, 1999) ("Since [the employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").

[8] *In re New Valley Corp.*, No. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001).

[9] *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997). *See also Harbor Fin. Partners v. Huizenga,* 751 A.2d 879, 889 (Del. Ch. 1999) (a "long-standing pattern of mutually advantageous business relations" between directors raises a reasonable doubt regarding independence).

[10] *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin*, 480 A.2d at 624).

In sum, a Board member is considered "independent" where he or she can base decisions "on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. What "extraneous considerations" are sufficient to make a director not independent depends on the facts of the case. As stated in *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990):

> In making the required judgment [concerning a director's independence,] no single factor – such as receipt of directorial compensation; family or social relationships; approval of the transaction attacked; or other relationships with the corporation (*e.g.*, attorney or banker) – may itself be dispositive in any particular case. Rather, the question is whether the accumulation of all factors creates the ***reasonable doubt*** to which *Aronson* refers.

*Id*. at 229 (emphasis added).

### 3.    Demand Is Excused Pursuant to Either *Rales* or the First Prong of *Aronson*

As discussed above, demand is excused if the plaintiffs raise a reasonable doubt regarding the directors' disinterestedness or independence. *Rales*, 634 A.2d at 936; *Aronson*, 473 A.2d at 814. Where, as here, the corporation's Board consists of an even number of directors, demand is excused if the plaintiffs plead facts sufficient to raise a reasonable doubt regarding the disinterestedness or independence of a majority of the Sonus Board. *Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000). Consequently, for demand to be excused, plaintiffs need only raise a reasonable doubt regarding the disinterestedness or independence of three of Sonus' six directors. *Id*. Plaintiffs easily do so with respect to Ahmed, Gruber, Anderson, Ferri, Notini and Severino, and therefore demand is excused.

### a.    As Inside Directors, There Is a Reasonable Doubt Regarding the Independence of Ahmed and Gruber

Defendants have tacitly admitted that as inside directors, Ahmed and Gruber are sufficiently interested in the subject matter of this litigation to defeat their independence. Delaware courts have likewise recognized the lack of independence of inside directors. *See In re Limited, Inc.*, No. 17148–NC, 2002 WL 537592, at *5 (Del. Ch. Mar. 27, 2002):

10

Gilman has served as a director since 1990. Since 1997, his principal employment has been as vice chairman and chief administrative officer of The Limited for which, during the years 1996-1998, he averaged $1.8 million in salary and bonuses. It is reasonable to infer that compensation of this magnitude is material to him. Moreover, as a general matter, compensation from one's principal employment is 'typically of great consequence' to the employee. Because of Mr. Wexner's holdings of The Limited and his position, as chairman, chief executive officer, and director, these allegations of particularized facts raise a reasonable doubt as to Gilman's independence from Mr. Wexner's will.    Sherman is the President and Chief Executive Officer of Danaher. His salary is approximately $1 million per year. Although Sherman's continued employment and substantial remuneration may not hinge solely on his relationship with the Rales brothers, there is little doubt that Steven Rales' position as Chairman of the Board of Danaher and Mitchell Rales' position as Chairman of its Executive Committee place them in a position to exert considerable influence over Sherman. In light of these circumstances, there is a reasonable doubt that Sherman can be expected to act independently considering his substantial financial stake in maintaining his current offices.[11]

*Rales*, 634 A.2d at 937.

Moreover, Ahmed and Gruber have longstanding business ties, sharing common investments in other telecommunications startups. ¶¶15, 16. Further, Ahmed also served as director on Winphoria along with Ferri, in which both Anderson and Ferri's venture capital firms had substantial investments. ¶15. Such long standing business ties, at a minimum, buttress the appearance of a lack of independence. Under Delaware law, facts concerning "current or past business, personal, and employment relationships with each other and the entities involved," *New Valley*, 2001 WL 50212, at *7, or a "long-standing pattern of mutually advantageous business relations" between directors are sufficient to raise a reasonable doubt regarding independence. *Harbor Fin. Partners*, 751 A.2d at 889. Even if "the actual extent of these relationships is not altogether clear" at the pleading stage, "the existence of these interests and relationships is enough to defeat a motion to dismiss." *New Valley*, 2001 WL 50212, at *8.

---

[11] *See also In re Cooper Co., Inc.*, No. 12584, 2000 WL 1664167, at *7 (Del. Ch. Oct. 31, 2000) ("it is reasonable to infer from the fact that Gary Singer was Messrs. Weiss's and Holcombe's corporate superior, that he (Gary) was in a position to exercise 'considerable influence' over them"); *Steiner v. Meyerson*, No. 13139, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [Chairman and Chief Executive Officer] Meyerson's interest in the transactions that plaintiff attacks.").

11

### b.    There Is a Reasonable Doubt Regarding Ferri, Anderson and Severino's Independence

As noted above, both Anderson and Ferri served on the Sonus Board to represent the interests of their respective venture capital firms. ¶17, 19. Moreover, both Anderson's Matrix partners and Ferri's North Border partners invested venture capital not only in Sonus, but also in Winphoria, where Ferri and Ahmed both served as directors. ¶¶15, 17, 19. Further, during the Relevant Period, Anderson sold nearly a half a million dollars of his personal holdings of Sonus stock during the period that the Company's results were overstated. ¶17. Likewise, Ahmed and Severino were both directors of PhotonEx Corp. ¶20. Jointly these three director defendants constituted the entire Audit Committee – the very entity charged with monitoring and enforcing the Company's internal policies and controls to see that all reported financial results were accurately stated and in compliance with GAAP. ¶63(d). As members of the Audit Committee they "had a duty to oversee the auditors, that is to guard the guardians." *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 38 (D. Mass 2002). Moreover, Severino and Ferri constituted a majority of the compensation committee responsible for establishing the compensation levels, *inter alia*, of Ahmed, with whom they shared interlocking directorships.

Defendants ask the Court to evaluate Anderson's one time sale of Sonus stock in isolation from the remainder of the Complaint. These facts, however cannot be read in isolation, but must be examined in light of the entire Complaint. *Int'l Equity*, 1997 WL 208955. When examined in their totality, the facts alleged here – interlocking directorship, common investments, insider sales, abdication of their responsibilities on the Audit Committee, and their connections with Ahmed – there can be little doubt that Anderson and Ferri lack the independence to evaluate a claim against themselves and their fellow business associates. *New Valley*, 2001 WL 50212, at *8 ("the existence of these interests and relationships is enough to defeat a motion to dismiss").

12

**4.    Demand Futility is Further Demonstrated by Defendants'
       Utter Abdication of Their Duties to the Company**

In his landmark decision *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 970

(Del. Ch. 1996), Chancellor Allen analyzed the responsibilities that directors owe to the corporation

by relying, in part, on the fact that "in recent years the Delaware Supreme Court has made ... clear

... the seriousness with which the corporation law views the role of the corporate board." *Id.* at 970.

The Chancellor then noted "the elementary fact that relevant and timely ***information*** is an essential

predicate for satisfaction of the board's supervisory and monitoring role...." *Id.* (emphasis in

original.)

> To properly exercise those roles, Chancellor Allen found that corporate boards could not:

> [S]atisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and *reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.*

> *    *    *

>       Thus, I am of the view that a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that *failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.*

*Id.* (emphasis added) (footnote omitted)

The Defendants fall far short of the *Caremark* standard in their conduct relating to Sonus'

revenue recognition practices. Even though Sonus' Board had established an Audit Committee

whose mandated responsibilities purportedly included a review of the Company's internal controls

and financial reporting – including such matters as proper revenue recognition, that committee was

nothing more than a pretext or sham behind which the entire Board hid for years while the Company

continued to recognize revenue in direct violation of GAAP.  ¶¶49-59, 63(d).

Any demand from Defendants for detailed evidentiary pleading showing each Defendants'

individual knowledge is equally unavailing. For, even in an action where the breach of fiduciary

13

duty claim "has at its core the charge that the defendant knew something," a plaintiff need only allege "sufficient well-pleaded facts from which it can be reasonably inferred that this 'something' was *knowable* and that the *defendant was in a position to know it.*" *Iotex Communications, Inc. v. Defries*, No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) (emphasis added). In this case, plaintiffs easily satisfy the *Iotex* standard by alleging the scope and extent of the revenue recognition practices that have left Sonus financially devastated and on the verge of de-listing. Certainly, the Company's problems were "*knowable*" and the Board was "*in a position to know*" them.

Significantly, where, as here, plaintiffs allege that the Defendants' failure to supervise and monitor involved a scheme of "significant magnitude and duration," it means that "demand futility is ordinarily found." *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000). The court there, in finding demand excused, concluded:

> [T]hat the Complaint has made a compelling case in support of the contention of Plaintiffs that *it would have been futile to require Plaintiffs to issue a demand* to the Director Defendants requesting them to take action against themselves *and certain senior Oxford executives for their* intentional or reckless conduct as alleged. *Not only would this require them to investigate and bring clams [sic] against themselves for their own misconduct, and the totality of their actions to date suggest most strongly that they will not take action....*

> In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, *demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors.*

*Id.* at 116, 117 (emphasis added) (citations omitted). *See also Miller v. Schreyer*, 200 A.D.2d 492, 494 (1st Dep't 1994) (decided under Delaware law, that "gross negligence was adequately pleaded in view of the magnitude and duration of the scheme which went undiscovered by the defendant directors.").

Here, the "magnitude and duration of the scheme" – continuing for an untold number of years and involving millions of dollars of improperly recognized revenue – demonstrate Defendants' recklessness and callous disregard of the red flags presented in light of restatements and revenue recognition issues throughout the industry.

14

5. **The Exculpatory Provision in Sonus' Certificate of**
   **Incorporation Does Not Exempt Defendants From Liability**

Under certain circumstances 8 Del. C. §102(b)(7) may shield directors from liability for

breaches of their duty of care. However, the breaches of duty alleged in the Complaint premised,

in part, on the Defendants' inexcusable pattern of inattention, failure to act with good faith, and

knowing or reckless abdication of their supervisory responsibilities with regard to the Company's

revenue recognition practices, are not immunized by 8 Del. C. §102(b)(7) or Sonus' Certificate of

Incorporation. Delaware law does not exempt directors from liability "for acts or omissions not in

good faith or which involve intentional misconduct or knowing violations of law...." Del. C.

§102(b)(7) (2002). *Emerald Partners v. Berlin*, 726 A.2d 1215, 1227 (Del. 1999) ("Section

102(b)(7) protections do not apply to violations of the fiduciary duties of good faith or loyalty.").[12]

It is well established that fraudulent and illegal acts cannot be the product of valid business judgment

by a board of directors. *See* Dennis J. Block, Nancy E. Barton, Stephen A. Radin, *The Business

Judgment Rule: Fiduciary Duties of Corporate Directors*, at 90 (5th ed. 1998) ("The business

judgement rule does not protect decisions by directors that constitute fraud, illegality or *ultra vires*

conduct").[13] Yet, under Delaware law, "[t]he business judgment rule is a presumption that 'in

making a business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company [and its

shareholders].'" *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (quoting *Aronson*, 473

---

[12] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve. The director's fiduciary duty to both the corporation and its shareholders has been characterized by this Court as a triad: due care, good faith, and loyalty. That triparte fiduciary duty does not operate intermittently but is the constant compass by which all director actions for the corporation and interactions with its shareholders must be guided.").

[13] *See also Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974)(business judgment rule cannot insulate directors from liability if they violated federal statute); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1350 (Del. 1985) ("[o]f course, the business judgment rule can only sustain corporate decision making or transactions that are within the power or authority of the Board"); *Kerbs v. Ca. E. Airways, Inc.*, 90 A.2d 652, 655 (Del. 1952) (Board cannot engage in acts which are illegal or ultra vires); *Steiner*, 1995 WL 441999, at *7 (same).

15

A.2d at 812). Thus, as explained by the *Caremark* court, defendants may be held liable for breach of their fiduciary duty in cases such as this where the directors "lacked good faith in the exercis[ing] of their monitoring responsibilities," which can occur from "an utter failure to attempt to assure a reasonable information and reporting system exists...." 698 A.2d at 971-72. *See also Solash v. Telex Corp.*, 1988 WL 3587, at * 9 (Del. Ch. Jan. 19, 1988) (recognizing that bad faith can be established by conduct "so grossly off-the-mark as to amount to 'reckless indifference'"). Thus, allegations of the lack of good faith in the exercise of board responsibilities arising from defendants' reckless conduct will satisfy the exemption under Delaware's liability shield and will provide a basis for defendants' liability. *See, e.g., Ballotti & Finkelstein Del. Corps. & Bus. Orgs.*, §4.19, at 4-367 [3d ed. Supp. 1996] ("To the extent that recklessness involves a ***conscious disregard of a known risk***, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under [this] statute.") (emphasis added).

The U.S. Court of Appeals for the Sixth Circuit found Delaware's liability shield unavailing in *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), *amended by*, 250 F.3d 997 (6th Cir. 2001). The court there held that 8 Del. C. §102(b)(7) does not protect against "duty of care claims based on reckless or intentional misconduct...." 250 F.3d at 1000. In language applicable to this action, *McCall* held that "regardless of how plaintiffs style their duty of care claims, we find that they have alleged a conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith. Thus, we hold that plaintiffs' claims are not precluded by Columbia's §102(b)(7) waiver provision." 250 F.3d at 1001. Significantly, Section 102(b)(7) can be used by Defendants only as an "affirmative defense." *Emerald Partners*, 726 A.2d at 1223. As such, the burden of demonstrating a lack of good faith is not upon plaintiffs, but "upon the party seeking the protection of the statute" – in this case, the Defendants. *Id.*

Thus, on a motion to dismiss, the Complaint should not be dismissed based on an exculpatory charter provision. *Emerald Partners*, 787 A.2d at 90 (the use of exculpatory provisions to shield directors from personal liability presents an affirmative defense not amenable for pre-trial

16

disposition). *See also Sanders v. Wang*, No. 16640,1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999), in which the court declined to dismiss plaintiffs' complaint based on an exculpatory provision at the summary judgment stage, holding:

> Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

*Id.* at *11. Hence, even if there is some uncertainty as to the plaintiffs' allegations regarding Defendants' breaches of fiduciary duties, the action should not be dismissed at the pleading stage.[14]

### 6.    The Complaint Properly States a Claim for Damages

Defendants argue that this action is not yet ripe and the damages are uncertain by focusing solely upon damages the Company will suffer as a result of the pending securities class actions. Contrary to Defendants' arguments, the Complaint properly alleges at least six specific elements of damages suffered by Sonus as a result of Defendants' misconduct. Defendants conveniently ignore that the Complaint alleges that Defendants' actions, *inter alia*: (i) "erased 46% of the Company's market capitalization, or about $1.2 billion," ¶¶6, 30; (ii) resulted in downgrades or suspension of coverage by analysts, ¶¶7, 31-32; (iii) has forced the Company to "waste valuable corporate assets by hiring the law firm of Hale and Dorr, LLP, and PricewaterhouseCoopers to conduct an independent investigation into the wrongdoing alleged herein," ¶7; (iv) "caused severe, irreparable, injury and damage to the Company's reputation and goodwill in the investment and business communities," ¶66; (v) "have caused Sonus to waste valuable corporate assets paying incentive based bonuses and stock options to certain executive officers," ¶85; and (vi) misappropriation of

---

[14]    Furthermore, those seeking the protections of 8 Del. C. §102(b)(7) bear the burden of proving that their actions were the product of good faith. *Emerald Partners*, 787 A.2d at 88-89 (decided on ***summary judgment*** and after discovery had been conducted). Therefore, it would be improper for the Court to dismiss Plaintiffs' claims when Defendants have not demonstrated that they acted in good faith. *See Kahn v. Roberts*, No. 12324, 1994 WL 70118, at *8 (Del. Ch. Feb. 28, 1994) (citing *Desert Equities v. Morgan Stanley Leveraged*, 624 A.2d 1199, 1208-09 (Del. 1993)) ("Whether or not the directors acted in bad faith in approving the [transaction] is a question of fact not reached at [the pleadings] stage.").

corporate assets by the Insider Selling Defendants. ¶¶91-94. Each of these are elements of recoverable damages for the claims asserted in the Complaint, independent of any eventual outcome of any parallel pending securities fraud claims. *See, e.g., In re Cendant Corp. Derivative Litig.*, 189 F.R.D. 117, 135 (D.N.J. 1999) ("Damage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved.").

Even the cases cited by Defendants recognize that claims asserting such recoverable damages should not be dismissed. *See, e.g., In re Symbol Techs. Sec. Litigation*, 762 F. Supp. 510, 516 (E.D.N.Y. 1991).

> With regard to defendants Steinberg, Swartz, Heiman, Schlenker, Mallement, Burke and Bravman, the motion under Rule 12(b)(6) must be denied. Plaintiff has alleged that each of the above-named defendants profited from insider trading of Symbol Technologies stock, thereby breaching a fiduciary duty owed to the Corporation.

The mere fact that certain of Plaintiffs' elements of damages are not yet calculable, does not make them speculative, nor does it render them premature. Therefore, Plaintiffs' claims should not be dismissed, merely because Defendants' actions continue to injure the Company.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order denying Defendants' Motion to Dismiss and sustaining the Complaint in its entirety.

Dated: Boston, Massachusetts,
April 7, 2004

SEGAL ROITMAN & COLEMAN

By: _M. T. Sullivan/sr_

Mary T. Sullivan, Esq. BBO#487130
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: (617) 742-0208
Facsimile: (617) 742-2187

FARUQI & FARUQI, LLP
Nadeem Faruqi, Esq.
Shane Rowley, Esq.
David H. Leventhal, Esq.
320 East 39th Street
New York, NY 10016
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

18

ROBBINS UMEDA & FINK, LLP
Brian J. Robbins, Esq.
Jeffrey P. Fink, Esq.
1010 Second Ave., Suite 2360
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Shane T. Rowley, hereby certify that I have this 7th day of April, 2004, caused to be served upon counsel for defendants listed below Plaintiffs' Joint Memorandum Of Law In Opposition To Defendants' Motion To Dismiss.

Thomas J. Dougherty, Esq.
Skadden, Arps, Slate, Meager & Flom, LLP
One Beacon Street
Boston, MA 02108

Robert S. Frank, Esq.
Choate Hall & Stewart
Exchange Place Building
53 State Street
Boston, MA 02109

Jeffrey B. Rudman, Esq.
Hale And Dorr, LLP
60 State Street
Boston, MA 02109

_____
Shane T. Rowley

Exhibit A



# FORM 8–K

## SONUS NETWORKS INC – SONSE

### Filed: March 29, 2004 (period: March 29, 2004)

Report of unscheduled material events or corporate changes. e.g acquisition bankruptcy resignation

# Table of Contents

**Item 12.** RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

SIGNATURE

Exhibit Index

EX–99 (Exhibits not specifically designated by another number and by investment companies)

EX–99 (Exhibits not specifically designated by another number and by investment companies)

--------------------------------------------------------------------------------

SECURITIES AND EXCHANGE
COMMISSION
WASHINGTON, D.C. 20549
-----------------------------------------------

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

March 29, 2004

Date of Report (Date of earliest event reported)
-----------------------------------------------

SONUS NETWORKS, INC.
(Exact Name of Registrant as Specified in its Charter)

| DELAWARE | 000-30229 | 04-3387074 |
|----------|-----------|------------|
| -----------  | ---------  | ---------- |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

250 APOLLO DRIVE, CHELMSFORD, MASSACHUSETTS     01824
(Address of Principal Executive Offices)    (Zip Code)

(978) 614-8100
(Registrant's telephone number, including area code)

--------------------------------------------------------------------------------

Item 12. RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The information in this Current Report on Form 8-K and the exhibit attached hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

On March 29, 2004, Sonus Networks, Inc. (Sonus) issued a press release providing an update on the status of its financial results. A copy of the press release is attached as Exhibit 99.1 hereto.

On March 29, 2004 at 8:30 a.m., Sonus will host a conference call and simultaneous webcast to discuss the contents of this press release. A copy of the script for this conference call is attached as Exhibit 99.2 hereto.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 29, 2004                          SONUS NETWORKS, INC.

                                              By: /s/ Stephen J. Nill_____
                                                  ----------------------------------
                                                  Stephen J. Nill
                                                  Chief Financial Officer,
                                                  Vice President of Finance and
                                                  Administration and Treasurer

Exhibit Index

99.1 Press release dated March 29, 2004.

99.2 Script for Conference Call dated March 29, 2004.

```
</TEXT>
</DOCUMENT>
```

Exhibit 99.1

Sonus Networks Provides Update on Status of Its Financial Results

CHELMSFORD, Mass.--(BUSINESS WIRE)--March 29, 2004--Sonus Networks (Nasdaq: SONS), a leading provider of voice over IP (VoIP) infrastructure solutions, today announced that the filing of its amended Annual Report on Form 10-K/A for the fiscal year ended December 31, 2003 will be delayed. The Company, having made substantial progress towards the completion of its review of 2003 and 2002 financial results, is now considering whether to expand the review to include additional prior periods. Sonus Networks' independent auditor, Ernst and Young LLP, was not the auditor of record for periods prior to 2002. Therefore, in the event that the Company determines its review should be expanded to include periods prior to 2002, such review and accompanying audit could be lengthy.

Sonus Networks is performing a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. The revenue issues under examination relate to the proper timing of revenue recognition and not whether the sales could ultimately be recorded as revenue. For the customer transactions under review, the products have been delivered and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course.

At this time, the Company expects that its review will lead to a restatement of historical financial statements for the fiscal year ended December 31, 2002 and for the first three quarters of fiscal year 2003. As a result, existing financial statements for those periods should not be relied upon. Sonus Networks does not expect that these restatements will impact its December 31, 2003 cash, cash equivalents and marketable securities balance, which exceeded $300 million.

"While today's announcement is regrettable, we are committed to accurate and transparent financial reporting and require additional time to complete our comprehensive review," said Hassan Ahmed, president and CEO, Sonus Networks. "Our business is strong and Sonus continues to build on its leadership position in the rapidly expanding VoIP market. We continue to add new customers, build important new partnerships and enhance our industry-leading product portfolio. We have a great deal of confidence in our business outlook for 2004."

As a result of the Company's delay in filing its Form 10-K for 2003, Sonus Networks expects to receive notification from Nasdaq that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities could be subject to delisting from the Nasdaq National Market. In addition, Sonus Networks anticipates that Nasdaq may change the Company's trading symbol from "SONS" to "SONSE." Sonus will make a timely request for a hearing before a Nasdaq Listing Qualifications Panel to address the filing deficiency, but there can be no assurance that the Panel will grant a request for continued listing.

Company Conference Call, Webcast and Replay Information

The Company will host a conference call and simultaneous webcast on Monday, March 29, 2004 at 8:30 am Eastern to discuss the contents of this press release.

To listen via telephone:
Dial-in number: +1-888-326-7098 or +1-706-758-2365

To listen via the Internet:
Sonus will host a live webcast of the conference call. To access the webcast, visit the Sonus Networks Investor Relations site at http://www.sonusnet.com.

Replay:
A telephone playback of the call will be available following the conference and can be accessed by calling +1-402-977-9140 or +1-800-633-8284. The access code for the replay is 21190372. The telephone playback will be available through April 12, 2004.

The webcast will be available on the Sonus Networks Investor Relations site through March 29, 2005. To access the replay of the webcast, visit the Investor Relations site at http://www.sonusnet.com.

About Sonus Networks

Sonus Networks, Inc. is a leading provider of voice over IP (VoIP) infrastructure solutions for wireline and wireless service providers. With its Open Services Architecture(TM) (OSA), Sonus delivers end-to-end solutions addressing a full range of carrier applications, including trunking and tandem switching, residential and business access, network border switching and enhanced services. Sonus' voice infrastructure solutions, including media gateways, softswitches and network management systems, are deployed in service provider networks worldwide. Sonus, founded in 1997, is headquartered in Chelmsford, Massachusetts. Additional information on Sonus is available at http://www.sonusnet.com.

This release may contain projections or other forward-looking statements regarding future events or the future financial performance of Sonus that involve risks and uncertainties. Readers are cautioned that these forward-looking statements are only predictions and may differ materially from actual future events or results. Readers are referred to the "Cautionary Statements" section of Sonus' Quarterly Report on Form 10-Q, dated November 10, 2003 and filed with the SEC, which identifies important risk factors that could cause actual results to differ from those contained in the forward-looking statements. Risk factors include, among others, uncertainties regarding the Company's ability to complete the audit and file its Annual Report on Form 10-K/A for 2003 and future periodic reports, risks as to the SEC's investigation of these or other matters, unforeseen issues encountered in the completion of the audit, uncertainties regarding the extent to which prior period financial statements will be restated, the continued adverse effect of developments in the telecommunications industry, Sonus' ability to grow its customer base, dependence on new product offerings, market acceptance of its products, competition from large incumbent vendors, rapid technological and market change and manufacturing and sourcing risks. In addition, any forward-looking statements represent Sonus' views only as of today and should not be relied upon as representing Sonus' views as of any subsequent date. While Sonus may elect to update forward-looking statements at some point, Sonus specifically disclaims any obligation to do so.

Sonus is a registered trademark of Sonus Networks. Open Services Architecture, GSX9000 and Insignus are trademarks of Sonus Networks. All other trademarks, service marks, registered trademarks, or registered service marks are the property of their respective owners.

```
    CONTACT: Sonus Networks, Inc.
             Investor Relations:
             Jocelyn Philbrook, 978-614-8672
             jphilbrook@sonusnet.com
             or
             Media Relations:
             Beth Morrissey, 978-614-8579
             bmorrissey@sonusnet.com


    </TEXT>
    </DOCUMENT>
```

Exhibit 99.2

Script for Sonus Networks Conference Call
March 29, 2004

Jocelyn Philbrook, director of investor relations:

Thank you. Good morning everyone. Thank you for joining us today as we discuss the press release Sonus issued this morning. With me today are Sonus' President and CEO, Hassan Ahmed and Chief Financial Officer, Steve Nill.

The press release was issued today at 7:30 am Eastern Time on Business Wire and on First Call. The text of this release also appears on our Web site at www.sonusnet.com.

Before Hassan offers his opening remarks, I would like to remind you that during this call, we will make projections or forward-looking statements regarding items such as future market opportunities and the company's financial performance. These projections or statements are just predictions and involve risks and uncertainties such that actual events or financial results may differ materially from those we have forecasted. As a result, we can make no assurances that any projections of future events or financial performance will be achieved. For a discussion of important risk factors that could cause actual events or financial results to vary from these forward-looking statements, please refer to the "Cautionary Statements" section of our quarterly report on Form 10-Q dated November 10th 2003.

Risk factors include, among others, uncertainties regarding the Company's ability to complete its review and the related audit and file its Annual Report on Form 10-K/A for 2003 and future periodic reports, risks as to the SEC's investigation of these or other matters, unforeseen issues encountered in the completion of the audit, uncertainties regarding the extent to which prior period financial statements will be restated, the continued adverse effect of developments in the telecommunications industry, Sonus' ability to grow its customer base, dependence on new product offerings, market acceptance of its products, competition from large incumbent vendors, rapid technological and market change and manufacturing and sourcing risks. In addition, any forward-looking statements represent Sonus' views only as of today and should not be relied upon as representing Sonus' views as of any subsequent date. While Sonus may elect to update forward-looking statements at some point, Sonus specifically disclaims any obligation to do so.

In addition, because we were unable to give several days' advance notice of this call, the statements we make on this call are not considered valid public disclosure for purposes of Regulation FD. To address this, we have filed a Form 8-K with the SEC containing our script for this call. However, because it was obviously impossible to include in that script the responses to questions asked on this call, our responses to questions must be limited to information covered in our prepared remarks. Please bear that in mind if we are unable to address certain questions you may wish to ask on this call.

I would now like to turn the call over to Hassan.

Hassan Ahmed, president and CEO:

Thanks Jocelyn. Good morning everyone and thank you for joining us today on such short notice. Today I will provide some comments on the financial review process that Sonus has undertaken. Then, since it has been a while since our last conference call, I will provide you with some detail on the progress that we are making in our business. Following that, Steve will then briefly discuss the audit with you.

This morning Sonus announced that we have delayed filing our amended 10-K for fiscal year ended 2003. As we had reported to you previously, Sonus is conducting a detailed review of its financial statements for 2003 and prior periods. We have made considerable progress toward completing the review of our 2003 and 2002 financial results and are now considering whether to expand the review to prior periods.

Sonus strives to achieve the highest level of integrity and transparency, in both our business operations and financial reporting. As we reported to you previously, we are engaged in a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. All of the revenue that Sonus had previously reported to you was the result of good business, meaning that the products had been shipped to our customers and we have either received payment or are receiving payment for the products in the ordinary course. We are deeply disappointed that during our year-end audit in January, senior management and our auditors discovered that certain employees had engaged in behavior that violated our code of conduct and potentially compromised the integrity of our financial reporting. We therefore felt it was necessary and appropriate to launch a comprehensive financial investigation.

We consider this a very serious matter and have responded with aggressive measures to address the issue. Sonus expanded the year-end financial review to cover not only 2003, but also prior periods. Sonus' audit committee launched an independent investigation to determine the extent of the behavior. Finally, Sonus proactively notified the Securities and Exchange Commission of the investigation and we have been providing them with the results of our investigation.

Since we last updated you, Sonus has been thoroughly reviewing the financial results we reported during 2002 and 2003. We are now considering whether to expand the review to include the results from additional prior periods. Ernst and Young was not our auditor for periods prior to 2002, and therefore, if we determine that it is appropriate to review prior periods, the review and accompanying audit could take some time.

I want to be clear that the delay in filing our results does not detract from the progress we have made in our business. Sonus has accomplished a lot over the last year, and continues to do so in 2004. While it could be easy to let the recent financial review overshadow our achievements, I want to remind you that this has not impacted the fundamentals of our business. Sonus has a strong competitive position in a market that is

now beginning to reach mainstream adoption.  We are pleased with the progress in our business to date and our start to 2004. Now let's get into some details.

In the fourth quarter, Sonus made important progress with its customers. For example, two of our largest customers, Verizon and Qwest, continued to roll out their Sonus-based networks.

In July last year, we announced that Verizon had chosen Sonus to deploy a long-distance packet voice network in select cities. I'm sure you saw their announcement about accelerating the build out of their packet switched network. Over the past several quarters, Sonus and Verizon have built a successful long-distance network. Sonus expects to continue to support and expand those deployments. Down the road, we anticipate there will be a number of voice over IP opportunities at Verizon, which we'll be aggressively pursuing.

For Qwest, 2003 marks the third year of substantial expansion of their next-generation network and Qwest has one of the larger installed bases of Sonus equipment. We continue to work with Qwest as they grow their packet voice network and expand these technologies into new applications.

In the fourth quarter, we announced that America Online is deploying a Sonus solution to offer premium services to their customers. AOL has grown their membership to over 35 million around the world and is known to many as a pioneer in new feature development for their users. Today, AOL offers their customers Internet call alert, email by phone and voicemail over their computers, all enabled by a packet voice infrastructure from Sonus.

Carrier deployment of packet voice solutions is accelerating, and monthly traffic volumes on Sonus-based networks have continued to ramp steadily from the 5 billion minutes per month we reported in Q3 to over 6.5 billion minutes per month today. This is an important validation of the scalability, reliability and quality of our solutions.

In Q4, Sonus delivered Release 5.1 of its industry-leading software, once again furthering our technology leadership with major new features and functionality that extend the applications of our solutions. Specifically, Sonus' new Network Border Switching capabilities address carriers' growing requirements for security, session control and address translation between IP networks, and facilitate the development of the ubiquitous all-IP network. As packet voice networks continue to proliferate, service providers are moving to connect to each other using IP, rather than circuits. This trend is opening up new opportunities for carriers in a number of key areas including packet peering, enterprise access, end user access, and application service provider access. Sonus' new network border switch enables carriers to address each of these opportunities with an advanced carrier grade solution.

Looking back, 2003 was an important year for Sonus. We strengthened our company in many of the dimensions we need to build a large business. We successfully broadened our customer base, including announcing relationships with AT&T, Verizon, America

Online and IDT. We made important additions to our product line, introducing new capabilities and features that widened our addressable market to include the wireless operators and network border switching. Major software releases introduced last year provided enhancements in a number of key areas, expanding our voice VPN features, broadening our international capabilities with a new set of international signaling variants, and delivering traffic control features that enable network performance optimization.

Taking a wider view, 2003 will be remembered as the year that voice over IP became a mainstream technology. It is hard to pick up a newspaper or industry report without some mention of voice over IP. More importantly, some of the largest carriers in the world have announced plans to offer VoIP services. At Sonus, our mission from the start has been to develop carrier class VoIP solutions. Driven in large part from the success of networks built on Sonus, carriers recognize that voice over IP technologies can deliver the same quality of service as their TDM networks, while harnessing the powerful service delivery platform of a converged IP network. This, combined with continued changes in the regulatory environment, is driving a lot of new competitive activity among the carriers.

Unlike the last major shift in switching technologies from analog to digital in the 1970s, voice over IP is much more than simply the next technology platform. By separating services and applications from transport, VoIP enables carriers to deliver broadband services to customers without having to own connectivity to the customer. This has the potential to change the structure of the industry and the players, redefining the winners and losers. So it is clear that packet voice technologies will play an important role in helping to shape the industry.

Looking ahead, 2004 is stacking up to be an incredibly exciting year for our industry and our company. Sonus' mission is clear: further expand our market presence, keep building our technology lead, extend our international reach, and accomplish all this within the context of a business that is financially strong.

We are making important progress towards these goals. Sonus recently announced its first OEM relationship with a global leader in the wireless market, Motorola. Motorola has integrated Sonus' industry-leading GSX9000 media gateway with the Motorola SoftSwitch, a next-generation switching platform for wireless carriers around the globe. Through this relationship with Motorola, Sonus is now able to offer a proven solution for the access portion of wireless carriers' networks, complementing Sonus' SMARRT Wireless solution for the core and effectively doubling our addressable market.

Additionally, Sonus recently announced that one of Japan's largest broadband communication carriers, Softbank Broadband, is deploying Sonus infrastructure as part of a multi-million dollar contract to build out a new packet-based, next-generation voice network. SBB was awarded approximately 6 million of 9 million new IP-based telephone numbers to be issued in Japan, and is expanding its network to accommodate the continued growth in subscribers. SBB is deploying Sonus' voice solutions to provide

long distance voice services first for residential subscribers and then for enterprise customers in later deployment phases.

By now it is obvious that carriers throughout the world will adopt voice over packet technologies. Sonus has announced positions with 32 carriers and we are just getting started. We are growing our sales force and investing in marketing to drive our solutions into large networks around the globe. Our trial base continues to be strong and is diverse across carrier type and application, including long distance, local, wireline and wireless operators.

In summary, this is an exciting time for our business. We are at the beginning of a long-term and fundamental opportunity for Sonus. The industry has moved to the next phase of the market in which incumbent carriers are beginning to adopt and deploy packet voice solutions. We entered 2004 with confidence. Sonus has winning technologies and a talented team, combined with an unwavering focus on building one of the premier suppliers in next-generation voice.

With that, I would now like to turn the call over to Steve.

 Steve Nill, vice president of finance and administration and CFO:

Thanks Hassan. I'd like to briefly comment on our review of the financial results. As the head of the finance organization, I am personally deeply disappointed with our current situation, and the impact that it has had on our company and our shareholders. For those of you who know Sonus, the integrity of our financials is paramount. And at Sonus, we hold ourselves to the highest standards of legal, ethical and honorable behavior. When we discovered the issues we're currently dealing with, we immediately began taking the appropriate and necessary steps to address them.

Over the last few months, we have put a great deal of effort into completing the expanded review and accompanying audit. During this process we have been thoroughly reviewing the 2002 and 2003 financial results previously reported to you. It is unfortunate that we were unable to file our amended Annual Report for 2003 within the 15-day grace period; however, we have made considerable progress towards completing the review of 2003 and 2002.

As part of completing our review, we are assessing the need to expand the review to prior periods. Our independent auditor, Ernst and Young, was not our auditor of record for periods prior to 2002. So, if it is determined that we need to expand our review into periods prior to 2002, completing the review and the accompanying audit could take some time.

Based on the information we have today, we expect to restate our historical financial results for fiscal year 2002 and for the first three quarters of fiscal year 2003. It is important to remember that all of the revenue we previously reported is the result of products that have been delivered to our customers and we have either received payment or are receiving payment for the products in the ordinary course. So while revenue is expected to

shift between periods or move between revenue and deferred revenue, the overall strength of our business remains unchanged. We ended the fiscal year 2003 with in excess of $300 million in cash, cash equivalents and marketable securities.

To begin to restore investor confidence, we need to get our results on file. We are investing substantial time and resources to complete this financial review as quickly as possible. However, we do expect to receive notification from the Nasdaq that we are not in compliance with their filing requirements and that we could be subject to delisting from Nasdaq. The Nasdaq could change our trading symbol to "SONSE." We will have seven days to request a hearing with the Nasdaq once we receive such notification. If the Nasdaq grants a hearing, it is usually scheduled within 2 to 3 weeks. There is no assurance that the panel will grant our request for continued listing.

One last subject I'd like to cover is the shareholder lawsuits that have been filed against our company in recent weeks. We believe that the company has substantial legal and factual defenses, which we intend to pursue vigorously.

As you can imagine, at this time we are not able to provide you with additional details on the audit or our restatements beyond what we've already told you. But, if you have questions related to other aspects of our business, we've made time for a few of them.

I'll turn the call over to the operator for questions.

```
</TEXT>
</DOCUMENT>
```

Created by 10KWizard Technology    www.10KWizard.com