UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>Consolidated Cases:<br>1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | Case No. 1-04-CV-10359 DPW<br><br>SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs, by their undersigned attorneys, for their shareholder derivative complaint, allege upon information and belief, except as to allegations about themselves, which are based upon personal knowledge, as follows:

## **NATURE OF ACTION**

1.      This is a consolidated shareholders' derivative action brought on behalf of nominal defendant Sonus Networks, Inc. ("Sonus" or "the Company"), a publicly traded Delaware corporation with headquarters and principal place of business in Chelmsford, Massachusetts. Sonus provides voice over IP (VoIP) infrastructure solutions for wireline and wireless service providers. In this action, plaintiffs, on behalf of Sonus, allege that defendants, who are current or former officers and/or directors of the Company, damaged Sonus by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to

issue false and misleading statements to the market regarding the Company's earnings and revenues; (iii) exposing the Company to massive liability for violations of the federal securities laws; (iv) damaging the Company's reputation: (v) unjustly obtaining incentive based compensation from the Company; and (vi) trading Sonus shares while in possession of material, non-public information regarding the true financial condition of the Company.

2.      On February 11, 2004, defendants caused Sonus to announce that several issues, practices and actions of certain employees had been identified relating to the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, and that the U.S. Securities & Exchange Commission ("SEC") had been notified of these developments. Defendants further reported that each of these issues might affect the Company's publicly reported 2003 financial results, and possibly financial statements for prior periods.

3.      On March 15, 2004, the Company announced that it would file for an extension of time to file with the SEC its audited financial statements for fiscal year 2003. On March 29, 2004, defendants announced a further delay in that filing, and that the anticipated restatement would extend to include fiscal year 2002. On June 24, 2004, defendants disclosed that fiscal year 2001 would also have to be restated. And on June 29, 2004, the Company disclosed that it had become the subject of a formal order of private investigation by the SEC.

4.      On July 28, 2004, Sonus announced a huge restatement of financial results, including the Company's financial statements for all of fiscal years 2001, 2002 and the first nine months of 2003. The restatement was extensive in scope and magnitude, and included material adjustments to the Company's accounting for revenue, deferred revenue, purchase accounting, impairments, accrued expenses and deferred compensation. As detailed herein, the restatement included large swings in reported results for revenue, deferred revenue, and expenses throughout the subject periods. Furthermore, earnings per share figures for each of fiscal year 2002 and the first nine months of fiscal year 2003 were restated downwards. For example, for the first nine months of 2003, revenues were restated downwards from $68 million to $46 million, deferred

revenues were increased by $50 million to $85.2 million, expenses were restated to $17.5 million from $32.9 million, and loss per share <u>more than tripled</u> to $.10.

5.  In connection with this restatement, the Company also admitted that "significant internal control matters" constituting "material weaknesses" had been identified, including "insufficient contract review and documentation; inadequate supervision and review within the finance and accounting department; inadequate segregation of duties; insufficient supporting documentation for and review of account reconciliations; lack of adequate controls over cash receipts; lack of adequate technical accounting expertise; insufficient equity review procedures and documentation; flawed foundations for accounting estimates; and inadequate quarterly and year-end financial statement close and review procedures." The Company stated that, throughout the subject periods, its "disclosure controls and procedures were inadequate." According to the Company, these problems were so severe that the inability to remedy them "could have a material adverse effect on our business, results of operations and financial condition, as well as impair our ability to meet our quarterly and annual reporting requirements in a timely manner."

6.  On March 15, 2005, defendants caused the Company to file a Form 10-K for fiscal year 2004, and disclosed even more detail regarding the internal control breakdown at the Company. According to the Form 10-K, "these material weaknesses include both entity-level control weaknesses as well as weaknesses in process, transaction and application controls as defined in the Committee of Sponsoring Organizations of the Treadway Commission (COSO) criteria." Specifically, the Form 10-K laid out in detail weaknesses in the following ten areas: inadequate entity level controls (including the "lack of uniform and consistent communication by all members of senior management regarding the importance of controls"), inadequate business processes and information systems, inadequate revenue recognition procedures and controls, inadequate segregation of duties and information systems users, inadequate financial statement preparation and review procedures, inadequate controls over cash receipts, inadequate controls

over equity transactions, inadequate purchasing controls, inadequate controls over inventory and cost of revenues, and inadequate information systems procedures and controls.

7.  All of these controls were the responsibility of the defendants named herein, who include the Company's senior management, members of the Company's board of directors, and members of the board's Audit Committee. Defendants permitted these conditions to exist at Sonus notwithstanding the fact that throughout the relevant periods, Sonus was a publicly traded company with stringent disclosure obligations to shareholders and the market under the federal securities laws. Defendants' utter failure to ensure that even the most basic information gathering, reporting systems and internal controls existed at Sonus was in bad faith, and created the poor control environment at Sonus which led directly to the restatement.

8.  Furthermore, defendants were on notice of several "red flags" which alerted them to problems with the Company's internal controls and accounting practices, yet they did nothing to fix these problems. As early as March 2001, defendants admitted in SEC filings that the Company's anticipated growth would put "significant strain" on the Company's management systems and that the Company's financial "controls and reporting systems," among others, would need to be improved. In March 2002, after the Company hired a "significant number" of employees and the business had expanded "rapidly," defendants made the same admission in SEC filings regarding the "significant strain" on the Company's management systems and the need to improve the Company's financial "controls and reporting systems."

9.  Thus, defendants were on notice that the Company's internal controls were not sufficient to support the Company's growth. Although the Company's revenue was reported to have tripled from 2000 to 2001, defendants failed to ensure proper controls were in place, and the Company's financial results for 2000 and 2001 were ultimately restated.

10. Furthermore, beginning in July 2002, Sonus and several of the defendants herein were sued in this court for violation of the federal securities laws. Plaintiffs in those cases alleged that defendants misled the market regarding the performance capabilities of the

Company's products, and further alleged that the Company's financial statements were false and misleading because defendants failed to properly account for certain transactions with two of the Company's most important customers. Those plaintiffs also alleged that certain of the Company's insiders, including some of the same defendants herein, unlawfully sold 6.4 million shares of Sonus stock for $158 million while in possession of inside information regarding these matters. On or about May 11, 2004, Judge Wolf denied defendants' motion to dismiss the complaint in that case. By virtue of the allegations there, defendants were on notice of problems with the Company's disclosure systems and accounting practices, and with the Company's insider trading policies, yet again they again failed to remedy these issues.

11.  Defendants' conduct has severely damaged the Company. As alleged herein, in addition to (1) unjustly collecting incentive based compensation during the relevant periods and (2) obtaining unlawful insider trading proceeds by virtue of stock sales when the price of the Company's stock was artificially inflated, defendants have exposed the Company to liability for violations of the federal securities laws asserted in a series of new class action complaints filed in this court ("the Class Actions"), as well as to significant legal and professional costs for investigation and the Company's defense. The Company's reputation in the securities markets has also been severely tarnished, hampering its ability to do business and secure funding.

12.  The Company has admitted that the state of its financial controls was so deficient that the failure to deal with these issues could materially impact the Company's business.

## JURISDICTION AND VENUE

13.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. Section 1332. This Court also has subject matter jurisdiction over plaintiffs' claims asserted under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), 15 U.S.C. §7243.

14.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this Judicial District because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

## PARTIES

16.     Plaintiff Michelle P. Berk held Sonus shares at relevant times, and continues to hold Sonus shares. Plaintiff is a citizen of Ontario, Canada.

17.     Plaintiff Michael Pisnoy held shares at relevant times and continues to hold Sonus shares. Plaintiff is a citizen of Florida.

18.     Plaintiff Daniel Williams held Sonus shares at relevant times, and continues to hold Sonus shares. Plaintiff is a citizen of Tennessee.

19.     Nominal Defendant Sonus is a Delaware corporation and maintains its principal executive offices at 250 Apollo Drive in Chelmsford, Massachusetts. According to its public statements, Sonus is a provider of voice infrastructure solutions for the "new public network." The Company's products are purportedly a new generation of "carrier-class" switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products purport to accelerate the convergence of voice and data transmission. Sonus went public in 2000 and trades on the NASDAQ National Market System with approximately 248 million shares outstanding.

20.     Defendant Hassan Ahmed ("Ahmed") was at all relevant times the president, CEO and a director of the Company, positions he has held since 1998. Ahmed beneficially owns 9.2 million shares of the Company's common stock, or 3.7%. For fiscal year 2001, Ahmed was paid $175,000 in salary, $75,000 in bonus, and $38,000 in other compensation, and was awarded options to purchase 640,000 shares of Sonus stock. For fiscal year 2002, Ahmed was paid $113,021 in salary, $48,400 in bonus, and $7,917 in other compensation. For fiscal year 2003, Ahmed was paid $153,125 in salary, $75,000 in bonus, and was awarded options to purchase 2,000,000 shares of Sonus stock. During fiscal years 2002 and 2003, Ahmed disposed of over

300,000 shares of Sonus stock by gift, for value exceeding $967,561. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003, Ahmed twice violated Section 16(a) reporting requirements in matters regarding Sonus stock. Ahmed is a citizen of Massachusetts.

21.  Defendant Edward T. Anderson ("Anderson") has been a director of the Company since 1997. Anderson served on the Audit Committee of the board throughout the relevant period. Anderson beneficially owns over 440,000 shares of the Company's common stock. Anderson is a venture capitalist and currently a partner with North Bridge Venture Partners, an early investor in Sonus. Anderson has extensive business ties with defendant Ferri, as alleged herein. During fiscal year 2003, Anderson sold over 65,000 shares of Sonus stock for over $448,000 in proceeds while in possession of material adverse inside information regarding the Company's financial results. During fiscal year 2002, Anderson gifted 100,000 Sonus shares for value of $37,000. Anderson is a citizen of Massachusetts.

22.  Defendant Albert A. Notini ("Notini") has been a director of the Company since 2003, and was made Chief Operating Officer in April 2004. Notini served on the Audit Committee prior to becoming COO. In March 2003, Notini received an award of options to purchase 50,000 shares of Sonus stock. Notini has served in various executive capacities with several companies, most recently as CFO of Manufacturers Services Limited. Prior to 1994, Notini was a senior partner with Hale & Dorr, LLP, (now Wilmer Cutler Pickering Hale & Dorr, LLP), the same law firm Notini and the Audit Committee hired to investigate the accounting problems at issue herein. Notini beneficially owns 25,000 shares of Sonus stock. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003, Notini violated Section 16(a) reporting requirements in matters regarding Sonus stock. Notini is a citizen of Massachusetts.

23.  Defendant Paul J. Ferri ("Ferri") has been a director of the Company since 1997. Ferri is a venture capitalist and currently a partner with Matrix Partners, another early investor in

Sonus. Ferri served on the Audit and Compensation Committees of the board throughout the relevant period. Ferri has extensive business ties with Anderson, as alleged herein. Ferri owns over 170,000 shares of the Company's common stock. Ferri is a citizen of Massachusetts.

24. Defendant Rubin Gruber ("Gruber") is one of the founders of Sonus. He has been a director of the Company since 1997 and served as Chairman of the Board from 1998 to early 2004, when he was elevated to the position of "Chairman Emeritus." He also served as President of the Company from 1997 to 1998. For fiscal year 2001, Gruber was paid $175,000 in salary, and was awarded options to purchase 320,000 shares of Sonus stock. For fiscal year 2002, Gruber was paid $113,021 in salary. For fiscal year 2003, Gruber was paid $153,125 in salary, and was awarded options to purchase 430,000 shares of Sonus stock. Gruber beneficially owns 4.4 million shares of the Company. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003 Gruber violated Section 16(a) reporting requirements in matters regarding Sonus stock. In December 2003, Gruber gifted 130,000 shares of Sonus stock for value exceeding $826,000. Gruber is a citizen of Massachusetts.

25. Defendant Paul Severino ("Severino") has been a director of the Company since 1999. Severino is a "private investor." Severino served on the Audit and Compensation Committees of the board throughout the relevant period. Severino beneficially owns over 576,000 shares of the Company's common stock. Severino is a citizen of Massachusetts.

26. Defendants Ahmed, Anderson, Notini, Ferri, Gruber and Severino are sometimes collectively referred to as the "Director Defendants." The Director Defendants comprised a majority (six of seven) of the directors serving at the time the first complaint in this action was filed. Each Director Defendant who is not an employee is eligible to receive options to purchase 10,000 shares of Sonus stock, at the discretion of the board, and the chairman of the Audit Committee receives $20,000 for his service. In May 2002 and 2003, defendants Anderson, Ferri and Severino received options to purchase 10,000 shares of Sonus stock.

27. As members of the Sonus board of directors, the Director Defendants had a duty to review the Company's accounting policies and internal controls to ensure that the Company was operating lawfully and in the best interests of its shareholders. Each of the Director Defendants, due to his extensive prior experience in financial and business matters, knew that accounting controls were of critical importance to a public company like Sonus.

28. Defendant John Michael O'Hara ("O'Hara") has served as Vice President of Marketing since 2002. According to the Company's 2003 Form 14 Proxy Statement, during fiscal year 2002, O'Hara violated Section 16(a) reporting requirements regarding transactions in Sonus stock. O'Hara was awarded options to purchase 220,000 shares in fiscal year 2002. During the relevant period, O'Hara sold 68,500 shares of stock for over $480,000 while in possession of material adverse inside information regarding the Company's financial results. O'Hara is a citizen of Massachusetts.

29. Defendant Edward N. Harris ("Harris") has served as Vice President of Manufacturing since 2002. During the relevant period, Harris sold 30,000 shares of stock for over $204,000 while in possession of material adverse inside information regarding the Company's financial results. Harris is a citizen of Massachusetts.

30. Defendant Stephen Nill ("Nill") served as CFO and Vice President of Finance and Administration of the Company throughout the relevant period. In July 2004, Nill was "requested" to resign from the Company. According to the Company's July 28, 2004 Form 10K/A, during fiscal year 2003 Nill violated Section 16(a) reporting requirements regarding transactions in Sonus stock. Nill is a citizen of Massachusetts.

31. Defendant Paul R. Jones ("Jones") has served as Vice President of Engineering since 2000. Jones beneficially owns over 671,000 shares of the Company's common stock. During the relevant period, Jones sold 100,000 shares of stock for over $857,000 while in possession of material adverse inside information regarding the Company's financial results. Jones is a citizen of Massachusetts.

32. Defendants Anderson, O'Hara, Harris, and Jones are sometimes collectively referred to as the "Insider Trading Defendants."

33. The Director Defendants and defendants O'Hara, Harris, Nill and Jones are sometimes collectively referred to as "the Individual Defendants."

34. Each of the Individual Defendants, by virtue of his management and/or directorship position, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. As corporate fiduciaries, the Individual Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of Sonus.

35. The Individual Defendants were required to supervise the preparation of Sonus' SEC filings and approve any reports concerning the company's financial condition and results of operations, including to assure that the Company complied with Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants likewise had a duty of loyalty to the company to act in the best interests of the company and its shareholders. Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing and/or disseminating the statements alleged herein,

36. Because of each of the Individual Defendants' positions with Sonus, each knew and had access to non-public information about the business of Sonus, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents (including Sonus' operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided to him in connection therewith.

37. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Sonus or to abstain from trading Sonus shares on such information.

## DEFENDANTS ISSUE MATERIALLY FALSE FINANCIAL STATEMENTS FOR A PERIOD OF ALMOST THREE YEARS

**Fiscal Year 2001**

38. On January 16, 2002, defendants caused Sonus to issue a press release disclosing financial results for fiscal year 2001. According to the press release:

> Revenues for fiscal year 2001 were $173.2 million compared with $51.8 million for fiscal year 2000. Adjusted net loss for fiscal year 2001 was $17.8 million or $0.10 per share, excluding restructuring charges of $25.8 million, write-off of goodwill and purchased intangibles of $374.7 million, amortization of goodwill and purchased intangibles of $107.8 million, stock-based compensation of $75.5 million and an in-process research and development charge of $43.8 million, compared with adjusted net loss for fiscal year 2000 of $23.3 million or $0.17 per share, excluding stock-based compensation of $26.7 million.
>
> Actual net loss for fiscal 2001 was $645.4 million or $3.74 per share, including restructuring charges, write-off of goodwill and purchased intangibles, amortization of goodwill and purchased intangibles, stock-based compensation and an in-process research and development charge, compared with an actual net loss for fiscal 2000 of $50.0 million or $0.52 per share, including stock-based compensation.

39. Defendant Ahmed commented as follows of fiscal year 2001 results:

> Q4 marked another good quarter of progress in product development, customer deployments and international expansion, all of which further our market leadership. We are well positioned to weather the difficult climate our industry faces today, and we will continue to take the steps necessary to build our financial strength and expand our leadership as the telecom industry

11

> emerges from its current economic downturn.
>
> While these are challenging times for the telecom industry, we are excited about Sonus' prospects in the year ahead," continued Ahmed. "Packet voice technologies from Sonus are vital to our customers' businesses, and the interest in our products is strong. We will continue our focus on delivering the most innovative solutions in the industry, and are driving to expand our business into new geographies and market segments as we further our position as the premier franchise in next-generation voice."

40. The financial results reported for fiscal year 2001 were repeated in the Company's filing on Form 10-K for fiscal year 2001, filed with the SEC on or about March 28, 2002. The Form 10-K represented that the financial statements therein complied with Generally Accepted Accounting Principles ("GAAP"). The Form 10-K was signed by defendants Ahmed, Nill, Gruber, Anderson, Ferri and Severino.

41. With respect to revenue recognition in particular, the notes to the consolidated financial statements represented as follows:

> Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

42. During fiscal year 2001, defendants caused the Company to issue and file quarterly reports on Form 10-Q for each of the first three quarters of fiscal year 2001. These Form 10-Qs were filed on April 20, 2001, August 7, 2001, and November 14, 2001. Each Form 10-Q was signed by defendant Nill, and represented that it had been prepared in accordance with SEC rules and regulations and represented fairly the Company's financial condition.

43. The financial results and statements regarding the Company's purported compliance with accounting standards reported for fiscal year 2001 were materially false and misleading. As alleged herein, on July 28, 2004, the Company announced that all of its financial results for fiscal year 2001 would have to be restated, and it was disclosed that the Company's internal accounting controls were "inadequate" as of December 31, 2003.

**Fiscal Year 2002**

44. On January 22, 2003, defendants caused Sonus to issue a press release disclosing financial results for fiscal year 2002. According to the press release:

> Revenues for fiscal year 2002 were $62.6 million compared with $173.2 million for fiscal year 2001.
>
> Net loss for fiscal year 2002 was $68.5 million or $0.36 per share compared with a net loss for fiscal year 2001 of $645.4 million or $3.74 per share.

45. Defendant Ahmed commented as follows on fiscal year 2002 results, emphasizing that the Company was on a path towards profitability:

> We made considerable progress in building our business fundamentals in Q4. <u>We reported a sequential increase in revenues and a reduced net loss compared to the third quarter, and our cash balance increased as well</u>. The gains made in the quarter are reflective of progress with our customers and our continued focus on Sonus' financial metrics.
>
> Looking ahead, our 2003 priorities are clear. We are focused on building our customer base, expanding into new target markets,

>and continuing to deliver the product innovations that have set us
>apart in the market. <u>Additionally, we will continue to manage our
>business with precision, driving toward profitability.</u>
>[emphasis supplied].

46. These financial results were repeated in the Company's filing on Form 10-K for fiscal year 2002, filed with the SEC on or about March 19, 2003. The Form 10-K represented that the financial statements therein complied with GAAP. The Form 10-K was signed by defendants Ahmed, Nill, Gruber, Anderson, Ferri and Severino.

47. With respect to revenue recognition in particular, the notes to the consolidated financial statements represented as follows:

>Sonus recognizes revenue from product sales to end users, resellers and distributors upon shipment, provided there are no uncertainties regarding acceptance, persuasive evidence of an arrangement exists, the sales price is fixed or determinable and collection of the related receivable is probable. If uncertainties exist, Sonus recognizes revenue when those uncertainties are resolved. In multiple element arrangements, in accordance with Statement of Position 97-2 and 98-9, Sonus uses the residual method when vendor-specific objective evidence does not exist for one of the delivered elements in the arrangement. Service revenue is recognized as the services are provided. Revenue from maintenance and support arrangements is recognized ratably over the term of the contract. Amounts collected prior to satisfying the revenue recognition criteria are reflected as deferred revenue. Warranty costs are estimated and recorded by Sonus at the time of product revenue recognition.

48. According to the Form 10-K for fiscal year 2002, defendants Ahmed and Nill "have reviewed and evaluated the effectiveness of Sonus' disclosure controls and procedures . . . as of a date within ninety days before the filing of this annual report," and "based on that evaluation, [Ahmed and Nill] have concluded that Sonus' current disclosure controls and procedures are effective to ensure that information required to be disclosed by Sonus in reports

that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms."

    49.    The Form 10-K also included certifications under Section 302 of Sarbanes-Oxley ("Section 302 Certifications") by defendants Ahmed and Nill stating the following:

> 1. I have reviewed this annual report on Form 10-K for the year ended December 31, 2002 ("Annual Report") of Sonus Networks, Inc. (the "Registrant");
>
> 2. Based on my knowledge, this Annual Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Annual Report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this Annual Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Annual Report;
>
> 4. <u>The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and have:</u>
>
> <u>(a) Designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Annual Report is being prepared;</u>
>
> <u>(b) Evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this Annual Report (the "Evaluation Date"); and</u>
>
> <u>(c) Presented in this Annual Report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;</u>

> 5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the audit committee of Registrant's board of directors:
>
> (a) <u>All significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls</u>; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal controls; and
>
> 6. The Registrant's other certifying officer and I have indicated in this Annual Report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.
> [emphasis supplied].

50.     During fiscal year 2002, defendants caused the Company to issue and file quarterly reports on Form 10-Q for each of the first three quarters of fiscal year 2002. These Form 10-Qs were filed on April 10, 2002, August 14, 2002, and November 13, 2002. The April 10, 2002 10-Q was signed by defendant Nill, and represented that it had been prepared in accordance with SEC rules and regulations. The August 14, 2002 10-Q contained Sarbanes-Oxley certifications by defendants Nill and Ahmed under Section 906 ("Section 906 Certifications"), stating that the Company's financial results complied with SEC reporting requirements and represented fairly the financial condition of the Company. The November 13, 2002 10-Q contained both Section 302 Certifications and Section 906 Certifications signed by defendants Nill and Ahmed.

51.     The financial results and statements regarding the Company's purported compliance with accounting standards reported for fiscal year 2002 were materially false and

misleading. As alleged herein, on July 28, 2004, the Company's financial results for all of fiscal year 2002 were restated, and it was disclosed that the Company's internal accounting controls were "inadequate" as of December 31, 2003.

**First Nine Months Of Fiscal Year 2003**

52. In early January 2003, Sonus stock was trading near $1.00 per share. During the first nine months of fiscal year 2003, defendants sought to communicate to shareholders and the market that the Company would finally be achieving profitability in fiscal year 2003.

53. For example, on April 9, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the first quarter of 2003. According to the press release, Sonus reported revenues of $16.0 million and a net loss of $4.4 million or $0.02 per share. Defendant Ahmed stated:

> Our financial results for the first quarter reflected good progress toward our business objectives. <u>We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss.</u> In Q1, we also continued to add new customers around the globe and made important additions to our product family.
> [emphasis supplied].

54. On April 10, 2003, Sonus stock closed at approximately $2.70 per share.

55. On April 22, 2003, the Individual Defendants caused the Company to issue a press release stating that the Company had sold 20 million shares of stock at $3.05 per share for total proceeds of $61 million.

56. On July 10, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the second quarter of 2003, again emphasizing the "drive to profitability." Defendants reported revenues of $21.4 million and a net loss of $3.2 million, or $0.01 per share. According to defendant Ahmed:

17

> We are pleased with the progress that we made in the second quarter, particularly with our 33% sequential revenue growth. <u>We executed across all areas of the business - broadening and strengthening our customer base, expanding our leading product offering, bolstering our balance sheet and advancing our drive to profitability.</u> [emphasis supplied].

57. On July 11, 2003, Sonus stock closed at approximately $7.10 per share.

58. On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward Profitability,' Chief Executive Says." The press release stated in relevant part:

> Sonus Networks Inc., a telecommunications-equipment maker, is trying to become profitable, Chief Executive Officer Hassan Ahmed said.
>
> "<u>We're definitely driving toward profitability as fast as we can,</u>" Ahmed said in a televised interview with Bloomberg News. He said he hasn't given guidance on the third quarter and whether Sonus would post a profit. [emphasis supplied].

59. With the stock price rising in response to these announcements of imminent profitability, defendant Anderson sold 65,000 shares for proceeds of over $448,000. Anderson had not sold any Sonus stock in the prior two years. Defendant O'Hara sold 55,000 shares for proceeds exceeding $381,000. Defendant Harris sold 30,000 shares for proceeds of over $204,000. Neither O'Hara nor Harris had ever sold Sonus stock before.

60. On September 23, 2004 defendants announced the sale by the Company of 17,000 more shares at $7.75 per share, for proceeds of approximately $126 million.

61. Finally, on October 8, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the third quarter of 2003, with a headline "Company achieves Quarterly Profit." Sonus reported revenues of $28.6 million and net income of $1.2 million, or $0.01 per diluted share – purportedly <u>its first quarterly profit</u>. According to defendant Ahmed:

18

> This was a strong quarter for Sonus Networks, our fourth
> consecutive quarter of revenue growth. Our revenues grew 34%
> sequentially to $28.6 million, reflecting increased market demand
> for packet telephony and the expanding number of customers who
> have adopted Sonus' solutions. <u>We achieved an important
> milestone in reporting our first quarterly profit on a GAAP basis</u>.
> [emphasis supplied].

62. On October 9, 2004, Sonus stock closed at $8.80 per share.

63. Following the October 8, 2003 announcement, substantial additional insider trading occurred, as the share price was buoyed by the Company's disclosure of the Company's purported quarterly profit. Jones sold 100,000 shares for proceeds of $857,000, and O'Hara sold an additional 13,750 shares for proceeds exceeding $108,000. Furthermore, defendant Gruber gifted 130,000 shares of Sonus stock, and defendant Ahmed gifted 101,000 shares.

64. On May 9, 2003, August 14, 2003, and November 10, 2003 defendants caused the Company to issue and file quarterly reports on Form 10-Q for the first three quarters of fiscal year 2003, respectively. The May 9, 2003 Form 10-Q contained Section 906 Certifications signed by defendants Nill and Ahmed. The August 14, 2003 and November 10, 2003 Form 10-Qs contained both Section 302 Certifications and Section 906 Certifications signed by defendants Nill and Ahmed.

65. The financial results and statements regarding the Company's purported compliance with accounting standards reported for the first nine months of fiscal year 2003 were materially false and misleading. As alleged herein, on July 28, 2004, the Company's financial results for all of fiscal year 2003 were restated, and it was disclosed that the Company's internal accounting controls were "inadequate" as of December 31, 2003.

## **THE TRUTH BEGINS TO EMERGE**

66.  On January 20, 2004, Sonus' stock closed at $9.91 per share, representing a two-year high. In fact, Sonus shares had jumped over 800% in the preceding year, based in large part upon the Company's purported return to profitability.

67.  However, on that same day, prior to the announcement of fourth quarter and full fiscal year 2003 results, defendants revealed that the Company would have to postpone the conference call scheduled to release these results pending the completion of its 2003 audit, and that upon completion of the audit, the Company would reschedule the conference call and provide further details.

68.  On February 11, 2004, more than 20 days after postponing release of its fourth quarter and full year results, after the close of regular trading, defendants made the following announcement:

> In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.
>
> In response to the issues identified, the Company has taken the following steps: