# PART 2

> -- The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.
>
> -- The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.
>
> -- The Company has terminated certain non-executive employees.
>
> -- Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.
>
> "<u>We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting</u>," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company responded promptly by taking appropriate measures to address these matters. We assure our shareholders, customers and employees that our management and Board of Directors are committed to taking all necessary steps to complete our review in an expeditious and comprehensive manner, and to prevent such problems from occurring in the future."
>
> At this time, Sonus Networks cannot provide an anticipated date for the completion of its review or the year-end audit, or for the rescheduling of the release of its fourth quarter and fiscal year results for the year ended December 31, 2003.
> [emphasis supplied].

69. On this shocking news, the Company's market value declined precipitously, as the share price eventually closed at $5.39 on February 12, 2004 on extremely heavy trading of over 96 million shares.

## ADDITIONAL DISCLOSURES SINCE FEBRUARY 11, 2004

70. Defendants' February 11, 2004 announcement was the first of several announcements during the course of a lengthy investigation into defendants' financial reporting and internal control practices.

21

71.    On March 15, 2004, defendants reported that Sonus would be unable to comply with the filing deadline for audited financial statements for fiscal year 2003.

> Sonus Networks (Nasdaq: SONS) announced that it intends to file its 2003 Annual Report on Form 10-K for the year ended December 31, 2003 today, excluding its audited financial statements and other related financial information. The Company also announced that it plans to file a Form 12b-25 (Notification of Late Filing) with the Securities and Exchange Commission (SEC) today requesting a 15-day extension to file the audited financial statements and other related financial information for its 2003 Annual Report on Form 10-K.
>
> The delay in filing the financial statements is the result of the Company's previously announced detailed review of certain revenue timing issues and practices and of certain other financial statement accounts. The Company has made considerable progress towards the completion of its review and intends to report its financial results for its fourth quarter and fiscal year ended December 31, 2003 upon completing the process. The Company will make every effort to amend its Form 10-K to include the financial statements and other omitted information by the 15th day following the original due date for the 10-K, or by March 30, 2004.
>
> "<u>Over the past two months, we have put a great deal of effort toward completing the review of our financials and establishing new practices and controls,</u>" said Hassan Ahmed, president and CEO, Sonus Networks. "At the same time, we have maintained strong focus and momentum in the business. We look forward to completing this process as quickly as possible."
> [emphasis supplied].

72.    On March 29, 2004, defendants announced that the Company would be unable to comply after all with filing of audited financial statements for fiscal year 2003, that the review could be expanded, and that the Company was subject to delisting by NASDAQ:

> Sonus Networks (Nasdaq: SONS), a leading provider of voice over IP (VoIP) infrastructure solutions, today announced that the filing of its amended Annual Report on Form 10-K/A for the fiscal year ended December 31, 2003 will be delayed. The Company, having made substantial progress towards the completion of its review of 2003 and 2002 financial results, <u>is now considering whether to expand the review to include additional prior periods</u>. Sonus Networks' independent auditor, Ernst and Young LLP, was not the

22

auditor of record for periods prior to 2002. Therefore, in the event that the Company determines its review should be expanded to include periods prior to 2002, such review and accompanying audit could be lengthy.

Sonus Networks is performing a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. The revenue issues under examination relate to the proper timing of revenue recognition and not whether the sales could ultimately be recorded as revenue. For the customer transactions under review, the products have been delivered and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course.

<u>At this time, the Company expects that its review will lead to a restatement of historical financial statements for the fiscal year ended December 31, 2002 and for the first three quarters of fiscal year 2003. As a result, existing financial statements for those periods should not be relied upon.</u>

\* \* \*

As a result of the Company's delay in filing its Form 10-K for 2003, Sonus Networks expects to receive notification from Nasdaq that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities could be subject to delisting from the Nasdaq National Market.
[emphasis supplied].

73. On March 30, 2004, the Boston Herald reported as follows regarding the Company's March 29, 2004 announcement:

> <u>Hassan Ahmed's problems at Sonus Networks Inc. appeared to worsen yesterday as the chief executive said the networking-systems maker faces delisting from the Nasdaq stock market as it tries to resolve misreported sales.</u>
>
> Sonus could be delisted because it missed a recent deadline for filing financial reports with federal regulators as it continued an internal accounting probe. Yesterday, the Chelmsford company said it would have to restate revenue for all of 2002 and the first three quarters of last year.
>
> <u>Ahmed also said that Sonus, which equips communications firms, may review its books for years before 2002 - further back than</u>

23

<u>expected</u>.

> Sonus has already fired some employees who "violated our code of conduct and potentially compromised the integrity of our financial reporting," <u>Ahmed said in a morning conference call. Sonus' shares fell 64 cents, or 14 percent, to $3.92 yesterday, and have lost 60 percent of their value since Sonus surprised investors on Jan. 20 by delaying its fourth-quarter and year-end financial reports</u>.
>
> <u>"Investors are waiting for the other shoe to drop," said Joe Noel, an analyst with Pacific Growth Equities in San Francisco. "I think most investors find it very difficult to believe that upper management did not know what was going on."</u>

\* \* \*

> <u>"The original expectation here was that this would all be cleaned up fairly quickly," said Eric Buck, a Janco Partners analyst. "(But) this is likely going to take significantly longer than was hoped for and expected."</u> [emphasis supplied].

74. On March 30, 2004, the Boston Globe reported as follows in an article captioned "Sonus shares tumble 14%, may face NASDAQ delisting":

> Lehman Brothers telecommunications stock analyst Steven Levy, whose firm helped Sonus stage a rocket-ride initial public stock offering in 2000, said each successive disclosure of financial problems in the last nine weeks "is more troubling than the last. <u>As much as I would like to believe that the underlying business is not being affected by this, at some point it has to become at least a distraction, a significant extra cost or just troubling for the closing of new business.</u>" [emphasis supplied].

75. On April 6, 2004, defendants announced that defendant Nill would "transition" from his CFO position to a new role as vice president for the Company, to be replaced on an interim basis by defendant Notini, and that defendant Gruber had been elevated to "Chairman Emeritus." It was separately reported that the Company's internal review would extend to periods prior to fiscal year 2002.

76. On April 7, 2004, the Boston Herald reported as follows in an article captioned "Sonus says 'so long' to CFO":

24

> Sonus Networks Inc. pushed aside its chief financial officer yesterday amid an internal probe into accounting problems while confirming its audit will be more extensive than previously expected.
>
> Sonus replaced Stephen Nill, CFO since 1999, with Albert Notini, a former CFO at Manufacturers' Services Ltd., who also was named president and chief operating officer.
>
> Separately, Chief Executive Hassan Ahmed added the chairman's role to his duties, replacing Sonus founder Rubin Gruber, who remains involved in business development.
>
> Analysts said Nill was moved to vice president of business operations to placate investors, who watched the firm's shares drop by 60 percent since the probe became public.
>
> <u>"It's clearly a signal that something happened on his watch (and) maybe he wasn't as diligent as he should have been," said Advest analyst Herbert Tinger.</u>
>
> The Chelmsford telecommunications equipment maker said the probe is focused on 2001 revenue, and possibly previous years, as well as results for 2002 and 2003.
>
> Sonus fired an unspecified number of workers after it discovered in January that revenue wasn't recorded properly. Sonus has said its sales levels won't change, but offered few details.
>
> "We're working to get this done as fast as we can," Michael O'Hara, Sonus' vice president of marketing, said of the probe. "(But) we anticipate this could be lengthy."
> [emphasis supplied].

77. On April 12, 2004, Mass High Tech reported as follows in an article captioned "Sonus accounting problems claim chief financial officer as probe widens:"

> <u>Sonus Networks replaced its chief financial officer last week, as the Chelmsford-based softswitch maker struggles to end speculation about accounting troubles that have given a black eye to the once highflying company.</u>
>
> Stephen Nill, who had been Sonus' CFO since the company went public four years ago, was demoted to vice president of business operations. His replacement is Bert Notini, formerly chief fiscal

25

> officer of Manufacturing Services Ltd. in Concord. Notini will serve as chief operating officer and oversee financial reporting until a permanent CFO is hired.
>
> <u>Investors exasperated with Sonus' revenue woes may welcome the management reshuffle, but it was not in time to stop a class-action lawsuit announced April 1. The suit alleges that Sonus misrepresented itself and engaged in accounting improprieties, causing investors in its common stock to suffer "substantial losses."</u>
>
> <u>Sonus had its own bad news to deliver: It has broadened the scope of its investigation into improperly booked revenues. Sonus was already reviewing revenue figures for fiscal 2003 and 2002, and now says it will scrutinize "additional prior periods."</u>
>
> The company did not say how far back its probe will reach.
>
> Sonus has reeled since January, when it announced that it could not present revenues for 2003 because several employees had booked sales in the wrong reporting periods. Since then the company has stressed that it is investigating only when revenues were booked and that all sales can be recorded as revenue.
>
> Sonus has not said when it will be able to wrap up its investigation and restate revenues correctly. <u>Meanwhile, several low-level employees were fired and the stock - which soared from $2 to $10 last year, among New England's best performers in 2003 - now hovers around $4.</u>
>
> \* \* \*
>
> Kevin Mitchell, an analyst with Infonetics Research, did lament that "each successive revelation from Sonus is more and more damaging." <u>He wonders whether the bad publicity will steer potential new customers away from Sonus, even as the much-hyped Internet telephony industry finally has legitimacy with telecommunications carriers.</u>
> [emphasis supplied].

78. On April 27, 2004, defendants announced that they were continuing their review of revenue recognition and "other financial statement accounts" for fiscal years 2002 and 2003.

79. On April 28, 2004, the Boston Herald reported in an article captioned "Sonus numbers soft amid internal probe":

26

> Sonus Networks Inc. offered investors only a few promising clues about its first- and fourth-quarter performance yesterday, delaying more detailed financial reports once again pending the outcome of an internal accounting probe.
>
> <u>"Clearly, it's disappointing," said Joseph Noel, an analyst at Pacific Growth Equities.</u>
>
> <u>"I think people were looking for more solid numbers and some comments about how the audit is going."</u>
>
> <u>The Chelmsford telecommunications-quipment maker is months overdue in reporting some results.</u>
>
> Hassan Ahmed, Sonus' chief executive, tried to reassure analysts in a conference call late yesterday. He said Sonus' cash position and quarterly shipments improved in the past three months, and the firm added about 40 jobs, bringing its work force to 438.
>
> Sonus doesn't plan on providing updated earnings and revenue figures until the accounting probe is completed. The firm recently missed a filing deadline, prompting Nasdaq market regulators to warn that its shares could be delisted.
>
> <u>The probe likely will prompt revenue restatements for 2002 and most of last year, possibly more. Sonus' shares have plunged in the past two months because of the uncertainty.</u>
> [emphasis supplied].

80. On May 24, 2004, defendants announced that the Company had received correspondence from NASDAQ stating that the Company was in violation of filing requirements for continued listing because it had failed to timely file its Form 10-Q for the first quarter of fiscal year 2004.

81. On June 29, 2004, defendants reported that the SEC had stepped up its inquiry into the Company and issued a formal order of investigation of the Company's financial reporting.

82. On July 19, 2004, defendants finally disclosed that the internal review was complete, revealing that the restatement had extended to a variety of accounting matters well beyond merely revenue recognition items:

>Sonus Networks, Inc. (Nasdaq: SONSE), a leading supplier of voice over IP (VoIP) infrastructure solutions to service providers, today provided an update on its previously announced financial review. Sonus Networks has completed the detailed review of its financial statements for fiscal years 2003, 2002 and 2001. Additionally, the Audit Committee of Sonus' Board of Directors has completed its internal investigation.
>
><u>As a result of the financial review, Sonus will restate its consolidated financial results for fiscal 2001 and 2002, and the first three quarters of fiscal 2003. As previously reported, the primary impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the revenue has been deferred and recognized in subsequent periods. In addition, other material restatements include adjustments to purchase accounting, impairments, accruals and deferred compensation.</u> [emphasis supplied].

## **THE RESTATEMENT**

83. On July 28, 2004, defendants announced the completion of the restatement:

>Sonus Networks, Inc. (Nasdaq: SONSE), a leading supplier of service provider voice over IP (VoIP) infrastructure solutions, today reported its financial results for the fourth quarter and fiscal year ended December 31, 2003, and for its first quarter ended March 31, 2004. <u>Sonus has restated its consolidated financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal 2003 in its Form 10-K/A filed with the Securities and Exchange Commission (SEC) on July 28, 2004</u>. Sonus today also filed its Form 10-Q for the first quarter of 2004 with the SEC. Sonus will hold a conference call to review its financial results at 8:15 am Eastern time, Thursday, July 29, 2004.
>
> * * *
>
>**Restatement of Consolidated Financial Statements**
>As a result of the financial review, Sonus has restated its consolidated financial results for fiscal years 2001 and 2002 and the first three quarters of fiscal 2003 as embodied in its Form 10-K/A. <u>As previously reported, the primary impact of the restatements is the adjustment to the timing of revenue recognition and certain other financial statement accounts. Principal adjustments to revenue relate to the timing of revenue where the</u>

28

<u>revenue has been deferred and recognized in subsequent periods. In addition, other material restatements include adjustments to purchase accounting, impairments, accruals and deferred compensation.</u>

An overview of adjustments by period is as follows:

2003 – Restated revenues for the first nine months of 2003 were $46.8 million compared with $66.0 million as initially reported. Restated deferred revenues as of September 30, 2003 were $85.2 million compared with $34.0 million as initially reported. Accrued expenses as of September 30, 2003 were $17.5 million compared with $32.9 million as initially reported. <u>Restated net loss was $22.0 million, or $0.10 per share, compared with $6.4 million, or $0.03 per share, as initially reported.</u>

2002 – Restated revenues for fiscal 2002 were $93.9 million compared with $62.6 million as initially reported. Restated deferred revenues as of December 31, 2002 were $59.8 million compared with $29.2 million as initially reported. Accrued expenses as of December 31, 2002 were $16.5 million compared with $33.4 million as initially reported. <u>Restated net loss was $73.8 million, or $0.39 per share, compared with $68.5 million, or $0.36 per share, as initially reported.</u>

2001 - Restated revenues for fiscal 2001 were $128.8 million compared with $173.2 million as initially reported. Restated deferred revenues as of December 31, 2001 were $60.4 million compared with $13.3 million as initially reported. Accrued expenses as of December 31, 2001 were $18.4 million compared with $27.7 million as initially reported. Restated net loss was $635.6 million, or $3.68 per share compared with $645.4 million, or $3.74 per share, as initially reported.

\* \* \*

Sonus also reported that Stephen J. Nill, its vice president of business operations and former chief financial officer, has resigned at the request of the Company. [emphasis supplied].

84.   On July 28, 2004, defendants filed a Form 10K/A for fiscal year 2003 containing the results of the restatement. The restatement revealed that the Company had violated accounting standards in a wide variety of categories. According to the Form 10-K/A, the restatement required adjustments to improper accounting for revenues (including issues related

29

to deferred revenues, maintenance revenues, product delivery and customer acceptance, and other "errors"), expenses (including accrued and restructuring expenses and benefits), valuation of intangibles in connection with certain corporate acquisitions in 2001, asset impairment, stock-based compensation, and inventory reserves. The restatement further revealed the need for adjustments to the Company's balance sheet and statement of operations.

85.     The Form 10-K/A also disclosed that, throughout the relevant period, the Company's internal controls and procedures had been decrepit and totally inadequate for a publicly traded company like Sonus. Although defendants Ahmed and Nill had repeatedly executed Section 302 Certifications under Sarbanes-Oxley certifying that the Company's internal controls were sufficient to ensure the proper reporting of financial information, in reality the Company's internal controls were in a woeful state:

> Our current management, with the participation of our principal executive officer and co-principal financial officers, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 240.13a-15(e) and 240.15d-15(e) of the Securities Exchange Act of 1934) as of December 31, 2003, which included an evaluation of disclosure controls and procedures applicable to the period covered by the filing of this periodic report. <u>As noted below, we have identified material weaknesses in our internal controls and procedures, as they existed as of December 31, 2003</u>.
>
> * * *
>
> <u>In connection with our restatement, we and Ernst & Young LLP, our independent auditors, identified and reported to our audit committee significant internal control matters that collectively constitute "material weaknesses." These internal control matters, any one or more of which may individually or together constitute a material weakness, include: insufficient contract review and documentation; inadequate supervision and review within the finance and accounting department; inadequate segregation of duties; insufficient supporting documentation for and review of account reconciliations; lack of adequate controls over cash receipts; lack of adequate technical accounting expertise; insufficient equity review procedures and documentation; flawed foundations for accounting estimates; and inadequate quarterly and year-end financial statement close and review procedures.</u>
> [emphasis supplied].

## DEFENDANTS' POST-RESTATEMENT OPTION AND BONUS AWARDS

86.     The 2003 Form 10-K/A further disclosed that, notwithstanding that the serious internal control problems which existed at the Company and the ensuing restatement of financial results, the Compensation Committee of the board awarded substantial cash and stock compensation for fiscal year 2003 to several of the Company's senior officers and directors – the very individuals who were responsible for ensuring the implementation of adequate internal controls and procedures in the first place, but failed to do so.

87.     In particular, defendant Ahmed, the Company's CEO during the relevant period, was awarded $75,000 in cash and options to purchase 2 million shares of Sonus stock, valued at up to $14 million based on a 10% rate of appreciation of Sonus stock over the term of the options. Ahmed received this award even though he already owned over 8 million shares of stock and obtained at least $23 million in proceeds from sales of Sonus stock during 2000 and 2001. In January 2004, just as the accounting problems were being revealed, Ahmed's annual salary was almost doubled to $295,000.

88.     Defendant Gruber, the Chairman of the board during the relevant period, was awarded options to purchase 430,000 shares of Sonus stock, valued at over $3 million based on a 10% rate of appreciation of Sonus stock over the term of the options. Gruber received this award even though he already owned over 4 million shares of Sonus stock and obtained at least $22 million in proceeds from sales of Sonus stock during 2001.

89.     Defendant Jones, a vice-president, was awarded options to purchase 540,000 shares of Sonus stock, valued at over $3.7 million based on a 10% rate of appreciation of Sonus stock over the term of the options.

90.     Defendant O'Hara, a vice president, was awarded options to purchase 100,000 shares of Sonus stock, valued at over $700,000 based on a 10% rate of appreciation of Sonus stock over the term of the options.

91.     Furthermore, defendant Notini, who served on the Audit Committee during most of fiscal year 2003 and therefore shares significant responsibility for the state of the Company's

internal controls, was hired as the Company's COO, receiving an employment contract with a salary of $325,000, a potential bonus of 85% of his base salary, and an award of options to purchase 2,450,000 shares of Sonus stock.

92.  Given the scope and nature of the restatement, these awards were unjustified. In a New York Times article "Why Not Restate Bonuses?" dated April 25, 2004, the Company's compensation practices had already been questioned:

> SANJAY KUMAR lost two prestigious posts when he resigned last week as chairman and chief executive of Computer Associates International amid its escalating accounting scandal. But he still has the mountain of money that the Computer Associates board has given him over the years.
>
> Now seems as good a time as any for Computer Associates shareholders to ask their directors whether any of this money will be returned to the company.
>
> The fact is, compensation committees of corporate boards take pains to devise performance goals upon which they claim to base the pay of top management. <u>So why shouldn't corporate officials who receive bonuses or other incentive compensation based on financial results be required to return part or all of that pay if those results turn out to have been misstated</u>?
>
> * * *
>
> Sonus Networks, a maker of products for voice and data networks, also disclosed this month that it would make a restatement. During 2002 and the first three quarters of 2003, some sales may have been recognized in the wrong periods, Sonus said. The company is also examining sales in earlier years.
>
> <u>In May 2002, three audit committee members received options to buy 10,000 shares of Sonus stock at $2.51 a share. They were Edward T. Anderson, managing general partner at North Bridge Venture Partners in Waltham, Mass.; Paul J. Ferri, general partner of Matrix Partners, a venture capital firm in Waltham, Mass.; and Paul J. Severino, a private investor and a director of MCK Communications Inc. in Needham, Mass.</u>
>
> <u>Last May, Sonus again granted the three directors options on another 10,000 shares, this time at $3.31 each.</u>

32

Sonus's stock is no longer the highflier it was in the bubble. But the stock reached $10 earlier this year and closed at $4.68 on Friday. The options, with a 10-year life, are quite valuable.

Given that Sonus's audit committee should have been on the alert for accounting improprieties, will the three members who received the options return them after the restatement? "I haven't thought about it," Mr. Severino said. "If it's appropriate for us to do, we will do it. It's nothing that's high on our list right now. We're just trying to do what we need to do to meet all our requirements."

Mr. Anderson and Mr. Ferri did not return phone calls seeking comment.

While the Sarbanes-Oxley law addresses the concept of clawing back compensation, the law states rather vaguely that chief executives and chief financial officers may have to forfeit bonuses when they have certified their companies' financial results and willful misconduct was involved. That leaves lots of wiggle room and says nothing about other executives whose pay is also based on financial hurdles.

\* \* \*

In 2002, when the Enron and WorldCom scandals were fresh, President Bush said in a speech: "Responsible leaders do not collect huge bonus packages when the value of their company dramatically declines."

Sad to say, Mr. President, but across corporate America these days, "responsible leader" is fast becoming an oxymoron.
[emphasis supplied].

## FURTHER REVELATIONS REGARDING THE CONDITION OF THE COMPANY'S INTERNAL CONTROLS

93.     On March 15, 2005, defendants caused the Company to file a Form 10-K for fiscal year 2004. The 2004 Form 10-K demonstrated that the Company's internal control problems were far more serious and pervasive than had been previously disclosed:

> Management's Report on Internal Control Over Financial Reporting

33

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2004 based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

Based on our assessment, we identified the following material weaknesses in our internal control over financial reporting as of December 31, 2004. As defined in the COSO framework, these material weaknesses include both entity-level control weaknesses as well as weaknesses in process, transaction and application controls. The nature of each of these material weaknesses in our internal control over financial reporting is described below along with the actual or potential effects on our financial statements issued during the existence of the material weakness.

*1. Inadequate entity-level controls.* We do not have effective entity level controls as defined in the COSO framework. These weaknesses include the following:

• Weaknesses in the control environment, including the lack of uniform and consistent communication by all members of senior management regarding the importance of controls; lack of adequate controls over authorizations and approvals of transactions and expenditures; lack of effective segregation of duties; and lack of adequate resources in accounting, finance and information systems to ensure that recurring errors are appropriately addressed.

• Weaknesses in the risk assessment controls, including the lack of adequate mechanisms for anticipating and identifying financial reporting risks; and for reacting to changes in the operating environment that could have a potential effect on financial reporting.

• Weaknesses over control activities including, the lack of necessary policies and procedures; lack of information systems access and security controls; and lack of adequate controls to safeguard assets, including computer programs and data files.

• Weaknesses over information and communication controls, including the lack of effective information systems and business processes required to support operations and reporting

34

requirements; lack of adequate controls over changes to financial applications; and lack of adequate communication of employees' duties and control responsibilities.

• Weaknesses in monitoring controls including, the lack of adequate staffing and procedures to ensure periodic evaluations of internal controls to ensure that appropriate personnel regularly obtain evidence that controls are functioning effectively and that identified control deficiencies are timely remedied.

If we were not, or are not in future periods, successful in identifying these control weaknesses, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**2. *Inadequate business processes and information systems.*** Our business processes and information systems are not adequately designed or utilized to effectively support financial reporting requirements. As a result significant manual post-closing procedures, analysis and adjustments are required to accurately and completely publicly report our financial results. We do not have sufficient procedures that ensure these analyses are adequately prepared and reviewed prior to the underlying transactions being posted to the general ledger, which may result in inaccurate balances on the general ledger that are then adjusted. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of increasing current assets, increasing non-current assets, decreasing current liabilities and increasing long term deferred revenue. In addition, they had the effect of decreasing revenue, decreasing cost of revenues, decreasing operating expenses and decreasing net income. If we were not, or are not in future periods, successful in identifying these general ledger-posting adjustments, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**3. *Inadequate revenue recognition procedures and controls.*** We do not have adequate procedures and controls to ensure that a) all significant terms of our arrangements with customers are documented and understood to ensure that our revenue recognition criteria are satisfied, b) all undelivered elements have been delivered prior to revenue being recognized, and c) maintenance and service revenue is properly recorded in the correct period. As a result, revenue-related material post-closing adjustments have been posted to our books and records and our financial statements. These adjustments, which are reflected in the accompanying financial statements for the year ended December 31, 2004, had the

35

effect of decreasing revenue, decreasing cost of revenues, increasing accounts receivable, increasing inventory, increasing deferred revenue and decreasing accrued expenses. If we were not, or are not in future periods, successful in identifying these revenue recognition adjustments, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**4. *Inadequate segregation of duties and information systems users.*** We do not have adequate procedures and controls in place to ensure proper segregation of duties within the purchasing/payables, billing/collection, payroll and contract approval processes. Information systems end users may also have the ability to gain unauthorized or inappropriate access to our systems. As a result, misappropriation of assets and adjustments in the financial statements could occur and not be prevented or detected by our controls in a timely manner.

**5. *Inadequate financial statement preparation and review procedures.*** We do not have adequate procedures and controls to ensure that accurate financial statements can be prepared and reviewed on a timely basis, including insufficient a) levels of supporting documentation, b) review and supervision within the accounting and finance departments, c) underlying accurate data to ensure that balances are properly summarized and posted to the general ledger, d) analysis of reserves and accruals, including inventory reserves, warranty accruals and royalty accruals, and e) technical accounting resources. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of increasing current assets, increasing non-current assets, decreasing current liabilities and increasing long term deferred revenue. In addition, they had the effect of decreasing revenue, decreasing cost of revenues, decreasing operating expenses and decreasing net income. If we were not, or are not in future periods, successful in identifying these adjustments, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**6. *Inadequate controls over cash receipts.*** We do not have appropriate segregation of responsibilities between custody and recording of cash receipts, or adequate controls to ensure that all invoices paid are timely recorded in our books and records. This could prevent us from recording cash receipts on our accounts receivable accurately and timely. As a result, misappropriation of assets and material misstatements in our financial statements could occur and not be prevented or detected by our controls in a timely manner. If we were not, or are not in future periods, successful in

36

identifying these cash receipt adjustments, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**7. *Inadequate controls over equity transactions.*** We do not have adequate review and supervision controls or sufficient supporting documentation of equity-related reconciliations and analyses to ensure the proper monitoring of equity transactions. As a result, adjustments in the equity accounts and financial statements could occur.

**8. *Inadequate purchasing controls.*** We do not have adequate authorization controls and procedures, or proper segregation of duties in our purchasing processes. As a result, misappropriation of assets and material misstatements in our financial statements could occur and not be prevented or detected by our controls in a timely manner. If we were not, or are not in future periods, successful in identifying these, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

**9. *Inadequate controls over inventory and cost of revenues.*** We do not have adequate procedures and controls to ensure that cost of revenues transactions are accurately recorded in the correct period, that inventory reserves and valuation accounts are properly analyzed and that any resulting adjusting entries are accurately and timely recorded in our general ledger. As a result, material post-closing adjustments have been posted to our general ledger. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of decreasing cost of revenues, increasing net income and increasing inventory.

**10. *Inadequate information systems procedures and controls.*** We do not have adequate procedures and controls over our information systems control environment, including controls to ensure that changes to financial applications are properly authorized and tested and that access to our information systems and financial applications are appropriately restricted. Therefore, we are not able to place reliance on our information systems' application controls and the resulting data. As a result, financial statement accounts may contain errors that have not been prevented or detected by our controls in a timely manner. If we were not, or are not in future periods, successful in identifying these adjustments, our quarterly or annual financial statements could be materially misstated, which could require a restatement.

Because of the material weakness described above, management

37

concluded that, as of December 31, 2004, our internal control over financial reporting was not effective based on the COSO criteria.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2004 has been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report, which is included on page F-3 of this Annual Report on Form 10-K.

94.   In a letter to the board of directors dated March 14, 2005, the Company's auditor, Ernst & Young LLP, concurred with defendants' report regarding the state of the Company's internal control environment:

> To the Board of Directors and Stockholders of
> Sonus Networks, Inc.:
>
> We have audited management's assessment, included in the accompanying Management's Report on Internal Control over Financial Reporting, that Sonus Networks, Inc. and subsidiaries (the "Company") did not maintain effective internal control over financial reporting as of December 31, 2004, because of the effect of the ten material weaknesses identified in management's assessment, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Sonus Networks, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following ten material weaknesses have been identified and included in management's assessment:

1. *Inadequate entity-level controls.* The Company does not have effective entity level controls as defined in the COSO framework. These weaknesses include the following:

• Weaknesses in the control environment, including the lack of uniform and consistent communication by all members of senior management regarding the importance of controls; lack of adequate controls over authorizations and approvals of transactions and expenditures; lack of effective segregation of duties; and lack of adequate resources in accounting, finance and information systems to ensure that recurring errors are appropriately addressed.

• Weaknesses in the risk assessment controls, including the lack of adequate mechanisms for anticipating and identifying financial reporting risks; and for reacting to changes in the operating

39