# PART 3

environment that could have a potential effect on financial reporting.

• Weaknesses over control activities, including the lack of necessary policies and procedures; lack of information systems access and security controls; and lack of adequate controls to safeguard assets, including computer programs and data files.

• Weaknesses over information and communication controls, including the lack of effective information systems and business processes required to support operations and reporting requirements; lack of adequate controls over changes to financial applications; and lack of adequate communication of employees' duties and control responsibilities.

• Weaknesses in monitoring controls, including the lack of adequate staffing and procedures to ensure periodic evaluations of internal controls to ensure that appropriate personnel regularly obtain evidence that controls are functioning effectively and that identified control deficiencies are timely remedied.

2. *Inadequate business processes and information systems.* The Company's business processes and information systems are not adequately designed or utilized to effectively support financial reporting requirements. Significant manual post-closing procedures, analysis and adjustments are required to accurately and completely publicly report financial results. The Company does not have sufficient procedures to ensure these analyses are adequately prepared and reviewed prior to the underlying transactions being posted to the general ledger, which may result in inaccurate balances on the general ledger that are then adjusted. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of increasing current assets, increasing non-current assets, decreasing current liabilities and increasing long term deferred revenue. In addition, they had the effect of decreasing revenue, decreasing cost of revenues, decreasing operating expenses and decreasing net income.

3. *Inadequate revenue recognition procedures and controls.* The Company does not have adequate procedures and controls to ensure that a) all significant terms of its arrangements with customers are documented and understood to ensure that revenue recognition criteria are satisfied, b) all undelivered elements have been delivered prior to revenue being recognized, and c) maintenance and service revenue is properly recorded in the correct period. As a result, revenue-related material post-closing

adjustments have been posted to its books and records and its financial statements. These adjustments, which are reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of decreasing revenue, decreasing cost of revenues, increasing accounts receivable, increasing inventory, increasing deferred revenue and decreasing accrued expenses.

4. *Inadequate segregation of duties and information systems users.* The Company does not have adequate procedures and controls in place to ensure proper segregation of duties within the purchasing/payables, billing/collection, payroll and contract approval processes. Information systems end users may also have the ability to gain unauthorized or inappropriate access to its systems. As a result, misappropriation of assets and adjustments in the financial statements could occur and not be prevented or detected by the Company's controls in a timely manner.

5. *Inadequate financial statement preparation and review procedures.* The Company does not have adequate procedures and controls to ensure that accurate financial statements can be prepared and reviewed on a timely basis, including insufficient a) levels of supporting documentation, b) review and supervision within the accounting and finance departments, c) underlying accurate data to ensure that balances are properly summarized and posted to the general ledger, d) analysis of reserves and accruals, including inventory reserves, warranty accruals and royalty accruals, and e) technical accounting resources. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of increasing current assets, increasing non-current assets, decreasing current liabilities and increasing long term deferred revenue. In addition, they had the effect of decreasing revenue, decreasing cost of revenues, decreasing operating expenses and decreasing net income.

6. *Inadequate controls over cash receipts.* The Company does not have appropriate segregation of responsibilities between custody and recording of cash receipts, or adequate controls to ensure that all invoices paid are timely recorded in its books and records. This could prevent the Company from recording cash receipts on its accounts receivable, accurately and timely. As a result, misappropriation of assets and material misstatements in its financial statements could occur and not be prevented or detected by the Company's controls in a timely manner.

7. *Inadequate controls over equity transactions.* The Company

41

does not have adequate review and supervision controls or sufficient supporting documentation of equity-related reconciliations and analyses to ensure the proper monitoring of equity transactions. As a result, adjustments in the equity accounts and financial statements could occur.

8. *Inadequate purchasing controls.* The Company does not have adequate authorization controls and procedures, or proper segregation of duties in its purchasing processes. As a result, misappropriation of assets and material misstatements in its financial statements could occur and not be prevented or detected by the Company's controls in a timely manner.

9. *Inadequate controls over inventory and cost of revenues.* The Company does not have adequate procedures and controls to ensure that cost of revenues transactions are accurately recorded in the correct period, that inventory reserves and valuation accounts are properly analyzed and that any resulting adjusting entries are accurately and timely recorded in its general ledger. As a result, material post-closing adjustments have been posted to its general ledger. Post-closing adjustments reflected in the accompanying financial statements for the year ended December 31, 2004, had the effect of decreasing cost of revenues, increasing net income and increasing inventory.

10. *Inadequate information systems procedures and controls.* The Company does not have adequate procedures and controls over its information systems control environment, including controls to ensure that changes to financial applications are properly authorized and tested and that access to its information systems and financial applications are appropriately restricted. Therefore, the Company is not able to place reliance on its information systems' application controls and the resulting data. As a result, financial statement accounts may contain errors that have not been prevented or detected by the Company's controls in a timely manner.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the December 31, 2004 financial statements, and this report does not affect our report dated March 14, 2005 on those financial statements.

In our opinion, management's assessment that Sonus Networks, Inc. did not maintain effective internal control over financial reporting as of December 31, 2004, is fairly stated, in all material respects, based on the COSO control criteria. Also, in our

42

>opinion, because of the effect of the material weaknesses described above on the achievement of the objectives of the control criteria, Sonus Networks, Inc. has not maintained effective internal control over financial reporting as of December 31, 2004, based on the COSO control criteria.

95.   On or about June 10, 2005, defendants cause Sonus to file with the SEC amended Form 10-Qs for the first three quarters of fiscal year 2003.

## DEFENDANTS FAILED TO ADDRESS "RED FLAGS"

96.   All of the Director Defendants were on notice of "red flags" demonstrating that the Company's internal controls systems were deficient, and that there were serious problems with the Company's disclosure systems.

97.   In particular, (1) defendants knew in 2001 and 2002 that the Company's internal controls had been placed under "significant strain" by the Company's rapid growth, and that these controls needed to be improved, and (2) defendants were on notice of allegations in a federal securities class action that the Company misled shareholders regarding the quality and capability of the Company's products, and that the Company's financial statements were inaccurate by virtue of improper accounting and reporting practices.

98.   In January 2001, defendant Ahmed publicly stated that fiscal year 2000 had been a year of "significant growth across every dimension of our business," and that the Company had embarked on an acquisition strategy for new technologies, expanded the Company's "product portfolio," and moved into "new geographies."

99.   In connection with anticipated future growth, the Company's Form 10-K for fiscal year 2000, filed in March 2001, stated as follows:

>_We intend to expand our operations rapidly and plan to hire a significant number of employees during 2001. Our growth has placed, and our anticipated growth will continue to place, a significant strain on our management systems and resources._ Our ability to successfully offer our products and implement our business plan in a rapidly evolving market requires effective planning and management processes. _We expect that we will need_

43

> to continue to improve our financial, managerial and
> manufacturing controls and reporting systems, and will need to
> continue to expand, train and manage our work force worldwide. If
> we fail to implement adequate control systems in an efficient and
> timely manner, our costs may be increased and our growth could
> be impaired and we may not be able to accurately anticipate and
> fulfill market demand, the result of which will be a loss of
> revenues and customers. [emphasis supplied].

100.   The fiscal year 2000 Form 10-K was signed by defendants Ahmed, Gruber, Anderson, Ferri and Severino, a majority of the board.

101.   In January 2002, defendants reported that the Company's revenue for 2001 had increased to $173 million (a figure later restated), a substantial increase over the previous year's revenue of just $51 million.

102.   In the Company's Form 10-K for 2001, filed in March 2002, defendants stated that, indeed, the Company had expanded "rapidly" in 2001, placing "significant strain" on the Company's internal controls:

> We have expanded our operations rapidly and have hired a
> significant number of employees during fiscal 2001. Our growth
> has placed, and our anticipated growth will continue to place, a
> significant strain on our management systems and resources. Our
> ability to successfully offer our products and implement our
> business plan in a rapidly evolving market requires effective
> planning and management processes. We expect that we will need
> to continue to improve our financial, managerial and
> manufacturing controls and reporting systems, and will need to
> continue to train and manage our worldwide workforce. If we fail
> to implement adequate control systems in an efficient and timely
> manner, our costs may be increased and our growth could be
> impaired and we may not be able to accurately anticipate and
> fulfill market demand, the result of which will be a loss of
> revenues and customers. [emphasis supplied].

103.   The fiscal year 2001 Form 10-K was signed by defendants Ahmed, Gruber, Anderson, Ferri and Severino, a majority of the board.

104.   These defendants were therefore on notice that the Company's internal controls were under "significant strain" and needed to be "improved" in light of the Company's rapid

44

revenue growth, hiring, and business expansion. The restatement and subsequent admissions that the Company's internal controls were practically non-existent clearly demonstrate that defendants failed to make the necessary improvements to the Company's internal controls.

105.   The board also knew that the Company's accounting and disclosures practices had been called into question in a series of class action complaints filed in this court beginning in July 2002 and pending before Judge Wolf. All of the Director Defendants knew about this litigation, as it was prominently discussed in SEC filings.

106.   In a Consolidated Amended Class Action Complaint for violation of the federal securities laws, filed on March 3, 2003, certain purchasers of Sonus stock alleged that between December 11, 2000 and January 16, 2002, Sonus made false statements regarding the quality and capabilities of the Company's products, and issued financial statements which failed to properly account for certain transactions, in violation of applicable accounting standards. The complaint alleged that these false statements had the effect of artificially inflating the price of Sonus stock, and causing damages to investors when the truth was revealed and the stock price declined. The complaint named defendants Ahmed, Gruber and Anderson and Nill, among others.

107.   According to the complaint in that case, defendants overstated the quality and performance and capabilities of the Company's products, thereby deceiving investors in Sonus stock regarding the Company's prospects. According to the complaint, defendants' repeated representations in press releases and SEC filings during the class period that Sonus provided "voice infrastructure products for the new public network," that "Sonus solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," that Sonus products met industry standards for voice transmission reliability, and that Sonus' "highly scalable products fully inter-operate with and extend the life and utility of today's public network" were materially false and misleading. According to the complaint, which contained information provided by numerous Sonus engineers and others, defendants knew that, contrary to their representations, the Company's products could not provide the voice quality transmission required by major carriers, and that product problems were known by senior management.

108. Furthermore, with respect to the Company's accounting procedures and financial statements, the complaint alleged that in order to induce sales and support revenue growth, defendants caused Sonus to employ an undisclosed practice of providing customers with "substantial financial inducements, such as loans or credits."

109. One such transaction occurred with Qwest, a big Sonus customer. According to the complaint, in exchange for a $20 million purchase by Qwest of certain Sonus products, Sonus was required to purchase a $20 million "IRU," or irrevocable right of use, obligating Sonus to pay for an amount of capacity on Qwest's fiber optic network over a period of several years. And in order to obtain a July 2001 transaction with Bellsouth, Sonus issued to Bellsouth $10 million of convertible debt with a 4.75% coupon and the right to convert the debt into Sonus stock in the event the trading price of Sonus stock reached $30 per share. According to the complaint, these types of sales practices have been "widely recognized and criticized as a means of misrepresenting a company's financial condition and performance." The complaint cites Lynn Turner, former chief accountant of the SEC, stating that these types of transactions raise "the real question of whether companies are creating real economic revenue or sham transactions financially engineered to report to shareholders." The complaint cites a telecom executive stating that these "hollow swap" transactions "shoot an arrow at the heart of the system."

110. The complaint further alleged that the Company's financial statements were rendered false and misleading because they did not disclose key elements of these transactions, which were designed to give the appearance of revenue. The complaint alleged that under APB Opinion 29, companies that engage in non-monetary transactions, such as exchanges or swaps during a reporting period, are required to disclose the nature of the transactions, the basis of accounting for the assets transferred, and gains or losses recognized. The complaint also alleged that SFAS No. 95, Statement of Cash Flows requires that information about all investing and financing activities of a company that affect recognized assets or liabilities but that do not result in cash receipts or payments, such as non-monetary asset exchanges, be disclosed in the financial statements. According to the complaint, none of these disclosures were made, causing the Company's financial results to be misstated and artificially inflating the Company's share price.

46

111.  According to the complaint, the Company's representations in SEC filings during the class period that the financial statements were accurate were therefore false and misleading. These filings included the Form 10-K for 2000, Form 10-Qs for the first three quarters of fiscal year 2001, and a Form S-4 Registration Statement.

112.  The complaint also alleged that while in possession of material inside information regarding the Company's disclosures, and its accounting practices and financial statements, certain of the Company's officers and directors sold 6.4 million shares of Sonus stock for $158 million, including three of the directors named herein. According to the complaint, during fiscal years 2000 and 2001, defendant Ahmed sold 807,000 shares for over $23 million. Defendant Anderson sold 292,000 shares for over $8.3 million. And defendant Gruber sold 782,000 shares for over $22.8 million. These insider trading allegations were yet another "red flag" regarding deficiencies with the Company's internal controls.

113.  On or about May 11, 2004, Judge Wolf denied defendants' motion to dismiss the complaint.

## DEFENDANTS' DISCLOSURES VIOLATED GAAP

114.  GAAP are principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

115.  Defendants implicitly represented that the financial results they reported for the Company during the relevant period were prepared in accordance with GAAP, and explicitly represented that the reported results reflected all adjustments, consisting of normal recurring accruals, necessary for a fair presentation thereof. As specified above, however, defendants'

47

representations concerning the Company's financial results during the relevant period were false and misleading in numerous material respects:

(a)     Defendants stated that the Company's financial statements fairly presented the Company's financial condition;

(b)     Defendants failed to disclose that the Company's internal controls were grossly inadequate and, as a result, the Company's ability to record, process, summarize, and report financial data in its financial statements was seriously deficient;

(c)     Defendants violated the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

(d)     Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

(e)     Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. That principle is particularly significant in the context of publicly-traded entities such as Sonus. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

(f)     Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

(g)    Defendants violated the principle that financial reporting should be reliable and represent what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

(h)    Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

(i)    Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).

116.   Further, the undisclosed adverse information concealed by defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by shareholders and investors to be disclosed and is known by corporate officials to be the type of information which is expected to be and must be disclosed.

117.   Under GAAP, restatement of previously issued financial statements is the most serious step, reserved only for situations in which no lesser remedy is available. Statement of Financial Accounting Standard No. 16, *Prior Period Adjustments*, and Accounting Principles Board Opinion No. 20, *Accounting Changes*, provide that restatements are only permitted -- and are required -- for *material accounting errors or irregularities that existed at the time the financial statements were prepared*. Specifically, the financial reports at issue herein materially misstated the Company's income during the subject periods and materially misstated that each of the financial reports for fiscal years 2001, 2002 and first nine months of 2003 had been prepared in accordance with GAAP.

118.   The restatement constitutes an admission that the financial reports were not prepared in accordance with GAAP, and an admission of both the falsity and the materiality of the misstatements.

## THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

119. All of the Director Defendants had the responsibility to ensure that there existed at Sonus sufficient internal controls to maintain the accuracy of its reported financial results.

120. Defendants Anderson, Ferri, Severino and Notini, in particular, all of whom served on the Audit Committee during part or all of the relevant period, had the responsibility to ensure that Sonus had sufficient accounting controls to insure the accuracy of its reported financial results. These defendants had a special relationship with the Company because they served on the Audit Committee.

121. According to the Company's audit committee charter, attached to its Form 14A Proxy Statement for fiscal year 2003:

> The primary purpose of the Audit Committee (the "Committee") is to assist the Board of Directors of the Corporation (the "Board") in fulfilling its oversight responsibilities to its stockholders and to the investment community by reviewing:
>
> -the financial reports and other financial information provided by the Corporation to its stockholders, to any governmental body or to the public;
>
> -the Corporation's systems of internal accounting and financial controls and disclosure controls and procedures;
>
> -the Corporation's auditing, accounting and financial reporting processes generally;
>
> -the independence, qualifications and performance of the Corporation's independent auditor; and
>
> -any legal compliance and ethics programs established by management and/or the Board.

122. Pursuant to the audit committee charter, the Audit Committee "oversee[s] the Corporation's internal accounting controls, disclosure controls and procedures and code of conduct" and "review[s] the adequacy of the Corporation's financial disclosure and reporting

processes, including any significant risks and uncertainties with respect to the quality, accuracy and completeness of the Corporation's financial disclosure and reporting processes." According to the charter, the Audit Committee reviews the Company's interim and audited financial statements. During each fiscal year at issue, the Audit Committee met to discuss these issues.

123. As members of the Audit Committee, defendants Anderson, Ferri, Severino and Notini were charged, according to Appendix D to Statement on Auditing Standards No. 55, <u>Consideration of the Internal Control Structure in a Financial Statement Audit</u> ("SAS 55"), with objectives such as (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

124. As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. Moreover, public ownership of such an entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

125. According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable

51

> assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing <u>supervision by management</u> to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [emphasis supplied].

126. When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements . . . may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, <u>Communications of Internal Control Structure Related Matters Noted in an Audit</u> ("SAS 60"), as a "material weakness" in the company's internal control structure.

## INSIDER TRADING ALLEGATIONS

127. As a result of the statements alleged herein regarding the Company's financial results, Sonus stock traded at artificially inflated levels through the relevant period. The Insider Trading Defendants knew or recklessly disregarded that revenues were being inflated through improper accounting, and that the Company's financial reporting was not based upon sound internal controls. Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold Sonus shares at artificially inflated prices while in possession of material, nonpublic information. The insider trading during the relevant period is summarized below:

| Name | Date | No. Shares Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| Edward T. Anderson | 7/18/03 | 32,378 | $6.85 | $221,789 |

52

|  | 7/18/03 | 33,206 | $6.84 | $227,129 |
|---|---|---|---|---|
|  |  | 65,584 |  | $448,918 |
| John Michael O'Hara | 7/22/03 | 15,000 | $6.95 | $104,250 |
|  | 7/22/03 | 15,000 | $7.03 | $105,450 |
|  | 7/22/03 | 15,000 | $6.82 | $102,300 |
|  | 7/22/03 | 10,000 | $6.92 | $69,200 |
|  | 10/22/03 | 5,000 | $7.90 | $39,500 |
|  | 10/22/03 | 5,000 | $7.85 | $39,250 |
|  | 10/22/03 | 3,750 | $7.91 | $29,662 |
|  |  | 68,750 |  | $489,612 |
| Paul Jones | 10/10/03 | 100,000 | $8.57 | $857,000 |
| Edward Harris | 7/18/03 | 30,000 | $6.81 | $204,300 |
| Totals |  | 364,334 |  | $2,277,830 |

128. Notably, all of these trades were made after the Company's July and October 2003 statements that it would soon be achieving "profitability," which statements caused the Company's share price to rise from approximately $1 in January 2003 to approximately $9 by October 2003 and $10 in early January 2004, prior to the announcement of the accounting problems. Furthermore, all of the trades were made after defendants became aware of the "red flags" alleged herein. Three of the four defendants had never traded Sonus stock, and defendant Anderson had not traded in two years. The complaint upheld by Judge Wolf contained allegations that defendant Anderson had engaged in unlawful insider trading.

129. Certain of the defendants also derived personal benefits by the inflated share price by gifting shares during this time period. During fiscal years 2002 and 2003, Ahmed disposed of over 300,000 shares of Sonus stock by gift, for value exceeding $967,561. During fiscal year 2002, Anderson gifted 100,000 Sonus shares for value of $37,000. In December 2003, Gruber gifted 130,000 shares of Sonus stock for value exceeding $826,000.

## DERIVATIVE ACTION ALLEGATIONS

130. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Sonus to enforce the claims of Sonus against the Individual Defendants, which may properly be asserted by Sonus and which Sonus has failed to enforce.

131. The wrongs complained of herein occurred during the time in which plaintiffs were Sonus shareholders. Plaintiffs continue to hold shares in Sonus. Hence, plaintiffs have standing to bring this derivative action on behalf of Sonus to recover damages for all of the conduct described in this complaint.

132. Plaintiffs will fairly and adequately protect the interests of Sonus and its shareholders in enforcing the rights of Sonus against the Individual Defendants. Plaintiffs' attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of Sonus to insure the rights of the Sonus. Plaintiffs have no interests adverse to Sonus.

## THE INDIVIDUAL DEFENDANTS HAVE DAMAGED THE COMPANY

133. By reason of their positions as fiduciaries of Sonus and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to Sonus fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each defendant owed to Sonus a fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of good faith and fair dealing.

134. In addition, as officers and/or directors of a public company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, services, management, projections and forecasts so that the market

price of the Company's common stock would be based, at all pertinent times, on truthful and accurate information.

135. The Individual Defendants either directly participated in the decisions to release the press releases and SEC filings complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature, or knew or were reckless in not knowing that such violations were occurring, and took no action to prevent or remedy the situation. Defendants' conduct is underscored by their extremely detailed admissions that the Company's internal controls were totally inadequate <u>going back for years</u>, although ensuring the existence of such controls is among their most important duties.

136. Defendants caused Sonus to engage in a course of conduct which was designed to and did artificially inflate the market price of Sonus stock. Defendants did this to prolong the appearance of good fortune at Sonus, profit personally by trading while in possession of material, non-public information concerning the true financial condition of the Company, and maximize the value of their substantial personal holdings of Sonus stock.

137. Defendants either knew or were reckless in not knowing that the acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Sonus stock and would artificially inflate the prices of those securities. Sonus' stock reached $10 per share in early 2004, yet traded as low as $2 to $3 per share after the truth regarding the Company's false financial statements was finally disclosed, and currently trades at approximately $5 per share.

138. Sonus has been damaged by its exposure to multi-million dollar damages claims by the members of the classes in the Class Actions, as well as to the substantial legal and other professional expenses to be incurred in connection with the Class Actions, the Audit Committee's internal inquiry, the now-concluded SEC investigation, and the NASDAQ delisting process. With respect to auditing costs alone, the Company spent at least <u>$4.8 million</u> on auditor fees in 2003, which figure includes amounts spent on the restatement.

139. Defendants have admitted the extent to which they have damaged the Company in connection with the ensuing litigation. According to the Company:

> We are generally obliged, to the extent permitted by law, to indemnify our current and former directors and officers who are named as defendants in some of these lawsuits. Defending against existing and potential litigation relating to the restatement of our consolidated financial statements will likely require significant attention and resources of management. Regardless of the outcome, such litigation and investigation will result in significant legal expenses and may also negatively affect our relationships with our customers and our employees. If our defenses are ultimately unsuccessful, or if we are unable to achieve a favorable settlement, we could be liable for large damage awards that could have a material adverse effect on our business, results of operations and financial condition.

140. The Company further reported as follows regarding costs associated with increased premiums for insurance coverage and the damaging impact upon the Company's ability to attract management:

> The facts underlying the lawsuits and SEC investigation have made director and officer liability insurance extremely expensive for us, and may make this insurance coverage unavailable for us in the future. Increased premiums could materially harm our financial results in future periods. The inability to obtain this coverage due to its unavailability or prohibitively expensive premiums would make it more difficult to retain and attract officers and directors and expose us to potentially self-funding any potential future liabilities ordinarily mitigated by director and officer liability insurance.

141. The Company also stated that it would incur distraction and substantial costs in connection with the SEC investigation:

> We have received a formal order of private investigation from the SEC. Our management will spend considerable time and effort cooperating with the SEC in its investigation. The significant time and effort expected to be spent on this SEC investigation may adversely affect our business, results of operations and financial condition. We may incur substantial costs in connection with the investigation including fines and significant legal expenses.

142.   An article dated July 29, 2004 on Thestreet.com reported:

> "We know that Sonus has been paying millions more in administrative expenses per quarter in extra legal, accounting, and consulting fees and that these expenses are not likely to diminish anytime soon," wrote Lehman Brothers analyst Steve Levy in a research note Thursday. Levy has a sell rating on the stock.

143.   The Company further reported disruption which would be created in connection with seeking new executive management, and that a new CFO would be required to rebuild the Company's relationship with the investment community:

> Since April 2004, we have made significant changes in our senior management team. We have hired a President and Chief Operating Officer and a new Vice President of Finance, Corporate Controller and Chief Accounting Officer. We presently are in the process of recruiting a new Chief Financial Officer. Because of these recent changes, our management team may not be able to work together effectively to successfully develop and implement our business strategies and financial operations. In addition, management will need to devote significant attention and resources to preserve and strengthen relationships with employees, customers and the investor community. If our new management team is unable to achieve these goals, our ability to grow our business and successfully meet operational challenges could be impaired.

144.   The Company has also reported that its internal controls are so bad that the inability to fix them would impact the Company's ability to make required filings.

144.   The Company even admitted that its ability to raise additional funds could be adversely affected, if not completely foreclosed:

> Furthermore, additional financings may not be available on terms favorable to us, or at all. A failure to obtain additional funding could prevent us from making expenditures that may be required to grow or maintain our operations.

145.   Defendants have thus admittedly caused substantial damages to Sonus' valuable franchise.

57

## **DEMAND IS EXCUSED FOR FUTILITY**

146. Demand on Sonus to bring this action has not been made and is not necessary because such demand would be futile. Sonus is controlled by its board of directors, a majority of whom are named herein. The Director Defendants, due to their participation in the wrongful acts alleged and their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether Sonus should prosecute this action. As a result, demand on Sonus and its board of directors is futile and therefore excused.

147. Among the facts demonstrating the futility of demand are the following:

(a) Defendant Ahmed was the CEO during a three year period in which his company issued false financial statements. As CEO, he was actively involved in the day-to-day management of Sonus and was directly responsible for the acts and omissions described herein, including the false and misleading statements and omissions of material facts made in Sonus' public filings and statements. Ahmed repeatedly certified under Sarbanes-Oxley that the Company's financial statements were accurate, and that its internal controls were sufficient. Yet in the Form 10K/A filed in connection with the restatement, Ahmed has admitted that all of his certifications were false. Contrary to his certifications, the Company's financial statements were materially inaccurate, and its internal controls were deficient. Violation of Sarbanes-Oxley can lead to significant regulatory penalties, and even criminal prosecution. As one article stated:

> [C]hief executive Hassan Ahmed and chief financial officer Stephen Nill have a big problem. Both personally signed off on the numbers quarter after quarter, in filings to the Securities and Exchange Commission as Sarbanes Oxley requires. Executives sign certification forms that swear to the numbers "based on my knowledge."

Under these circumstances, it is inconceivable that Ahmed would vote to assert the Company's claims, where to do so would require him to authorize claims which may implicate him in conduct for which he may be held accountable to federal authorities. He is also a primary defendant in the Class Action, and would never vote to pursue claims which may compromise his defense in those cases. Furthermore, defendant Ahmed received substantial cash and stock

58