# PART 4

option awards for incentive based pay during fiscal years 2002 and 2003, during which time the
Company's financial results were overstated. Ahmed would never authorize litigation which
could result in him being deprived of these substantial sums.

      (b)     Defendant Gruber was Chairman of the board throughout the subject periods. As
Chairman during fiscal years 2001, 2002 and 2003, Gruber presided over a corporation with
seriously deficient internal controls, which issued dozens of false and misleading press releases
and SEC filings to shareholders and investors, in violation of SEC rules and regulations and the
federal securities laws. Thus, Gruber's tenure as Chairman is now defined by an accounting
disaster and total breakdown in the board's oversight duties. It is inconceivable that he would
vote to sue to enforce claims given his primary responsibility for the Company's operations as
Chairman during the subject periods. Furthermore, Gruber received substantial incentive based
compensation for fiscal year 2003, notwithstanding the accounting scandal which unfolded on
his watch. He would never vote to pursue claims which could jeopardize these substantial sums.

      (c)     Defendant Anderson sold thousands of shares of Sonus stock while in possession
of material adverse inside information that the Company had engaged in improper revenue
recognition practices, that the Company's internal controls were totally inadequate, and that the
price of Sonus stock was therefore artificially inflated. Anderson was aware of this information
as a result of his service on the Audit Committee, which has primary responsibility for the
Company's financial reporting practices. Anderson is also highly knowledgeable regarding the
Company's operations and financial results as his venture capital firm is one of the Company's
substantial investors. Andersen had not sold Sonus stock since 2001, and traded only after the
price of Sonus shares had risen dramatically in 2003 based upon defendants' repeated
representations that the Company would purportedly turn the corner to profitability as fiscal year
2003 progressed. He was aware of "red flags." Thus, Anderson benefited from the misconduct,
in breach of his fiduciary duties of loyalty to Sonus and its shareholders. This defendant received
substantial personal benefits from these transactions. The complaint upheld by Judge Wolf
contained similar allegations that Anderson sold 292,000 shares of stock for over $8 million in
proceeds, including many sales after positive announcements were made. Anderson would never

vote to investigate his own misconduct or to sue himself for breach of fiduciary duty, particularly where his inside trades are already at issue in the class action before Judge Wolf.

(d)    None of the other Director Defendants did anything to prevent the insider trading engaged in by defendant Anderson, or the substantial insider trading engaged in by defendants O'Hara, Harris and Jones. These directors had a duty to ensure that policies against illegal insider trading existed at the Company, and to ensure that such policies would be enforced. The Director Defendants were on notice that allegations regarding improper insider trading had been made against certain of the Company's officers and directors, and were therefore under an obligation to administer policies designed to prevent further unlawful sales from taking place. These directors knew of the unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of the duty of loyalty. These directors would never sue themselves or their colleagues to recover said insider trading proceeds.

(e)    During fiscal years 2001 and 2002, the Audit Committee consisted of Anderson, Ferri and Severino. During most of fiscal year 2003, the Audit Committee consisted of Anderson, Notini and Severino. Thus, four of the Director Defendants, comprising a majority of the board, served on the Audit Committee during the relevant period. By virtue of their service on the Audit Committee, these four Director Defendants had a special relationship with the Company. The Audit Committee should properly have been the keystone of Sonus' governance and finance. Instead, the Director Defendants, and Anderson, Ferri, Severino and Notini in particular, failed to ensure that Sonus' Audit Committee was an informed, vigilant and effective overseer of the Company's financial reporting process and its internal control systems, as confirmed by defendants' admission in the restatement that virtually all of the Company's internal controls were inadequate. As defendants first admitted in July 2004:

> In connection with our restatement, we and Ernst & Young LLP,
> our independent auditors, identified and reported to our audit
> committee significant internal control matters that collectively
> constitute "material weaknesses." These internal control matters,
> any one or more of which may individually or together constitute a
> material weakness, include: insufficient contract review and
> documentation; inadequate supervision and review within the

60

>finance and accounting department; inadequate segregation of
>duties; insufficient supporting documentation for and review of
>account reconciliations; lack of adequate controls over cash
>receipts; lack of adequate technical accounting expertise;
>insufficient equity review procedures and documentation; flawed
>foundations for accounting estimates; and inadequate quarterly and
>year-end financial statement close and review procedures.

As defendants then admitted in the Company's March 2005 Form 10-K, material weaknesses existed in the following ten areas: inadequate entity level controls (including the "lack of uniform and consistent communication by all members of senior management regarding the importance of controls"), inadequate business processes and information systems, inadequate revenue recognition procedures and controls, inadequate segregation of duties and information systems users, inadequate financial statement preparation and review procedures, inadequate controls over cash receipts, inadequate controls over equity transactions, inadequate purchasing controls, inadequate controls over inventory and cost of revenues, and inadequate information systems procedures and controls. It is apparent that, as a practical matter, Sonus had no internal controls whatsoever, although it had been a public company since 2000. This was a sustained and systematic failure of these defendants to exercise oversight. All of this was the Audit Committee's primary responsibility. These defendants violated the Company's Audit Committee Charter. By virtue of their bad faith conduct, the Audit Committee defendants face a substantial likelihood of liability and are therefore interested.

(f)     By virtue of the "red flags" alleged herein, all of the Director Defendants knew that Sonus lacked an adequate system of internal controls. These defendants were on notice that the Company was experiencing dramatic revenue growth in 2001. In fact, SEC filings in 2001 and 2002 signed by a majority of the board admitted that improvements to the Company's internal controls were therefore required to compensate for "significant strain" on those controls. They stated that "we expect that we will need to continue to improve our financial, managerial and manufacturing controls and reporting systems, and will need to continue to train and manage our worldwide workforce." The restatement demonstrates that they failed to remedy any these

problems. These defendants also knew that the Company's public disclosures and its accounting and reporting practices had been called into question in the federal securities class action filed in July 2002 pending before Judge Wolf. Nevertheless, the Director Defendants permitted these conditions to persist, setting the Company up for the damaging and embarrassing restatement. This was a sustained and systematic failure of these defendants to exercise oversight. These defendants cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because they face a substantial likelihood of liability and are interested personally in the outcome.

(g)     The Audit Committee's purported investigation of the accounting irregularities announced on February 11, 2004 was a sham in that defendants Anderson, Severino and Notini were investigating themselves and their own failure to properly oversee and implement proper accounting controls. Notably, although the investigation is now complete, the Company has not asserted any claims against these directors notwithstanding that their wrongdoing was the proximate cause of the restatement. It defies logic that the Audit Committee members could perform an objective investigation of their own misconduct, or that of their friends and colleagues in the Company. Furthermore, defendants hired defendant Notini's old law firm to perform the investigation, which law firm would obviously never implicate Notini or any other board members in any misconduct. The absence of internal controls directly contributed to the false financial disclosures alleged herein, and was the proximate cause of Sonus' exposure to massive liability for violation of federal securities laws.

(h)     Sonus is and was controlled by its board, and the Director Defendants are ultimately responsible for the Company's financial reporting. Defendants' misconduct has given rise to the Class Actions, in which open market purchasers of Sonus stock have sued the Company and certain of the directors and/or officers asserting claims under the federal securities laws. None of the Director Defendants is in a position to exercise independent business judgment with respect to the claims alleged herein due to his participation in and responsibility for the conduct giving rise to the Class Actions, which have damaged and will continue to damage

Sonus. Furthermore, all of the Director Defendants except Notini signed SEC filings which are now in dispute in the Class Actions.

      (i)        The Compensation Committee of the board establishes and implements compensation policies for the Company's senior executives. Defendants Ferri and Severino serve on the Compensation Committee of the board. Notably, these defendants also served on the Audit Committee, so they were aware of the Company's rampant internal control deficiencies and financial reporting problems. These defendants awarded substantial incentive based compensation to several of the Company's officers and directors, including defendants Ahmed and Gruber, based upon inflated financial results, as alleged herein. In particular, these defendants awarded substantial cash and millions of stock options for fiscal year 2003. These awards were made for fiscal 2003 notwithstanding the Company's accounting disaster. This was unjustified and a waste of corporate assets. These defendants would never vote to pursue claims which would expose them to personal liability for wasting the corporation's assets. Furthermore, the principal occupations of defendants Ahmed and Gruber are with Sonus. Defendants Ferri and Severino, as members of the Compensation Committee, exert control over all compensation awarded to Ahmed and Gruber. Ahmed and Gruber can not act independently of Ferri and Severino and would never vote to sue Ferri and Severino.

      (j)        The other Director Defendants are beholden to defendant Ahmed, who has long held the most powerful executive positions with the Company. Even after the misconduct alleged herein came to light, which occurred while Ahmed was chief executive, Ahmed was elevated to Chairman of the board in 2004 and granted an option award for 2 million shares and a cash bonus, and his salary was almost doubled. In November 2001, Ferri was quoted as saying that Ahmed "made all the difference in the world" to Sonus. With respect to Sonus' hiring of defendant Ahmed, Gruber was quoted as saying: "There were 50 companies on I-495, and all 50 of them wanted Hassan." Likewise, the Director Defendants are beholden to defendant Gruber. Gruber is one of the Company's founders, and even after the accounting scandal which now defines his tenure as Chairman, the other directors bestowed him with the title of "Chairman

Emeritus" and approved incentive awards for him. It is apparent that defendants Ferri, Anderson, Notini and Severino could not and will not act independently of Ahmed or Gruber.

(k)    Sonus has agreed to indemnify its directors and officers against liability for acts and omissions occurring in the performance of their duties and maintains insurance policies to cover the costs of such indemnification. Under the terms of those insurance policies, claims against directors which are brought by the Company, or other directors, are excluded from coverage. Therefore, Sonus' board, or any committee thereof, is effectively disabled from complying with a demand that would cause the Company to bring suit against the Individual Defendants because to do so would result in the loss of their insurance coverage.

(l)    The Director Defendants have extensive personal and business relationships which compromise their independence. In order to bring this action for breaches of fiduciary duty, the members of the board would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company. This they will not do. Five of the six Director Defendants have worked closely on the Board together for at least five years, and would never take a position antagonistic to one another, particularly in light of the Class Actions.

(m)    The venture capital firms of defendants Anderson and Ferri (North Bridge and Matrix) were substantial investors in Sonus, and frequently invest in the same companies, including Sycamore Networks, Inc., Silverback Technologies, Crossbeam Systems, Cadia Networks, Cascade Communications (where defendant Ahmed once served as an executive), Equipe Communications, AppIQ, Blue Dolphin Group, Argon Networks, Arris Networks, Arrowpoint Communications, Firstsense Software, Redstone Communications, Appian Communications, Terrapulse, and Nauticus Networks, to name but a few. One 2001 article described Ferri and Anderson as a "tag-team" who "travel as a pair" with respect to their common venture capital investments. Indeed, both Anderson and Ferri pointed to Sonus as a portfolio company on their venture capital firms' websites. And a 2001 Boston Globe article states:

> It's common lore in Boston venture circles: Where Matrix goes,
> North Bridge isn't far behind.
>
> * * *
>
> There's nothing unusual about top VCs investing together in start-
> ups. That's typical from here to Silicon Valley. <u>But these two take
> the buddy system to a different level.</u>
>
> <u>Like school pals joined at the hip</u>, they've backed 19 of the same
> companies in two years, according to PricewaterhouseCoopers. By
> the accountants' figures, that's nearly half the 44 companies North
> Bridge backed in 1999, 2000, and early this year. And it adds up to
> 37 percent of Matrix's deals. [emphasis supplied].

These defendants would never vote to investigate or sue each other, or compromise the business

or reputation of their respective venture capital firms by investigating or suing the officers and

directors of a corporation in which both have invested. Significantly, duirng 2001 and 2002,

these two defendants, whose common interests extend far beyond Sonus, constituted a majority

of the Audit Committee which so utterly failed to ensure the integrity of the Company's internal

controls and financial reporting.

(n)    These two defendants also have very public profiles in the venture capital

community. According to a 2004 article in the Boston Globe, Ferri and Anderson are "certifiable

stars in the venture world with enviable records that extend for decades." According to the

website of a company for which Ferri serves as a director, Ferri has previously been named "Best

VC in Boston" and received a 2001 Massachusetts Telecommunications Council award naming

him "Venture Capitalist of the Year." None of the other directors would vote to sue directors

with such high profiles in the local business community.

(o)    In addition to the close business relationship that exists between Ferri and

Anderson, defendants Ahmed, Gruber and Severino also have a history of interlocking business

relationships among each other and Ferri and Anderson. For example, Ahmed and Ferri serve

together on the board of a Company named Airvana. Ahmed and Ferri also served together on

the board of a company named Winphoria Networks, in which defendant Anderson's venture

65

capital firm invested. Ahmed and Severino serve together on the board of a company named PhotonEx Corp, in which defendant Anderson's venture capital firm invested. Gruber and Ahmed have invested together in a company named Narad Networks. Severino and Ahmed serve together on the board of the Massachusetts Telecommunications Council. On his venture capital firm's website, defendant Anderson posted the praise of defendant Severino, with whom Anderson worked in connection with Wellfleet Communications:

> Ed Anderson was in all respects a co-founder of Wellfleet Communications. He was involved with us from the concept to $500M revenues. He is strategic as well as operational and he brings an intensity of focus to the important challenges we all face in building a successful enterprise.

On his venture capital firm's website, defendant Ferri posted the praise of defendant Gruber:

> I've raised capital from numerous VCs, but the people at Matrix truly collaborate as partners with their portfolio companies. Their solid perspective supports start-up every step of the way.

These relationships demonstrate the unusual closeness and extent of the Director Defendants' intertwined business relationships, which they would never jeopardize by voting to sue one another. The Director Defendants would therefore not initiate litigation.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

148. Plaintiffs incorporate by reference the allegations set forth above.

149. In bad faith violation of their fiduciary duties to Sonus and its shareholders, defendants issued false and misleading statements to Sonus' shareholders and the investing public regarding the Company's results and business prospects throughout the relevant period, and failed to institute a system of internal controls. By reason of this conduct, defendants have exposed Sonus to potential liability in the Class Actions and the cost of defending such litigation.

150.    In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

151.    Consequently, Sonus has been and is being further damaged by defendants' bad faith conduct in breach of their fiduciary duties.

## SECOND CAUSE OF ACTION
### GROSS NEGLIGENCE

152.    Plaintiffs incorporate by reference the allegations set forth above.

153.    The preparation and dissemination of quarterly and annual financial statements that were materially false and inaccurate and not in accordance with GAAP represents a sustained and systematic failure by the Individual Defendants to assure the existence within Sonus of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting. Indeed, defendants have admitted that the the Company's financial controls were grossly inadequate.

154.    The breach by defendants of their duty to act with reasonable care was grossly negligent, reckless, and lacked a good faith effort by defendants to perform their fiduciary responsibilities.

155.    Sonus has been damaged by defendants' gross negligence and reckless disregard of their duties.

## THIRD CAUSE OF ACTION
### BREACH OF CONTRACT

156.    Plaintiffs incorporate by reference the allegations set forth above.

157.    In consideration of the substantial compensation and professional enhancement and prestige, which each of the defendants received as directors and/or officers of Sonus, each of those defendants contracted with Sonus to act in the best interest of Sonus and to cause Sonus to operate lawfully and properly.

67

158.    Each defendant named as a Sonus officer had an express agreement with Sonus which he breached by his actions, as set forth herein. Each of the Director Defendants also had an express agreement to serve as a director of the corporation in exchange for compensation, which each Director Defendant breached by his actions herein.

159.    By their actions and omissions set forth herein those defendants breached their contractual obligations and commitments to Sonus by not acting in the best interests of Sonus and causing or permitting Sonus to act in unlawful and improper ways.

160.    Sonus has been damaged by defendants' breach of their contracts.

## FOURTH CAUSE OF ACTION

## BREACH OF DUTY OF LOYALTY-INSIDER TRADING-AGAINST THE INSIDER TRADING DEFENDANTS

161.    Plaintiffs incorporate by reference the allegations set forth above.

162.    By reason of their positions as directors and/or officers of Sonus during the relevant period, at the time the Insider Trading Defendants sold their Sonus shares, each had access to and knew highly material information regarding Sonus, and knew or should have known that the public disclosure of this information would adversely affect the market price of Sonus stock.

163.    In selling their Sonus stock, as set forth above, the Insider Trading Defendants used Sonus' material, non-public information for personal gain, in breach of their fiduciary duties to Sonus and its shareholders.

164.    By reason of the aforesaid insider sales, the Insider Trading Defendants profited through their fiduciary positions. Defendants are obliged to disgorge these unlawful profits for the benefit of Sonus.

## FIFTH CAUSE OF ACTION

## WASTE OF CORPORATE ASSETS AGAINST DEFENDANTS FERRI AND SEVERINO

165.    Plaintiffs incorporate by reference the allegations set forth above.

166.    Defendants Ferri and Severino have caused Sonus to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its officers and directors based on false financial statements, which incentive based compensation was not earned and should never have been paid.

167.    As a result of the waste of corporate assets, these defendants are liable to the Company.

## SIXTH CAUSE OF ACTION
## FOR UNJUST ENRICHMENT

168.    Plaintiffs incorporate by reference the allegations set forth above.

169.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sonus.

170.    Plaintiffs, as shareholders and representatives of Sonus, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## SEVENTH CAUSE OF ACTION
## FOR DISGORGEMENT UNDER SARBANES-OXLEY

171.    Plaintiffs incorporate by reference the allegations set forth above.

172.    During the relevant period, based substantially upon false and misleading representations concerning the financial and operational condition of the Company, certain of the Individual Defendants received millions in unearned, performance based compensation, in the form of salary, cash bonuses and option awards, as alleged in detail herein.

173.    These defendants should be required to disgorge the gains they have unjustly obtained at the expense of Sonus and its shareholders, and a constructive trust for the benefit of Sonus and its shareholders should be imposed upon them as contemplated by the disgorgement provisions of Section 304 of Sarbanes-Oxley.

69

## EIGHTH CAUSE OF ACTION

## FOR ABUSE OF CONTROL

174.    Plaintiffs incorporate by reference the allegations set forth above.

175.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sonus, for which they are legally responsible.

176.    As a direct and proximate result of the Individual Defendants' abuse of control, Sonus has sustained significant damages.

177.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

*WHEREFORE,* plaintiffs, on behalf of Sonus, demand judgment against defendants, and each of them jointly and severally as follows:

A.    determining that this suit is a proper derivative action and certifying plaintiffs as appropriate representatives of Sonus for said action.

B.    declaring that each of the Individual Defendants breached his fiduciary duty to Sonus;

C.    determining and awarding Sonus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.    awarding plaintiffs the costs and disbursements of this action, including reasonable fees and costs to plaintiffs' attorneys, accountants and experts;

E.    granting such other and further relief as the Court may deem just and proper.

70

## JURY DEMAND

Plaintiffs demand a trial by jury.


DATED: July 1, 2005

By: /s/ David Pastor
David Pastor (BBO NO. 391000)
John C. Martland (BBO NO. 332980)
GILMAN AND PASTOR, LLP
60 State Street
37th Floor
Boston, MA  02109
Telephone: (617) 742-9700

Liaison Counsel

Robert C. Schubert (BBO NO. 562242)
Juden Justice Reed
Willem F. Jonckheer
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California  94111
Telephone: (415) 788-4220

Lead Counsel

Gregory M. Nespole
WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP
270 Madison Avenue, 9th Floor
New York, New York 10016
Telephone (212) 545-4600

Bruce G. Murphy
LAW OFFICES OF BRUCE G. MURPHY
265 Llwyds Lane
Vero Beach, Florida 32963
(772) 231-4202

Paul Warner
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX  77027
Telephone: (713) 622-7271

71

William Federman
FEDERMAN & SHERWOOD
120 N. Robinson
Oklahoma City, OK 73102
Telephone (405) 235-1560

Derivative Counsel