## IMPROPER STATEMENTS AND INSIDER TRADING DURING THE RELEVANT PERIOD

35.    On April 9, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Reports 2003 First Quarter Financial Results; Revenues Increase 27% Sequentially, Loss Narrows to $0.02 Per Share." The press release stated in relevant part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, today reported its financial results for the first quarter ended March 31, 2003, in accordance with U.S. generally accepted accounting principles (GAAP).
>
> Revenues for the first quarter of fiscal 2003 were $16.0 million compared with $12.7 million in the fourth quarter of fiscal 2002. Net loss for the first quarter of fiscal 2003 was $4.4 million or $0.02 per share compared with a net loss for the fourth quarter of fiscal 2002 of $12.8 million or $0.07 per share. Revenues for the first quarter of fiscal 2002 were $21.2 million and the net loss for the first quarter of fiscal 2002 was $16.2 million or $0.09 per share.
>
> *"Our financial results for the first quarter reflected good progress toward our business objectives," said Hassan Ahmed, president and CEO, Sonus Networks. "We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family."*

36.    On April 22, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Announces Sale of 20 Million Shares of Common Stock." The press release stated in relevant part:

> Sonus Networks, a leading provider of voice infrastructure solutions for the new public network, today announced that it has completed a public offering of 20 million shares of Common Stock at a per share price of $3.05. The offering was made under an effective registration statement.
>
> *"Enhancing our financial strength has been an important component of our strategy as we seek to expand our partnerships with some of the world's largest service providers," said Hassan Ahmed, president and CEO, Sonus Networks. "The financial transaction announced today bolsters our balance sheet, and positions us to build on our success in providing the next-generation, carrier-class solutions that enable voice services to be delivered over packet-based networks."*

20

37.    On June 5, 2003, *CNNfn* issued a transcript of an interview with defendant Ahmed which stated in relevant part:

> DASS:  Your stock price has seen an amazing run.  We were just putting up the chart there a few minutes ago.  What are going to be the key drivers to keep that momentum going?
>
> *AHMED:  Well, as I said, I think the – we're approaching certainly 2003 with an awful lot of confident [sic] because we're seeing not only a transition of the way people are – way carriers are spending their capital towards the types of things that we do, but we're also seeing a much broader customer base looking at deploying or moving forward with deployment of this technology.  So we see a broader set of carriers moving forward.  We see – we see capital being devoted to this.*
>
> *And we, in general, find that every – ultimately every carrier in the world is going to make a transition to packet-oriented network.  This is the way networks of the future will be built.  Some of them have already voted and started down this path with us and we feel that there are a lot more to follow.  So I think the catalysts are very strong for people building out this infrastructure.*

38.    On July 10, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Reports 2003 Second Quarter Financial Results." The press release stated in relevant part:

> Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, Thursday reported its financial results for the second quarter ended June 30, 2003.
>
> Revenues for the second quarter of fiscal 2003 were $21.4 million compared with $16.0 million for the first quarter of fiscal 2003 and $21.3 million for the second quarter of fiscal 2002. Net loss for the second quarter of fiscal 2003 was $3.2 million or $0.01 per share compared with a net loss for the first quarter of fiscal 2003 of $4.4 million or $0.02 per share and a net loss of $17.8 million or $0.09 per share for the second quarter of fiscal 2002.
>
> Revenues for the first six months of fiscal 2003 were $37.4 million compared with $42.5 million in the same period last year.  Net loss for the first six months of fiscal 2003 was $7.6 million or $0.04 per share compared with a net loss for the first six months of fiscal 2002 of $34.0 million or $0.18 per share.

21

39.    On July 18, 2003, *Bloomberg* issued a release entitled "Sonus is 'Driving Toward Profitability,' Chief Executive Says."  The press release stated in relevant part:

Sonus Networks Inc., a telecommunications-equipment maker, is trying to become profitable, Chief Executive Officer Hassan Ahmed said.

*"We're definitely driving toward profitability as fast as we can," Ahmed said in a televised interview with Bloomberg News.  He said he hasn't given guidance on the third quarter and whether Sonus would post a profit.*

*Ahmed said the company expects sales from outside the U.S. to eventually increase to 50 percent of its total revenue.*

40.    On July 18, 2003, defendant Harris sold 30,000 Sonus shares at $6.82 per share, for proceeds of $204,600.

41.    On July 22, 2003, defendant O'Hara sold 55,000 Sonus shares at $6.82-$7.03 per share, for proceeds of $381,200.

42.    On August 1, 2003, the Individual Defendants caused the Company to issue a press release entitled, "Sonus Networks Issues Statement Regarding Incorrect Report On Financial Guidance."  The press release stated in relevant part:

Sonus Networks today issued the following statement regarding erroneous and false information reported by Multex on July 31. An article appeared on Multex Investor indicating that Sonus Networks had revised its financial guidance for Q3 FY2003 and for the fiscal year 2003. The information included in the article was incorrect and was not provided by the company.

*With regard to its projected future results, Sonus Networks refers you to the financial guidance provided as part of its Q2 quarterly financial conference call on July 10, 2003, which included, among other things, that it expects its revenues to increase in the third quarter of FY2003 by 15-20% over reported second quarter 2003 revenues of $21.4 million.  For more detailed information on the guidance provided by the company, please refer to the webcast of this conference call, which can be accessed in the Investor Relations section of Sonus' web site at www.sonusnet.com.*

43.    On October 8, 2003, the Individual Defendants caused the Company to issue a press release entitled "Sonus Networks Reports 2003 Third Quarter Financial Results; Rev Grow 34% Sequentially, 285% Over Previous Year; Company Achieves Quarterly Profit."  The press release stated in relevant part:

Sonus Networks Inc. - Westford, Mass.

3rd Quar Sept. 30:

|  | 2003 | 2002 |
|---|---|---|
| Revenue | $28,644 | $7,445 |
| Net income | 1,209 | (21,638) |
| Avg shrs (diluted) | 239,446 | 191,823 |
| Shr earns | | |
| Net income | .01 | (.11) |

Figures in parentheses are losses.

Excluding amortization [sic] of stock-based compensation, amortization of goodwill and purchased intangible assets, and the write-off of goodwill, Sonus earned $2.35 million, or a penny a share, in the latest quarter, up from a loss of $14.6 million, or 8 cents a share, a year ago.

Analysts had expected the company to lose a penny a share for the quarter, according to a survey of analysts compiled by Thomson First Call.

Shares of Sonus closed the regular session Wednesday at $8.30, up 27 cents a share, or 3.4%.  In after-hours trading, shares rose further to $8.93 a share.

44.    On October 9, 2003, *Bloomberg* issued a release entitled "Sonus Networks' Ahmed on Earnings Outlook."  The release stated in relevant part:

Hassan Ahmed, chief executive of Sonus Networks Inc., talks with Bloomberg's Carol Massar from Boston about the company's third-quarter profit, spending by telecommunications companies and outlook for earnings growth.  Sonus, a telecommunications-equipment maker, reported net income of $1.2 million, its first-ever quarterly profit.

***

AHMED:  Good morning, Carol.  How are you?

23

MASSAR: I'm doing well. And your stock's doing well in the pre-market. It is trading higher already. Investors certainly seem improved [sic] with your earnings results. What was the reason behind the earnings improvement?

AHMED: Well, one of the things that we've been able to do this year is consistently grow our top line, our revenues, based on not only the strength of our existing customers but the addition of major new customers such as Verizon, for example, into the mix. And so, our top line has grown. We've been managing our expenses very carefully and all that's led to a profit. And also, we generated about $4 million in cash from operations.

MASSAR: Viewing the marketplace really, we're not seeing a lot of companies spending, and now you're saying that we were starting to see that. My understanding is that earnings will improve because companies like Qwest and Global are stepping up their spending. Who else is placing orders with you guys?

AHMED: Well, you know, it's interesting, the – in our marketplace what's happening is that while overall telecom spending still isn't increasing carriers are being much more careful about how they're spending the money, and they're shifting expenditure towards their next-generation networks. And what we do in terms of building next-gen voice networks has – is a very high priority for a number of these carriers. So, really across the board in the U.S. as well as overseas we're seeing carriers take packet collecting and voice-over-IP technology a lot more seriously and stepping up to deploying it.

*MASSAR: What does that mean for your earnings going forward then?*

*AHMED: Well, certainly a big part of our focus is on growing our company and broadening our customer base. So, we're very much focused on continuing to grow the top line in our company and, obviously as a result of that, grow the bottom line.*

*MASSAR: What about the bottom line? Take this quarter. Analyst consensus expecting earnings to be flat. Is that what you're expecting at this point?*

*AHMED: We're – our guidance that we offered last night certainly is for earnings to come in about the same level as it did this quarter and for the top line to grow somewhere between 10 and 15 percent.*

45.    On October 10, 2003, defendant Jones sold 100,000 Sonus shares at $8.575 per share,

for proceeds of $875,000.

46.    On October 18, 2003, defendant Anderson sold 65,584 Sonus shares at $6.84-$6.85 per share, for proceeds of $448,918.34.

47.    On October 22, 2003, defendant O'Hara sold 13,750 Sonus shares at $7.85-$7.91 per share, for proceeds of $108,413.

48.    On January 20, 2004, *Bloomberg* issued a release entitled "Sonus Networks Delays Release of 4th-Qtr Results Pending Audit." The release stated in relevant part:

> Sonus Networks Inc., a maker of switches and networking equipment for Internet calling, said it delayed the release of its fourth-quarter results pending the completion of an audit.

## IMPROPER FINANCIAL REPORTING

49.    The Individual Defendants, particularly management and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal controls for Sonus and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required under GAAP, to:

> (1)    Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)    Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (a)    Transactions are executed in accordance with management's general and specific authorization; and
> >
> > (b)    Transactions are recorded as necessary to permit preparation of financial statements in

25

conformity with generally accepted accounting principles.

50.     In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

51.     According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

52.     Sonus will have to admit that it inappropriately recorded transactions included in its FY 2003 results, and will have to restate those results to remove millions in improperly reported revenues, such that its FY 2003 financial statements were not a fair presentation of Sonus' results and were presented in violation of GAAP and SEC rules.

53.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial

26

statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

54.    In Sonus' 2002 Form 10-K, it represented that it recognized revenue in accordance with GAAP.

55.    Pursuant to GAAP, which describes the accounting for revenues, revenue should not be recognized unless there is persuasive evidence of an agreement, collection is probable and delivery has occurred.

56.    During the Relevant Period, Sonus improperly recognized revenue even though these conditions did not exist.

57.    Ultimately, on February 11, 2004, Sonus announced that its results would be delayed. However, in actuality, the Company will need to restate its FY 2003 results to eliminate millions in revenue that had been improperly recorded and increase its past-stated expenses.

58.    The fact that Sonus will restate its financial statements for FY 2003 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sonus was to correct for material errors in its previously issued financial statements. See APB No. 20, ¶¶ 7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. See APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited

27

circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Sonus' restatement will not be due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements. Thus, the restatement will be an admission by Sonus that its previously issued financial results and its public statements regarding those results were false.

59.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

28

accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

     e.    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

     f.    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

     g.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

     h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

60.    Plaintiff brings this action derivatively in the right and for the benefit of Sonus to redress injuries suffered, and to be suffered, by Sonus as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as

well as the aiding and abetting thereof, by the Individual Defendants. Sonus is named as a nominal defendant solely in a derivative capacity.

61.    Plaintiff will adequately and fairly represent the interests of Sonus in enforcing and prosecuting its rights.

62.    Plaintiff is and was a owner of the stock of Sonus during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

63.    The current Board of Directors of Sonus consists of the following individuals: Director Defendants Ahmed, Gruber, Anderson, Notini, Ferri and Severino. Plaintiff has not made any demand on the present Board of Directors of Sonus to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Sonus Board participated in the illegal insider selling:

(i)    During the Relevant Period, Anderson engaged in massive insider trading disposing of 65,584 shares of his personally held Sonus stock for proceeds of $448,918.34. Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

b.    The Compensation Committee of the Board determines, after consulting with

30

the CEO, establishes, authorizes and administers Sonus' compensation policies, practices and plans for Sonus' directors, executive officers and other key personnel. The Compensation Committee is comprised of defendants Ferri and Severino. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Ferri and Severino. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Ahmed, Gruber, Anderson and Notini is futile;

        c.      The principal professional occupation of defendants Ahmed and Gruber is their employment with Sonus, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Accordingly, defendants Ahmed and Gruber lack independence from defendants Ferri and Severino, who exert influence over defendants Ahmed and Gruber's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Ahmed and Gruber incapable of impartially considering a demand to commence and vigorously prosecute this action;

        d.      According to Sonus' Proxy Statements filed with the SEC, Director Defendants Anderson, Ferri and Severino served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of Sonus' internal auditors and independent accountants. The Audit Committee evaluates Sonus' organization and its internal controls, policies, procedures and practices to determine whether they are reasonably designed to: provide for the safekeeping of Sonus' assets; assure the accuracy and adequacy of Sonus' records and financial statements; reviews Sonus' financial statements and reports; monitors compliance with Sonus' internal controls, policies, procedures and practices; and receives direct compliance reports

from Sonus' internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee recommended that the Board include the improper audited financial statements in Sonus' filings with the SEC during the Relevant Period. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

       e.     The entire Sonus Board of Directors and senior management participated in the wrongs complained of herein. Sonus' directors are not disinterested or independent due to the following: Director Defendants Ahmed, Gruber, Anderson, Notini, Ferri and Severino served on the Sonus Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to Sonus and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Sonus Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Sonus to millions of dollars in liability for possible violations of applicable securities laws;

       f.     The Director Defendants of Sonus, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Sonus' stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

       g.     As detailed herein in particularity at ¶¶ 15-20, in order to bring this suit, all of the directors of Sonus would be forced to sue themselves and persons with whom they have

extensive business and personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in ¶¶15-20 because a majority of the Director Defendants have long-term personal, professional and financial relationships with each other and other board members, a majority of the Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

h.     The acts complained of constitute knowing violations of the fiduciary duties owed by Sonus' officers and directors and these acts are incapable of ratification;

i.     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

j.     Any suit by the Director Defendants to remedy these wrongs would likely expose the Individual Defendants and Sonus to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

k.     Sonus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Sonus any part of the damages Sonus suffered and will suffer thereby;

l.     If the Director Defendants were to bring this derivative action against

themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

      m.    If Sonus' current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Sonus. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiffs assert, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Sonus against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Sonus, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Sonus to sue them, since they will face a large uninsured liability.

34

64.    Moreover, despite the Director Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for Sonus for any of the wrongdoing alleged by plaintiffs herein.

65.    Plaintiff has not made any demand on shareholders of Sonus to institute this action since such demand would be a futile and useless act for the following reasons:

   a.    Sonus is a publicly held company with approximately 244.45 million shares outstanding, and tens of thousands of shareholders;

   b.    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

   c.    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66.    As a direct result of the Individual Defendants' breaches of their fiduciary duties and other violations of law, the Company has been severely damaged. The Individual Defendants' conduct have caused severe, irreparable, injury and damage to the Company's reputation and goodwill in the investment and business communities and threaten to virtually destroy this once valuable franchise. For at least the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Sonus' ability to raise capital - on favorable terms - will be impaired in the future. Indeed, the Company's market capitalization has already been severely damaged with over $1.2 billion erased, or 46% of the Company's market value during the Relevant Period, and severely reducing the Company's financing options and the Company has been downgraded by multiple analysts.

67.    In addition, significant Company money will have to be spent defending the Company in the numerous securities fraud lawsuits brought against the Company as a direct result of the conduct of the Individual Defendants. These lawsuits will costs hundreds of thousands to defend and possibly millions if not tens of millions to resolve. In addition, the Company has and will continue to waste corporate funds relating to investigations and the audit and impending restatement including already having to hire Hale and Dorr and PricewaterhouseCoopers to conduct an independent investigation.

## VI.

### CAUSES OF ACTION

### COUNT I

**Against All Individual Defendants for Breach of Fiduciary Duty**

68.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.    The Individual Defendants owed and owe Sonus fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Sonus the highest obligation of good faith, fair dealing, loyalty and due care.

70.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

71.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's

corporate interests.

72.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Sonus has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

73.     Plaintiff on behalf of Sonus has no adequate remedy at law.

## COUNT II

### Against All Individual Defendants for Abuse of Control

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sonus, for which they are legally responsible.

76.     As a direct and proximate result of the Individual Defendants' abuse of control, Sonus has sustained significant damages.

77.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

78.     Plaintiff on behalf of Sonus has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Gross Mismanagement

79.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

80.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

37

to prudently managing the assets and business of Sonus in a manner consistent with the operations of a publicly held corporation.

81.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sonus has sustained significant damages in excess of tens of millions of dollars.

82.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

83.     Plaintiff on behalf of Sonus has no adequate remedy at law.

## COUNT IV

### Against All Individual Defendants for Waste of Corporate Assets

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the improper statements and improper financial reporting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Sonus to waste valuable corporate assets by paying incentive based bonuses and stock options to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions as well as wasting funds for an internal investigation, having to hire Hale and Dorr and PricewaterCoopers to conduct an independent investigation, as well waste relating to the pending restatement.

86.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of Sonus has no adequate remedy at law.

38

## COUNT V

### Against All Defendants for Unjust Enrichment

88.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Sonus.

90.    Plaintiff, as a shareholder and representative of Sonus, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VI

### Against The Insider Selling Defendants For Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Sonus common stock on the basis of such information.

93.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when he sold Sonus common stock.

94.    At the time of his stock sales, the Insider Selling Defendants' sales of Sonus comm[...]

stock while in possession and control of this material adverse non-public information was a breach of his fiduciary duties of loyalty and good faith.

95.      Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of Sonus have an effective remedy;

C.      Awarding to Sonus restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants including all illegal proceeds from insider selling;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.


## JURY DEMAND

40

Plaintiff demands a trial by jury.

DATED: February 20, 2004

Mary T. Sullivan, Esq. BBO#487130
SEGAL ROITMAN & COLEMAN
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: 617/742-0208
Facsimile: 617/742-2187

Nadeem Faruqi, Esq.
FARUQI & FARUQI, LLP
320 East 39th Street
New York, NY 10016
Telephone: 212/983-9330
Facsimile: 212/983-9331

Attorneys for Plaintiffs

Mts-7343/complaintfinal.doc

41