# **Exhibit F**

## COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT

SUFFOLK, ss
BUSINESS LITIGATION SESSION

---

STEVEN PALMA, Derivatively on Behalf of )
SONUS NETWORKS, INC., )
)
                            Plaintiffs, )
    vs. )
)
HASSAN M. AHMED, RUBIN GRUBER, )
EDWARD T. ANDERSON, PAUL J. FERRI, )
ALBERT A. NOTINI, PAUL J. SEVERINO, )
PAUL R. JONES, EDWARD N. HARRIS, J. )
MICHAEL O'HARA and STEVEN J. NILL, )
)
                            Defendants, )
        -and- )
)
SONUS NETWORK, INC., a Delaware )
corporation, )
)
                    Nominal Defendant. )
)
)

Civil Action No. 04-0753-BLS

**DERIVATIVE ACTION**

Judge Allan Van Gestel

---

### PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated:   Boston, Massachusetts,
         April 7, 2004

SEGAL ROITMAN & COLEMAN
Mary T. Sullivan, Esq. BBO#487130
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: (617) 742-0208
Facsimile: (617) 742-2187

FARUQI & FARUQI, LLP
Nadeem Faruqi, Esq.
Shane Rowley, Esq.
David H. Leventhal, Esq.
320 East 39th Street
New York, NY 10016
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

ROBBINS UMEDA & FINK
Brian J. Robbins, Esq.
Jeffrey P. Fink, Esq.
1010 Second Ave., Suite 2360
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. -ii-
I. INTRODUCTION ................................................................... 1
II. STATEMENT OF FACTS ........................................................... 3
   A. The Parties ................................................................. 3
   B. False Public Announcements of Revenue Growth
      Fueling the Company's First Profitable Quarter ................................ 4
   C. Fraudulent Revenue Recognition Practices .................................... 5
III. ARGUMENT ...................................................................... 6
   A. The Court Must Deny Defendants' Motion to Dismiss
      Pursuant to Rule 23.1 ....................................................... 6
     1. Legal Standards Applicable to the Motion to Dismiss ....................... 6
     2. Applicable Legal Standards for Evaluating Demand Futility ................. 7
     3. Demand Is Excused Pursuant to Either *Rales*
        or the First Prong of *Aronson* ......................................... 10
     4. Demand Futility is Further Demonstrated by Defendants'
        Utter Abdication of Their Duties to the Company ........................ 13
     5. The Exculpatory Provision in Sonus' Certificate of
        Incorporation Does Not Exempt Defendants From Liability ................ 15
     6. The Complaint Properly States a Claim for Damages ....................... 17
IV. CONCLUSION ................................................................... 18

## TABLE OF AUTHORITIES

**Cases**                                                                                      Page(s)

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) .................................................. 7, 9, 10, 15

*Balsavich v. Local 170, Int'l Bhd. of Teamsters,*
    356 N.E.2d 1217 (1976) .......................................................... 6

*Bartlett v. New York, N. H. & H. R. Co.,*
    109 N.E. 452 (1915) ............................................................. 7

*Beneville v. York,*
    769 A.2d 80 (Del. Ch. 2000) ..................................................... 10

*Brehm v. Eisner,*
    745 A.2d 244 (Del. 2000) ....................................................... 7, 8

*Charbonnier v. Amico,*
    324 N.E.2d 895 (1975) ........................................................... 6

*Conley v. Gibson,*
    355 U.S. 41 (1957) ............................................................... 6

*Desert Equities v. Morgan Stanley Leveraged,*
    624 A.2d 1199 (Del. 1993) ...................................................... 17

*Druker v. Roland Wm. Jutras Assocs., Inc.,*
    348 N.E.2d 763 (1976) ........................................................... 6

*Emerald Partners v. Berlin,*
    726 A.2d 1215 (Del. 1999) .................................................. 15-17

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) ....................................................... 8

*Harbor Fin. Partners v. Huizenga,*
    751 A.2d 879 (Del. Ch. 1999) .................................................. 9, 11

*Harhen v. Brown,*
    730 N.E.2d 859 (2000) ...................................................... 1, 6, 7

*Harris v. Carter,*
    582 A.2d 222 (Del. Ch. 1990) ................................................... 10

*In re Caremark Intern. Inc. Derivative Litig.,*
    698 A.2d 959 (Del. Ch. 1996) ............................................... 13, 16

*In re Cendant Corp. Derivative Litig.,*
    189 F.R.D. 117 (D.N.J. 1999) ................................................... 18

*In re Cooper Co., Inc.,*
    No. 12584, 2000 WL 1664167 (Del. Ch. Oct. 31, 2000) .......................... 11

*In re Lernout & Hauspie Sec. Litig.,*
    286 B.R. 33 (D. Mass 2002) .................................................... 12

*In re Limited, Inc.,*
    No. 17148–NC, 2002 WL 537592 (Del. Ch. Mar. 27, 2002) ...................... 10

                                                                                                    Page(s)

*In re New Valley Corp.*,
    No. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) .................... 9, 11, 12

*In re Oxford Health Plans, Inc.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) .................................................. 14

*In re Polymedica Corp.*,
    No. 01-3446, 2002 WL 1809095 (Mass. July 16, 2002) .................... 7

*In re Symbol Techs. Sec. Litigation*,
    762 F. Supp. 510 (E.D.N.Y. 1991) .............................................. 18

*Int'l Equity Capital Growth Fund, L.P. v. Clegg*,
    No. 14995, 1997 WL 208955 (Del. Ch. Apr. 22, 1997) .................... 9, 12

*Iotex Communications, Inc. v. Defries*,
    No. 15817, 1998 WL 914265 (Del. Ch. Dec. 21, 1998) .................... 14

*Kahn v. Roberts*,
    No. 12324, 1994 WL 70118 (Del. Ch. Feb. 28, 1994) ...................... 17

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ..................................................................... 7

*Kerbs v. Ca. E. Airways, Inc.*,
    90 A.2d 652 (Del. 1952) ............................................................ 15

*Malone v. Brincat*,
    722 A.2d 5 (Del. 1998) .............................................................. 15

*McCall v. Scott*,
    239 F.3d 808 (6th Cir. 2001), *amended by*, 250 F.3d 997 (6th Cir. 2001) ........... 16

*Miller v. Schreyer*,
    200 A.D.2d 492 (1st Dep't 1994) .............................................. 14, 15

*Mizel v. Connelly*,
    No. 16638, 1999 WL550396 (Del. Ch. July 22, 1999) ...................... 9

*Moran v. Household Int'l, Inc.*,
    500 A.2d 1346 (Del. 1985) ........................................................ 15

*Nader v. Citron*,
    360 N.E.2d 870 (1977) ............................................................ 6, 7

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) .......................................................... 9

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ........................................................ 8-11

*Sanders v. Wang*,
    No. 16640, 1999 WL 1044880 (Del. Ch. Nov. 8, 1999) .................... 17

*Solash v. Telex Corp.*,
    1988 WL 3587 (Del. Ch. Jan. 19, 1988) ...................................... 16

*Steiner v. Meyerson*,
    No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995) .................... 11, 15

Page(s)

**Statutes**

8 Del. C. §102(b)(7) .................................................. 15, 16

**Other Authorities**

*Ballotti & Finkelstein Del. Corps. & Bus. Orgs.*,
    (3d ed. Supp. 1996) ............................................. 16

Dennis J. Block, Nancy E. Barton, Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors*,
    (5th ed. 1998) .................................................. 15

## I. **INTRODUCTION**

After the close of the market on January 20, 2004, defendants[1] surprised the investing public by postponing the announcement of Sonus Networks, Inc.'s ("Sonus" or the "Company") fourth quarter 2003 and year end financial results. ¶3.[2] They then further shocked the market on February 11, 2004, when they revealed for the first time that the Company had identified improper revenue recognition practices which would force the restatement of its 2003 financial statements and possibly other periods as well. ¶4.[3] These startling revelations caused the price of Sonus stock to plummet, erasing half of the Company's market capitalization and leading to a downgrade by every analyst that covered Sonus stock. ¶¶5-7. Even during the pendency of this action, Defendants continued to stun the market by announcing that the improper revenue recognition practices were so pervasive that in addition to restating financial results for the first three quarters of 2003, Sonus would be forced to restate all of 2002 and that an investigation of revenue practices was ongoing for previous years. *See* Sonus Form 8-K, filed March 29, 2004, attached hereto as Exhibit A.[4] Defendants recognized

---

[1] The individual defendants are Hassan M. Ahmed, Rubin Gruber, Edward T. Anderson, Paul J. Ferri ("Ferri"), Albert A. Notini ("Notini"), Paul J. Severino ("Severino"), Paul R. Jones ("Jones"), Edward N. Harris ("Harris"), J. Michael O'Hara ("O'Hara"), and Steven J. Nill ("Nill"). Except where specifically noted, these individuals will be collectively referred to herein as "Defendants."

[2] All paragraph ("¶__" or "¶¶__") references are to the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets and Unjust Enrichment in *Palma v. Ahmed, et al.* (the "Complaint") unless otherwise stated.

[3] A parallel action titled *Tillman v. Ahmed, et al.*, 04-0754 BLS, was filed on February 20, 2004. Plaintiffs are concurrently moving to have the two actions consolidated. Plaintiffs Tillman and Palma ("Plaintiffs") are jointly filing this opposition to Defendants' motion to dismiss both actions.

[4] Defendants have disputed the number of directors alleged in the Complaint. Under Massachusetts law, the Court may only consider matters outside the complaint to the extent that they are publicly filed and are referenced in the Complaint. *Harhen v. Brown*, 730 N.E.2d 859, 862-63 (2000). The Form 3 for which Defendants seek judicial notice is never referenced in the Complaint, nor an integral part of Plaintiffs' claims and should not considered by the Court. If the Court considers the Form 3 Plaintiffs ask that the Court also take judicial notice of Sonus' Form 8-K filed March 29, 2004, a true and correct copy of which is attached hereto as Exhibit A. Furthermore, to

(continued...)

the severe repercussions these announcements would have on the Company, acknowledging that they could lead to the de-listing of Sonus stock by NASDAQ. *Id.* These revelations have also destroyed over half of the Company's market capitalization – well over one billion dollars. ¶6.

This derivative action was brought on behalf of nominal defendant Sonus against certain officers and directors of the Company to recover the substantial damages caused by this long standing and pervasive scheme to inflate revenues through improper revenue recognition. The Complaint details each director defendants' interests and wrongdoing, rendering them unable or unwilling to bring an action against themselves, including insider selling, interlocking directorates, domination and complete abdication of their obligation to oversee the Company's financial reporting. ¶¶15-24, 60-67.

Confronted by a well-pled, comprehensive Complaint, Defendants' request for dismissal is premised on ignoring their own actions - including manipulating or turning a blind eye to Sonus' fraudulent revenue recognition practices for years, disseminating misleading and inaccurate information about the Company to the public while selling over $2 million dollars worth of their own Company stock, and failing to enforce or put in place internal controls to assure accurate financial reporting. *Id.* A plain reading of the Complaint as a whole reveals that any demand on the board to sue themselves would have been a futile act and as such excused under governing law. Accordingly, Defendants' Motion to Dismiss should be denied in its entirety.

---

[4](...continued)
the extent the Court considers matters outside the Complaint, plaintiffs seek leave to amend to allege futility of demand with regard to H. Brian Thompson as a defendant, who apparently was appointed by the director defendants without shareholder approval in late October 2003, shortly before the announcement of the false revenue recognition practices.

2

## II. STATEMENT OF FACTS

### A. The Parties

The Complaint names an overwhelming majority – six out of seven – of the members of the Board of Directors as defendants, including: Ahmed, President and Chief Executive Officer ¶15; Gruber, founder and Chairman of the Board ¶16; Anderson, director and member of the Board's Audit Committee designed, *inter alia*, to monitor revenue recognition practices ¶17; Ferri, director and member of the Audit Committee ¶18; Notini, director ¶19; and Severino, director and member of the Audit Committee. ¶20.

Contrary to Defendants' arguments, however, the Complaint does not merely assert blanket claims of interest on behalf of each director to establish demand futility, but rather provides copious detail with regard to each of the director defendants. These detailed facts are not mere innuendo as the Defendants would have the Court believe, rather they are a portrait of a Board of Directors where each of the directors share close business and personal ties along with personal interests in the transactions. These business and personal relationships make each of the director defendants unable to impartially evaluate any demand that could possibly be submitted, rendering demand a futile act in this action.

As more fully discussed below, Ferri and Anderson are managing partners of Matrix Partners and North Bridge Partners, respectively, venture capital firms that made what proved to be highly profitable investments in Sonus and were appointed to the board to oversee their firms' investment. ¶¶17, 19. Curiously, these personally interested venture-capitalist bankers were selected to comprise a majority of the Audit Committee. Moreover, Ferri shared an interlocking directorship with Ahmed on the Winphoria Networks' board – another telecommunications start up funded by Matrix and North Bridge. ¶¶17, 19. Moreover, while the trading price of Sonus stock was artificially inflated by the revenue recognition practices that Anderson, as an Audit Committee member was charged with monitoring, Anderson sold $448,918.34 worth of his own personal Sonus stock holdings. ¶17.

Similarly unable to evaluate any demand in a disinterested fashion are Ahmed and Gruber, both inside directors who are longstanding business associates sharing common investments who received and were reliant upon the significant compensation they received as Company executives, compensation that was determined by their fellow director defendants on the Compensation Committee. ¶¶15, 16. As noted above Ahmed further shares an interlocking directorate with Ferri, as well as Severino at PhotonEx Corp. ¶15. In a further curious relationship, defendant Notini is a former senior partner at Hale & Dorr, LLP, the law firm retained to conduct the very investigation into Sonus' revenue recognition practices, and a leading firm in the region for venture capital transactions. ¶18. Moreover, in a further twist, Hale & Dorr, LLP, is also representing the director defendants in this litigation.

The Complaint further names as defendants Sonus Vice Presidents Jones, ¶23; Harris, ¶21; and O'Hara, who each sold substantial personal holding of Sonus stock during the Relevant Period, as well as Chief Financial Officer Nill. ¶24.

### B. False Public Announcements of Revenue Growth Fueling the Company's First Profitable Quarter

Sonus manufactures switches and software that enable voice services to be delivered over packet based networks designed for the transmission of data. ¶2. Throughout the Relevant Period[5] Defendants issued a stream of false positive public announcements proclaiming the success of their products and business model. On April 9, 2003, Defendants issued a press release announcing first quarter 2003 financial results, prepared "in accordance with U.S. Generally Accepted Accounting Principals ("GAAP")", heralding 27% growth in revenues and a narrowing of the Company's net loss to just $0.02. ¶35. In that release, defendant Ahmed boasted "We grew our revenues 27 percent over the last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1 we also continued to add new customers around the globe and made

---

[5] For the purposes of the Complaint, the Relevant Period was defined as April 9, 2003 through February 11, 2004. ¶1.

important additions to our product family." ¶35. Using this growth, Sonus announced the sale of 20 million additional shares of Company stock on April 22, 2003. ¶36.

On July 10, 2003, Defendants reported second quarter 2003 financial results again heralding dramatically increased revenues and a reduction of the net loss to just $0.01 per share. ¶38. Based on these results, defendant Ahmed boasted that "we are definitely driving toward profitability as fast as we can." ¶39. On the heels of these false financial statements and deceptive good news, Defendants Harris and O'Hara together sold 85,000 shares of their personal Sonus stock holdings at inflated prices, receiving over $500,000 in proceeds. ¶¶41-42.

On October 8, 2003, Defendants proclaimed the Company's first purported profit, announcing revenue growth of "285% Over Previous Year," as well as the Company's first quarterly profit of $1,209,000. ¶43. In an interview with, *Bloomberg*, Ahmed boasted that the Company was able to "consistently grow our top line, our revenues...." claiming that this combined with "managing our expenses very carefully and all that's led to a profit." ¶44. Ahmed further announced that the Company would "continu[e] to grow the top line in our company and, obviously as a result of that, grow the bottom line." *Id.* Consequently, Ahmed forecast continued profits and quarterly growth of 10 to 15 percent. *Id.* While the market was flooded with this false positive news, Defendants Johnson, Anderson and O'Hara sold over 179,000 shares of their own Sonus stock holdings for proceeds of nearly $1.5 million. ¶¶45-47.

C.   **Fraudulent Revenue Recognition Practices**

In fact, however, the Company's steady increase in revenues and reduction in operating loss – and ultimate profit – were not the product of precise management, new customers or innovative products as proclaimed throughout the Relevant Period, but instead were the direct result of Defendants' long standing mismanagement and systemic failure to control or uncover the fraudulent revenue recognition practices ongoing at the Company. Thus, less than two months after Defendants announced the Company's first purported profit and insiders unloaded $1.5 million in their personal stock, Defendants surprised the market on January 20, 2004 by postponing the announcement of

Sonus' fourth quarter and year end financial results, without explanation, pending the completion of the year end audit. ¶26. They then further shocked the market on February 11, 2004, when they revealed for the first time that the Company had identified improper revenue recognition practices which would force the restatement of its 2003 financial statements and possibly other periods as well. ¶28. In a transparent attempt to avoid blame, Defendants fired several non-executive employees of the Company, blaming them for the practices. *Id.* Analysts, however, were not convinced, with one noting that it "sounds a lot like scapegoating." ¶33.

These startling revelations caused the price of Sonus stock to plummet, erasing over $1 billion of the Company's market capitalization. ¶¶27, 29, 30. Immediately on the heels of this announcement, Sonus stock was downgraded or suspended from coverage by every analyst that followed the Company. ¶32.

### III. ARGUMENT

**A.  The Court Must Deny Defendants' Motion to Dismiss Pursuant to Rule 23.1**

**1.  Legal Standards Applicable to the Motion to Dismiss**

In derivative actions, as in all other case, on a motion to dismiss the "court accepts as true allegations of complaint." *Harhen*, 730 N.E.2d at 862 (2000) (citing *Nader v. Citron*, 360 N.E.2d 870, 872 (1977)). It is also well settled that "the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs' favor, are to be taken as true." *Nader*, 360 N.E.2d at 872 (citing *Balsavich v. Local 170, Int'l Bhd. of Teamsters*, 356 N.E.2d 1217 (1976); *Druker v. Roland Wm. Jutras Assocs., Inc.*, 348 N.E.2d 763, 765 (1976); *Charbonnier v. Amico*, 324 N.E.2d 895, 899 (1975)). The Massachusetts Supreme Court in *Nader* further expressly adopted the standard for evaluating the validity of claims enunciated by the United States Supreme Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), holding that:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim ***unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.***

*Nader*, 360 N.E.2d at 872 (emphasis added). Moreover, for purposes of a motion to dismiss, the Court may only consider documents outside the complaint only if they are referred to in the plaintiffs' complaint without converting the motion to dismiss into a motion for summary judgment. *Harhen*, 730 N.E.2d at 862.[6]

### 2. Applicable Legal Standards For Evaluating Demand Futility

Sonus is incorporated in Delaware, and therefore Delaware law governs the Court's demand futility analysis. *See, e.g., Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991); *Bartlett v. New York, N. H. & H. R. Co.*, 109 N.E. 452, 456 (1915) ("It is not a technical rule of pleading, but one of substantive right."); *In re Polymedica Corp.*, No. 01-3446, 2002 WL 1809095 (Mass. July 16, 2002).

Under Delaware law, the Court:

> [M]ust decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Hence, the Court ... must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof. As to the latter inquiry the court does not assume that the transaction is a wrong to the corporation requiring corrective steps by the board. Rather, the alleged wrong is substantively reviewed against the factual background alleged in the complaint. As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board.

*Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled in part on other grounds sub nom., Brehm v. Eisner*, 745 A.2d 244 (Del. 2000).

---

[6] As discussed earlier Plaintiffs did not name H. Brian Thompson as a defendant. Apparently Thompson was only appointed by the director defendants (and without shareholder approval) in late October 2003, shortly before the announcement of the improper revenue recognition practices. Defendants have disputed his exclusion and therefore the Board's composition and while Plaintiffs assert that the Court may only consider matters outside the Complaint to the extent that they are publicly filed and referenced in the Complaint, should the Court consider the Form 3 as requested by Defendants, Plaintiffs seek leave to amend the Complaint to allege demand futility with regard to Thompson.

Under the "reasonable doubt" standard, contrary to Defendants' arguments, plaintiffs are not obliged to prove at the pleading stage that the directors were interested or the transaction was not shielded by the business judgment rule. Instead, plaintiffs must allege, with particularity, facts that would give a reasonable shareholder reason to doubt the ability of the Board to consider disinterestedly a demand. *Id. Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993) (endorsing reasonable doubt standard); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.17 (Del. 1996), *overruled in part on other grounds sub nom., Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

This reasonable doubt standard promotes a strong public policy, since "the derivative suit ... [is a] potent tool[ ] to redress the conduct of a torpid and unfaithful management." *Rales*, 634 A.2d at 933. It is further particularly appropriate in derivative suits, because plaintiffs typically has not had the benefit of discovery. *Id.* at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery"). The reasonable doubt standard "is sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where [as here,] the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes*, 673 A.2d at 1217. Thus, plaintiffs' burden here is not to prove wrongdoing or demonstrate that they are likely to win on the merits; rather, plaintiffs' burden at the pleading stage is only to allege particularized facts which, if true, would give a reasonable shareholder reason to doubt the ability of the Board to consider a demand. Plaintiffs amply meet that burden.

Where the Complaint does not challenge a specific action of the Board, but rather the Board's failure to properly monitor and implement appropriate controls, Delaware courts have collapsed the test into a single prong. Under those circumstances:

> [A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its

8

independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Rales*, 634 A.2d at 935.

With regard to either the *Rales* test or the first prong of the *Aronson* test:

> [A] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.

*Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. Such "extraneous considerations or influences" may include, *inter alia*: (i) a director's position as an employee of the corporation;[7] (ii) "current or past business, personal, and employment relationships with each other and the entities involved";[8] (iii) "a clear pattern of mutual advantage" between the directors;[9] or (iv) where the director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[10] Moreover, even if no single allegation taken in isolation would be sufficient to raise a reasonable doubt regarding a director's independence, in combination the totality of plaintiffs' allegations may be sufficient to do so. *Int'l Equity*, 1997 WL 208955, at *5 ("In combination, however, I find the plaintiff has alleged particular facts that support a reasonable doubt as to [defendant]'s independence.")

---

[7] *Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"). *See also Mizel v. Connelly*, No. 16638, 1999 WL550396 at *3 (Del. Ch. July 22, 1999) ("Since [the employee-directors] each derive their principal income from their employment at [the corporation], it is doubtful that they can consider the demand on its merits without also pondering whether an affirmative vote would endanger their continued employment.").

[8] *In re New Valley Corp.*, No. 17649, 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001).

[9] *Int'l Equity Capital Growth Fund, L.P. v. Clegg*, No. 14995, 1997 WL 208955, at *5 (Del. Ch. Apr. 22, 1997). *See also Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (a "long-standing pattern of mutually advantageous business relations" between directors raises a reasonable doubt regarding independence).

[10] *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812; *Pogostin*, 480 A.2d at 624).

In sum, a Board member is considered "independent" where he or she can base decisions "on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. What "extraneous considerations" are sufficient to make a director not independent depends on the facts of the case. As stated in *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990):

> In making the required judgment [concerning a director's independence,] no single factor – such as receipt of directorial compensation; family or social relationships; approval of the transaction attacked; or other relationships with the corporation (*e.g.*, attorney or banker) – may itself be dispositive in any particular case. Rather, the question is whether the accumulation of all factors creates the ***reasonable doubt*** to which *Aronson* refers.

*Id*. at 229 (emphasis added).

### 3. Demand Is Excused Pursuant to Either *Rales* or the First Prong of *Aronson*

As discussed above, demand is excused if the plaintiffs raise a reasonable doubt regarding the directors' disinterestedness or independence. *Rales*, 634 A.2d at 936; *Aronson*, 473 A.2d at 814. Where, as here, the corporation's Board consists of an even number of directors, demand is excused if the plaintiffs plead facts sufficient to raise a reasonable doubt regarding the disinterestedness or independence of a majority of the Sonus Board. *Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000). Consequently, for demand to be excused, plaintiffs need only raise a reasonable doubt regarding the disinterestedness or independence of three of Sonus' six directors. *Id*. Plaintiffs easily do so with respect to Ahmed, Gruber, Anderson, Ferri, Notini and Severino, and therefore demand is excused.

#### a. As Inside Directors, There Is a Reasonable Doubt Regarding the Independence of Ahmed and Gruber

Defendants have tacitly admitted that as inside directors, Ahmed and Gruber are sufficiently interested in the subject matter of this litigation to defeat their independence. Delaware courts have likewise recognized the lack of independence of inside directors. *See In re Limited, Inc.*, No. 17148-NC, 2002 WL 537592, at *5 (Del. Ch. Mar. 27, 2002):

> Gilman has served as a director since 1990. Since 1997, his principal employment has been as vice chairman and chief administrative officer of The Limited for which, during the years 1996-1998, he averaged $1.8 million in salary and bonuses. It is reasonable to infer that compensation of this magnitude is material to him. Moreover, as a general matter, compensation from one's principal employment is 'typically of great consequence' to the employee. Because of Mr. Wexner's holdings of The Limited and his position, as chairman, chief executive officer, and director, these allegations of particularized facts raise a reasonable doubt as to Gilman's independence from Mr. Wexner's will. Sherman is the President and Chief Executive Officer of Danaher. His salary is approximately $1 million per year. Although Sherman's continued employment and substantial remuneration may not hinge solely on his relationship with the Rales brothers, there is little doubt that Steven Rales' position as Chairman of the Board of Danaher and Mitchell Rales' position as Chairman of its Executive Committee place them in a position to exert considerable influence over Sherman. In light of these circumstances, there is a reasonable doubt that Sherman can be expected to act independently considering his substantial financial stake in maintaining his current offices.[11]

*Rales*, 634 A.2d at 937.

Moreover, Ahmed and Gruber have longstanding business ties, sharing common investments in other telecommunications startups. ¶¶15, 16. Further, Ahmed also served as director on Winphoria along with Ferri, in which both Anderson and Ferri's venture capital firms had substantial investments. ¶15. Such long standing business ties, at a minimum, buttress the appearance of a lack of independence. Under Delaware law, facts concerning "current or past business, personal, and employment relationships with each other and the entities involved," *New Valley*, 2001 WL 50212, at *7, or a "long-standing pattern of mutually advantageous business relations" between directors are sufficient to raise a reasonable doubt regarding independence. *Harbor Fin. Partners*, 751 A.2d at 889. Even if "the actual extent of these relationships is not altogether clear" at the pleading stage, "the existence of these interests and relationships is enough to defeat a motion to dismiss." *New Valley*, 2001 WL 50212, at *8.

---

[11] *See also In re Cooper Co., Inc.*, No. 12584, 2000 WL 1664167, at *7 (Del. Ch. Oct. 31, 2000) ("it is reasonable to infer from the fact that Gary Singer was Messrs. Weiss's and Holcombe's corporate superior, that he (Gary) was in a position to exercise 'considerable influence' over them"); *Steiner v. Meyerson*, No. 13139, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [Chairman and Chief Executive Officer] Meyerson's interest in the transactions that plaintiff attacks.").

### b. There Is a Reasonable Doubt Regarding Ferri, Anderson and Severino's Independence

As noted above, both Anderson and Ferri served on the Sonus Board to represent the interests of their respective venture capital firms. ¶17, 19. Moreover, both Anderson's Matrix partners and Ferri's North Border partners invested venture capital not only in Sonus, but also in Winphoria, where Ferri and Ahmed both served as directors. ¶¶15, 17, 19. Further, during the Relevant Period, Anderson sold nearly a half a million dollars of his personal holdings of Sonus stock during the period that the Company's results were overstated. ¶17. Likewise, Ahmed and Severino were both directors of PhotonEx Corp. ¶20. Jointly these three director defendants constituted the entire Audit Committee – the very entity charged with monitoring and enforcing the Company's internal policies and controls to see that all reported financial results were accurately stated and in compliance with GAAP. ¶63(d). As members of the Audit Committee they "had a duty to oversee the auditors, that is to guard the guardians." *In re Lernout & Hauspie Sec. Litig.*, 286 B.R. 33, 38 (D. Mass 2002). Moreover, Severino and Ferri constituted a majority of the compensation committee responsible for establishing the compensation levels, *inter alia*, of Ahmed, with whom they shared interlocking directorships.

Defendants ask the Court to evaluate Anderson's one time sale of Sonus stock in isolation from the remainder of the Complaint. These facts, however cannot be read in isolation, but must be examined in light of the entire Complaint. *Int'l Equity*, 1997 WL 208955. When examined in their totality, the facts alleged here – interlocking directorship, common investments, insider sales, abdication of their responsibilities on the Audit Committee, and their connections with Ahmed – there can be little doubt that Anderson and Ferri lack the independence to evaluate a claim against themselves and their fellow business associates. *New Valley*, 2001 WL 50212, at *8 ("the existence of these interests and relationships is enough to defeat a motion to dismiss").

> 4. **Demand Futility is Further Demonstrated by Defendants'
>    Utter Abdication of Their Duties to the Company**

In his landmark decision *In re Caremark Intern. Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996), Chancellor Allen analyzed the responsibilities that directors owe to the corporation by relying, in part, on the fact that "in recent years the Delaware Supreme Court has made ... clear ... the seriousness with which the corporation law views the role of the corporate board." *Id.* at 970. The Chancellor then noted "the elementary fact that relevant and timely *information* is an essential predicate for satisfaction of the board's supervisory and monitoring role...." *Id.* (emphasis in original.)

> To properly exercise those roles, Chancellor Allen found that corporate boards could not:
>
> [S]atisfy their obligation to be reasonably informed concerning the corporation, without assuring themselves that information and *reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.*
>
> \* \* \*
>
> Thus, I am of the view that a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that *failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.*

*Id.* (emphasis added) (footnote omitted)

The Defendants fall far short of the *Caremark* standard in their conduct relating to Sonus' revenue recognition practices. Even though Sonus' Board had established an Audit Committee whose mandated responsibilities purportedly included a review of the Company's internal controls and financial reporting – including such matters as proper revenue recognition, that committee was nothing more than a pretext or sham behind which the entire Board hid for years while the Company continued to recognize revenue in direct violation of GAAP. ¶¶49-59, 63(d).

Any demand from Defendants for detailed evidentiary pleading showing each Defendants' individual knowledge is equally unavailing. For, even in an action where the breach of fiduciary

duty claim "has at its core the charge that the defendant knew something," a plaintiff need only allege "sufficient well-pleaded facts from which it can be reasonably inferred that this 'something' was *knowable* and that the *defendant was in a position to know it.*" *Iotex Communications, Inc. v. Defries*, No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998) (emphasis added). In this case, plaintiffs easily satisfy the *Iotex* standard by alleging the scope and extent of the revenue recognition practices that have left Sonus financially devastated and on the verge of de-listing. Certainly, the Company's problems were *"knowable"* and the Board was *"in a position to know"* them.

Significantly, where, as here, plaintiffs allege that the Defendants' failure to supervise and monitor involved a scheme of "significant magnitude and duration," it means that "demand futility is ordinarily found." *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000). The court there, in finding demand excused, concluded:

> [T]hat the Complaint has made a compelling case in support of the contention of Plaintiffs that *it would have been futile to require Plaintiffs to issue a demand* to the Director Defendants requesting them to take action against themselves *and certain senior Oxford executives for their* intentional or reckless conduct as alleged. *Not only would this require them to investigate and bring clams [sic] against themselves for their own misconduct, and the totality of their actions to date suggest most strongly that they will not take action....*
>
> In numerous cases where liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, *demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors.*

*Id.* at 116, 117 (emphasis added) (citations omitted). *See also Miller v. Schreyer*, 200 A.D.2d 492, 494 (1st Dep't 1994) (decided under Delaware law, that "gross negligence was adequately pleaded in view of the magnitude and duration of the scheme which went undiscovered by the defendant directors.").

Here, the "magnitude and duration of the scheme" – continuing for an untold number of years and involving millions of dollars of improperly recognized revenue – demonstrate Defendants' recklessness and callous disregard of the red flags presented in light of restatements and revenue recognition issues throughout the industry.

14