**5.     The Exculpatory Provision in Sonus' Certificate of
Incorporation Does Not Exempt Defendants From Liability**

Under certain circumstances 8 Del. C. §102(b)(7) may shield directors from liability for

breaches of their duty of care. However, the breaches of duty alleged in the Complaint premised,

in part, on the Defendants' inexcusable pattern of inattention, failure to act with good faith, and

knowing or reckless abdication of their supervisory responsibilities with regard to the Company's

revenue recognition practices, are not immunized by 8 Del. C. §102(b)(7) or Sonus' Certificate of

Incorporation. Delaware law does not exempt directors from liability "for acts or omissions not in

good faith or which involve intentional misconduct or knowing violations of law...." Del. C.

§102(b)(7) (2002). *Emerald Partners v. Berlin*, 726 A.2d 1215, 1227 (Del. 1999) ("Section

102(b)(7) protections do not apply to violations of the fiduciary duties of good faith or loyalty.").[12]

It is well established that fraudulent and illegal acts cannot be the product of valid business judgment

by a board of directors. *See* Dennis J. Block, Nancy E. Barton, Stephen A. Radin, *The Business

Judgment Rule: Fiduciary Duties of Corporate Directors*, at 90 (5th ed. 1998) ("The business

judgement rule does not protect decisions by directors that constitute fraud, illegality or *ultra vires*

conduct").[13]  Yet, under Delaware law, "[t]he business judgment rule is a presumption that 'in

making a business decision the directors of a corporation acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company [and its

shareholders].'" *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (quoting *Aronson*, 473

---

[12] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("The directors of Delaware corporations
stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose
boards they serve. The director's fiduciary duty to both the corporation and its shareholders has been
characterized by this Court as a triad: due care, good faith, and loyalty. That triparte fiduciary duty
does not operate intermittently but is the constant compass by which all director actions for the
corporation and interactions with its shareholders must be guided.").

[13] *See also Miller v. Am. Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974)(business judgment
rule cannot insulate directors from liability if they violated federal statute); *Moran v. Household
Int'l, Inc.*, 500 A.2d 1346, 1350 (Del. 1985) ("[o]f course, the business judgment rule can only
sustain corporate decision making or transactions that are within the power or authority of the
Board"); *Kerbs v. Ca. E. Airways, Inc.*, 90 A.2d 652, 655 (Del. 1952) (Board cannot engage in acts
which are illegal or ultra vires); *Steiner*, 1995 WL 441999, at *7 (same).

A.2d at 812). Thus, as explained by the *Caremark* court, defendants may be held liable for breach of their fiduciary duty in cases such as this where the directors "lacked good faith in the exercis[ing] of their monitoring responsibilities," which can occur from "an utter failure to attempt to assure a reasonable information and reporting system exists...." 698 A.2d at 971-72. *See also Solash v. Telex Corp.*, 1988 WL 3587, at * 9 (Del. Ch. Jan. 19, 1988) (recognizing that bad faith can be established by conduct "so grossly off-the-mark as to amount to 'reckless indifference'"). Thus, allegations of the lack of good faith in the exercise of board responsibilities arising from defendants' reckless conduct will satisfy the exemption under Delaware's liability shield and will provide a basis for defendants' liability. *See, e.g.*, *Ballotti & Finkelstein Del. Corps. & Bus. Orgs.*, §4.19, at 4-367 (3d ed. Supp. 1996) ("To the extent that recklessness involves a ***conscious disregard of a known risk***, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under [this] statute.") (emphasis added).

The U.S. Court of Appeals for the Sixth Circuit found Delaware's liability shield unavailing in *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), *amended by*, 250 F.3d 997 (6th Cir. 2001). The court there held that 8 Del. C. §102(b)(7) does not protect against "duty of care claims based on reckless or intentional misconduct...." 250 F.3d at 1000. In language applicable to this action, *McCall* held that "regardless of how plaintiffs style their duty of care claims, we find that they have alleged a conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith. Thus, we hold that plaintiffs' claims are not precluded by Columbia's §102(b)(7) waiver provision." 250 F.3d at 1001. Significantly, Section 102(b)(7) can be used by Defendants only as an "affirmative defense." *Emerald Partners*, 726 A.2d at 1223. As such, the burden of demonstrating a lack of good faith is not upon plaintiffs, but "upon the party seeking the protection of the statute" – in this case, the Defendants. *Id.*

Thus, on a motion to dismiss, the Complaint should not be dismissed based on an exculpatory charter provision. *Emerald Partners*, 787 A.2d at 90 (the use of exculpatory provisions to shield directors from personal liability presents an affirmative defense not amenable for pre-trial

16

disposition). *See also Sanders v. Wang*, No. 16640,1999 WL 1044880, at *11 (Del. Ch. Nov. 8, 1999), in which the court declined to dismiss plaintiffs' complaint based on an exculpatory provision at the summary judgment stage, holding:

> Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defense as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness.

*Id.* at *11. Hence, even if there is some uncertainty as to the plaintiffs' allegations regarding Defendants' breaches of fiduciary duties, the action should not be dismissed at the pleading stage.[14]

### 6.    The Complaint Properly States a Claim for Damages

Defendants argue that this action is not yet ripe and the damages are uncertain by focusing solely upon damages the Company will suffer as a result of the pending securities class actions. Contrary to Defendants' arguments, the Complaint properly alleges at least six specific elements of damages suffered by Sonus as a result of Defendants' misconduct. Defendants conveniently ignore that the Complaint alleges that Defendants' actions, *inter alia*: (i) "erased 46% of the Company's market capitalization, or about $1.2 billion," ¶¶6, 30; (ii) resulted in downgrades or suspension of coverage by analysts, ¶¶7, 31-32; (iii) has forced the Company to "waste valuable corporate assets by hiring the law firm of Hale and Dorr, LLP, and PricewaterhouseCoopers to conduct an independent investigation into the wrongdoing alleged herein," ¶7; (iv) "caused severe, irreparable, injury and damage to the Company's reputation and goodwill in the investment and business communities," ¶66; (v) "have caused Sonus to waste valuable corporate assets paying incentive based bonuses and stock options to certain executive officers," ¶85; and (vi) misappropriation of

---

[14]    Furthermore, those seeking the protections of 8 Del. C. §102(b)(7) bear the burden of proving that their actions were the product of good faith. *Emerald Partners*, 787 A.2d at 88-89 (decided on ***summary judgment*** and after discovery had been conducted). Therefore, it would be improper for the Court to dismiss Plaintiffs' claims when Defendants have not demonstrated that they acted in good faith. *See Kahn v. Roberts*, No. 12324, 1994 WL 70118, at *8 (Del. Ch. Feb. 28, 1994) (citing *Desert Equities v. Morgan Stanley Leveraged*, 624 A.2d 1199, 1208-09 (Del. 1993)) ("Whether or not the directors acted in bad faith in approving the [transaction] is a question of fact not reached at [the pleadings] stage.").

corporate assets by the Insider Selling Defendants. ¶¶91-94. Each of these are elements of recoverable damages for the claims asserted in the Complaint, independent of any eventual outcome of any parallel pending securities fraud claims. *See, e.g., In re Cendant Corp. Derivative Litig.*, 189 F.R.D. 117, 135 (D.N.J. 1999) ("Damage to one's business and reputation is a cognizable injury for which damages may be awarded if the underlying charges are proved.").

Even the cases cited by Defendants recognize that claims asserting such recoverable damages should not be dismissed. *See, e.g., In re Symbol Techs. Sec. Litigation*, 762 F. Supp. 510, 516 (E.D.N.Y. 1991).

> With regard to defendants Steinberg, Swartz, Heiman, Schlenker, Mallement, Burke and Bravman, the motion under Rule 12(b)(6) must be denied. Plaintiff has alleged that each of the above-named defendants profited from insider trading of Symbol Technologies stock, thereby breaching a fiduciary duty owed to the Corporation.

The mere fact that certain of Plaintiffs' elements of damages are not yet calculable, does not make them speculative, nor does it render them premature. Therefore, Plaintiffs' claims should not be dismissed, merely because Defendants' actions continue to injure the Company.

## IV.  CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court enter an Order denying Defendants' Motion to Dismiss and sustaining the Complaint in its entirety.

Dated: Boston, Massachusetts,
April 7, 2004

SEGAL ROITMAN & COLEMAN

By: *M. T. Sullivan /SR*

Mary T. Sullivan, Esq. BBO#487130
11 Beacon Street, Suite 500
Boston, MA 02108
Telephone: (617) 742-0208
Facsimile: (617) 742-2187

FARUQI & FARUQI, LLP
Nadeem Faruqi, Esq.
Shane Rowley, Esq.
David H. Leventhal, Esq.
320 East 39th Street
New York, NY 10016
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

18

ROBBINS UMEDA & FINK, LLP
Brian J. Robbins, Esq.
Jeffrey P. Fink, Esq.
1010 Second Ave., Suite 2360
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiffs

19

## CERTIFICATE OF SERVICE

I, Shane T. Rowley, hereby certify that I have this 7th day of April, 2004, caused to be served upon counsel for defendants listed below Plaintiffs' Joint Memorandum Of Law In Opposition To Defendants' Motion To Dismiss.

Thomas J. Dougherty, Esq.
Skadden, Arps, Slate, Meager & Flom, LLP
One Beacon Street
Boston, MA 02108

Robert S. Frank, Esq.
Choate Hall & Stewart
Exchange Place Building
53 State Street
Boston, MA 02109

Jeffrey B. Rudman, Esq.
Hale And Dorr, LLP
60 State Street
Boston, MA 02109

Shane T. Rowley

Exhibit A



# FORM 8–K

## SONUS NETWORKS INC – SONSE

**Filed: March 29, 2004 (period: March 29, 2004)**

Report of unscheduled material events or corporate changes. e.g acquisition bankruptcy resignation

# Table of Contents

**Item 12.** RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

SIGNATURE

Exhibit Index

EX–99 (Exhibits not specifically designated by another number and by investment companies)

EX–99 (Exhibits not specifically designated by another number and by investment companies)

---------------------------------------------------------------------------------

SECURITIES AND EXCHANGE
COMMISSION
WASHINGTON, D.C. 20549
------------------------------------------------

FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

March 29, 2004

Date of Report (Date of earliest event reported)
------------------------------------------------

SONUS NETWORKS, INC.
(Exact Name of Registrant as Specified in its Charter)

| DELAWARE | 000-30229 | 04-3387074 |
|---|---|---|
| ------------ | ---------- | ---------- |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

250 APOLLO DRIVE, CHELMSFORD, MASSACHUSETTS     01824
(Address of Principal Executive Offices)    (Zip Code)

(978) 614-8100
(Registrant's telephone number, including area code)

---------------------------------------------------------------------------------

Item 12. RESULTS OF OPERATIONS AND FINANCIAL CONDITION.

The information in this Current Report on Form 8-K and the exhibit attached hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as shall be expressly set forth by specific reference in such a filing.

On March 29, 2004, Sonus Networks, Inc. (Sonus) issued a press release providing an update on the status of its financial results. A copy of the press release is attached as Exhibit 99.1 hereto.

On March 29, 2004 at 8:30 a.m., Sonus will host a conference call and simultaneous webcast to discuss the contents of this press release. A copy of the script for this conference call is attached as Exhibit 99.2 hereto.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 29, 2004                    SONUS NETWORKS, INC.

                                        By: /s/ Stephen J. Nill_____
                                        -----------------------------------
                                            Stephen J. Nill
                                            Chief Financial Officer,
                                            Vice President of Finance and
                                            Administration and Treasurer

Exhibit Index

99.1 Press release dated March 29, 2004.

99.2 Script for Conference Call dated March 29, 2004.

&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

Exhibit 99.1

Sonus Networks Provides Update on Status of Its Financial Results

CHELMSFORD, Mass.--(BUSINESS WIRE)--March 29, 2004--Sonus Networks (Nasdaq: SONS), a leading provider of voice over IP (VoIP) infrastructure solutions, today announced that the filing of its amended Annual Report on Form 10-K/A for the fiscal year ended December 31, 2003 will be delayed. The Company, having made substantial progress towards the completion of its review of 2003 and 2002 financial results, is now considering whether to expand the review to include additional prior periods. Sonus Networks' independent auditor, Ernst and Young LLP, was not the auditor of record for periods prior to 2002. Therefore, in the event that the Company determines its review should be expanded to include periods prior to 2002, such review and accompanying audit could be lengthy.

Sonus Networks is performing a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. The revenue issues under examination relate to the proper timing of revenue recognition and not whether the sales could ultimately be recorded as revenue. For the customer transactions under review, the products have been delivered and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course.

At this time, the Company expects that its review will lead to a restatement of historical financial statements for the fiscal year ended December 31, 2002 and for the first three quarters of fiscal year 2003. As a result, existing financial statements for those periods should not be relied upon. Sonus Networks does not expect that these restatements will impact its December 31, 2003 cash, cash equivalents and marketable securities balance, which exceeded $300 million.

"While today's announcement is regrettable, we are committed to accurate and transparent financial reporting and require additional time to complete our comprehensive review," said Hassan Ahmed, president and CEO, Sonus Networks. "Our business is strong and Sonus continues to build on its leadership position in the rapidly expanding VoIP market. We continue to add new customers, build important new partnerships and enhance our industry-leading product portfolio. We have a great deal of confidence in our business outlook for 2004."

As a result of the Company's delay in filing its Form 10-K for 2003, Sonus Networks expects to receive notification from Nasdaq that it is not in compliance with the filing requirements for continued listing on Nasdaq and that its securities could be subject to delisting from the Nasdaq National Market. In addition, Sonus Networks anticipates that Nasdaq may change the Company's trading symbol from "SONS" to "SONSE." Sonus will make a timely request for a hearing before a Nasdaq Listing Qualifications Panel to address the filing deficiency, but there can be no assurance that the Panel will grant a request for continued listing.

Company Conference Call, Webcast and Replay Information


The Company will host a conference call and simultaneous webcast on Monday, March 29, 2004 at 8:30 am Eastern to discuss the contents of this press release.

    To listen via telephone:
    Dial-in number: +1-888-326-7098 or +1-706-758-2365

    To listen via the Internet:
    Sonus will host a live webcast of the conference call. To access the webcast, visit the Sonus Networks Investor Relations site at http://www.sonusnet.com.

    Replay:
    A telephone playback of the call will be available following the conference and can be accessed by calling +1-402-977-9140 or +1-800-633-8284. The access code for the replay is 21190372. The telephone playback will be available through April 12, 2004.


The webcast will be available on the Sonus Networks Investor Relations site through March 29, 2005. To access the replay of the webcast, visit the Investor Relations site at http://www.sonusnet.com.

    About Sonus Networks


Sonus Networks, Inc. is a leading provider of voice over IP (VoIP) infrastructure solutions for wireline and wireless service providers. With its Open Services Architecture(TM) (OSA), Sonus delivers end-to-end solutions addressing a full range of carrier applications, including trunking and tandem switching, residential and business access, network border switching and enhanced services. Sonus' voice infrastructure solutions, including media gateways, softswitches and network management systems, are deployed in service provider networks worldwide. Sonus, founded in 1997, is headquartered in Chelmsford, Massachusetts. Additional information on Sonus is available at http://www.sonusnet.com.

This release may contain projections or other forward-looking statements regarding future events or the future financial performance of Sonus that involve risks and uncertainties. Readers are cautioned that these forward-looking statements are only predictions and may differ materially from actual future events or results. Readers are referred to the "Cautionary Statements" section of Sonus' Quarterly Report on Form 10-Q, dated November 10, 2003 and filed with the SEC, which identifies important risk factors that could cause actual results to differ from those contained in the forward-looking statements. Risk factors include, among others, uncertainties regarding the Company's ability to complete the audit and file its Annual Report on Form 10-K/A for 2003 and future periodic reports, risks as to the SEC's investigation of these or other matters, unforeseen issues encountered in the completion of the audit, uncertainties regarding the extent to which prior period financial statements will be restated, the continued adverse effect of developments in the telecommunications industry, Sonus' ability to grow its customer base, dependence on new product offerings, market acceptance of its products, competition from large incumbent vendors, rapid technological and market change and manufacturing and sourcing risks. In addition, any forward-looking statements represent Sonus' views only as of today and should not be relied upon as representing Sonus' views as of any subsequent date. While Sonus may elect to update forward-looking statements at some point, Sonus specifically disclaims any obligation to do so.

Sonus is a registered trademark of Sonus Networks. Open Services Architecture, GSX9000 and Insignus are trademarks of Sonus Networks. All other trademarks, service marks, registered trademarks, or registered service marks are the property of their respective owners.

     CONTACT: Sonus Networks, Inc.
              Investor Relations:
              Jocelyn Philbrook, 978-614-8672
              jphilbrook@sonusnet.com
              or
              Media Relations:
              Beth Morrissey, 978-614-8579
              bmorrissey@sonusnet.com


</TEXT>
</DOCUMENT>

Exhibit 99.2

Script for Sonus Networks Conference Call
March 29, 2004

Jocelyn Philbrook, director of investor relations:

Thank you. Good morning everyone. Thank you for joining us today as we discuss the press release
Sonus issued this morning. With me today are Sonus' President and CEO, Hassan Ahmed and Chief
Financial Officer, Steve Nill.

The press release was issued today at 7:30 am Eastern Time on Business Wire and
on First Call. The text of this release also appears on our Web site at
www.sonusnet.com.

Before Hassan offers his opening remarks, I would like to remind you that during this call, we
will make projections or forward-looking statements regarding items such as future market
opportunities and the company's financial performance. These projections or statements are just
predictions and involve risks and uncertainties such that actual events or financial results may
differ materially from those we have forecasted. As a result, we can make no assurances that any
projections of future events or financial performance will be achieved. For a discussion of
important risk factors that could cause actual events or financial results to vary from these
forward-looking statements, please refer to the "Cautionary Statements" section of our quarterly
report on Form 10-Q dated November 10th 2003.

Risk factors include, among others, uncertainties regarding the Company's
ability to complete its review and the related audit and file its Annual Report
on Form 10-K/A for 2003 and future periodic reports, risks as to the SEC's
investigation of these or other matters, unforeseen issues encountered in the
completion of the audit, uncertainties regarding the extent to which prior
period financial statements will be restated, the continued adverse effect of
developments in the telecommunications industry, Sonus' ability to grow its
customer base, dependence on new product offerings, market acceptance of its
products, competition from large incumbent vendors, rapid technological and
market change and manufacturing and sourcing risks. In addition, any
forward-looking statements represent Sonus' views only as of today and should
not be relied upon as representing Sonus' views as of any subsequent date. While
Sonus may elect to update forward-looking statements at some point, Sonus
specifically disclaims any obligation to do so.

In addition, because we were unable to give several days' advance notice of this call, the
statements we make on this call are not considered valid public disclosure for purposes of
Regulation FD. To address this, we have filed a Form 8-K with the SEC containing our script for
this call. However, because it was obviously impossible to include in that script the responses
to questions asked on this call, our responses to questions must be limited to information
covered in our prepared remarks. Please bear that in mind if we are unable to address certain
questions you may wish to ask on this call.

I would now like to turn the call over to Hassan.

Hassan Ahmed, president and CEO:

Thanks Jocelyn. Good morning everyone and thank you for joining us today on such short notice. Today I will provide some comments on the financial review process that Sonus has undertaken. Then, since it has been a while since our last conference call, I will provide you with some detail on the progress that we are making in our business. Following that, Steve will then briefly discuss the audit with you.

This morning Sonus announced that we have delayed filing our amended 10-K for fiscal year ended 2003. As we had reported to you previously, Sonus is conducting a detailed review of its financial statements for 2003 and prior periods. We have made considerable progress toward completing the review of our 2003 and 2002 financial results and are now considering whether to expand the review to prior periods.

Sonus strives to achieve the highest level of integrity and transparency, in both our business operations and financial reporting. As we reported to you previously, we are engaged in a detailed review of the timing of revenue recognized from customer transactions and of other financial statement accounts. All of the revenue that Sonus had previously reported to you was the result of good business, meaning that the products had been shipped to our customers and we have either received payment or are receiving payment for the products in the ordinary course. We are deeply disappointed that during our year-end audit in January, senior management and our auditors discovered that certain employees had engaged in behavior that violated our code of conduct and potentially compromised the integrity of our financial reporting. We therefore felt it was necessary and appropriate to launch a comprehensive financial investigation.

We consider this a very serious matter and have responded with aggressive measures to address the issue. Sonus expanded the year-end financial review to cover not only 2003, but also prior periods. Sonus' audit committee launched an independent investigation to determine the extent of the behavior. Finally, Sonus proactively notified the Securities and Exchange Commission of the investigation and we have been providing them with the results of our investigation.

Since we last updated you, Sonus has been thoroughly reviewing the financial results we reported during 2002 and 2003. We are now considering whether to expand the review to include the results from additional prior periods. Ernst and Young was not our auditor for periods prior to 2002, and therefore, if we determine that it is appropriate to review prior periods, the review and accompanying audit could take some time.

I want to be clear that the delay in filing our results does not detract from the progress we have made in our business. Sonus has accomplished a lot over the last year, and continues to do so in 2004. While it could be easy to let the recent financial review overshadow our achievements, I want to remind you that this has not impacted the fundamentals of our business. Sonus has a strong competitive position in a market that is

now beginning to reach mainstream adoption.  We are pleased with the progress in
our business to date and our start to 2004. Now let's get into some details.

In the fourth quarter, Sonus made important progress with its customers. For example, two of our
largest customers, Verizon and Qwest, continued to roll out their Sonus-based networks.

In July last year, we announced that Verizon had chosen Sonus to deploy a
long-distance packet voice network in select cities. I'm sure you saw their
announcement about accelerating the build out of their packet switched network.
Over the past several quarters, Sonus and Verizon have built a successful
long-distance network. Sonus expects to continue to support and expand those
deployments. Down the road, we anticipate there will be a number of voice over
IP opportunities at Verizon, which we'll be aggressively pursuing.

For Qwest, 2003 marks the third year of substantial expansion of their next-generation network
and Qwest has one of the larger installed bases of Sonus equipment. We continue to work with
Qwest as they grow their packet voice network and expand these technologies into new
applications.

In the fourth quarter, we announced that America Online is deploying a Sonus
solution to offer premium services to their customers. AOL has grown their
membership to over 35 million around the world and is known to many as a pioneer
in new feature development for their users. Today, AOL offers their customers
Internet call alert, email by phone and voicemail over their computers, all
enabled by a packet voice infrastructure from Sonus.

Carrier deployment of packet voice solutions is accelerating, and monthly traffic volumes on
Sonus-based networks have continued to ramp steadily from the 5 billion minutes per month we
reported in Q3 to over 6.5 billion minutes per month today. This is an important validation of
the scalability, reliability and quality of our solutions.

In Q4, Sonus delivered Release 5.1 of its industry-leading software, once again
furthering our technology leadership with major new features and functionality
that extend the applications of our solutions. Specifically, Sonus' new Network
Border Switching capabilities address carriers' growing requirements for
security, session control and address translation between IP networks, and
facilitate the development of the ubiquitous all-IP network. As packet voice
networks continue to proliferate, service providers are moving to connect to
each other using IP, rather than circuits. This trend is opening up new
opportunities for carriers in a number of key areas including packet peering,
enterprise access, end user access, and application service provider access.
Sonus' new network border switch enables carriers to address each of these
opportunities with an advanced carrier grade solution.

Looking back, 2003 was an important year for Sonus. We strengthened our company in many of the
dimensions we need to build a large business. We successfully broadened our customer base,
including announcing relationships with AT&T, Verizon, America

Online and IDT. We made important additions to our product line, introducing new capabilities and features that widened our addressable market to include the wireless operators and network border switching. Major software releases introduced last year provided enhancements in a number of key areas, expanding our voice VPN features, broadening our international capabilities with a new set of international signaling variants, and delivering traffic control features that enable network performance optimization.

Taking a wider view, 2003 will be remembered as the year that voice over IP became a mainstream technology. It is hard to pick up a newspaper or industry report without some mention of voice over IP. More importantly, some of the largest carriers in the world have announced plans to offer VoIP services. At Sonus, our mission from the start has been to develop carrier class VoIP solutions. Driven in large part from the success of networks built on Sonus, carriers recognize that voice over IP technologies can deliver the same quality of service as their TDM networks, while harnessing the powerful service delivery platform of a converged IP network. This, combined with continued changes in the regulatory environment, is driving a lot of new competitive activity among the carriers.

Unlike the last major shift in switching technologies from analog to digital in the 1970s, voice over IP is much more than simply the next technology platform. By separating services and applications from transport, VoIP enables carriers to deliver broadband services to customers without having to own connectivity to the customer. This has the potential to change the structure of the industry and the players, redefining the winners and losers. So it is clear that packet voice technologies will play an important role in helping to shape the industry.

Looking ahead, 2004 is stacking up to be an incredibly exciting year for our industry and our company. Sonus' mission is clear: further expand our market presence, keep building our technology lead, extend our international reach, and accomplish all this within the context of a business that is financially strong.

We are making important progress towards these goals. Sonus recently announced its first OEM relationship with a global leader in the wireless market, Motorola. Motorola has integrated Sonus' industry-leading GSX9000 media gateway with the Motorola SoftSwitch, a next-generation switching platform for wireless carriers around the globe. Through this relationship with Motorola, Sonus is now able to offer a proven solution for the access portion of wireless carriers' networks, complementing Sonus' SMARRT Wireless solution for the core and effectively doubling our addressable market.

Additionally, Sonus recently announced that one of Japan's largest broadband communication carriers, Softbank Broadband, is deploying Sonus infrastructure as part of a multi-million dollar contract to build out a new packet-based, next-generation voice network. SBB was awarded approximately 6 million of 9 million new IP-based telephone numbers to be issued in Japan, and is expanding its network to accommodate the continued growth in subscribers. SBB is deploying Sonus' voice solutions to provide

long distance voice services first for residential subscribers and then for enterprise customers in later deployment phases.

By now it is obvious that carriers throughout the world will adopt voice over packet technologies. Sonus has announced positions with 32 carriers and we are just getting started. We are growing our sales force and investing in marketing to drive our solutions into large networks around the globe. Our trial base continues to be strong and is diverse across carrier type and application, including long distance, local, wireline and wireless operators.

In summary, this is an exciting time for our business. We are at the beginning of a long-term and fundamental opportunity for Sonus. The industry has moved to the next phase of the market in which incumbent carriers are beginning to adopt and deploy packet voice solutions. We entered 2004 with confidence. Sonus has winning technologies and a talented team, combined with an unwavering focus on building one of the premier suppliers in next-generation voice.

With that, I would now like to turn the call over to Steve.

  Steve Nill, vice president of finance and administration and CFO:

Thanks Hassan. I'd like to briefly comment on our review of the financial results. As the head of the finance organization, I am personally deeply disappointed with our current situation, and the impact that it has had on our company and our shareholders. For those of you who know Sonus, the integrity of our financials is paramount. And at Sonus, we hold ourselves to the highest standards of legal, ethical and honorable behavior. When we discovered the issues we're currently dealing with, we immediately began taking the appropriate and necessary steps to address them.

Over the last few months, we have put a great deal of effort into completing the expanded review and accompanying audit. During this process we have been thoroughly reviewing the 2002 and 2003 financial results previously reported to you. It is unfortunate that we were unable to file our amended Annual Report for 2003 within the 15-day grace period; however, we have made considerable progress towards completing the review of 2003 and 2002.

As part of completing our review, we are assessing the need to expand the review to prior periods. Our independent auditor, Ernst and Young, was not our auditor of record for periods prior to 2002. So, if it is determined that we need to expand our review into periods prior to 2002, completing the review and the accompanying audit could take some time.

Based on the information we have today, we expect to restate our historical financial results for fiscal year 2002 and for the first three quarters of fiscal year 2003. It is important to remember that all of the revenue we previously reported is the result of products that have been delivered to our customers and we have either received payment or are receiving payment for the products in the ordinary course. So while revenue is expected to

shift between periods or move between revenue and deferred revenue, the overall strength of our business remains unchanged. We ended the fiscal year 2003 with in excess of $300 million in cash, cash equivalents and marketable securities.

To begin to restore investor confidence, we need to get our results on file. We are investing substantial time and resources to complete this financial review as quickly as possible. However, we do expect to receive notification from the Nasdaq that we are not in compliance with their filing requirements and that we could be subject to delisting from Nasdaq. The Nasdaq could change our trading symbol to "SONSE." We will have seven days to request a hearing with the Nasdaq once we receive such notification. If the Nasdaq grants a hearing, it is usually scheduled within 2 to 3 weeks. There is no assurance that the panel will grant our request for continued listing.

One last subject I'd like to cover is the shareholder lawsuits that have been filed against our company in recent weeks. We believe that the company has substantial legal and factual defenses, which we intend to pursue vigorously.

As you can imagine, at this time we are not able to provide you with additional details on the audit or our restatements beyond what we've already told you. But, if you have questions related to other aspects of our business, we've made time for a few of them.

I'll turn the call over to the operator for questions.


&lt;/TEXT&gt;
&lt;/DOCUMENT&gt;

---

Created by 10KWizard Technology   www.10KWizard.com