UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>_____<br><br>Consolidated Cases:<br>1-04-CV-10359 DPW; 1-04-CV-10384 DPW; 1-04-CV-10576 DPW | **Case No. 1-04-CV-10359 DPW**<br><br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED COMPLAINT** |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

SUMMARY OF FACTS ....................................................................................................... 4

    A.   Sonus' Financial Reporting in 2001, 2002 and 2003. .................................................. 4

    B.   Defendants' Insider Trading. ....................................................................................... 5

    C.   First Disclosures of Accounting Problems. ................................................................. 5

    D.   The Restatement. ......................................................................................................... 5

    E.   Further Revelations Regarding Internal Controls. ...................................................... 6

    F.   Defendants Were On Notice of "Red Flags." .............................................................. 7

    G.   The Directors Were Responsible for the Internal Controls of Sonus. ......................... 8

    H.   The Company Has Been Damaged By The Accounting Scandal. ................................. 9

    I.   This Board Lacks Independence. ................................................................................. 9

THE FEDERAL COMPLAINT ALLEGES MANY NEW AND MORE DETAILED FACTS

    THAN THE STATE COMPLAINT ................................................................................. 11

ARGUMENT ...................................................................................................................... 12

    A.   Collateral Estoppel Does Not Apply. ........................................................................ 12

        1.   Defendants Cite No Case Applying Collateral Estoppel To A Decision on

            Demand Futility. ................................................................................................ 13

        2.   Plaintiffs Plead Far More Detailed Facts. .......................................................... 14

    B.   Demand Is Excused. .................................................................................................. 17

        1.   Plaintiffs' "Caremark" Allegations Excuse Demand. .......................................... 18

        2.   Plaintiffs' Insider Trading Claims Support Demand Futility. .............................. 22

3.    Demand Is Excused Where The Board Participates In Misleading Shareholders. 23

4.    This Board Cannot Act Impartially or Objectively ............................................... 24

CONCLUSION ........................................................................................................................... 25

TABLE OF AUTHORITIES

**Cases**

Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984) ......................................................... 17, 18, 25

DeCosta v. Viacom Int'l, Inc., 981 F. 2d 602 (1st Cir. 1992) ....................................... 15

Dollens v. Zionts, No. C 01 2826, 2002 U.S. Dist LEXIS 13511 (N.D. Ill. July 24, 2002)......... 22

Dresdner v. Goldman Sachs Trading Corp., 269 N.Y.S. 360 (N.Y. 1934).................................. 15

Faigin v. Kelly, 184 F.3d 67 (1st Cir. 1999).................................................................. 13

Grobow v. Perot, 539 A.2d 180 (Del. 1988)................................................................. 18

Grossman v. Johnson, 674 F. 2d 115 (1st Cir. 1982) .................................................... 16

In re Abbott Laboratories Deriv. Litig, 325 F.3d 795 (7th Cir. 2003).......................... 21

In re Caremark Int'l, Inc., 698 A.2d 959 (Del. Ch. 1996)............................................ 18

In re Cendant Derivative Litig., 189 F.R.D. 117 (D.N.J. 1999) ................................... 23

In re FirstEnergy Shareholder Deriv. Litig., 320 F. Supp. 2d 621 (N.D. Ohio 2004) ................. 21

In re Microsoft Corporation Antitrust Litigation, 355 F. 3d 322 (4th Cir. 2004)......................... 12

In re New Valley Corp. Derivative Litig., 2001 Del. Ch. LEXIS 13 (Del. Ch. Jan. 11, 2001) .... 24

In re Oracle Corp. Deriv. Litig., 824 A.2d 917 (Del. Ch. 2003)................................... 24

In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111 (S.D.N.Y. 2000) ...................... 21, 22

In re Storage Technology Sec. Litig., 804 F. Supp. 1368 (D. Colo. 1992) ................. 23

In re Strangie, 192 F.3d 192 (1st Cir. 1999)................................................................. 12

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) ............................................ 17

Landy v. D'Allesandro, 316 F. Supp. 2d 49 (D. Mass. 2004) ...................................... 16

McCall v. Scott, 239 F.3d 808 (6th Cir. 2001) .............................................. 18, 21, 22

Mitzner v. Hastings, 2005 U.S. Dist LEXIS 835 (N.D. Cal., January 14 2005) ......................... 21

Nathan v. Rowan, 651 F.2d 1223 (6th Cir. 1981)......................................................... 13

New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326 (1st Cir. 1995)........... 12

Parklane Hosiery Co., Inc., v. Shore, 439 U.S. 322 (1979) ........................................................... 13

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ....................................................................... 17, 18

Schneider v. Colegio De Abogados De Puerto Rico, 546 F. Supp. 1251 (D.P.R. 1982) ............. 12

## Statutes

15 U.S.C. §7241 ............................................................................................................................. 12

15 U.S.C. §7243(a) ........................................................................................................................... 2

18 U.S.C. §1350 .............................................................................................................................. 12

Federal Rule of Civil Procedure 23.1 ........................................................................................... 17

## Other Authorities

Restatement (Second) of Judgments §27 ...................................................................................... 15

## Treatises

*Moore's Federal Practice*  (3d. ed. 2004) ................................................................................... 13

## INTRODUCTION

This is a consolidated shareholders' derivative action brought on behalf of nominal defendant Sonus Networks, Inc. ("Sonus" or "the Company"), a Delaware corporation. The defendants are several of the Company's current or former officers and directors.

On July 28, 2004, a huge restatement of the Company's financial results was announced, including financial statements for all of fiscal years 2001, 2002 and the first nine months of 2003. The restatement was extensive in scope and magnitude, and included material adjustments to the Company's accounting for revenue, deferred revenue, purchase accounting, impairments, accrued expenses and deferred compensation. The restatement resulted in large swings in reported results for revenue, deferred revenue and expenses throughout the subject periods, as well as admissions by defendants that "significant internal control matters" constituting "material weaknesses" existed at the Company, including, but not limited to, "lack of adequate technical accounting expertise," "flawed foundations for accounting estimates" and "inadequate quarterly and year-end financial statement close and review procedures."

On March 5, 2005, defendants filed a Form 10-K for fiscal year 2004 which described the full extent of the Company's internal control problems. The remarkable admissions contained in the Form 10-K demonstrate that as a practical matter, the Company had no functioning accounting controls whatsoever. Breakdowns were identified in ten distinct areas, including inadequate entity level controls (including the "lack of uniform and consistent communication by all members of senior management regarding the importance of controls"), inadequate business processes and information systems, inadequate revenue recognition procedures and controls, inadequate segregation of duties and information systems users, inadequate financial statement preparation and review procedures, inadequate controls over cash receipts, inadequate controls

over equity transactions, inadequate purchasing controls, inadequate controls over inventory and cost of revenues, and inadequate information systems procedures and controls.

During the reporting periods in which defendants were causing Sonus to operate in this fashion, several of the Company's officers and directors collectively sold over 364,000 shares of Sonus stock at inflated prices while in possession of material adverse inside information regarding these matters, for proceeds of over $2.2 million. Furthermore, in addition to their substantial salaries, several officers and directors were awarded incentive-based cash compensation, bonus and stock option awards by the Compensation Committee of the board of directors based on the Company's inflated earnings performance.

Remarkably, throughout fiscal year 2003 defendants boasted to shareholders that the Company was "driving toward profitability," causing a huge increase in the price of the Company's stock. As has now been revealed, these representations had absolutely no basis, as the Company's accounting systems were in shambles and incapable of yielding any accurate information. When the truth was finally revealed, the Company's share price collapsed. This has damaged the Company by exposing it to massive liability in a series of securities class action lawsuits, the embarrassment of a formal SEC proceeding, and substantial related costs and expenses. Defendants have also harmed the Company's reputation with the financial and business communities and among customers.

To remedy these harms, plaintiffs assert claims on behalf of Sonus for breach of fiduciary duty, gross negligence, breach of contract, breach of the duty of loyalty and insider trading, waste of corporate assets, unjust enrichment, disgorgement under the Sarbanes-Oxley Act of 2002, 15 U.S.C. §7243(a), and abuse of control. Plaintiffs further allege that demand on the Company's board to assert these claims is excused for futility.

Defendants do not move to dismiss the substantive claims, but make two principal arguments related to demand futility. First, they claim that Judge Van Gestel's order granting defendants' motion to dismiss in the Massachusetts Superior Court action <u>In re Sonus Networks, Inc. Derivative Litigation</u>, 04-0753-BLS, precludes plaintiffs in this action from litigating the demand futility issue. Alternatively, they argue that even if collateral estoppel does not apply, the federal complaint is not sufficiently particularized to excuse demand under Rule 23.1 and Delaware law.  These arguments must be rejected.

First, defendants have failed to satisfy the stringent requirements of collateral estoppel. The state complaint was filed by different shareholders and collateral estoppel does not apply. Furthermore, the complaint here contains many facts which were not alleged in the state complaint, and which are dispositive in plaintiffs' favor on demand futility. Among these facts are particularized allegations from the Company's own SEC filings showing that the directors have known about the Company's internal control weaknesses <u>for years</u>, but failed to do anything about them. Under these circumstances, plaintiffs' case must proceed.

Second, the futility of demand has been established under applicable law.  Defendants were on notice that the Company's internal controls were inadequate, yet failed to take any steps to fix these problems, leading directly to an accounting disaster. These controls were the responsibility of all the director defendants, a majority of whom even served on the board's Audit Committee during some or all of the relevant period. Defendants' failure to remedy these problems, and the deplorable state of the Company's internal controls now revealed, raise a substantial likelihood of liability for bad faith breach of fiduciary duty.

## SUMMARY OF FACTS

**A.     Sonus' Financial Reporting in 2001, 2002 and 2003.**

Sonus is a Delaware corporation located in Chelmsford, Massachusetts. According to its public statements, Sonus provides internet voice infrastructure solutions. Sonus trades on the NASDAQ National Market System with 246.5 million shares outstanding. ¶19.[1] Named as defendants are six of the seven board members serving at the time the first of the consolidated derivative actions was filed: Hassan Ahmed, Edward T. Anderson, Albert A. Notini, Paul J. Ferri, Rubin Gruber, and Paul Severino, collectively the "Director Defendants." Also named are four officers: John O'Hara, Edward Harris, Stephen Nill and Paul Jones.

Defendants publicly reported financial results for fiscal years 2001 and 2002 on January 16, 2002 and January 23, 2003, respectively. ¶¶38-43, 44-51. Defendants publicly reported financial results for the first three quarters of fiscal year 2003 on April 9, 2003, July 10, 2003, and October 8, 2003, respectively. ¶¶52-65. According to defendants, the third quarter of fiscal year 2003 was the Company's "first quarterly profit on a GAAP basis." ¶61.

For each reporting period, defendants represented in SEC filings that the reported financial results complied with Generally Accepted Accounting Principles ("GAAP"), and in particular with applicable revenue recognition rules. Furthermore, beginning in fiscal year 2002, the Company's SEC filings contained certifications signed by defendants Ahmed and Nill under Sarbanes-Oxley attesting to the accuracy of the Company's financial results, as well as to the integrity of the Company's internal controls, including representations that the internal controls had been properly "designed" and "evaluated" for deficiencies. ¶¶49, 50, 64.

---

[1] All paragraph ("¶") references are to the Second Amended Consolidated Shareholder Derivative Complaint.

**B.     Defendants' Insider Trading.**

In response to defendants' announcements of progressively increasing 2003 quarterly earnings, the price of Sonus stock rose from approximately $1.00 per share in January 2003 to nearly $10 per share in January of 2004. ¶¶62, 65. As the price of Sonus shares was rising from its January 2003 price of $1.00 per share, defendants Anderson, O'Hara, Jones and Harris collectively sold 364,334 shares of Sonus stock for proceeds of $2.27 million. ¶127. Anderson had not sold stock in two years, and the three others had never traded Sonus stock. ¶128.

**C.     First Disclosures of Accounting Problems.**

On January 20, 2004, prior to the announcement of fourth quarter and fiscal year 2003 results, defendants revealed that the Company would postpone its earnings release pending the completion of the 2003 audit. ¶67.  On February 11, 2004, defendants announced that the "integrity" of the Company's financial statement had been "compromised" and that certain individuals had been "terminated." ¶68. On March 15, 2004, defendants announced that the Company would seek an extension to file year-end financial statements for fiscal year 2003 with the SEC, and that defendants were "establishing new practices and controls." ¶71. On March 29, 2004, defendants announced that the investigation would be expanded to include "additional prior periods." ¶72. On April 27, 2004, defendants announced they were continuing the review of revenue recognition and "other financial statement accounts" for 2002 and 2003. ¶78. On June 29, 2004, defendants reported that the SEC had stepped up its inquiry and had issued a formal order of investigation of the Company's financial reporting. ¶81.

**D.     The Restatement.**

The restatement of fiscal years 2001, 2002 and the first nine months of 2003 was announced in a press release on July 28, 2004. ¶83. It was also reported that defendant Nill, the

Company's CFO, "resigned at the request of the Company." ¶83.  In a Form 10-K filed on the

same date, defendants admitted that the Company's internal controls had been totally inadequate

and suffered from material weaknesses throughout the relevant period. ¶¶84-85. Although

defendants Ahmed and Nill had repeatedly executed Section 302 Certifications under Sarbanes-

Oxley certifying that the Company's internal controls were sufficient to ensure the proper

reporting of financial information, in reality the Company's internal controls were in a woeful

state, and suffered from such basic failures as insufficient contract review and documentation;

inadequate supervision and review within the finance and accounting department; inadequate

segregation of duties; insufficient supporting documentation for and review of account

reconciliations; lack of adequate controls over cash receipts; lack of adequate technical

accounting expertise; insufficient equity review procedures and documentation; flawed

foundations for accounting estimates; and inadequate quarterly and year-end financial statement

close and review procedures. ¶¶84-85.

### E.    Further Revelations Regarding Internal Controls.

On March 15, 2005, defendants filed a Form 10-K for fiscal year 2004. The 2004 Form

10-K demonstrated that the Company's internal control problems were far more serious and

pervasive than had been previously disclosed. In a section entitled "Management's Report on

Internal Control Over Financial Reporting," defendants admitted in extraordinary detail material

weaknesses in ten distinct areas, including inadequate entity level controls, inadequate business

processes and information systems, inadequate revenue recognition procedures and controls,

inadequate segregation of duties and information systems users, inadequate financial statement

preparation and review procedures, inadequate controls over cash receipts, inadequate controls

over equity transactions, inadequate purchasing controls, inadequate controls over inventory and

cost of revenues, and inadequate information systems procedures and controls. ¶93. Just a small

sampling of the disclosures demonstrates the extent of the problems:

> We do not have adequate procedures and controls to ensure that
> accurate financial statements can be prepared and reviewed on a
> timely basis, including insufficient a) levels of supporting
> documentation, b) review and supervision within the accounting
> and finance departments, c) underlying accurate data to ensure that
> balances are properly summarized and posted to the general ledger,
> d) analysis of reserves and accruals, including inventory reserves,
> warranty accruals and royalty accruals, and e) technical accounting
> resources.

In a letter to the board dated March 14, 2005, the Company's auditor, Ernst & Young

LLP ("E&Y"), concurred regarding the state of the internal control environment. ¶94.

### F.    Defendants Were On Notice of "Red Flags."

All of the Director Defendants were on notice of "red flags" demonstrating that the

Company's internal controls systems were deficient, and that there were serious problems with

the Company's disclosure systems and practices. ¶96.

As early as March 2001, almost three full years before the restatement, defendants stated

in a Form 10-K for fiscal year 2000 that the Company's growth had placed a "significant strain"

on the Company's "management systems and resources," and expected that they would need to

"continue to improve our financial, managerial and manufacturing controls and reporting

systems" and "expand, train and manage our work force worldwide." ¶99. In a March 2002 Form

10-K for fiscal year 2001, after revenues had reportedly tripled, defendants reported that they had

hired a "significant number" of new employees, and again stated that a "significant strain" had

been placed on the Company's "management systems and resources" by the Company's growth,

and again expected that they would need to "continue to improve our financial, managerial and

manufacturing controls and reporting systems" and "expand, train and manage our work force

worldwide." ¶102. The restatement and subsequent admissions that the Company's accounting controls were practically non-existent demonstrate that defendants failed to make the necessary improvements to the Company's internal controls. ¶104.

The board also knew that the Company's accounting and disclosure practices had been called into question in a series of class action complaints filed in this court beginning in July 2002 and pending before Judge Wolf. All of the Director Defendants knew about this litigation, as it was prominently discussed in SEC filings, and some were named as defendants. ¶105. According to the complaint in that case, defendants overstated the quality and performance and capabilities of the Company's products, thereby deceiving investors in Sonus stock regarding the Company's prospects. ¶107. Furthermore, with respect to the Company's accounting procedures and financial statements, the complaint alleged that in order to induce sales and support revenue growth, defendants caused Sonus to employ a practice of providing customers with "substantial financial inducements, such as loans or credits" ¶108, in violation of accounting rules. These practices were undisclosed, and have been "widely recognized and criticized as a means of misrepresenting a company's financial condition and performance." ¶109.

Regarding scienter, according to the complaint, during fiscal years 2000 and 2001, defendant Ahmed sold 807,000 shares of Sonus stock for over $23 million. Defendant Anderson sold 292,000 shares for over $8.3 million. And defendant Gruber sold 782,000 shares for over $22.8 million. These insider trading allegations were yet another "red flag" regarding deficiencies with the Company's internal controls as they relate to insider trading. ¶112. On or about May 11, 2004, Judge Wolf denied defendants' motion to dismiss. ¶113.

### G.    The Directors Were Responsible for the Internal Controls of Sonus.

All of the Director Defendants had the responsibility to ensure that there existed at Sonus sufficient internal controls to maintain the accuracy of its reported financial results, including

revenue recognition. Defendants Anderson, Ferri, Severino and Notini in particular, comprising a majority of the board, and all of whom served on the Audit Committee of the board during part or all of the relevant period, had the responsibility to ensure that Sonus had sufficient accounting controls to insure the accuracy of its reported financial results. ¶¶119-126.

**H.     The Company Has Been Damaged By The Accounting Scandal.**

In the Form 10-K for fiscal year 2003 announcing the restatement, defendants admitted the harm suffered by the Company as a result of the restatement. Damages include $4.8 million spent on auditor fees for the restatement; exposure to liability in class action litigation, as well as related investigation, defense and indemnification costs; extremely expensive D&O insurance rates; risks to viability of business and financial strategies and operations; exposure to further risk as a result of the Company's lack of internal controls and the potential inability to timely implement new ones; and prohibitively expensive financing. Other recoverable damages include unjust compensation awards and insider trading proceeds. ¶¶87-91, 127, 133-145.

**I.     This Board Lacks Independence.**

The Form 10-K for fiscal year 2003 also disclosed that, notwithstanding the restatement which has damaged the Company and severely harmed shareholder value, the Compensation Committee of the board, consisting of defendants Ferri and Severino, awarded substantial cash and stock compensation for fiscal year 2003 to several of the Company's senior officers and directors – the very individuals who were responsible for ensuring the implementation of adequate internal controls and procedures but utterly failed to do so. ¶¶86-92.

The board is beholden to defendant Ahmed. Although he was the Company's principal executive officer during the restated periods, Ahmed was actually <u>elevated</u> to chairman of the board in April 2004, a clear indication of his control. ¶76. Also in April 2004, Gruber, one of the

Company's founders and chairman of the board during the restated period, was given the honorary title "Chairman Emeritus," notwithstanding the huge accounting scandal that occurred on his watch. ¶75. These new positions were cemented with substantial incentive-based compensation awards granted by their friends on the Compensation Committee of the board. As revealed in the very same Form 10-K that detailed the restatement, for 2003 defendant Ahmed was awarded incentive based compensation of $75,000 in cash and options to purchase 2,000,000 shares of Sonus stock, valued at up to $14 million. Ahmed received this award even though he already owned over 8 million shares of stock and had obtained at least $23 million from sales of Sonus stock during 2000 and 2001. In January 2004, just as the accounting problems were being revealed, Ahmed's salary was almost doubled to $295,000. ¶87. "Chairman Emeritus" Gruber was awarded options to purchase 430,000 shares of Sonus stock, valued at over $3 million, even though he already owned over 4 million shares of Sonus stock and had obtained at least $22 million from sales of Sonus stock during 2001. ¶88.

    The enormous awards given to Ahmed and Gruber on the heels of the accounting scandal are consistent with Ahmed's domination and control of the board. Indeed, other board members have openly communicated their allegiance to Ahmed. ¶147. In addition, the board members have extensive business relationships which demonstrate that they resemble more of a club than an aggressive gatekeeper. Anderson and Ferri, who during fiscal years 2001 and 2002 comprised a majority of the Audit Committee, are high-profile Boston venture capitalists who have invested in dozens of the same companies, and are known in the community as "school pals" and a "tag-team" who "travel as a pair." One article states that Anderson and Ferri "take the buddy system to a different level." Anderson, Ferri, Ahmed, Gruber and Severino have many common investments among them, and their business and professional relationships are extensive. ¶147.

## THE FEDERAL COMPLAINT ALLEGES MANY NEW AND MORE DETAILED FACTS THAN THE STATE COMPLAINT

The state and federal complaints are fundamentally different, with the federal complaint containing far more detailed allegations, as well as a claim under federal law. According to Judge Van Gestel's order at page 2, the complaint he dismissed with prejudice was filed on February 20, 2004, and he did not consider any facts not alleged in the complaint. Order at 7 (state complaint would "live or die" as written).  Plaintiffs' many additional allegations both predate and postdate February 20, 2004.

As discussed above, plaintiffs have included detailed allegations from 2001, 2002 and 2003 which demonstrate that defendants were on notice of numerous "red flags" which alerted them to the internal control deficiencies at the Company and problems with the Company's disclosure practices and insider trading controls. Defendants concede, as they must, that none of these specific allegations were ever before Judge Van Gestel.

At the time the state complaint was filed, the only known fact regarding the restatement was the February 11, 2004 revelation regarding revenue issues, and that an investigation was under way.  This is five months before the July 2004 restatement was announced, and over a year before the March 2005 disclosures regarding the ten areas in which material internal control deficiencies were identified. The full details of the restatement and its causes are alleged in the operative complaint in this case, which was not filed until July 1, 2005. As explained below, these developments are all highly probative of demand futility.

Therefore, in addition to the "red flag" allegations, Judge Van Gestel did not consider (1) the scope and extent of the restatement, which covered almost three full fiscal years; (2) defendants' admissions that the Company's internal controls were deficient throughout the relevant period and constituted "material" weaknesses; (3) defendant Ahmed's certifications

under Sections 302 and 906 of the Sarbanes-Oxley Act, 15 U.S.C. §7241 and 18 U.S.C. §1350, which have now proven to be false; (4) defendants' admissions regarding losses suffered by the Company as a result of the restatement; (5) the extraordinary detail regarding internal control deficiencies provided by defendants and E&Y in the March 2005 Form 10-K; and (6) facts bearing on the board's deference to defendants Ahmed and Gruber, including their new positions on the board and huge incentive-based compensation awards.

Furthermore, the federal complaint contains an exclusively federal claim for disgorgement under Section 304 of Sarbanes Oxley, premised on the improper receipt of compensation, as well as a breach of contract claim.

## **ARGUMENT**

### A.    **Collateral Estoppel Does Not Apply.**

State law controls whether a federal court may afford the judgment of a state court collateral estoppel effect. New Hampshire Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 328 (1st Cir. 1995). Under Massachusetts law, the moving party bears the burden of showing that (1) the issue sought to be precluded from re-litigation is identical to that decided in a former proceeding; (2) the issue was actually litigated; (3) it was decided on the merits; and (4) the party against whom preclusion is sought is the same as, or in privity with, the party to the former proceeding.  In re Strangie, 192 F.3d 192, 194 (1st Cir. 1999).

To apply  collateral estoppel or issue preclusion to an issue or fact, the proponent must demonstrate that "the issue or fact is identical  to the one previously litigated." In re Microsoft Corporation Antitrust Litigation, 355 F. 3d 322, 326 (4th Cir. 2004).  All reasonable doubts are resolved against issue preclusion. Schneider v. Colegio De Abogados De Puerto Rico, 546 F. Supp. 1251, 1271 (D.P.R. 1982). "The requirement of determining whether the party against

whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." Parklane Hosiery Co., Inc., v. Shore, 439 U.S. 322, 328 (1979).

Whether a party is estopped from litigating an issue is a highly fact specific inquiry. "[I]ssue preclusion applies only if the issue in the prior litigation is identical to the issue in subsequent litigation, [and] . . . a difference in pertinent facts, sufficient to substantially change the issue renders the doctrine of issue preclusion inapplicable." *See Moore's Federal Practice* § 132.02[2][e] (3d. ed. 2004)(emphasis added). The First Circuit has ruled that identical issues must be presented. "It is common ground that the reach of collateral estoppel must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." Faigin v. Kelly, 184 F.3d 67, 78 (1st Cir. 1999)(emphasis added). Under the foregoing principles, collateral estoppel does not apply here.

### 1.    Defendants Cite No Case Applying Collateral Estoppel To A Decision on Demand Futility.

Defendants concede that plaintiffs were not parties to the state case, but claim that plaintiffs are in privity with the state plaintiff. But defendants' cases hold only that when the underlying substantive claims have been dismissed, res judicata may operate to bar a lawsuit by another shareholder. For example, see Nathan v. Rowan, 651 F.2d 1223, 1226 (6th Cir. 1981) (plaintiff's case was dismissed where he filed suit after a prior derivative claim had been barred by the statute of limitations). But here, the only issue litigated in the state action was the fact-intensive preliminary inquiry to determine whether that shareholder plaintiff would be given standing to proceed with the substantive claims. As defendants admit, the substantive claims remain untouched. Def. Mem. at 6 ("Defendants should not be misunderstood as arguing that Judge Van Gestel's decision was 'on the merits' as to the substantive cause of action.") Defendants themselves characterize demand futility as a "precondition to sue." Id.

Thus, all that has happened in the state action is that one Sonus shareholder alleged the futility of demand and lost. But plaintiffs here are unrelated to the state plaintiff. They have different lawyers and filed a different lawsuit in a different court armed with a different set of facts. Defendants cite no case in which a decision to reject the standing of one particular shareholder may be wielded against all others to foreclose enforcement by the shareholders of the substantive claims. Indeed, since the underlying claims survive, it is hard to see how a shareholder who failed to establish standing to enforce them could be in privity with "the corporation and all nonparty shareholders." <u>Nathan</u> at 1226. He is not. The state and federal plaintiffs are no more in privity than are the members of an uncertified class. While all plaintiffs may be seeking to enforce the corporation's claims, plaintiffs' individual allegations regarding the threshold issue of standing to proceed must be evaluated independently.

### 2.     Plaintiffs Plead Far More Detailed Facts.

The <u>only issue</u> decided by Judge Van Gestel is that <u>the state plaintiff</u> failed to allege demand futility. But the facts alleged by the federal plaintiffs "substantially change the issue" regarding demand futility, and collateral estoppel is therefore inappropriate. As summarized above, the federal plaintiffs allege a multitude of additional facts which allegations bear directly on demand futility. These allegations include (1) three specific instances that the directors were put on notice of "red flags" regarding problems with the Company's internal controls, (2) the broad reach of the  restatement, and (3) the admission regarding the state of the Company's internal controls. In contrast, the state plaintiffs alleged none of these "red flags," and their allegations regarding the restatement are limited to the mere announcement of an investigation, months before the results of the restatement were even reported. Plaintiffs' allegations change the landscape of the derivative claims and make them much more powerful.

Defendants argue that plaintiffs' allegations regarding "red flags" should be disregarded because the "red flags" date from a period before the filing of the state complaint, citing <u>DeCosta v. Viacom Int'l, Inc.</u>, 981 F. 2d 602 (1st Cir. 1992). There, plaintiff sued CBS in 1963 for a trademark violation but lost because he failed to prove likelihood of consumer "confusion." He then registered his trademark and filed suit again <u>over 20 years later</u> claiming a change in the law and the facts regarding "confusion," and won a jury trial. Applying collateral estoppel, the First Circuit reversed, primarily on the basis that changes in trademark law did not materially change the legal analysis. The court also rejected DeCosta's "new" evidence as more of the same he already provided at the first trial regarding "confusion." <u>DeCosta</u> is irrelevant. Plaintiffs are different shareholders asserting different allegations in a different court.

But collateral estoppel would not apply in any event. As explained above, Judge Van Gestel never considered allegations like plaintiffs' "red flag" allegations. In <u>DeCosta</u>, Judge Breyer observed that "collateral estoppel does not bar relitigation of an issue transformed by significant factual or legal changes," citing the Restatement (Second) of Judgments §27. Plaintiffs' "red flag" allegations represent such "significant factual changes" to the demand futility question. In any event, it would be unfair to exclude these allegations because another litigant failed to raise them. As the Supreme Court stated in <u>Parklane</u>, it must be assured that the party against whom enforcement is sought have had a "full and fair opportunity" to litigate. <u>See Dresdner v. Goldman Sachs Trading Corp.</u>, 269 N.Y.S. 360, 367-68 (N.Y. 1934) ("the first action brought by a stockholder furnishes no adequate security that other shareholders will be assured of a complete remedy.  The one first in the field may not be possessed of all the facts. He may omit from his complaint material allegations of facts which have been discovered by another more vigilant and industrious.")

Defendants also argue that the Court should not consider facts which became known after the first derivative complaints were filed in February 2004, citing Grossman v. Johnson, 674 F. 2d 115, 123 (1st Cir. 1982). There, the court stated that demand futility is gauged "at the time the derivative actions is commenced" and not with the benefit of "hindsight." In Grossman, the court rejected a demand futility allegation contained in an amended complaint which was based on a statement made by the directors in a motion to dismiss the initial complaint. Similarly, in the case upon which Grossman relied, the Third Circuit observed that a Special Litigation Committee report recommending that an action be dismissed was not probative of demand futility because, again, the report was created after the complaint was filed.

 These cases present unique situations in which plaintiffs sought to exploit positions taken by defendants in litigation after the lawsuits were filed. Here, plaintiffs are simply including public disclosures of facts which relate directly to, and elaborate upon, the subject matter of their prior complaints. Furthermore, unlike the cited cases, all of the facts underlying the restatement and the internal control weaknesses already existed in February 2004, but were concealed.  This is not "hindsight." While defendants may be anxious to have these facts excluded, they are obviously relevant to the subject matter of the case, and their inclusion is consistent with plaintiffs having been given leave to amend – which is routine in derivative cases in the First Circuit. Landy v. D'Allesandro, 316 F. Supp. 2d 49, 75 (D. Mass. 2004).

Finally, defendants argue that "all of the salient facts" were before Judge Van Gestel when he ruled. As described in detail above, this is simply not true. Defendants also claim that (1) certain of the post-February 2004 disclosures were provided to Judge Van Gestel before he held the hearing on defendants' motion to dismiss, and that he rejected them, and (2) had the restatement announced on July 28, 2004 "been important," it would have been brought to Judge Van Gestel's attention. These arguments are destroyed by Judge Van Gestel's order, which

makes clear that the state complaint would "live or die" as written. Order at 7. Indeed, the Order does not acknowledge whatever later submissions the state plaintiff did make.

## B.    Demand Is Excused.

Motions to dismiss a derivative complaint for failure to make a pre-litigation demand are considered pursuant to Federal Rule of Civil Procedure 23.1 and the substantive law of the state of incorporation, here Delaware. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-99 (1991). Rule 23.1 requires that a shareholder seeking to file a derivative action allege that he or she made a pre-suit demand on the corporation's board of directors, or allege facts showing why such a demand would have been futile. The complaint must "allege with particularity" the efforts made to obtain the action the plaintiff desires from the directors, or the reasons for the plaintiff's failure to obtain the action or for not making the effort.

Under Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984), where shareholders file a derivative suit on behalf of a corporation without making pre-litigation demand, the Court must consider whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Aronson, 473 A.2d at 814. Where there is no conscious decision by directors to act or refrain from acting, the business judgment rule has no application because the absence of board action makes it impossible to perform the essential inquiry contemplated by Aronson. Thus, where allegations involve board inaction, only the first prong of the Aronson test will apply. Rales v. Blasband, 634 A.2d 927, 930 (Del. 1993).

Under Rales, the court must determine "whether or not the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. To establish reasonable doubt,

plaintiffs are not required to plead facts that would be sufficient to support a judicial finding of demand futility. <u>Grobow v. Perot</u>, 539 A.2d 180, 186 (Del. 1988). Nor are plaintiffs required to demonstrate a reasonable probability of success on the merits. <u>Rales</u>, 634 A.2d at 934. Whether plaintiffs have alleged facts sufficient to create a reasonable doubt must be determined from the "accumulation" of all facts. <u>McCall v. Scott</u>, 239 F.3d 808, 816 (6th Cir. 2001).

Under <u>Rales</u>, a director is considered interested when, for example, he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. <u>Rales</u>, 634 A.2d at 936. While the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the allegations in the complaint present "a substantial likelihood" of liability on the part of a director. See <u>Rales</u>, 634 A.2d at 936 (quoting <u>Aronson</u>, 473 A.2d at 815).

### 1.    Plaintiffs' "<u>Caremark</u>" Allegations Excuse Demand.

Nonfeasance by directors of their fiduciary duty to discharge supervisory and monitoring responsibilities constitutes a breach of the fiduciary duty of care and creates a reasonable doubt excusing demand. Under the standards established in <u>In re Caremark Int'l, Inc.</u>, 698 A.2d 959 (Del. Ch. 1996), director liability "may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." 698 A. 2d at 967. The court held that "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation," a "sustained or systematic failure of the board to exercise oversight - such as an utter failure to attempt to assure a reasonable information and reporting system exists - will establish the lack of good faith that is a necessary condition to liability." <u>Id</u>. at 971.

Defendants concede that <u>Caremark</u> allegations can give rise to bad faith breach of fiduciary duty which excuses demand, but argue that plaintiffs must allege that defendants "were aware of or recklessly disregarded" internal control deficiencies. <u>But that is precisely what plaintiffs have alleged</u>. At ¶¶96-113 of the complaint, plaintiffs make a series of allegations which plainly demonstrate that defendants have been on notice since no later than March 2001 that the Company's internal controls needed to be improved, and that allegations had been made that accounting rules had been manipulated. The restatement and the extraordinary internal control problems which have now been revealed show that defendants failed to act.

For example, in March 2001, defendants stated in a Form 10-K (signed by a majority of the directors) that they "<u>intended to expand</u>" and that "our growth has placed, and our anticipated growth will continue to place, a <u>significant strain</u> on our management systems and resources." Defendants also stated that "we expect that we will need to <u>continue to improve</u> our financial, managerial and manufacturing controls and reporting systems, and will need to continue to expand, train and manage our work force worldwide." ¶99.

In March 2002, defendants stated in a Form 10-K (again signed by a majority of the directors) that they "<u>have expanded</u>" and "hired a significant number of employees." Defendants again stated that "our growth has placed, and our anticipated growth will continue to place, a <u>significant strain</u> on our management systems and resources" and that "we expect that we will need to <u>continue to improve</u> our financial, managerial and manufacturing controls and reporting systems, and will need to continue to train and manage our worldwide workforce." ¶102.

The reasonable inference to which plaintiffs are entitled is clear – the directors were on notice that the Company's internal controls were not sufficient in light of the Company's rapid growth, and needed to be improved. As has now been revealed, the internal controls were never improved, and an accounting disaster resulted. Defendants try to argue that these statements are

forward-looking, but they are obviously statements reflecting existing conditions. Remarkably, defendants try to discredit their own disclosures to the SEC and their shareholders regarding internal controls by calling them "boilerplate," "generic" and "vanilla." That defendants would make such an argument shows how powerful these allegations are.

There are more "red flags." The board also knew that the Company's accounting and disclosure practices had been called into question in a series of class action complaints filed in this court beginning in July 2002 and pending before Judge Wolf. The consolidated complaint in that case alleged that the financial statements were manipulated, and Judge Wolf later denied the motion to dismiss. Defendants argue that the complaint before Judge Wolf concerned only representations regarding product performance, but the allegations are very clear that the allegations extend to false financial statements. ¶¶109-110. Combined with their prior knowledge regarding the "significant strain" on the Company's internal controls, these allegations provided even more notice to defendants, or at an absolute minimum, should have spurred them to investigate the adequacy of the Company's controls. Again, the reasonable inference is that the defendants did not act, and within two years an enormous restatement occurred.

Plaintiffs' Caremark allegations are particularly powerful with respect to the Audit Committee, upon which four of the directors (themselves a majority) served during some or all of the relevant period. In SEC filings, defendants reported to shareholders that the Audit Committee performed a series of detailed functions, including "review of financial reports" and other information provided to shareholders and the public, review of the Company's "systems of internal accounting and financial controls and disclosure controls and procedures," and review of "the Corporation's auditing, accounting and financial reporting processes generally." ¶¶119-126. The extraordinarily poor condition of the Company's internal controls as has now been revealed could never be squared with good faith performance of these duties. ¶¶93-94.

Furthermore, Audit Committee members are not ordinary outside directors. In fact, in a case cited by defendants, <u>Mitzner v. Hastings</u>, 2005 U.S. Dist LEXIS 835 at *16 (N.D. Cal., January 14 2005), the court held that in a case involving allegations of false financial statements, demand futility allegations against Audit Committee members would suffice because such directors have a "special relationship" with the Company.

Several analogous cases have held that where directors are on notice of "red flags" but fail to act, they face <u>Caremark</u> liability, and are interested for purposes of considering a shareholder demand. For example, in <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 192 F.R.D. 111 (S.D.N.Y. 2000), demand was excused under <u>Caremark</u> where the directors were on notice of problems with billing practices and the corporation's computer system, but failed to act, resulting in corporate liability. In that case, there was notice that the planned computer conversion could not be done, defendants had received a report from a consultant that the computer system was deficient, and defendants had access to a state insurance department report indicating that the company's internal controls and accounting practices were deficient.

Similarly, in <u>McCall</u>, 239 F. 3d 808, demand was excused under <u>Caremark</u> where the directors failed to heed "red flags" indicating that the corporation was engaged in systematic healthcare billing fraud. One "red flag" was a qui tam complaint which, although it was dismissed, "clearly presented claims" of improper practices. 239 F. 3d at 822. <u>See</u> <u>also</u> <u>In re FirstEnergy Shareholder Deriv. Litig.</u>, 320 F. Supp. 2d 621 (N.D. Ohio 2004) (demand excused under Ohio law in derivative action against directors of utility company where "despite the many warning signs of problems" at a power plant, directors failed to act and "ignored warning signs"); <u>In re Abbott Laboratories Deriv. Litig</u>, 325 F.3d 795 (7th Cir. 2003), (demand excused where "sustained and systematic failure of the board to exercise oversight" was so egregious that it rose to the level of "intentional" where directors were aware of warning letters concerning

violations of federal regulations, SEC filings demonstrated that defendants were aware of the

regulatory issues, and the FDA had met with Abbott representatives concerning violations.)

The cases are clear that where directors ignore or fail to respond to "red flags," they face

a substantial likelihood of liability for bad faith conduct, and demand is excused. Here,

defendants' own SEC filings demonstrate that they knew the Company's internal controls were

not up to the task. They even received a "warning" by way of allegations made in the litigation

before Judge Wolf. But the internal controls were not fixed, resulting in corporate loss.

Plaintiffs' allegations are more than sufficient under the foregoing cases.

**2.    Plaintiffs' Insider Trading Claims Support Demand Futility.**

Plaintiffs' insider trading claims also support demand futility. Many cases hold that

insider trading claims render directors interested for breach of the duty of loyalty. Dollens v.

Zionts, 2002 U.S. Dist LEXIS 13511 (N.D. Ill. July 24, 2002). Here, plaintiffs allege that

Anderson, a member of the Audit Committee, sold shares of Sonus while in possession of inside

information regarding the Company's terrible internal controls. Plaintiffs allege that Anderson

had not sold in two years, and that his sales were timed to obtain the benefit of the rise in the

Company's share price in 2003 caused by statements that the Company would soon be achieving

profitability. ¶128. These allegations render Anderson interested.

Plaintiffs' allegations that the other directors did nothing to stop the insider trading of

Anderson and the others are also probative of demand futility. In Oxford at 117-118, the court

concluded that "participation in insider trading during the relevant period would create a

reasonable doubt concerning the disinterestedness of any Director, and knowledge of or

participation in the actions of a friend and colleague in doing so . . . would bear adversely on the

independence or disinterestedness of most or all of the Directors." Here, it is a reasonable

inference that all of the directors were aware of the trading, as four defendants sold substantial

holdings for $2.2 million immediately following the second and third quarter 2003 earnings releases. Notably, at the time of these trades, insider trading allegations (later upheld) had already been made against Anderson and others in the case before Judge Wolf.

### 3.    Demand Is Excused Where The Board Participates In Misleading Shareholders.

The cases also hold that demand is also futile where the board participates in misleading the shareholders. For example, see In re Cendant Derivative Litig., 189 F.R.D. 117, 127-130 (D.N.J. 1999) (complaint satisfies Aronson where plaintiffs pled "that each of the Director Defendants signed, approved, and published" false statements, ten directors engaged in insider trading, eight received "special compensation packages," and all were defendants in class action litigation); In re Storage Technology Sec. Litig., 804 F. Supp. 1368, 1375-1376 (D. Colo. 1992) (demand excused where directors allegedly "disseminated the misleading statements and participated in a conspiracy to conceal the true, adverse information" and "by concealing the true information and issuing misleading statements . . . caused Storage Technology to violate the securities laws and exposed the corporation to significant liability.")

Likewise, plaintiffs allege that each defendant participated in the issuance of false financial statements to shareholders, and caused the Company to violate accounting standards and securities laws. Particularly probative is that in 2003 defendants boasted that the Company was "driving toward profitability" with a series of sequential quarters of improving earnings, even though the Company's internal controls were later revealed to be so bad that no reliable financial information could have ever provided any reasonable basis for these representations.

Defendant Ahmed, the Company's principal executive officer, not only made statements and signed SEC filings, but signed certifications under Sarbanes-Oxley attesting to the Company's financial results and the adequacy of its internal controls. These certifications were

in violation of federal law. His potential exposure to civil fines or worse for violation of Sarbanes-Oxley, as well as disgorgement, renders him interested under the cases cited.

### 4. This Board Cannot Act Impartially or Objectively.

The Delaware test for directorial independence "focuses on whether the directors, for any substantial reason, cannot act with only the best interests of the corporation in mind." In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 937-938 (Del. Ch. 2003). "That is, the Supreme Court cases ultimately focus on impartiality and objectivity." Oracle, 824 A.2d at 938. Contrary to defendants' argument, their extensive business and other relationships are indeed probative of their lack of independence. In re New Valley Corp. Derivative Litig., 2001 Del. Ch. LEXIS 13, *25 (Del. Ch. Jan. 11, 2001) (considering "current or past business, personal, and employment relationships with [other directors] and entities involved").

Plaintiffs' allegations raise a reasonable doubt that this board could act "with impartiality and objectivity" regarding a demand. Common sense dictates that Anderson and Ferri, whose intertwined business interests are notorious, would never take positions antagonistic to one another, or sue the board of a company in which both their venture capital firms have invested. This is far from a "mere outside business relationship" as defendants contend. Similarly, at an absolute minimum, there is a reasonable doubt that the other board members would sue Anderson and Ferri given their high profiles as "certifiable stars" in the local venture capital community. ¶147. Furthermore, these defendants' venture capital firms appear to be vehicles for a series of common investments and board memberships among the defendants. Id.

In any event, even under the analysis urged by defendants, the board has demonstrated that it is "beholden" to Ahmed, the central figure in the case. Ferri and Gruber have publicly praised Ahmed. Notwithstanding the problems that have befallen the Company, Ferri and Severino, as members of the Compensation Committee, granted Ahmed a stock option package

valued at up to $14 million for fiscal year 2003, even though Ahmed already owns millions of shares of Sonus stock and made $23 million selling Sonus shares in 2000-2001. ¶87. And even after the restatement, the other directors <u>elevated</u> Ahmed to chairman of the board.

The same is true with respect to Gruber, another inside director. Gruber is a co-founder of the Company and throughout the restated periods served as chairman of the board. For his part in the accounting scandal, Gruber was anointed "Chairman Emeritus," granted a stock option award worth up to $3 million for fiscal year 2003 by Ferri and Severino, and remains with the Company in business development. Gruber received all of this even though he already owns 4 million shares of Sonus stock and made $22 million selling Sonus stock in 2001. ¶88. It is apparent that the director defendants cannot act impartially with respect to Gruber either.

These allegations demonstrate "a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling" – Ahmed and Gruber. See <u>Aronson</u>, 473 A. 2d at 816.

## **CONCLUSION**

For the foregoing reasons, the motion to dismiss should be denied.

DATED: September 12, 2005

By: <u>/s/ David Pastor</u>
DAVID PASTOR, BBO NO. 391000
JOHN MARTLAND, BBO NO. 332980
GILMAN AND PASTOR, LLP
60 State Street, 37th Floor
Boston, Massachusetts 02109
Telephone: (617) 742-9700

Liaison Counsel

Page 25

ROBERT C. SCHUBERT  BBO NO. 562242
JUDEN JUSTICE REED
WILLEM F. JONCKHEER
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California  94111
Telephone: (415) 788-4220

Lead Counsel

GREGORY M. NESPOLE
WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP
270 Madison Avenue, 9th Floor
New York, New York 10016
Telephone (212) 545-4600

PAUL WARNER
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX  77027
Telephone: (713) 622-7271

LAW OFFICES OF BRUCE G. MURPHY
Bruce G. Murphy, Esq.
265 Llwyds Lane
Vero Beach, Florida 32963
(772) 231-4202

Derivative Counsel