# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) |

Case No.  04-10359-DPW

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS
## SECOND AMENDED CONSOLIDATED
## <u>SHAREHOLDER DERIVATIVE COMPLAINT</u>

# TABLE OF CONTENTS

ARGUMENT.................................................................................................................................1

I.    Plaintiffs Cannot Avoid The Collateral Estoppel Effect Of Judge van Gestel's Decision......1

   A.    Plaintiffs Are In Privity With State Plaintiffs ...................................................................2

   B.    Plaintiffs' Purported "New" Facts Do Not Create A New
      Issue ..................................................................................................................................3

        1.    Plaintiffs' Purported "New" Pre-February 23, 2004 Facts Do Not
            Create A New Issue ...............................................................................................4

        2.    Plaintiffs' Purported "New" Post-February 23, 2004 Facts Do Not
            Create A New Issue ...............................................................................................6

        3.    The "New" Post-February 23, 2004 Facts Were, or Could Have
            Been, Before Judge van Gestel and In Any Case Are Cumulative ........................7

II.    Demand Is Not Excused ............................................................................................................9

   A.    Plaintiffs Have Not Pleaded A Caremark Claim ...............................................................9

   B.    Plaintiffs Have Alleged No Facts Suggesting Board
      Participation In Misleading Shareholders..........................................................................15

   C.    Plaintiffs' Conclusory Insider Trading Allegations Do Not
      Excuse The Lack of Demand..............................................................................................16

   D.    Plaintiffs Do Not Plead Lack Of Independence ................................................................17

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

<u>Federal Cases</u>

*In re Abbott Lab. Deriv. Litig.*,
  325 F.3d 795 (7th Cir. 2003) ...........................................................................12, 13

*In re Cendant Deriv. Litig.*,
  189 F.R.D. 117 (D.N.J. 1999) ....................................................................................15

*Cramer v. Gen. Tel. & Elec. Corp.*,
  582 F.2d 259 (3d. Cir. 1978) ......................................................................................3

*DeCosta v. Viacom Int'l, Inc.*,
  981 F.2d 602 (1st Cir. 1992)................................................................................4, 5, 6

*Dollens v. Zionts*,
  No. 01 C02826, 2002 U.S. DIST LEXIS 13511 (N.D. Ill. July 24, 2002) ...............16

*Faigin v. Kelly*,
  184 F.3d 67 (1st Cir. 1999)..........................................................................................5

*In re First Energy Sh'lder Deriv. Litig.*,
  2d 621 (N.D.Ohio 2004) ............................................................................................12

*In re Focus Enhancements, Inc. Sec. Litig.*,
  309 F. Supp. 2d 134 (D. Mass. 2001) ..........................................................................9

*Gerrity v. Chapin*,
  No. 79 Civ. 2393, 1980 WL 1364 (S.D.N.Y. Jan. 9, 1980).........................................3

*Grossman v. Johnson*,
  674 F.2d 115 (1st Cir. 1982)........................................................................................6

*In re Kauffman Mut. Fund Actions*,
  479 F.2d 257 (1st Cir. 1973)........................................................................................3

*Landy v. D'Allesandro*,
  316 F. Supp. 2d 49 (D. Mass. 2004) ..........................................................................16

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001) ................................................................................12, 14

*Mitzner v. Hastings*,
  2005 WL 88966 (N.D. Cal. Jan. 14, 2005) ................................................................14

*Nathan v. Rowan*,
  651 F.2d 1223 (6th Cir. 1981) ......................................................................................2

*National Wildlife Fed'n v. Gorsuch*,
　744 F.2d 963 (3d Cir. 1983) .................................................................................2

*In re New Valley Corp. Deriv. Litig.*,
　No. Civ. A. 17649, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ...........................18, 19

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　187 F.R.D. 133 (S.D.N.Y. 1999) .........................................................................12

*In re Oxford Health Plans, Inc. Sec. Litig.*,
　192 F.R.D. 111 (S.D.N.Y. 2000) ..................................................................6, 11, 17

*In re Party City Sec. Litig.*,
　147 F. Supp. 2d 282 (D.N.J. 2001) ......................................................................16

*In re Peritus Software Servs., Inc. Sec. Litig.*,
　52 F. Supp. 2d 211 (D. Mass. 1999) ....................................................................10

*Pignons S.A. de Mecanique v. Polaroid Corp.*,
　701 F.2d 1 (1st Cir. 1983)......................................................................................6

*Spector v. Sidhu*,
　No. Civ.3:03-CV-0841-H, 2004 WL 350682 (N.D. Tex. Jan. 26, 2004) .................16

*In re Storage Tech. Corp. Sec. Litig.*,
　804 F. Supp. 1368 (D. Colo. 1992).....................................................................7, 15

*United States v. Washington*,
　641 F.2d 1368 (9th Cir. 1981) ...............................................................................6

State Cases

*Aronson v. Lewis*,
　473 A.2d 805 (Del. 1984) ..................................................................................3, 15

*Beam v. Stewart*,
　845 A.2d 1040 (Del. 2000) ............................................................................17, 18, 20

*Brehm v. Eisner*,
　746 A.2d 244 (Del. 2000) ......................................................................................3

*Dresdner v. Goldman Sachs Trading Corp.*,
　240 A.D. 242 (N.Y. 1934) .....................................................................................6

*Guttman v. Huang*,
　823 A.2d 492 (Del. Ch. 2003) .........................................................................13, 14, 15

*Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins*,
　No. Civ.A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004).......................14

*In re Oracle Corp. Deriv. Litig.*,
   824 A.2d 917 (Del. Ch. 2003) ..........................................................................18, 19

*Rattner v. Bidzos*,
   No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003)................................14

*Schnizter v. O'Connor*,
   653 N.E.2d 825 (Ill. App. Ct. 1995) ......................................................................3

<u>Secondary Sources</u>

*Moore's Federal Practice,*
   § 132.02[2] (3d ed. 2004) ......................................................................................5

**ARGUMENT**

Pre-suit demand on a board of directors is a prerequisite to derivative litigation, and Judge van Gestel has already determined that failure to make such demand was not excused. As this Court has made clear, in order to avoid a "much higher" standard, Plaintiffs have chosen to engage in a "game of chicken." (June 1, 2005 Hearing Transcript ("Tr.") at 4.) Rather than make demand, Plaintiffs instead claim that their Second Amended Consolidated Shareholder Derivative Complaint ("Complaint") presents new or more detailed facts than the ones already considered and rejected with prejudice. Plaintiffs, however, overstate both the "newness" and the relevance of their "additional" facts, which are legally insufficient either to avoid the preclusive effect of Judge van Gestel's decision or to show why, if considered anew, they render demand futile. Even if this Court chooses to duplicate Judge van Gestel's efforts and reassess the demand futility issue, the same conclusion follows: Plaintiffs have failed to show any reason to wrest a fundamental corporate decision, *i.e.*, the decision to commit the corporation to litigation, from Sonus' Board of Directors (of which 4 of 6 of the named Director Defendants (and 5 of 7 overall) were outsiders at the time the original complaint was filed).

**I.      Plaintiffs Cannot Avoid The Collateral Estoppel Effect Of Judge van Gestel's Decision**

In their opening memorandum, Defendants demonstrated that Plaintiffs are legally estopped from relitigating the demand futility issue by Judge van Gestel's ruling in the derivative state court litigation brought by other Sonus shareholders ("State Plaintiffs"). (See Def. Mem. at 5-12.) Looking to relitigate that decided issue, Plaintiffs now deny that they are in privity with State Plaintiffs, and argue that they are not estopped from relitigating demand futility because they have alleged "new and more detailed facts." (Opp. at 11, 14.) But Plaintiffs *are* in privity with State Plaintiffs, and their allegedly "new" facts are both irrelevant and immaterial.

As to the "new" pre-Complaint facts (pre-February 23, 2004, the filing date of the Complaint), the First Circuit has consistently held that merely presenting more evidence to support a claim is insufficient to avoid the collateral estoppel effect of a prior adverse ruling, especially when that evidence could have been provided previously. The Plaintiffs' "new" post-Complaint facts are legally irrelevant for the same reason, and because they arose after the date relevant to demand futility, namely the date the complaint was filed. (See infra § II.) Moreover, the post-Complaint facts were before Judge van Gestel when he made his decision and add nothing material to the evidence already considered.

### A.    Plaintiffs Are In Privity With State Plaintiffs

Plaintiffs originally did not dispute that they are in privity with the State Plaintiffs. (See February 4, 2005 Opp. at 8-10.) Now, however, Plaintiffs claim to be "unrelated to the state plaintiff." (Opp. at 14.) That is not so.

Despite "hav[ing] different lawyers and fil[ing] a different lawsuit in a different court," (Opp. at 14), Plaintiffs and State Plaintiffs all sued on behalf of Sonus to assert its claims, not their own.[1]   This establishes privity. Nathan v. Rowan, 651 F.2d 1223, 1226 (6th Cir. 1981) ("in shareholder derivative actions arising under Fed. R. Civ. P. 23.1, parties and their privities include the corporation and all non-party shareholders.")  While Plaintiffs try to sidestep this settled doctrine by attempting to distinguish privity for "fact-intensive" issues from privity for "substantive claims," they provide neither authority nor explanation for any such distinction.

---

[1]        It bears noting that Plaintiffs were well aware of the State Actions and that the Court was waiting for Judge van Gestel's decision on the motion to dismiss filed in those cases. (See December 12, 2004 Def. Mem. at 3-4.)  To the extent Plaintiffs believed the State Plaintiffs were not adequately representing the Company's interests, they could have sought to intervene. See Nat'l Wildlife Fed'n v. Gorsuch, 744 F.2d 963, 971-72 (3d Cir. 1983) (collateral estoppel properly invoked against plaintiffs who, though not parties to an earlier action, bypassed an opportunity to intervene in the earlier action).

(Opp. at 13-14.)[2]  Plaintiffs also do not even address Defendants' cases demonstrating privity between shareholder plaintiffs in the derivative context.  (See Def. Mem. at 11-12 (citing Cramer v. Gen. Tel. & Elec. Corp., 582 F.2d 259, 266-67 (3d. Cir. 1978) (precluding derivative claim where previous shareholder's identical claim dismissed)); Gerrity v. Chapin, No. 79 Civ. 2393, 1980 WL 1364  at *4 (S.D.N.Y. Jan. 9, 1980) (in context of collateral estoppel in derivative context, it is "irrelevant that one action was filed by plaintiff [shareholder] Van Tassel and the other by plaintiff [shareholder] Gerrity"); Schnizter v. O'Connor, 653 N.E.2d 825, 833 (Ill. App. Ct. 1995) (affirming dismissal on res judicata grounds based on previous dismissal of another shareholder's derivative complaint).

As a matter of law, Plaintiffs and State Plaintiffs are the same for the purposes of collateral estoppel.  Because the State Plaintiffs cannot relitigate demand futility, neither can Plaintiffs.

### B.    Plaintiffs' Purported "New" Facts Do Not Create A New Issue

State Plaintiffs, with whom Plaintiffs are in privity, had a full and fair opportunity to litigate the issue of demand futility, and did so litigate.   As the First Circuit has made clear, plaintiffs have only *one* opportunity to demonstrate demand futility.  In re Kauffman Mut. Fund Actions, 479 F.2d 257, 267 (1st Cir. 1973).  Plaintiffs' Opposition nowhere addresses, let alone distinguishes, Kauffman.  Despite Plaintiffs' assertion that they have pled "far more detailed" new facts that "transform" the demand futility issue here from that litigated before Judge van Gestel (see Opp. at 15), these "more detailed" facts are either irrelevant as a matter of law or

---

[2]    Plaintiffs' real argument appears to be that it would be unfair for this Court to apply collateral estoppel and thus "foreclose" Sonus shareholders from enforcing Sonus' claims through a derivative suit.  (Opp. at 14.)  This argument is doubly mistaken.  First, the Board of Directors, not the shareholders, has primary responsibility for enforcing any Sonus claim; this is why derivative plaintiffs must make demand on the Board or adequately plead that demand is excused.  Aronson v. Lewis, 473 A.2d 805, 811-812 (Del. 1984), overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000).  Second, as Plaintiffs themselves must concede, Director Defendants have expressly maintained their right to assert, in keeping with the best interests of the Company, substantive claims on behalf of the Corporation (i.e., the shareholders).  (Def. Mem. at 6 n. 6.)

immaterial. Thus, the previously decided issue of demand futility has *not* changed, and collateral estoppel applies.

### 1.    Plaintiffs' Purported "New" Pre-February 23, 2004 Facts Do Not Create A New Issue

Plaintiffs' "new" pre-February 23, 2004 facts "could have been provided the first time" and are thus irrelevant. DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 611 (1st Cir. 1992) (reversing jury verdict and estopping relitigation of trademark confusion issue when plaintiff's "evidence amounts to no more than added efforts to prove the same 'ultimate facts' he failed to prove the first time"); (see Def. Mem. at 7-8 (arguing that pre-Complaint class action lawsuit and SEC filings were widely known and publicly available).)[3] Plaintiffs try to distinguish DeCosta on the basis that the DeCosta plaintiffs presented "more of the same," *i.e.*, cumulative, evidence rather than (what Plaintiffs claim is) entirely new evidence, and because DeCosta involved the same plaintiff revisiting an earlier litigation, rather than two different plaintiffs in privity. (Opp. at 15.) These immaterial distinctions do not affect DeCosta's import as the controlling and leading case.

Although the DeCosta court described certain of plaintiff's additional evidence as merely cumulative, it emphasized that "new" facts, just like those provided by Plaintiffs here, which "[could] have been provided the first time," did not affect the application of collateral estoppel. DeCosta, 981 F.2d at 611. Here, State Plaintiffs plainly "could have" informed Judge van Gestel

---

[3]    To the extent that Plaintiffs' post-Complaint facts are "no more than added efforts to prove the same 'ultimate facts' [plaintiff] failed to prove the first time," they are also barred from consideration by DeCosta. 981 F.2d at 611.

about the Steinberg litigation and Sonus' SEC filings.   And as noted above, Plaintiffs *are* in privity with State Plaintiffs.[4]

Even if the fact that State Plaintiffs "could have" presented more evidence was not dispositive, Plaintiffs fail to show that their "new" pre- February 23, 2004 facts make any legal difference.  Plaintiffs misread <u>DeCosta</u> on this point; even assuming the new facts could be characterized as "significant factual changes" (which they cannot for the reasons set forth <u>infra</u> at § II and Def. Mem. at 14-16), <u>see</u> Opp. at 13, 15, <u>DeCosta</u> held that, significant or not, where "new" evidence is "designed to prove the same ultimate fact … that [plaintiff] failed to prove before," it does not permit plaintiffs a second bite at the apple.  981 F.2d at 611 (<u>citing</u> <u>Restatement (Second) of Judgments</u>, § 27, cmt. c).  Here the "ultimate fact," demand futility, is the same.

Similarly, while Plaintiffs cite <u>Moore's Federal Practice</u>, Opp. at 13, to the effect that an issue is no longer "identical" if there is "a difference in pertinent facts, *sufficient to substantially change the issue*," § 132.02[2][e] (3d. ed. 2004) (emphasis added), they fail to note that <u>Moore</u> further states that "[a] party may not assert a change in controlling facts when the facts … could have been discovered in the exercise of due diligence[,]" <u>id</u>., and "[a] party… cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first[.]"  <u>Id</u>. at [d].[5]  Nor is Plaintiffs' position supported by the one case cited by <u>Moore</u> in the section relied on by Plaintiffs in which a court found a sufficiently substantial

---

[4]        As to Plaintiffs' effort to distinguish <u>DeCosta</u> as supposedly based "primarily" on legal, rather than factual, estoppel, (Opp. at 15), the <u>DeCosta</u> court addressed estoppel both on legal and factual grounds, and Defendants rely specifically on the court's holding and reasoning in the context of applying estoppel to the *factual* changes advanced.   (Def. Mem. at 7.)

[5]        Although Plaintiffs argue that an estopped issue must be "identical in all respects," the case they cite is readily distinguishable on its facts:  the first proceeding involved the question whether defendant "had abused the judicial process in failing to produce evidence to substantiate claims … made [in an autobiography] regarding [plaintiff's] supposed involvement in shady investment activities,"  while the issue in the second proceeding was "the truthfulness *vel non* of the remarks contained in [defendant's] autobiography."  <u>Faigin v. Kelly</u>, 184 F.3d 67, 78 (1st Cir. 1999).  The court went on to note that, "the issues must be defined by the judicial determinations at stake."  <u>Id</u>.  Here, the judicial determinations at stake are *identical*—whether demand futility is excused.

factual change.  Id. at [e] (citing United States v. Washington, 641 F.2d 1368, 1374 (9th Cir.

1981), cert. denied, 454 U.S. 1143 (1981) (holding that enforcement of *tribal* fishing rights in

subsequent litigation not the same issue as compensation of *individual* Indians in previous

litigation for purposes of collateral estoppel).

Plaintiffs further argue that it would be  "unfair to exclude" Plaintiffs' "new" pre-February

23, 2004 facts.  (Opp. at 15).  This turns the matter precisely on its head; what would be unfair is

to permit Plaintiffs to expose the Defendants to repeated derivative suits, adding incremental

evidence each time in the hope that they will ultimately plead sufficient facts to excuse demand.

See DeCosta, 981 F.2d at 611; Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 2-3

(1st Cir. 1983) ("[o]nce a plaintiff has had a chance to prove a fact, he cannot reopen the matter

simply by stating that he wishes to introduce more or better evidence").[6]

### 2.    Plaintiffs' Purported "New" Post-February 23, 2004 Facts Do Not Create A New Issue

Plaintiffs further attempt to avoid Judge van Gestel's ruling by relying on supposedly "new"

*post*-February 23, 2004 facts, notwithstanding that at the June 1, 2004 hearing before this Court,

Plaintiffs conceded (as they had to) that "demand futility is [gauged] at the time the Complain[t]

is filed."  (Tr. at 16.)  Both Plaintiffs and Defendants have cited cases that stand for this

proposition.  See, e.g., Grossman v. Johnson, 674 F.2d 115, 123 (1st Cir. 1982) (futility gauged

at time of complaint "not afterward with the benefit of hindsight) (cited at Def. Mem. 8); In re

Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111, 114 n.1 (S.D.N.Y. 2000) ("under

Delaware law, demand futility must be 'gauged by the circumstances existing at the time of [the

filing of the] derivative suit'") (cited at  Opp. 21, 22.)

---

[6]        The authority upon which Plaintiffs rely for this supposed unfairness is not to the contrary.  In Dresdner v.
Goldman Sachs Trading Corp., 240 A.D. 242 (N.Y. 1934), the court held that more than one shareholder is allowed
to *initiate* their own derivative suit.  Id. at 243-47.  This not a point of disagreement, and the holding is consistent
with settled law, with some notable exceptions such as in the federal securities context, that pla intiffs may engage in
a race to the courthouse and to judgment with one another.  In short, Dresdner has nothing to do with the issue
here—demand futility and collateral estoppel.

Plaintiffs now claim that this rule applies only in "unique situations" so as to only preclude plaintiffs from using post-Complaint litigation positions adopted by defendants. (Opp. at 16.) But plaintiffs cite no supporting authority, and the law is clearly to the contrary.[7] Even under Plaintiffs' own authority, a derivative defendant's "post-filing activity does not alter [the court's] analysis of the conditions as they existed when [plaintiff] filed [its] suit." In re Storage Tech. Corp. Sec. Litig., 804 F. Supp. 1368, 1376 (D. Colo. 1992) (refusing to stay derivative action while defendants investigate merits of plaintiffs' derivative suit because futility gauged at time of demand).

Attempting to have it both ways, but succeeding in neither, Plaintiffs add that they may rely on post-Complaint facts because "the facts underlying the restatement and the internal control weaknesses already existed in February 2004, but were concealed." (Opp. at 16) (emphasis in original.) This assertion is disingenuous because the Complaint offers absolutely no evidence of any such "concealment," nor can Plaintiffs otherwise demonstrate any "concealment."

### 3.    The "New" Post-February 23, 2004 Facts Were, or Could Have Been, Before Judge van Gestel And In Any Case Are Cumulative

Plaintiffs further claim that they are entitled to reconsideration of demand futility because Judge van Gestel supposedly did not consider certain post-February 23, 2004 facts put before him by the State Plaintiffs. (Opp. at 11, 15-16.) Plaintiffs latch onto the colorful phrase "live or die" from Judge van Gestel's decision, but fail to inform the Court that this phrase was made in the context of the State Plaintiffs' belated attempt to interject another Director, Thompson, as a

---

[7]    It is simple logic that directors could only make the decision to accept or refuse demand based on the facts *known at the time demand would or should have been made*. Retroactively imputing knowledge of later discovered facts to directors is grossly unfair, and it creates disincentives for defendants to thoroughly investigate and remedy alleged problems.

defendant without filing a motion to amend.[8]  Judge van Gestel did not foreclose consideration of

additional facts put before him by State Plaintiffs:

> "[State Plaintiffs'] complaints were each filed on February 20,
> 2004, and the defendants' motions to dismiss revealing
> Thompson's existence as a director were served on March 22,
> 2004.  [State Plaintiffs] have yet, however, to take any steps to add
> Thompson as a party.  Apparently, they prefer to have this Court
> decide the present motions and thereafter seek leave to amend their
> complaints.  That is not the order of preference for this Court.  The
> complaints will live or die as written when the arguments were
> presented to the Court."

(State Order at 7, n. 5.)  Although Judge van Gestel ended further consideration of the status of

unnamed director Thompson, he did not foreclose consideration of other facts State Plaintiffs put

before him, including: (1) the existence of the (now terminated) formal SEC probe into the

Company's financial reporting; (2) the Form 8K filed by Sonus with the SEC on March 29,

2004; and (3) issue of deficient internal controls.  (See Def. Mem. at 9-10.)  Judge van Gestel

issued no orders preventing Plaintiffs from submitting such facts, nor did Defendants move to

strike such submissions even though they were, and still are, irrelevant as a matter of law to the

extent they raised any post-Complaint facts.  Moreover, the Restatement's details as to

quantification of the amounts at issue and identification of the material weaknesses in internal

controls were publicly available in Sonus' 10-K/A as of July 28, 2004 (although State Plaintiffs

chose not to submit them), months before Judge van Gestel issued his decision.

    Not only did Judge van Gestel not foreclose State Plaintiffs from presenting additional

facts, but those additional facts that were before him (or could have been placed before him)

when he determined that demand was not excused are essentially the same ones Plaintiffs here

claim distinguish this case from that one.  At best, Plaintiffs' "new" post-Complaint facts provide

---

[8]     Plaintiffs should have grasped the nature of this procedural issue by now, as it was discussed at length at
the prior hearing before this Court.  (See Tr. at 7-12, 15-17.)

further detail as to the scope of internal control deficiencies, but they reveal nothing about what the Director Defendants knew or should have known about any control deficiencies, and therefore add nothing to the <u>Caremark</u> analysis crucial to the question of whether Plaintiffs can establish "interest" by a "substantial likelihood of personal liability."  <u>See</u> <u>infra</u> §II(A).  As this Court itself has recognized, "[t]here is nothing in terms of changes that were developed here that weren't before Judge van Gestel.  Just got worse for the Company."  (Tr. at 17).)[9]

## II.     Demand Is Not Excused

### A.     Plaintiffs Have Not Pleaded A <u>Caremark</u> Claim

Plaintiffs' assertion that their "<u>Caremark</u> allegations excuse demand" is incorrect for a simple reason – notwithstanding their exaggeration of the import of their allegations, they do not plead the type of particularized facts needed to demonstrate demand futility based on a <u>Caremark</u> claim.

Although Plaintiffs assert that the Director Defendants "were aware of or recklessly disregarded" internal control deficiencies, <u>see</u> Opp. at 19, arguing that Defendants made "remarkable admissions" as to those controls in the Restatement, <u>id</u>. at 1, Plaintiffs point to no page of the Restatement where the Director Defendants allegedly made any such admissions because there are none.  Plaintiffs' allegations are pure hindsight based on no particularized, *contemporaneous* supporting facts.  Merely relying on the fact of the Restatement, or facts that the Company's own investigation unearthed, does not satisfy Plaintiffs' burden to show that any Director Defendants, much less a majority, knew of the deficiencies in the controls *any time prior to the Board's investigation in early 2004*.  <u>See</u> <u>In re Focus Enhancements, Inc. Sec. Litig.</u>,

---

[9]     Plaintiffs' attempts to rely on facts contained in Sonus' March 15, 2005 Form 10-K are similarly misplaced.  (Opp. at 12, 14).  Disclosures contained in this 10-K reflect Director Defendants' awareness of internal control deficiencies *more than one year after the filing of Plaintiffs' initial complaint* and contain no evidence that Director Defendants knew of said deficiencies prior to the Board's early 2004 investigation.  <u>See</u> <u>infra</u> §II(A).

309 F. Supp. 2d 134, 160 (D. Mass. 2001) ("clearly insufficient" for plaintiffs to allege "that because of the announced restatement, the defendants must have known of the problems at the time they occurred"); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 223 (D. Mass. 1999) ("after-the-fact accounting admissions . . . do not by themselves suffice to show that the misstatements occurred knowingly or recklessly).[10]

Plaintiffs' reliance on Sonus' historical public filings fares no better.  For example, Plaintiffs rely heavily on Sonus' boilerplate risk factors from its 2001 and 2002 Form 10-Ks, which listed 25 and 26 risk factors, respectively.  As an initial matter, the general risk factor heading itself refers to the listed risks as a possibility, not a current condition:

> "RISK FACTORS-- Investing in our common stock involves a high degree of risk.  You should carefully consider the risks described below before buying our common stock.  If any of the following risks actually occurs, the trading price of our common stock could decline and you may lose all or part of your investment."  (Emphasis added.)

Both 10-Ks then included risk factors entitled, "Our failure to manage our expansion effectively in a rapidly changing market could increase our costs, harm our ability to sell future products and impair our future growth." (Emphasis added.)

While both the 2001 and 2002 risk factors went on to refer to strains placed on the Company's management systems and resources by current and anticipated growth, such "strains" scarcely amount to "red flags" putting Defendants on notice of any particular internal control issue or accounting problem.  As any company grows it needs to monitor its various systems to make sure people are trained, integrated, and managed.  Appropriately, the risk factors go on to state that the Company has "hired a significant number of employees (Opp. at 19) and that the Company "will need to continue to improve [its] financial, managerial and manufacturing

---

[10]    Although these cases were decided in the context of the scienter inquiry in securities cases, the principle is exactly the same – earlier knowledge or recklessness cannot be inferred simply from a later disclosure of problems.

controls and reporting systems[.]"[11]  (Emphasis added).  Despite Plaintiffs' claim that these risk factors somehow put Director Defendants on notice of internal control deficiencies (Opp. at 19), the only reasonable inference is that the Company was hiring new people to meet the new demands and was managing its growth.

Contrary to Plaintiffs' suggestions, the risk factors nowhere state, nor can there be a fair inference to support the claim, that any internal controls were deficient.  It is certainly not reasonable to infer from such general risk factors that Director Defendants knew or should have known, *prior to the outcome of Sonus' own investigation*, that internal controls were deficient. Plaintiffs cannot transform these general risk factors into "red flags" by virtue of the results of Sonus' 2004 investigation, some 2-3 years later.

Similarly, Plaintiffs assertions concerning a class action lawsuit filed against Sonus in 2002, In re Sonus Networks et al., 1:02-cv-11315-MLW (D. Mass.) ("Steinberg"), fail to establish any "red flag."  The existence of a civil lawsuit, in which no discovery has yet occurred, concerning product problems and the proper accounting for two specific transactions, does not have anything to do with the company's internal controls, much less amount to notice of a systemic failure of internal controls as required by Caremark.[12]

Plaintiffs own authorities demonstrate the type of particularized factual allegations, of which their Complaint is devoid, needed to show a substantial likelihood of liability for a Caremark violation.  In In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111 (S.D.N.Y. 2000) the plaintiffs pleaded detailed facts demonstrating that the defendants were aware of the

---

[11]    Plaintiffs mistakenly argue that Defendants tried to "discredit" Sonus' Form 10-K risk factor statements. (Opp. at 20.)  Defendants merely placed the forward-looking statements, whose purpose is to provide the public with a range of *potential* risks that the Company faces, in context.  (Def. Mem. at 16.)

[12]    The Steinberg plaintiffs cited the two transactions not as evidence of accounting fraud or internal controls problems, but rather as evidence of an attempt to conceal product problems by failing to disclose quid pro quos supposedly demanded as a condition of buying Sonus' products.  (See Def. Mem. at 15-16.)

nature and magnitude of their company's computer problems and that its financial statements were based on inherently unreliable data, including that: (i) the CEO/Chairman was told by the chief information officer that the planned computer conversion could not be done reliably; (ii) defendants received a report from an outside consultant hired to evaluate the failed computer conversion informing them that the computer system was deficient; (iii) defendants had access to a state insurance department report indicating that the company's internal controls and accounting practices were deficient; and (iv) defendants knew that the computer system could not age the premiums receivable or unpaid claims. See In re Oxford Health Plans, Inc. Sec. Litig., 187 F.R.D. 133, 139 (S.D.N.Y. 1999).

Similarly, in McCall, the plaintiffs pleaded "particularized facts . . . present[ing] a substantial likelihood of director liability for intentional or reckless breach of the duty of care" in the context of claims alleging widespread and systemic health care fraud by defendants. McCall v. Scott, 239 F.3d 808, 824 (6th Cir. 2001)(relying on allegations, among others, that audit committee's earlier internal audits had uncovered specific facts showing that improper practices were being employed throughout the company, including discrepancies between cost reports submitted to government and secret internal reports).

The remaining Caremark cases cited by Plaintiffs are equally non-applicable. In In re First Energy Shareholder Deriv. Litig., demand was automatically excused as a matter of Ohio law, contrary to the law of Delaware applicable here, because all directors were named in the

complaint as "wrongdoers *and* defendants." 320 F. Supp. 2d 621, 624 (N.D.Ohio. 2004) (emphasis in original).[13]

The facts pled in In re Abbott Lab. Deriv. Litig. also contrast starkly with Plaintiffs' allegations in this case. 325 F.3d 795, 799-801 (7th Cir. 2003). The Abbott court excused demand when derivative plaintiffs brought suit after six years during which, at various times, directors were aware that: (i) the FDA conducted thirteen inspections of the company's facilities; (ii) the FDA issued formal warning letters to the Company; (iii) the FDA and company entered into a compliance plan with which Abbott failed to comply; (iv) the company disclosed its FDA non-compliance notifications to the SEC; and (v) the company signed a consent decree prohibiting it from selling certain products and providing for a $100 million fine. Id.

In contrast to these cases, where the plaintiffs were able to plead particularized facts showing that directors abdicated their responsibilities, Plaintiffs here allege no facts to show what the board did or did not do (either right or wrong) in its "attempt to assure a reasonable information and reporting system exist[ed]." (Opp. at 18.) Plaintiffs do not describe what internal controls were in place at the Company, what the Audit Committee did or did not do (either right or wrong) to review the Company's financial statements, or how these procedures compared to a reasonable system of internal controls. Cf. Guttman v. Huang, 823 A.2d 492, 507 (Del. Ch. 2003) (complaint failed to excuse lack of demand on audit committee members because, among other reasons, failed to plead that Committee "devoted patently inadequate time to its work, or … had clear notice of serious accounting irregularities.") For example, Plaintiffs point to the Audit Committee's role in "reviewing [Sonus'] financial reports," (Compl. ¶121),

---

[13]    The court further noted in dicta that demand would have been futile because, among other things, defendants inadequately addressed safety problems, failed to maintain power lines, and "disregarded industry practices" at a nuclear power plant, leading to an SEC investigation, a Nuclear Regulatory Committee investigation, a grand jury investigation, and a class action lawsuit—all of which predated the filing of the derivative complaint. In re First Energy Shareholder Deriv. Litig., 320 F. Supp. 2d 621, 624-25 (7th Cir. 2003). This contrasts vividly with the pre-Complaint facts alleged here by Plaintiffs.

but do not allege what procedures were in place for such review or what role the board played in designing or approving those procedures.[14]

In the absence of these basic allegations, Plaintiffs' claim of a "sustained or systematic failure of the board to exercise oversight" amounts to mere conjecture.[15]  Indeed, all that is established by these few facts is that the Company had an audit committee designed to oversee the Company's internal controls and that those controls were later determined to be inadequate. (See Compl. ¶¶ 85, 119-26.)  Under Plaintiffs' own authority, such allegations are insufficient. See McCall, 239 F.3d at 820 n. 11 ("While the audit procedures failed to prevent the alleged fraud, the Board assured that nationwide audits, internal and external, were undertaken with attention to areas that could have legal ramifications for Columbia.  As a result, we agree with the district court that there is not a substantial likelihood of liability based upon a failure to assure that reasonable reporting systems existed.").[16]

---

[14]     Such facts – whether good or bad – are likely to reside in Sonus' book and records reflecting what meetings were held by and presentations made to the Audit Committee about internal controls, the committee's involvement in the establishment and/or monitoring of such controls, and how the controls were structured and intended to operate.  But, in not even attempting to conduct a pre-suit investigation into any of these matters in order to plead particularized facts, Plaintiffs have ignored the "repeated admonitions of the Delaware Supreme Court … for derivative plaintiffs to proceed deliberately and use the books and records device to gather the materials necessary to prepare a solid complaint." Guttman, 823 A.2d at 504.

[15]     Without such allegations, Plaintiffs not only fail to plead the "lack of good faith that is a necessary condition to liability" under Caremark, see Opp. at 18, they also fail to plead gross negligence.  See Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *12-13 (Del. Ch. Oct. 7, 2003) (complaint did not "plead[] with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence" where "conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee").  Of course, Defendants cannot be personally liable for gross negligence due to the exculpation clause in the Company's charter, so such allegations would in any event be insufficient to excuse demand.  (See Def. Mem. at 20-1); see also Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ.A. 20228-NC, 2004 WL 1949290, at *12 (Del. Ch. Aug. 24, 2004) ("it is important to highlight yet again that the standard moves beyond gross negligence.  To survive a motion to dismiss based on this standard, where the charter contains a § 102(b)(7) provision, a plaintiff must plead facts that, if true, would imply that a Board 'consciously and intentionally disregarded [its] responsibilities.'")

[16]     Nor, despite Plaintiffs' assertion to the contrary, are its purported "red flags" "particularly powerful" as to Director Defendants who served on Sonus' Audit Committee.  Specifically, and contrary to Plaintiffs' portrayal, Mitzner v. Hastings does not stand for the proposition that simply making demand futility allegations against audit committee members "would suffice." (Opp. at 21 (citing 2005 WL 88966 (N.D. Cal. Jan. 14, 2005) (applying Delaware law and dismissing plaintiffs' derivative complaint for failure to make demand because majority of directors were disinterested and independent, stating in dicta only that such allegations against audit committee members "may suffice.") (emphasis added.))

**B.**    **Plaintiffs Have Alleged No Facts Suggesting Board Participation In Misleading Shareholders**

The absence of facts demonstrating a substantial likelihood of liability for a majority of the directors is fatal to the Plaintiffs' claim of demand futility based on purported director misconduct.  (See Def. Mem. at 17-20.)  Mere empty conclusions about participation and knowledge of the sort on which the Complaint and Opposition rely are insufficient.  Aronson v. Lewis, 473 A.2d 805, 817 (Del. 1984).  Plaintiffs' own authority, in fact, demonstrates plainly the type of particularized factual allegations needed to show a substantial likelihood of liability, but which are missing here.

In In re Cendant Deriv. Litig., the plaintiffs alleged, in part, that the audit committee was specifically informed that income was overstated by $23 million and could not be reconciled; that the accounting irregularities were so basic that they were discovered after one day of investigation; that the officers and directors were told that in excess of $100 million of income was non-recurring; that more than $200 million in adjustments were necessary in order to meet budget; and that ten directors sold approximately 4 million shares of stock and various officers and directors received significant fees and special compensation packages from the merger.  189 F.R.D. 117, 124-25 (D.N.J. 1999).[17]  Plaintiffs' factual allegations in this case nowhere approach pleading this type of board responsibility for accounting irregularities that would raise a substantial likelihood of liability and excuse lack of demand.  See Guttman, 823 A.2d at 507.

---

[17]    Moreover, all of the Cendant directors were defendants in class action litigation.  By contrast, here five of the six named Sonus directors face no risk of liability in the pending, parallel securities litigation because they are not even named as defendants.  Therefore, this super majority of directors would have been free to consider demand without fear that any facts possibly uncovered in litigation commenced by Sonus might somehow be used against them in such securities litigation.  Finally, the decision in In re Storage Tech. Corp. Sec. Litig., lacks sufficient description of the allegations pled in that case to provide a meaningful comparison.  Unlike here, however, the plaintiffs there claimed that the Director Defendants "participated in a conspiracy to conceal the true, adverse information" and "planned, proposed, authorized, approved, or ratified [] alleged insider trading".  804 F. Supp. 1368, 1376 (D.Colo. 1992).

### C.    Plaintiffs' Conclusory Insider Trading Allegations Do Not Excuse The Lack of Demand

Only one Director Defendant, Mr. Anderson, is alleged to have made a small sale of his stock (13%; he retained 87%) during the relevant period.[18]  His continued holdings made his small sale per se unsuspicious.  (See Def. Mem. at 22.)[19]  Moreover, the conclusory argument that Anderson "sold shares of Sonus while in possession of inside information regarding the Company's terrible internal controls," is unsupported by any allegation showing that he had any knowledge of specific accounting or internal controls issues at the time he sold the stock.[20]

Sales by one director that do not even render that director interested obviously cannot render other *non-selling* director defendants interested.  See Landy v. D'Allesandro, 316 F. Supp. 2d 49, 73-75 (D. Mass. 2004) (Keeton, J.) (rejecting allegations that directors were interested because they failed to prevent trading by another director; "[o]ne purchase by one director . . . does not create inappropriate interest on the part of the entire board."); see also Spector v. Sidhu, No. Civ. 3:03-CV-0841-H, 2004 WL 350682, at *5 (N.D. Tex. Jan. 26, 2004) ("the mere

---

[18]    Plaintiffs make much of Mr. Anderson supposedly trading after the Company allegedly made statements that the Company "would soon be achieving profitability."  (Opp. at 22) (emphasis added).  As Plaintiffs' own Complaint makes clear, however, Sonus' statements on July 10 and 18, 2003 were that the Company was "advancing [its] drive to profitability" and that it was "driving toward profitability as fast as [it] can," (Compl. ¶¶ 56 and 58), and in the context of the latter statement, Ahmed further stated that he had no guidance "whether Sonus would post a profit."  (Id.)  Neither of these indicates that Sonus would "soon be achieving" profitability. Furthermore, Plaintiffs cannot rely on Anderson's stock sales following a positive public announcement but not proximate in time to any "bad" news to support an inference of scienter.  Defendants respectfully submit that, as a matter of logic, trading following "good" news, without more, does *not* give rise to *any* inference of scienter.  While sales of stock immediately before a negative disclosure may be suggestive of prior knowledge of an imminent stock price drop, sales following good -- and entirely public -- news are completely consistent with innocent behavior.  One would *expect* rational stockholders to trade after an increase in stock price.  See In re Party City Sec. Litig., 147 F. Supp. 2d 282, 312 (D.N.J. 2001) ("Trading following public announcements simply evidences compliance with the securities laws . . . [i]ndeed, insiders are only permitted to trade in a "window" after a public announcement is made.")

[19]    In fact, the stock sold was owned not by Mr. Anderson personally, but by a trust in which his children are beneficiaries.  (See Dec. 12, 2004 Def. Mem. at 15 n. 25.)  Plaintiffs have not even alleged that Mr. Anderson was the trustee of that trust (which he was not), or any other facts showing he had any connection with the trust's investment decisions.

[20]    Plaintiffs' authority for the proposition that insider trading claims make directors interested is inapposite because, unlike here, that case involved coordinated selling by a majority of the board.  Dollens v. Zionts, No. 01 C02826, 2002 U.S. DIST LEXIS 13511, at *20-21 (N.D. Ill. July 24, 2002) (five of eight directors sold stock during a ten day period).

allegation of insider trading by one insider Director is not sufficient to excuse demand on the entire Board"). Even under Plaintiffs' own authority, they would need to plead with particularity that non-selling directors had "knowledge of or participation in" another director's sale. (See Opp. at 22 (quoting Oxford, 192 F.R.D. at 117-18).) But instead of pleading any *facts*, all Plaintiffs offer is the lame assertion that "it is a reasonable inference that all of the directors were aware of the trading and did nothing to prevent it." (Opp. at 22-23.)

Although Plaintiffs attempt to argue that the trades of three non-director defendants (Messrs. O'Hara, Jones and Harris) render *non-selling Director Defendants* interested, Plaintiffs neither plead any basis to infer that the sale of stock by the three non-director defendants was improperly based on inside information about accounting or controls issues,[21] nor provide any reason why the Director Defendants would have known about the non-director defendants' trades in time to prevent them, let alone that such sales were wrongful. Any factual predicate for Plaintiffs' argument is completely missing.

### D.    Plaintiffs Do Not Plead Lack Of Independence

Personal and business relationships of the type alleged here do not show that any director lacked independence.[22] (See Def. Mem. at 23-25.) "In order to show lack of independence" Plaintiffs must show that a director is "so 'beholden' to an interested director . . . that his or her 'discretion would be sterilized.'" Beam v. Stewart, 845 A.2d 1040, 1055 (Del. 2000). Moreover, "[a]llegations of . . . mere outside business relationships" are insufficient to show a lack of independence unless the complaint "states with particularity facts indicating that a

---

[21]    In fact, these non-director defendants worked outside the finance department (marketing, engineering and manufacturing) and are not alleged to have had any involvement with accounting or internal controls. (See Compl. ¶¶ 28, 29, 31.)

[22]    As an initial matter, Plaintiffs do not dispute that a director's lack of independence only excuses lack of demand where he lacks independence from an interested party. (Compare Def. Mem. at 23 with Opp. at 24-25.) Here, where none of the directors are interested (because none face a substantial risk of liability), the independence question is irrelevant.

relationship . . . is so close that the director's independence may *reasonably* be doubted." Id. at 1051. In contrast to the particularized facts set forth in the Oracle or New Valley cases relied upon by Plaintiffs, Plaintiffs plead no such particularized facts here.

First, Oracle did not involve the question presented here - whether Plaintiffs have fulfilled their burden to plead particularized facts sufficient to overcome the presumption of director independence. See In re Oracle Corp. Deriv. Litig., 824 A.2d 917 (Del. Ch. 2003). Instead, Oracle involved the independence of a Special Litigation Committee (SLC) after demand had already been deemed futile, a situation where the burden of showing independence rested with defendants, not on plaintiffs as it does here. See id. at 937. In its most recent decision interpreting the independence requirement in a purported demand futility case, the Delaware Supreme Court, in commenting on this lower court decision, went out of its way to stress (in a section of its opinion entitled "A Word About the Oracle Case") that "th[is] procedural distinction relating to the diametrically-opposed burdens" may be "outcome determinative on the issue of independence." See Beam, 845 A.2d at 1055.

Second, Oracle involved particularized facts showing pecuniary links between the members of the SLC and the director defendants that go well beyond the routine business relationships alleged by Plaintiffs here, such as: (i) one defendant had made a $50,000 donation to Stanford in appreciation for an SLC member giving a speech, half of which the SLC member received for his research; (ii) an SLC member was a steering committee member and senior fellow of a Stanford research institute to which a defendant had contributed almost a half-million dollars and was Chair of its Advisory Board, and to which another defendant had considered donating $170 million for a scholarship program; (iii) a defendant was Chairman of a foundation that had

donated in excess of ten million dollars to Stanford; and (iv) another defendant was sole director of a foundation that had donated nearly ten million dollars to Stanford.  824 A.2d at 942-47.[23]

New Valley is just as distinct from this case as Oracle.  The board of directors of New Valley Corporation ("New Valley") approved the purchase of 99.1% of the stock of a subsidiary company of Brooke Group's ("Brooke") for $55 million.  In re New Valley Corp. Deriv. Litig., No. Civ. A. 17649, 2001 WL 50212 at *3 (Del. Ch. Jan. 11, 2001) (unpublished) (attached at Trans. Aff. Ex. A).  At the time, Brooke had negative net assets and owned 42% of New Valley. Id. at *1.  Moreover, the majority of New Valley's board of directors who approved the purchase had pecuniary interests in or relations to Brooke:  (i) the chairman of the board and CEO was Brooke's majority shareholder, and was owed over $1.5 million a year plus bonus from Brooke; (ii) two directors had received $30,000 from Brooke to act as director nominees in a proxy bid for a third company; (iii) one director drew substantial compensation from *both* New Valley and Brooke; and (iv) one director owned approximately 11% of Brooke's stock.  Id. at *1, *7.[24]  The directors, therefore, essentially stood on both sides of a challenged transaction.

In contrast, the Complaint here merely asserts that:  (i) two Director Defendants' venture capital firms have invested in the same start-up companies (Compl. ¶ 148(m)); (ii) the same two Director Defendants have "high profiles" in the investment community (id. ¶ 148(n)); (iii) certain Director Defendants have made complimentary statements about each other (or their venture capital companies) (id. ¶ 148(o)); and (iv) certain Director Defendants have served on the various boards together (id.).  Plaintiffs cite no authority suggesting that these types of

---

[23]    In addition to these pecuniary relationships, one of the defendant directors was a fellow Stanford professor with SLC members and another defendant director was a former teacher of a SLC member.  See Oracle, 824 A.2d at 942-47.

[24]    Even the Special Committee set up to determine whether or not the board should approve the transaction consisted of three directors, two of whom were the individuals who had received $30,000 payments from Brooke. Id. at *2.

relationships overcome the presumption of director independence.  See Beam, 845 A.2d at 1050 ("[a]llegations of a mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.")

Finally, nothing in the Complaint demonstrates that a majority of the board members are so connected to, or more appropriately "beholden to," an interested party that the majority cannot act independently of that interested party.  The fact that Mr. Ahmed has been praised by some of the other Director Defendants in the past or was made Chairman of the Board and awarded stock options[25] does not give rise to any inference that the board is beholden to him,  and Plaintiffs do not cite any authority otherwise.  It is also incongruous that Plaintiffs would claim that Ferri and Anderson have "high profiles as 'certifiable stars' in the local venture capital community" (Opp. at 24), but that Director Defendants would value their reputations lightly enough to risk them on behalf of Ahmed. (Id. at 24-25.)  See Beam, 845 A.2d at 1052 (non-interested director must be "more willing to risk his or her reputation than risk the relationship with the interested director.") Furthermore, it is disingenuous for Plaintiffs to argue that the board is beholden to Mr. Gruber because they "anointed" him Chairman Emeritus, Opp. at 25, when they originally alleged that he was "demoted" to that position.  (See First Amended Compl. ¶ 79.)

### CONCLUSION

For the reasons set forth above and in their opening memorandum, Defendants respectfully request that the Court dismiss the Complaint, in its entirety, with prejudice and without leave to amend.

---

[25]    Plaintiffs attempt to make Mr. Ahmed's stock option award seem excessive by arguing that the option would be worth up to $14 million.  See Opp. at 24.  Plaintiffs' Complaint and the SEC filing it relies on, however, makes clear that this hypothetical value is "based on a 10% rate of appreciation of Sonus stock" over the ten year term of the options.  Compl. ¶87; 10K/A filed July 28, 2004 at 51 (attached at Trans. Aff. Ex. B).  Of course, this is pure speculation.  In fact, if Sonus shareholders see the price of their stock increase 10% for each of the next ten years, defendants respectfully suggest that Mr. Ahmed will have earned every penny.  Certainly the Company continues to do well under his stewardship, with revenues in 2004 of $170,738,000 (increased from 2003 revenue of $93,210,000).  (March 15, 2005 10-K at 22 (attached at Trans. Aff. Ex. C).)

Respectfully submitted,


/s/ Gregory F. Noonan
Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Peter A. Spaeth (BBO #545202)
Gregory F. Noonan (BBO #651035)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000
*Attorneys for Defendants Edward T.
Anderson, Paul J. Ferri, Albert A. Notini, Paul J.
Severino and Nominal Defendant
Sonus Networks, Inc.*

/s/ John R. Baraniak
Robert S. Frank, Jr. (BBO #177240)
John R. Baraniak, Jr. (BBO #552259)
Choate Hall & Stewart
Two International Place
Boston, Massachusetts 02110
Tel:  (617) 248-5000
Fax:  (617) 248-4000
*Attorneys for Defendant Hassan M. Ahmed*



/s/ Matthew J. Matule
Thomas J. Dougherty (BBO #132300)
Matthew J. Matule (BBO #632075)
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822
*Attorneys for Defendant Stephen J. Nill*

<u>/s/ John D. Hughes</u>
John D. Hughes (BBO #243660)
Edwards & Angell LLP
101 Federal Street
Boston, Massachusetts 02110
Tel:  (617) 439-4444
Fax:  (617) 439-4170
*Attorneys for Defendants Paul R. Jones, Edward*
*N. Harris, J. Michael O'Hara and Rubin Gruber*

Dated:    September 30, 2005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Consolidated Shareholder Derivative Complaint, as well as the accompanying Transmittal Affidavit of Gregory F. Noonan, was served on all counsel of record either electronically or by first-class mail this 30th day of September, 2005.

<u>/s/ Gregory F. Noonan</u>