Exhibit A

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
(Cite as: 2001 WL 50212 (Del.Ch.))

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
In re NEW VALLEY CORPORATION Derivative
Litigation
**No. Civ.A. 17649.**

Date Submitted Dec. 19, 2000.
Date Decided Jan. 11, 2001.

Jay W. Eisenhofer, Megan D. McIntyre, John C. Kairis, Grant & Eisenhofer, P.A., Wilmington, Delaware, and Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Judith L. Spanier, Abbey, Gardy & Squitieri, LLP, New York, New York, for Plaintiffs, of counsel.

Michael D. Goldman, Peter J. Walsh, Jr., Brian C. Ralston, Potter Anderson & Corroon LLP, Wilmington, Delaware, Michael L. Hirschfeld, Jennifer M. Anglim, Allana F. Stark, Teresa A. Gonsalves, Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 Pending before me in this derivative action is defendants' motion to dismiss the plaintiffs' amended complaint. This Memorandum Opinion constitutes my decision on defendants' motion.

### I. BACKGROUND FACTS [FN1]

FN1. As this is a decision on defendants' motion to dismiss, I will recite the facts as presented in the amended complaint.

*A. The Parties*

The plaintiff shareholders in this consolidated derivative action are Richard Fuss ("Fuss") and Richard C. Goodwin ("Goodwin"). The plaintiffs are, and have at all relevant times been, shareholders of nominal defendant New Valley Corporation ("New Valley"). New Valley is a Delaware

corporation with its principal offices in Miami, Florida. Among New Valley's endeavors is its investment banking and brokerage business and the ownership and management of commercial real estate.

BGLS, Inc. ("BGLS"), a Delaware corporation, owns all the stock of New Valley Holdings, Inc. ("NV Holdings") and is the controlling stockholder of New Valley. BGLS is wholly owned by Brooke Group, Ltd ("Brooke"). Thus, as of September 30, 1996, Brooke owned, either directly or indirectly, 100% of NV Holdings, approximately 42% of the outstanding New Valley common stock, approximately 60% of the New Valley Class A Preferred shares, and approximately 9% of the outstanding New Valley Class B Preferred shares. As a result of a July 1999 recapitalization by New Valley, Brooke's voting power and ownership increased from approximately 42% to just over 55%. Brooke is a named defendant.

The individual defendants in this action are various current and former members of New Valley's Board of Directors. Those individual defendants are: Bennett S. Lebow ("LeBow"), Howard M. Lorber ("Lorber"), Arnold I. Burns ("Burns"), Ronald J. Kramer ("Kramer"), Richard J. Lampen ("Lampen"), Henry C. Beinstein ("Beinstein"), Barry W. Ridings ("Ridings"), Richard S. Ressler ("Ressler"), and Victor M. Rivas ("Rivas"). [FN2] Moreover, each of these individuals has intertwining relationships with various entities connected to, or doing business with, New Valley. [FN3]

> FN2. Ressler is no longer a member of New Valley's Board of Directors and was replaced by Rivas. Thus, at the time of the transaction at issue, the New Valley board was comprised of: LeBow, Lorber, Burns, Kramer, Ressler, Lampen, Beinstein, and Ridings (the "Individual Defendants"). The current Board is: LeBow, Lorber, Burns, Kramer, Lampen, Beinstein, Ridings, and Rivas (the "Current Board").

> FN3. The precise nature of each of these subsidiary relationships will be examined below.

*B. Brooke's Need for Cash*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                           Page 2
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
(Cite as: 2001 WL 50212 (Del.Ch.))

In 1995, New Valley emerged from bankruptcy with over $300 million in unrestricted cash with which it began to make various investments. As of December 31, 1995, New Valley had current assets of $234,165,000 (consisting of, *inter alia,* $38,559,000 in cash and cash equivalents and $164,592,000 of investment securities) and current liabilities of $183,292,000. Despite this apparent wealth, as of September 30, 1996, New Valley had allowed the dividends on its preferred stock to accrue to a total of $40/share for Class A and $39.59/share for Class B.

Brooke, however, was not nearly so financially vigorous. By September 1996, Brooke's balance sheet showed total current assets of $81,433,000 ($54 million of which was inventory), but included current liabilities of $166,223,000. During the first nine months of 1996, Brooke suffered severe cash flow deficits and financed the bulk of its operations and investment activities with borrowing and the few dividends it did receive from its New Valley shares. Brooke also had two looming needs for large amounts of money or additional financing. [FN4] First, in March 1997, the more than $10 million balance on its revolving credit facility would mature and, second, it would be forced to redeem certain notes in 1998 for $37.5 million.

> FN4. In addition to these future expenses, the plaintiffs note that Brooke was saddled with the ongoing contractual liability to pay LeBow (Brooke's Chairman, President, and CEO) a yearly salary of nearly $1.5 million with a minimum bonus of $742,188 plus a payment of 10% of his base salary in lieu of executive benefits.

*2 Brooke found the cash reserves held by its subsidiary, New Valley, extremely attractive. Relying on the "trickling-in" of dividends, however, was not an efficient way for Brooke to gain access to those reserves because Brooke did not own all of the outstanding preferred shares of New Valley. Thus, a significant portion of that cash would "leave the family" and go to New Valley's outside shareholders.

*C. The Solution Presents Itself*

In January 1997, in a move that would apparently ease the financial woes of Brooke, New Valley began to discuss and evaluate the possibility of purchasing certain assets from Brooke. The contemplated transaction involved New Valley purchasing from Brooke 99.1% of the common stock of Brook's subsidiary, BML. BML was involved in Russian real estate development and its principal assets were three properties in Moscow-Ducat Place I, II, and III. Ducat Place I was a completed office building. Ducat Place II was a nearly complete office building. Ducat Place III was a planned, but not yet constructed, mixed-use building. The anticipated purchase price for the BML stock was $55 million subject to a final appraisal of Ducat Places II and III and receipt of a favorable fairness opinion. Finally, the transaction was set to close on or before January 31, 1997. This proposed transaction was presented at a special meeting of New Valley's Board of Directors on January 8, 1997.

At this same Board meeting, the directors were informed of the somewhat incestuous relationships among the parties. More specifically, they were advised that Brooke ultimately controlled both BML and New Valley and that Directors LeBow, Lorber, and Lampen had direct financial or employment relationships with one or more of the parties to the transaction. Because of these relationships, the Board established a Special Committee to review the transaction with the aid of legal and financial counsel and to make recommendations to the full Board concerning the transaction. The Special Committee consisted of Beinstein, Burns, and Ridings.

The Special Committee met twice. The first meeting, on January 15, 1997, was attended by Committee members Beinstein and Burns (but not Ridings), Lampen, and representatives of Fischbein Badillo Wagner & Harding ("Fischbein") as legal counsel and Oppenheimer & Co., Inc. as financial advisers. Lampen distributed a draft appraisal by Healey & Baker of Ducat Places II and III. Oppenheimer explained to the Committee that the $55 million purchase price included a "goodwill" premium that accounted for the difference between the purchase price and the appraised values of Ducat Places II and III plus the net proceeds from a planned sale of Ducat Place I.

The Committee met again on January 28, 1997. The same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                          Page 3
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
**(Cite as: 2001 WL 50212 (Del.Ch.))**

parties were in attendance except Ridings also was present. At or shortly before this meeting, the Special Committee received the proposed purchase agreement, the final Healey & Baker appraisal dated January 23, 1997, and an Oppenheimer fairness opinion dated January 27, 1997.

*3 Oppenheimer based its fairness opinion on the Healey & Baker appraisal and on the expected cash flows of the Ducat properties. Using these as a jumping-off point, Oppenheimer found that the value of BML's assets, in their entirety, was approximately $71 million. After subtracting $23 million in liabilities and assuming $8 million in goodwill, Oppenheimer ultimately opined that the $55 million transaction price was fair.

Based on the appraisal, the fairness opinion, and the advice of legal counsel, the Special Committee adopted a resolution recommending to the full New Valley Board that New Valley proceed with the transaction. The next day, the full New Valley Board voted to follow the recommendation of the Special Committee and approved the purchase of the BML stock under the purchase agreement's terms. On January 31, 1997, Brooke publicly announced the deal.

*D. The Aftermath*

In March 1997, Fuss filed a derivative action alleging that the defendants breached their fiduciary duties by approving the BML transaction at an unfair price and based upon an unfair process. On or about November 17, 1998, in accordance with to 8 Del. C. § 220, Goodwin served a demand letter on New Valley seeking to inspect the corporation's books and records relating to the disputed transaction. On December 11, 1998, Goodwin filed a complaint seeking to enforce these inspection rights. Shortly before trial, the parties settled this dispute and certain documents were presented to Goodwin. Thereafter, on December 9, 1999, Goodwin filed a derivative complaint alleging substantially the same claims as those in the Fuss complaint, but containing additional factual allegations based, in part, on the information gleaned from the documents produced in the § 220 action.

On February 7, 1999, this Court consolidated the two separate actions and directed that Goodwin's complaint would serve as the complaint for the consolidated action. On February 28, 2000, plaintiffs filed an amended derivative complaint for the purpose of correcting certain factual errors identified by the defendants relating to the composition of the Board at the time Goodwin filed his original complaint. The amended complaint contains three separate counts. Count I alleges that the individual directors breached their fiduciary duties in approving the transaction. Count II avers that Brooke, through its agents and as controlling shareholder of New Valley, breached its fiduciary duties owed to New Valley. Count III, against Brooke, asserts that Brooke aided and abetted the individual defendants in breaching their fiduciary duties. Finally, the amended complaint alleges that prior demand on the Board, pursuant to Court of Chancery Rule 23.1, was futile in this derivative action.

The defendants filed a motion to dismiss the amended complaint. The Court heard oral argument on the motion on December 19, 2000. This is the Court's decision on the motion.

*E. Summary of the Arguments*

*4 The defendants' move to dismiss this action on several grounds. First, they seek the dismissal of this action because the amended complaint fails to state a claim upon which relief can be granted. Specifically, the defendants argue that the complaint should be dismissed because the factual allegations in the complaint are belied by the documents produced in the § 220 action and which the plaintiffs used in identifying and pleading their cause of action. The defendants also insist that the complaint fails to state a claim because the plaintiffs have failed properly to allege that the transaction was not "entirely fair" to New Valley.

Next, the defendants contend that the amended complaint should be dismissed because the plaintiffs failed to plead adequately that demand on the Board was excused under Court of Chancery Rule 23.1. Finally, the defendants seek the dismissal of the breach of fiduciary duty claims against the disinterested directors because the claim is affirmatively barred by § 102(b)(7) of the Delaware General Corporation Law ("DGCL").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                         Page 4
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
**(Cite as: 2001 WL 50212 (Del.Ch.))**

The plaintiffs defend against this motion by arguing that the defendants improperly rely on documents outside of the complaint to support their motion to dismiss for failure to state a claim. Moreover, they assert that the burden is on the defendants to prove "entire fairness" because there is a reasonable doubt (1) that a majority of the board could have disinterestedly and independently considered a demand, and (2) that the transaction was otherwise the product of a valid business judgment.

The plaintiffs also urge that they have properly pled demand futility because a majority of the Board is interested in the transaction or lacked independence. Finally, they argue that § 102(b)(7) does not bar their claims because exceptions in that provision apply to this transaction.

## II. ANALYSIS

### A. Standard of Review

The standard this Court applies when evaluating a motion to dismiss under Rule 12(b)(6) is rigorous. A complaint will be dismissed only if "it appears to a reasonable degree of certainty that the plaintiff will not be entitled to relief under any set of facts that could be proved in support of his claim." [FN5] Moreover, in this procedural setting, I consider, as I must, all well-pled facts as true and draw all inferences in a light most favorable to the non-moving party. [FN6] "What this effectively means is that the Court must consider the various factual permutations possible within the framework of the plaintiff's allegations and conclude whether any one conceivable set of facts could possibly merit granting plaintiff relief. If so, the claim cannot be dismissed." [FN7] Finally, while the complaint is designed to give only general notice of the claim asserted, merely conclusory allegations will not be accepted as true absent specific allegations of fact to support them . [FN8]

 FN5. *Wood v. Frank E. Best, Inc.,* Del. Ch., C.A. No. 16281, Chandler, C. (July 9, 1999), mem. op. at 2 (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180 (1988)).

 FN6. *Id.*

 FN7. *Apple Computer, Inc. v. Exponential*

*Technology, Inc.,* Del. Ch., C.A. No. 16315, Chandler, C. (Jan. 21, 1999), mem. op. at 29.

 FN8. *See Solomon v. Pathe Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996).

As a general rule, the Court, in ruling on a motion to dismiss, will consider only those matters raised in the operative pleading, the complaint. [FN9] The Court may, however, "consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint." [FN10]

 FN9. *In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 68 (1995).

 FN10. *In re Lukens Inc. Shareholders Litig.,* Del. Ch., 757 A.2d 720, 727 (1999) (citing *In re Santa Fe Pac. Corp. Shareholder Litig.,* 669 A.2d at 69-70).

### B. Application of the Standard to This Case

**\*5** In the present case, I must analyze the defendants' motion in light of the standard set forth above. To that end, I must decide: (1) whether the complaint fails to state a claim for which relief can be granted because the documents upon which the plaintiffs base their allegations contradict the factual allegations in the complaint; (2) whether the complaint must be dismissed because the plaintiffs have failed to properly allege a lack of "entire fairness;" (3) whether the complaint must be dismissed for a failure to adequately plead that demand on the Board was excused; and (4) whether the claim for breach of fiduciary duty against the disinterested directors is barred by § 102(b)(7) of the DGCL.

### 1. The Documents Outside the Complaint

The plaintiffs, in their complaint, openly acknowledge that some of the allegations in the complaint are a direct result of information gleaned from documents provided to Goodwin after the settlement of the § 220 action. [FN11] The plaintiffs did not, however, actively incorporate these documents into the complaint either by reference or by appending them to the complaint. The defendants argue that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
(Cite as: 2001 WL 50212 (Del.Ch.))

Page 5

certain documents are either integral to, or effectively incorporated by reference into, the plaintiffs' complaint and must be considered in evaluating this motion to dismiss. Those documents are: the minutes of the New Valley Board and Special Committee meetings, the Healey & Baker appraisal, and the Oppenheimer fairness opinion.

> FN11. See Pls.' Am. Compl. at 1 and 2 ("This amended Complaint is based, in part, on the information contained in those documents.").

In this case, I am not persuaded that the documents highlighted by the defendants are either integral to, or effectively incorporated into, the plaintiffs' amended complaint. In comparing these documents in this case to documents in other cases, it is clear that these documents do not directly portray a complete picture of the reasons behind the actions and decisions of each New Valley director.

The Delaware Supreme Court's decision in *In re Santa Fe Pac. Corp. Shareholder Litig.* [FN12] is one of the seminal cases on this issue and provides this Court with significant guidance. There, the Supreme Court affirmed the Court of Chancery's consideration of a proxy statement in ruling on a motion to dismiss, stating:

> FN12. 669 A.2d 59 (1995).

> It was certainly proper to consult the Joint Proxy to analyze the disclosure claim because the operative facts relating to such a claim *perforce* depend upon the language of the Joint Proxy. Thus, the document is used not to establish the truth of the statements therein, but to examine only what is disclosed. [FN13]

> FN13. *Id.* at 69.

The Court also quotes from an earlier Court of Chancery decision for the proposition that "the court may judiciously rely on [documents outside the complaint] not to resolve disputed facts but at least to establish what was disclosed to the shareholders." [FN14] It also recognized that in addition to disclosure statements in disclosure disputes, the relevant publication in libel cases and the contract in breach of contract cases are also types of documents outside the complaint that courts have considered on motions to

dismiss. Other Delaware decisions on this issue seem to follow this limitation on going outside the complaint and reflect that our Courts most often do so only to consider the actual disclosures in a disclosure dispute and the contracts in a breach of contract dispute. [FN15] Thus, this exception to the general rule is narrowly tailored to specific types of documents and specific uses of those documents.

> FN14. *Id.* (quoting from *Abbey v. E.W. Scripps Co.,* Del. Ch., C.A. No. 13397, Allen, C. (Aug. 9, 1995), mem. op. at 4, n. 1).

> FN15. For disclosure disputes, *see In re Lukens Inc. Shareholders Litig.,* Del. Ch., 757 A.2d 720 (1999); *Sanders v. Devine,* Del. Ch., C.A. No. 14679, Lamb, V.C. (Sept. 24, 1997), mem. op.; *Wiener v. The Southern Co.,* Del. Ch., C.A. No. 10525, Jacobs, V.C. (Jan. 24, 1992), mem. op.; *Glaser v. Norris,* Del. Ch., C.A. No. 9538, Chandler, V.C. (Jan. 6, 1992), op. For breach of contract disputes, *see Midland Food Services, LLC v. Castle Hill Holdings, LLC,* Del. Ch., C.A. No. 16779, Strine, V.C. (July 16, 1999), mem. op.; *Ash/Ramunno Assoc., Inc. v. Branner,* Del. Ch., C.A. No. 12389, Hartnett, V.C. (May 21, 1993), mem. op.

**6** The documents in this case, the minutes of the meetings, the appraisal, and the fairness opinion, are not in the same nature as a disclosure statement, a contract, or an allegedly libelous publication. The latter are operative documents that are central to the cause of action. The former are more evidentiary in nature. Thus, the "truth" of the matters contained in those documents may tend to prove or disprove the plaintiffs' allegations. In this case, the plaintiffs contend that the defendants breached their fiduciary duties by approving and entering into the disputed transaction. While the minutes of the meetings describe the actions of the Board and the Special Committee and, to a certain extent, explain the rationale behind the Board's actions, the minutes of the meetings do not reflect exactly what each director thought of, or understood about, the proposed transaction at the time he voted to approve it. Thus, the documents, on their face, do not reflect the complete picture that can only really be drawn after discovery. Similarly, while the fairness

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                        Page 6
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
**(Cite as: 2001 WL 50212 (Del.Ch.))**

opinion and appraisal may on their face be clear on what they say and do not say, it is not clear from these two documents how the import of that information registered with each director.

Additionally, I note that the defendants argue that New Valley "must have the opportunity to bring to the Court's attention errors in plaintiffs' *interpretation* and *mischaracterizations* in plaintiffs' recitation of the contents of such documents." [FN16] Matters of interpretation and characterization are matters where reasonable minds can differ. Disputed matters of interpretation and characterization of documents do not fall within this exception to the general rule and, in my opinion, should not be injected into a motion to dismiss.

> FN16. Defs.' Reply Br. at 4 (emphasis added).

Based on the authority cited above, I conclude that the documents highlighted by the defendants are neither integral to, nor effectively incorporated into, the plaintiffs' complaint. Thus, I will not consider those documents in evaluating the pending motion to dismiss. [FN17] The defendants' argument that the extraneous documents contradict the factual allegations in the complaint and, thus, the complaint fails to state a claim, is not persuasive and fails.

> FN17. Goodwin availed himself of the "tools at hand" by filing the § 220 action. He should not now be penalized for taking this step that our courts have encouraged. Plaintiffs are urged to use these "tools" to gather information and evaluate whether a legitimate claim exists. The defendants stress that courts have looked to outside documents, as a policy matter, to prevent parties from quoting only portions of documents such that it hides the inevitable conclusion that the claim is doomed to fail. While I have found here that the documents will not be considered on this motion to dismiss, I do believe that the same policy considerations are fostered by Court of Chancery Rule 11. *See Mizel v. Connelly,* Del. Ch., C.A. No. 16638, Strine, V.C. (Aug. 2, 1999), mem. op. at 12-13. In *Mizel,* Vice Chancellor Strine refused to

consider an affidavit on a motion to dismiss, but was troubled by what the affidavit apparently showed about the allegations in the complaint. He went on to note that Rule 11 may be implicated if the documents ultimately "raised a serious question regarding whether the plaintiff's attorney had drafted the factual allegations in the complaint in good faith and after 'an inquiry reasonable under the circumstances.' After the repeated admonitions of the Supreme Court to use the 'tools at hand,' lawyers who fail to use those tools to craft their pleadings do so at some peril." *Id.*

*2. Pleading of "Entire Fairness"*

In considering this issue, the Court "must first review the complaint to ascertain whether [the plaintiffs'] entire fairness claim is subsumed within it. All that is required is that the complaint give 'fair notice' of these claims. A court undertaking that analysis must afford a liberal construction to the language of the pleading." [FN18] Once the entire fairness standard has been pled, the defendants bear the initial burden of demonstrating the two aspects: fair dealing and fair price. [FN19] That burden, however, may be shifted to the plaintiffs to show that the transaction was *not* entirely fair in two situations. The first is where the transaction has been approved "by an independent committee of directors who have real bargaining power that can be exerted in dealings with a majority shareholder who does not dictate the terms" of the transaction. [FN20] The second is the approval of the transaction by a fully informed vote of the majority of the minority shareholders.

> FN18. *Emerald Partners v. Berlin,* Del.Supr., 726 A.2d 1215, 1220 (1999).

> FN19. *Id.* at 1222.

> FN20. *Id.* at 1222-23.

*7 Both sides appear to agree that the transaction at issue will be evaluated under the "entire fairness" standard. Moreover, the amended complaint, read as a whole, gives "fair notice" of these claims. In this case, the real dispute on this issue centers around which party bears the ultimate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                      Page 7
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
**(Cite as: 2001 WL 50212 (Del.Ch.))**

burden of showing the existence or absence of entire fairness.

At this stage of the proceedings, I do not have to decide which party bears the ultimate burden on this issue. First, because the Court is evaluating the legal sufficiency of the complaint, it has no evidence from the defendants that would allow it to determine whether they have adequate proof that a truly independent committee with real bargaining power evaluated the transaction. Thus, the Court is not adequately poised to determine if the defendants have successfully shifted the burden to the plaintiffs.

Second, even if the ultimate burden is on the plaintiffs to show the transaction is not entirely fair, these plaintiffs have sufficiently alleged facts which, if true, are reasonably calculated to show that the approval of this transaction was fatally flawed in that it was not the result of a fair process and did not result in a fair price. [FN21] For these reasons, I conclude that the plaintiffs have alleged facts sufficient to initially plead an entire fairness claim. Thus, defendants' argument-that plaintiffs' complaint is legally deficient as to this claim-fails.

> FN21. *See* Pls.' Am. Compl. ¶¶ 47-55 for allegations of unfair process and ¶¶ 37-46 for allegations of unfair price.

3. *Pleading of Demand Excused*

The defendants argue that this derivative suit should be dismissed because the plaintiffs have not sufficiently pled that demand on the board, as required by Court of Chancery Rule 23.1, has been excused. As Vice Chancellor Jacobs has noted:

> Under our well developed caselaw in this area, a derivative complaint must be dismissed unless it alleges with particularity facts demonstrating that demand would have been futile. Demand is considered futile, and will be excused, only if the particularized facts alleged in the complaint create a reasonable doubt (*i.e.*, reason to doubt) that (1) the directors upon whom the demand would be made were disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [FN22]

> FN22. *Zupnick v. Goizueta,* Del. Ch., 698 A.2d 384, 386 (1997).

The New Valley Board changed composition from the time of the transaction to the time Goodwin filed his complaint. The parties have expended considerable time and energy debating whether demand was excused as to the Board that approved the transaction or as to the Board as it was composed when the amended complaint was filed. The defendants urge the Court to examine demand futility in the context of the makeup of the current board. Logically, however, at this stage I do not have to decide this issue, for the plaintiffs have alleged particularized facts that, if true, give me reason to believe that demand on even the current Board would have been futile.

The amended complaint pleads with particularity facts that give this Court some reason to believe that a majority of New Valley's current Board is not disinterested or independent. [FN23] The facts alleged in the complaint show that all the members of the current Board have current or past business, personal, and employment relationships with each other and the entities involved. For instance, some conflicts are quite clear as in the case of LeBow who is New Valley's Chairman and CEO but also the controlling shareholder of Brooke. The nature and extent that others may be interested is less clear. Burns and Ridings both received $30,000 from Brooke for agreeing to be a director nominee in Brooke's proxy bid for RJR Nabisco Holdings Corp. in 1996. Burns also is a former non-lawyer employee of a law firm that has rendered substantial legal services to New Valley. Lampen is employed by, and receives substantial compensation from, both New Valley and Brooke. Ressler is a Director for New Valley and owns approximately 10.8% of Brooke's stock. Finally, Rivas is both a director of New Valley and CEO of Landenburg, a subsidiary of New Valley. While this list is not exhaustive, it does provide some indication of the nature of some of the conflicts.

> FN23. *See* Pls.' Am. Compl. at ¶¶ 2-19, 70.

*8 Although the actual extent of these relationships is not altogether clear at this point in the litigation, [FN24] the existence of these interests and relationships is enough to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                          Page 8
Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)
(Cite as: 2001 WL 50212 (Del.Ch.))

defeat a motion to dismiss. The Court will reserve judgment on the ultimate nature of these relationships until an adequate record exists, after further discovery and factual development. Thus, I conclude that plaintiffs have sufficiently pled demand futility to survive the defendants' motion to dismiss. [FN25]

> FN24. Although some of the allegations of interestedness appear innocuous on the surface, the plaintiffs assert that some of the directors (like Rivas) are beholden to LeBow for their allegedly lucrative employment positions outside of New Valley and, thus, are not disinterested.

> FN25. Because the plaintiffs have satisfied their pleading burden on this prong of the demand futility test, I do not have to reach the question whether the decision was the product of the exercise of valid business judgment.

*4. Are Plaintiffs' Claims Barred by § 102(b)(7)?*

Defendants argue that New Valley's certificate of incorporation contains a provision, in accordance with 8 *Del. C.* § 102(b)(7), limiting the liability of directors and, thus, that this action should be dismissed as to the directors they identify as disinterested. [FN26] Section 102(b)(7), however, contains several exceptions to its limited liability rule. For instance, liability will not be limited (1) where a director has breached the duty of loyalty, (2) for acts not in good faith or for intentional misconduct, and (3) where the director has derived an improper personal benefit. [FN27]

> FN26. The defendants contend that Burns, Beinstein, Ridings, and Rivas are disinterested directors. They seem to concede that the remaining defendants are "interested."

> FN27. *See* 8 *Del. C.* §§ 102(b)(7)(i),(ii), and (iv).

Counts I and II of the amended complaint allege that the defendants breached their duty of loyalty and acted in bad faith. Both, if proven, fall within the exceptions to the exculpatory provision. Moreover, for substantially the same reasons as above, I find that the plaintiffs have alleged sufficient facts in support of Counts I and II to initially

plead that the defendants breached their duty of loyalty and have acted in bad faith. For these reasons, I find that the defendants' arguments for dismissal fall short.

### III. CONCLUSION

When evaluating a motion to dismiss this Court ordinarily may not consider documents outside the complaint. That being so, I consider only the well pleaded allegations of the amended complaint to determine whether the plaintiffs' case survives a motion to dismiss.

Accepting the allegations in the amended complaint as true and construing all inferences in favor of the plaintiffs, I conclude that they have supported all three counts of their amended complaint with well-pled allegations of fact. Because I am reasonably certain that the plaintiffs will be entitled to relief if their allegations ultimately prove true, I deny the defendants' motion to dismiss.

An Order has been entered in accordance with this Memorandum Opinion.

### ORDER

For the reasons assigned in this Court's Memorandum Opinion entered in this case on this date, it is,

ORDERED that defendants' motion to dismiss the amended complaint in this action is denied.

Not Reported in A.2d, 2001 WL 50212 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.