## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE SONUS NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) ) | Case No.  04-10359-DPW |

## NOTICE OF SUPPLEMENTAL AUTHORITY

The defendants, Edward T. Anderson, Paul J. Ferri, Albert A. Notini, Paul J. Severino, Hassan Ahmed, Rubin Gruber, Paul R. Jones, Edward N. Harris, J. Michael O'Hara and Stephen J. Nill and nominal defendant Sonus Networks, Inc. (the "Defendants"), respectfully bring to the Court's attention the following supplemental authority issued near the time or after the close of briefing on the Defendants' Motions to Dismiss, now scheduled for oral argument on December 7, 2005:

1,      Sachs v. Sprague, -- F. Supp. 2d--, 2005 WL 3116952, at *5-6 (D. Mass. Nov. 22, 2005) (the Court rejected plaintiffs' claim that demand was excused under a Caremark theory, where plaintiffs alleged that director defendants' failed to supervise corporate conduct and "by virtue of [their] position(s) 'knew the adverse non-public information[.]'") (See Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Second Amended Consolidated Shareholder Derivative Complaint at 14-15; Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Second Amended Consolidated Shareholder Derivative Complaint ("Def. Reply") at 13-14.

2.      Steinberg v. Sonus Networks, Inc., No. 02-11315-MLW (D. Mass. Oct. 5, 2005) (dismissing case after class was decertified and plaintiffs' voluntarily moved to dismiss action) (see Def. Reply at 11); and

3.    Neer v Pelino, 389 F. Supp. 2d 648, 655, 657 (E.D. Pa. Sept. 27, 2005) (the court

held that "Congress did not intend to create an implied cause of action in Section 304 of [the

Sarbanes-Oxley Act of 2002]" and the court could not "imply[] a private right [as that] would…

require [it] to rewrite Congress's statute.")  (See Second Amended Consolidated Shareholder

Derivative Complaint at ¶¶ 172-174).

Copies of the authorities are attached hereto for the Court's convenience.


Respectfully submitted,

/s/  Gregory F. Noonan
Jeffrey B. Rudman (BBO #433380)
James W. Prendergast (BBO #553073)
Daniel W. Halston (BBO #548692)
Peter A. Spaeth (BBO  #545202)
Gregory F. Noonan (BBO #651035)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Tel:  (617) 526-6000
Fax:  (617) 526-5000
*Attorneys for Defendants Edward T.
Anderson, Paul J. Ferri, Albert A. Notini, Paul J.
Severino and Nominal Defendant
Sonus Networks, Inc.*


/s/  John R. Baraniak (by perm. GFN)
Robert S. Frank, Jr. (BBO #177240)
John R. Baraniak, Jr. (BBO #552259)
Choate Hall & Stewart
Two International Place
Boston, Massachusetts 02109
Tel:  (617) 248-5000
Fax:  (617) 248-4000
*Attorneys for Defendant Hassan M. Ahmed*

/s/ Matthew J. Matule (by perm. GFN)
Thomas J. Dougherty (BBO #132300)
Matthew J. Matule (BBO #632075)
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, Massachusetts 02108
Tel: (617) 573-4800
Fax: (617) 573-4822
*Attorneys for Defendant Stephen J. Nill*

/s/ John D. Hughes (by perm. GFN)
John D. Hughes (BBO #243660)
Edwards & Angell LLP
101 Federal Street
Boston, Massachusetts 02110
Tel: (617) 439-4444
Fax: (617) 439-4170
*Attorneys for Defendants Paul R. Jones, Edward N.*
*Harris, J. Michael O'Hara and Rubin Gruber*

Dated: December 1, 2005

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing Notice of Supplemental Authority was served on all counsel of record either electronically or by first-class mail this 1st day of December, 2005.

<u>/s/ Gregory F. Noonan</u>

Westlaw.

2005 WL 3116592                                                                                          Page 1
--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Steve SACHS, et al., Plaintiffs
v.
Steven SPRAGUE, et al., Defendants
**No. CIV.A. 04-30032-MAP.**

Nov. 22, 2005.

**Background:** Shareholders brought derivative action against directors of technology corporation, stemming from purported dissemination of false and misleading statements regarding corporation's condition and prospects. Directors moved for dismissal.

**Holding:** The District Court, Ponsor, J., held that shareholders failed to aver reasonable doubt concerning directors' disinterest.
Motion granted.

**[1] Corporations ☞206(5)**

101k206(5) Most Cited Cases
Before bringing derivative suit on behalf of corporation, plaintiff must demonstrate that corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[2] Corporations ☞206(4)**
101k206(4) Most Cited Cases

**[2] Corporations ☞212**
101k212 Most Cited Cases
In context of pre-suit demand, directors are entitled to presumption of disinterest under Delaware law; however, presumption disappears if corporate decision will have materially detrimental impact on director, but not on corporation and stockholders. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[3] Corporations ☞320(5)**
101k320(5) Most Cited Cases
Under Delaware law, to demonstrate disabling interest that prevents director from impartially considering demand in context of pre-suit demand requirements, plaintiff must plead facts that establish substantial likelihood of director's personal liability. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[4] Corporations ☞310(1)**
101k310(1) Most Cited Cases
For director to be "independent" under Delaware law, he must be both disinterested and free from influence of other interested persons.

**[5] Corporations ☞310(1)**
101k310(1) Most Cited Cases
To establish lack of independence under Delaware law, plaintiffs must show that directors are beholden to interested directors, or so under their influence that their discretion would be sterilized.

**[6] Corporations ☞320(8)**
101k320(8) Most Cited Cases
Shareholders who brought derivative action against directors of technology corporation, stemming from purported dissemination of false and misleading statements regarding corporation's condition and prospects, failed to allege sufficient facts establishing reasonable doubt concerning directors' disinterest under Delaware law, as required to plead demand futility; complaint failed to aver absence of system that might give rise to inference that there was sustained and systematic failure of board to exercise oversight of corporate conduct. Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[7] Corporations ☞206(4)**
101k206(4) Most Cited Cases

**[7] Corporations ☞320(5)**
101k320(5) Most Cited Cases
Ordinarily, derivative plaintiff seeking to establish non-interested director's lack of independence under Delaware law must plead facts that would support inference that non-interested director would be more willing to risk his reputation than risk relationship with interested director.
Michael D. Blanchard, Bingham McCutchen LLP--Hartford, Hartford, CT, for Wave Systems Corporation, George Gilder, Gerard T. Feeney, John E.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2005 WL 3116592                                                                                          Page 2
--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

Bagalay, Jr., John E. McConnaughy, Jr., Nolan Bushnell, Steven Sprague, Defendants.

Robert A. Buhlman, Bingham McCutchen LLP, Boston, for Wave Systems Corporation, George Gilder, Gerard T. Feeney, John E. Bagalay, Jr., John E. McConnaughy, Jr., Nolan Bushnell, Steven Sprague Defendants.

William B. Federman, The Law Firm of Federman & Sherwood, Oklahoma City, OK, for Charlene Harvey, Jeff Swanson, Steve Sachs, Plaintiffs.

Jeffrey P. Fink, Robbins Umeda & Fink, LLP, San Diego, CA, for Steve Sachs, Charlene Harvey, Jeff Swanson, Plaintiffs.

Eunice E. Lee, Bingham McCutchen LLP, Boston, for Wave Systems Corporation, George Gilder, Gerard T. Feeney, John E. Bagalay, Jr., John E. McConnaughy, Jr., Nolan Bushnell, Steven Sprague, Defendants.

Keith A. Minoff, Robinson Donovan, P.C., Springfield, for Steve Sachs, Charlene Harvey, Jeff Swanson, Plaintiffs.

Caroline A. Schnurer, Robbins Umeda & Fink, LLP, San Diego, CA, for Steve Sachs, Plaintiff.

Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Jr., Pittsburgh, PA, for Charlene Harvey, Jeff Swanson, Steve Sachs, Wave Systems Corporation, Defendants.

MEMORANDUM REGARDING DEFENDANTS'
MOTION TO DISMISS (Dkt. No. 29)
PONSOR, D.J.

I. INTRODUCTION

*1 This is a shareholder derivative action brought by shareholders of Wave Systems Corporation ("Wave" or the "Company"), on behalf of the Company, against certain of its officers and directors for, among other things, breaching their fiduciary duties by disseminating, or permitting the dissemination of, false and/or misleading statements regarding the Company's condition and prospects. Citing Fed.R.Civ.P. 23.1, 12(b)(6), and 9(b), nominal Defendant Wave and the individual Defendants moved to dismiss Plaintiffs' verified consolidated amended complaint

("amended complaint") on the grounds that Plaintiffs neither made a pre-suit demand upon Wave's Board nor demonstrated why a demand would have been futile. The court allowed this motion to dismiss on September 26, 2005. This memorandum will set forth the reasons supporting this ruling.

II. FACTUAL AND PROCEDURAL BACKGROUND

"When presented with a motion to dismiss, the district court must take as true 'the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor.'" *Medina-Claudio v. Rodriguez-Mateo,* 292 F.3d 31, 34 (1st Cir.2002) (citations omitted). What follows, then, is a brief version of such facts as alleged in Plaintiffs' amended complaint.

Wave is incorporated under the laws of the State of Delaware. (Dkt. No. 24, Am.Compl.¶ 20.) Since its inception in 1988, this self-described "development stage company" had never managed to successfully market any of its digital security services or technologies. (*Id.* at ¶ 5.) By December 31, 2002, the Company found itself over $230 million dollars in debt and in need of $11 million in cash to continue operations in 2003. (*Id.* at ¶ 6.)

With no major revenue source in sight, the Company was forced to close a private placement of Series H Stock on April 30, 2003. (*Id .* at ¶ 7.) Although this private investment in the publicly held Company resulted in net proceeds of $4,465,571, the placement terms, from Wave's perspective, were quite onerous. (*Id.*) Not only did they restrict the Company's capacity to generate additional funds through future equity offerings by giving the Series H shareholders a right of first refusal, they also required Wave to pay significant dividends to these preferred shareholders. (*Id.*) Because the Company lacked the resources to redeem the preferred stock or pay the dividends, Wave's status as a going concern seemed to rest on the automatic conversion of these preferred shares to Class A Common Stock. Under the terms of the placement, such a conversion could only occur if the closing bid on Wave's stock exceeded $1.90 for fifteen of twenty consecutive trading days. (*Id.* at ¶ 8.) With the stock consistently trading at under $1.00 per share in the Spring of 2003, it appeared unlikely this condition would be met.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



On May 15, 2003, the Company issued a press release in which Director and Chief Executive Officer, Defendant Steven Sprague ("Sprague"), stated that "key industry participants are finally beginning to recognize the value Wave can add and are evaluating ways that they can work with us to benefit from our position." (*Id.* at ¶ 45.) In its Form 10-K/A filed on June 30, 2003, Wave expanded on Sprague's optimistic assessment by forecasting $5 million in sales based upon "the anticipation that various deals we are working on will close." (*Id.* at ¶ 54 (noting the Company's continuing efforts to "solidify [ ] strategic alliances with the major personal computer manufacturers to force collaborative efforts to distribute its products to consumers").)

**\*2** On July 31, 2003, with the market primed to expect a substantial revenue stream, the Company issued a press release, announcing an agreement with Intel Corporation that would "enable Intel to bundle Wave's software and services with a future Intel desktop motherboard ." (*Id.* at ¶ 55.) Although the terms of the deal were not disclosed (*id.* at ¶ 57 (citation omitted)), Wave's stock soared and closed that day at $2.25 per share, a gain of 168% from the day before (*id.* at ¶ 56.)

The Company's stock was still on the rise when, on August 4, 2003, Wave announced a partnership with IBM destined to "significantly help us in our objective to deliver open and interoperable solutions to business customers." (*Id.* at ¶ 61.) Once again, despite the fact that the deal's terms were undisclosed (*id.* at ¶ 64 (citation omitted)), the market reacted positively, and Wave's stock closed at $4.42 per share, up $ .77 per share from its previous closing price (*id.* at ¶ 63.)

On August 12, 2003, Wave filed the first of four filings with the SEC in which the Company characterized its recent deals with Intel and IBM as "Material Changes." (*Id.* at ¶¶ 75, 81-83.) Two days later, during a conference call with analysts, Sprague finally revealed that the Intel deal was a non-exclusive licensing agreement with no minimum licensing requirements. (*Id.* at ¶ 78.) Sprague also admitted that although the Company's products were compatible with IBM's, Wave did not have a licensing agreement with the computer giant. (*Id.*) Despite these revelations, Wave's CEO

stood by the Company's earlier predictions of significant revenue growth. (*Id.*) Pressed to indicate the source of his sanguinity, Sprague told analysts that "we've been much more comfortable than perhaps our shareholders can be because it's hard to see the data that we have. But we're very comfortable." (*Id.* at ¶ 79.)

In the meantime, on August 5, 2003, Wave's Chief Financial Officer, Defendant Gerard K. Feeney ("Feeney"), sold 100,000 shares of the Company's stock for $500,000 (*id.* at ¶ 69); on August 6, 2003, Sprague himself sold 150,000 Wave shares for $533,841 (*id.* at ¶ 70); and, on August 19, 2003, Wave Director, Defendant Nolan Bushnell ("Bushnell"), sold 10,000 shares of Wave stock for $35,742 (*id.* at ¶ 71). These sales caught the spike in Wave's stock value at $3.17-$5.00 per share, and neither Feeney, Sprague, nor Bushell filed a timely SEC Form 4 reporting them. (*Id.* at ¶¶ 69-71; *see also id.* at ¶ 72 (alleging that Sprague neglected to report the sale of other Wave shares in early August 2003).)

In December 2003, the SEC commenced an investigation relating to "certain public statements made by Wave during and around August 2003, as well as certain trading in Wave's securities during such time." (*Id.* at ¶ 87.) On this news, the Company's shares closed at $1.50 on December 18, 2003. (*Id.* at ¶ 88.)

**\*3** In February 2004, Plaintiffs Steve Sachs, Jeff Swanson, and Charlene Harvey each filed separate shareholder derivative complaints. (Dkt. No. 9, Pl. Swanson's Opp. Mot. Consolidate 3.) Based on counsel's representations, this court allowed a motion to consolidate all Wave derivative actions on September 3, 2004. (Dkt. No. 16, Mem. & Order 1.) Plaintiffs subsequently filed a six-count Verified Consolidated Amended Complaint against: "the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information" (Count I); "All Defendants for Breach of Fiduciary Duty" (Count II); "All Defendants for Abuse of Control" (Count III); "All Defendants for Gross Mismanagement" (Count IV); "All Defendants for Waste of Corporate Assets" (Count V); and "All Defendants for Unjust Enrichment" (Count VI). (Dkt. No. 24, Am.Compl.¶¶ 96-123.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2005 WL 3116592                                                  Page 4
--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

In their amended complaint, Plaintiffs concede that they "have not made any demand upon the present Board ... to institute this action." (*Id.* at ¶ 94.) In support of their contention that "such a demand would [have been] a futile, wasteful and useless act" (*id.*), Plaintiffs point to the following "facts": (1) Sprague and Bushnell sold shares of Wave Systems while in possession of "adverse non-public information" (*id.* at ¶ 94(a)(i)-(ii)); (2) Defendants John E. McConnaughy, Jr. ("McConnaughy") and John E. Bagalay ("Bagalay"), as members of Wave's Compensation Committee, control the pay of the other three board members (*id.* at ¶ 94(b)); (3) McConnaughy, Bagalay, and Bushnell face a substantial likelihood of personal liability for neglecting their oversight responsibilities as members of Wave's Audit Committee (*id.* at ¶ 94(d)); (4) each Board member breached his fiduciary duty by failing to prevent and/or correct material misrepresentations made by the Company (*id.* at ¶ 94(e)); (5) the board members, through their "interrelated business, professional and personal relationships, have developed debilitating conflicts of interest" (*id.* at ¶ 94(f)); and (6) Sprague and his father, Peter, so dominate the Board that the other four directors "are incapable of making an impartial determination whether to sue Steven Sprague (*id.* at ¶ 94(g)).

### III. DISCUSSION

Defendants first move to dismiss all counts under Fed.R.Civ.P. 23.1. Rule 23.1 dictates that the derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... or [the reasons] for not making the effort." Defendants argue that none of the reasons Plaintiffs offer for their admitted failure to make a pre-suit demand satisfy Rule 23.1, and therefore, the entire suit must be dismissed.

In addition, Defendants move to dismiss under Fed.R.Civ.P. 12(b)(6). Dismissal pursuant to Rule 12(b)(6) is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Medina-Claudio,* 292 F.3d at 34 (citations omitted). Defendants contend that each count in the amended complaint falls short of this plaintiff-friendly standard. They argue that whereas Counts II-VI fail to

allege any legally cognizable theory of damages and are barred by an exculpatory clause in Wave's Certificate of Incorporation, Count I (insider trading) fails to comply with the particularity requirements of Fed.R.Civ.P. 9(b) and neglects to plead the elements of the claim.

### A. *Pleading Demand Futility.*

**\*4** [1] "Before bringing a derivative suit on behalf of a corporation, a plaintiff must 'demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions." ' *Caviness v. Evans,* 229 F.R.D. 354, 358 (D.Mass.2005) (quoting *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95-96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)). The rationale for this policy is quite simple.

> The purpose of the demand requirement is, of course, to require resort to the body legally charged with conduct of the company's affairs before licensing suit in the company's name by persons not so charged. Given the expense of litigation, and the normal presumptions running in favor of those acting for the company, this seems only reasonable.

*Heit v. Baird,* 567 F.2d 1157, 1162 n. 6 (1st Cir.1977); *see also id.* at 1160 (noting that Rule 23.1 "has been vigorously enforced" in the First Circuit); *Gonzalez Turul v. Rogatol Distributors, Inc.,* 951 F.2d 1, 2 (1st. Cir.1991) (citation omitted) ("To be allowed, sua sponte, to place himself in charge without first affording the directors the opportunity to occupy their normal status, a stockholder must show that his case is exceptional.").

To determine whether the circumstances pled in Plaintiffs' amended complaint would have made a demand futile, this court must turn to the laws of Delaware, the state of Wave's incorporation. *See Landy v. D'Alessandro,* 316 F.Supp.2d 49, 57 (D.Mass.2004). In *Rales v. Blasband,* 634 A.2d 927 (Del.1993), the Delaware Supreme Court instructed courts to

> determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Id.* at 934. Only "[i]f the derivative plaintiff satisfies this burden," will demand "be excused as futile." *Id.*

At the time Plaintiffs' amended complaint was filed, there were five directors on Wave's Board--Sprague, Bushnell, Bagalay, McConnaughy, and George Gilder ("Gilder"). (Dkt. No. 24, Am.Compl.¶ 94.) Accordingly, Plaintiffs "must create a reasonable doubt concerning the disinterestedness or independence of at least [three] of these directors." *Caviness,* 229 F.R.D. at 358-59; *see also Orman v. Cullman,* 794 A.2d 5, 22 (Del.Ch.2002) ("[A] plaintiff must normally plead facts demonstrating 'that a *majority* of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director." ') (citations omitted).

### 1. Reasonable Doubt.

In *Grobow v. Perot,* 539 A.2d 180 (Del.1988), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000), the Delaware Supreme Court, wary of articulating a "rote and inelastic" test for demand futility, concluded

> that it would be neither practicable nor wise to attempt to formulate a criterion of general application for determining reasonable doubt. The facts necessary to support a finding of reasonable doubt either of director disinterest or independence ... will vary with each case. Reasonable doubt must be decided by the trial court on a case-by-case basis employing an objective analysis.

**\*5** *Id.* at 186. For the plaintiff whose claim "is not based on mere suspicions or stated solely in conclusory terms," the concept of reasonable doubt "is sufficiently flexible and workable." *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996), *overruled on other grounds by Brehm,* 746 A.2d 244.

### 2. Interest.

[2][3] In the context of a pre-suit demand, directors are entitled to a presumption of disinterest. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1048-49 (Del.2004). Under *Rales,* this presumption disappears if "a corporate decision will have a materially detrimental impact on [the] director, but not on

the corporation and the stockholders." 634 A.2d at 936. [FN1] To demonstrate a disabling interest that "prevents a director from impartially considering a demand," a plaintiff must plead facts that establish a "substantial likelihood" of a director's personal liability. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (citations omitted).

### 3. Independence.

[4][5] For a director to be "independent," he or she must be both disinterested and free from "the influence of other interested persons." *Id.; see also Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984), *overruled on other grounds by Brehm,* 746 A.2d 244 (stating that an independent director must be able to make a decision "based on the corporate merits of the subject before the board rather than extraneous considerations or influences"). "To establish lack of independence, [plaintiffs] must show that the directors are 'beholden' to the [interested directors] or so under their influence that their discretion would be sterilized." *Rales,* 634 A.2d at 936; *see also In re Oracle Corp. Derivative Litig.,* 824 A.2d 917, 938-39 (Del.Ch.2003) (citations omitted) (noting that a director may be "beholden" due to "personal or other relationships" with an interested party).

### B. Analysis.

[6] In their Response and Objection to Defendants' Motion to Dismiss, Plaintiffs assert that there is reasonable doubt concerning a majority of the board's disinterest based upon each director's failure to fulfill his obligation to supervise corporate conduct. (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 9.) This claim finds scant support in Delaware law. [FN2] *See In re Caremark Int'l, Inc. v. Derivative Litig.,* 698 A.2d 959, 971 (Del.Ch.1996).

In *Caremark,* a case cited by Plaintiffs, the court observed that, "[t]he claim ... that the directors ... violated a duty to be active monitors of corporate performance ... is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Id.* at 967. For the *Caremark* court, a director's obligation to monitor corporate performance entailed a duty to ensure the existence of an adequate "corporate information and reporting system." *Id.* at 970.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Here, there are no allegations concerning the absence of such a system that might give rise to the inference that there was a "sustained and systematic failure of the board to exercise oversight." *Guttman v. Huang,* 823 A.2d 492, 506 (Del.Ch.2003) (citation omitted); *see also id.* at 507 ("I am, of course, not opining that [the Company's] directors actually implemented an adequate system of financial controls. What I am opining is that there are not well-pled factual allegations ... that the ... independent directors committed any culpable failure of oversight under the *Caremark* standard."). Nor are there any particularly pled facts supporting "an inference that the directors ... possess[ed] knowledge of facts suggesting potential ... improprieties ... and took no action to respond to them." *Id.* at 507 n. 36 (citation omitted).

*6 Instead, Plaintiffs iterate (and reiterate) the charge that each individual Defendant, by virtue of his position(s),

> knew the adverse non-public information about the business of Wave Systems, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.

(Dkt. No. 24, Am.Compl.¶¶ 21, 22, 23, 24, 25, 26.)

This tendency to discuss Defendants in "collective terminology," *In re Stratus Computer, Inc.,* Civ. A. 89-2075-Z, 1992 WL 73555, at * 8 (D.Mass. Mar.27, 1992), [FN3] evinces a failure "to heed the numerous admonitions by [Delaware's] judiciary for derivative plaintiffs to obtain books and records before filing a complaint," *Guttman,* 823 A.2d at 493; *see also In re Citigroup Inc. S'holders Litig.,* No. 19827, 2003 WL 21384599 (Del.Ch. June 5, 2003) (suggesting derivative plaintiffs' "failure to use the 'tools at hand' " was "the product of a race to the courthouse"); *White v. Panic,* 793 A.2d 356, 365 (Del.Ch.2000) ("Information gained by means of a request to inspect corporate books or records might have led to the facts justifying an inference that the Director Defendants reached their conclusions because of considerations other than stockholder interest.").

It also renders Plaintiffs incapable of adequately pleading a *Caremark* claim. *See Guttman,* 823 A.2d at 506-07. [FN4] Of course, as Plaintiffs themselves appear to recognize, the only directors [FN5] whose disinterest is suspect are those who sold Company stock in August 2003 as its price was cresting. (*See* Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 9 n. 7.) [FN6] Assuming that such sales did constitute a disabling interest for Sprague and Bushnell, [FN7] Plaintiffs must still overcome the presumption of either Bagalay's, Gilder's, or McConnaughy's independence. *See Beam,* 845 A.2d at 1050. [FN8]

In an attempt to impugn their independence, Plaintiffs make two general claims: (1) "a web of entanglements" between Gilder [FN9] and the Spragues gives rise to a reasonable doubt that he was capable of "objectively and independently considering whether to sue [Steven] Sprague" (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 12, 13); and (2) "a majority of Wave's Board is controlled and dominated" by the Sprague family (*id.* at 15).

In support of their first contention, Plaintiffs cite a 1989 interview, in which Gilder acknowledged his longtime friendship with Peter Sprague (*id.* at 13.), and note that "Gilder and Steven Sprague often participate together in technology conferences" (Dkt. No. 24, Am.Compl.¶ 94(f)(ii)). While "long-standing personal and business ties ... cannot overcome the presumption of independence that all directors ... are afforded," *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 355 (Del.Ch.1998), *aff'd in part, rev'd in part and remanded by Brehm,* 746 A.2d 244, Plaintiffs' additional allegation that Gilder has staked his reputation on Steven Sprague's success raises an interesting question, but, in the end, is insufficient to forestall dismissal.

*7 Citing a *New York Post* article, in which Gilder extolled Steven Sprague's potential as a technology CEO, [FN10] Plaintiffs allege that

> if Gilder were to recommend that legal proceedings be instituted against Steven Sprague ... it would be an admission by Gilder of Steven Sprague's failure as a corporate executive as well as Gilder's failure as a technology company analyst and judge of corporate executive talent.

(Dkt. No. 24, Am.Compl.¶ 94(f)(ii).) "This," Plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3116592                                                                          Page 7
--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

claim, "Gilder would not do ...." (*Id.*).

[7] Ordinarily, a derivative plaintiff seeking to establish a non-interested director's lack of independence must "plead facts that would support the inference that ... the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." *Beam,* 845 A.2d at 1052. Here, Plaintiffs contend that, to take the action that they desired, Gilder would have had to risk *both* his relationship with Steven Sprague *and* his professional reputation.

The problem with this argument is Plaintiffs' failure to establish: (a) the extent to which Gilder still profits from his reputation as a technology company analyst; (b) that Gilder has a greater "material interest" in his reputation as an analyst than he does as "a careful fiduciary"; [FN11] or (c) that Gilder is simply incapable of admitting a mistake.

Confined at this stage to the four corners of the amended complaint, this court cannot draw any conclusion about how a decision to sue Steven Sprague might have affected Gilder's career. Admittedly, it could have caused some to question Gilder's judgment. However, in order to conclude that, at the time the original complaints were filed, the prospect of this outcome compromised Gilder's independence, this court would need information conspicuously absent from the amended complaint. *Cf. supra* note 4 (noting how Plaintiffs' failure to specify the actual fees paid by the Compensation Committee rendered Plaintiffs' allegations of control by committee members conclusory).

Plaintiffs buttress their second broad claim with two media reports. The first, a Hoover profile from October 6, 2004, purports to show that the Spragues "own 65% of Wave Systems Class B common shares, giving them voting control over the Company." (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 15.) The second, an August 26, 2003 article in *Free Republic,* describes a series of questionable loans made by Wave's seven-member 2001 Board "to then-Chairman and Chief Executive Peter Sprague," and evinces Steven Sprague's awareness "of the power [over the board that] he and his father have wielded." (*Id.* at 15-17.) Plaintiffs contend that together these reports

describe a pliant board incapable of holding Steven Sprague accountable for his misdeeds.

This argument of voting control and general board pliancy has been emphatically rejected. Even if the Spragues, by virtue of their Class B common stock, did maintain voting control over the Company, [FN12] a family's "control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling [family] demonstrating that the directors are beholden to the [family]." *Beam,* 845 A.2d 1054; *see also id.* at 1051 (Allegations that [Martha] Stewart and the other directors moved in the same social circles ... even when coupled with *Stewart's 94% voting power,* are insufficient, without more, to rebut the presumption of independence.") (emphasis added).

**\*8** To demonstrate that, in February 2004, the outside directors were beholden to the Spragues, Plaintiffs point out that Gilder, Bagalay, McConnaughy, and Bushnell were members of the seven-member 2001 Board that approved loans to Peter Sprague totaling over one million dollars "during a year in which the company lost $48.7 million and saw its stock price plunge 40%." (Dkt. No. 24, Am.Compl.¶ 94(g) (citing *A Wave of Delusion,* Free Republic, Aug. 26, 2003).) [FN13] While such conduct may not epitomize "ideal corporate governance," *Brehm,* 746 A.2d at 256, it falls far short of establishing the outside directors' impotence, *Rales,* 634 A.2d at 936. Indeed, as the August 26, 2003 article points out, the directors could, and did, offer a reasonably logical explanation for the Peter Sprague loans: "having insiders sell stock in a company that's precarious is more damaging than having the company make loans to its officers." (Dkt. No. 24, Am.Compl. ¶ 94(g) (quoting Gilder).) Accordingly, even if the 2001 board actions were the subject of the litigation, Plaintiffs' allegations could not "overcome the business judgment rule presumption that the directors acted in good faith and after a careful investigation when they voted to authorize the transaction[s]." *In re Compucom Sys., Inc. S'holders Litig.,* No. Civ. A. 499-N, 2005 WL 2481325, at *1 (Del.Ch. Sept.29, 2005).*

Finally, the picture of Board complicity painted by Steven Sprague is not nearly as significant as Plaintiffs suggest.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3116592                                                                                    Page 8
--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

[FN14] First, Sprague's remarks conveyed his impression that the 2001 Wave board was incapable of denying loan requests made by his father--the founder of the company "who probably hired all the people that are on the board." Sprague's comments did not convey any opinion concerning Gilder, Bagalay, or McConnaughy's capacity to take action detrimental to him if faced with compelling reasons to do so. Second, the quote captures Steven Sprague's impression of his father's influence over the board in 2001 when Peter Sprague was Board Chairman and the Company CEO. In February 2004, Peter Sprague held neither of these positions. Third, Sprague was not in the position to offer a "public admission ... that the Board is incapable of acting independently of [him] and his father." (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 17.) Such an admission could only come from those directors allegedly incapable of independent action.

Ultimately, because the amended complaint lacks facts sufficient to support a reasonable inference that a majority of the board could not exercise disinterested and independent judgment, Plaintiffs were required to make demand on the board before pursuing a derivative suit. _Beam,_ 845 A.2d at 1057. Because Plaintiffs did not make a pre-suit demand, their amended complaint must be dismissed.

In reaching this conclusion, the court should not be viewed as interposing a technicality to shield corporate malfeasance. When offering a lawsuit _on behalf of_ a corporation, plaintiffs have an obligation to show clearly, as a preliminary matter, that the corporation lacks the capacity to protect its own interests. When they fail to do this, dismissal is proper.

*9 In this respect, it is significant, and perhaps consoling, to observe that, if improper action was taken, other remedies exist that lack the requirement of a pre-suit demand. Indeed, this court currently has before it a separate lawsuit, _Brumbaugh v. Wave Sys. Corp.,_ 04-cv-30022-MAP, in which individuals who acquired Wave stock between July 31, 2003, and December 18, 2003, now seek to recover damages for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

Equally important, the record indicates that even if Plaintiffs' failure to make a pre-suit demand was ignored, other fatal defects in the amended complaint would require dismissal. [FN15]

## IV. CONCLUSION

For the reasons stated above, this court allowed the Motion to Dismiss (Docket No. 29) of nominal Defendant Wave Systems Corporation and individual Defendants on September 26, 2005. The clerk is ordered to enter judgment for Defendants on all counts. This case may now be closed.

> FN1. This presumption of disinterest also disappears if a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." _Rales,_ 634 A.2d at 936 (citations omitted).

> FN2. Notably, Plaintiffs made no effort during oral argument to buttress the contention that "each of the Individual Defendants face a substantial likelihood of liability for ... permitting the Company and defendants Sprague and Bushnell, and Feeney to engage in [unlawful] conduct." (Dkt. No. 33, Pls.' Resp. & Objection Defs.' Mot. Dismiss 9, 10; _see_ Dkt. No. 39, Tr. Hr'g 42:17-64:16, Mar. 10, 2005.)

> FN3. (_See, e.g.,_ Dkt. No. 24, Am. Compl. ¶ 38 ("[T]he Individual Defendants collectively and individually initiated a course of conduct that was designed to and did ... conceal the fact that the Company was improperly misrepresenting its financial results," in order to "maintain [their] executive and directorial positions" and "deceive the investing public ....").)

> FN4. Plaintiffs two other theories of director interest stem from alleged (in)action by Wave's Audit and Compensation Committees. After electing not to pursue either of these theories in their Response or during oral argument, Plaintiffs have resurrected Audit Committee allegations in their most recent memorandum. (_See_ Dkt. No. 42, Pls.' Resp. Defs.' Mot. to Cite Suppl. Authority

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

4-6.) Because the amended complaint is completely silent as to the workings of Wave's Audit Committee, *see Guttman,* 823 A.2d at 507 (noting the absence of facts leading to the inference that an audit committee "met only sporadically and devoted patently inadequate time to its work"), and neglects to mention the fees received by outside directors or how such fees were "material" to Bagalay, Gilder, or McConnaughy, *cf. Landy v. D'Alessandro,* 316 F.Supp.2d 49, 71 (D.Mass.2004) (specifying the precise remuneration awarded to non-employee directors), the court need not tarry on these conclusory allegations.

FN5. The allegation that Feeney, a non-director, also engaged in illegal insider selling is immaterial "for the purposes of determining demand futility." *Rattner v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323, at *9 n. 47 (Del.Ch. Sept.30, 2003).

FN6. Plaintiffs' skepticism about the timing of Sprague and Bushnell's stock sales is understandable. As the Second Circuit has observed, "a spokesperson ... cash[ing] in his own stock can in appropriate circumstances be like a ship's captain exiting into the safety of a lifeboat while assuring the passengers that all is well." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 67 (2nd Cir.2001). However, this court is mindful that the amended complaint fails to describe the relationship between the trades in question and the Company's permitted trading periods, or the trading patterns of Defendants prior to the relevant period. *See Gutman v. Huang,* 823 A.2d 492, 498 (Del.Ch.2003); *Rattner,* 2003 WL 22284323, at *11 (noting the absence of any particularized allegations that the "temporal proximity" between defendant directors' sales and alleged misleading statements was not "in fact part of the Company's practice to prevent Company insiders from improperly benefitting from informational asymmetries").

FN7. As the *Guttman* court observed,

[a]lthough insider sales [to marketplace buyers] are (rightly) policed by powerful forces--including the criminal laws ... a director [is not] "interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information.

823 A.2d at 502. Because Plaintiffs do not allege that Sprague or Bushnell sold stock to the Company, this court's assumption that they were interested, "is merely that, an assumption, and not a legal conclusion." *Id.* at 503 n. 21.

FN8. Given this court's assumption that Bushnell's stock sales made him "interested," it need not discuss Plaintiffs' allegations that his relationship with the Spragues also compromised his independence.

FN9. It should go without saying that Bagalay's service as a Wave director since 1993 (Dkt. No. 24, Am.Compl.¶ 94(f)(iv)) does not rebut the presumption of his independence. Similarly unavailing is the argument that because McConnaughy and Peter Sprague are trustees of the Strang Cancer Prevention Clinic (*id.* at ¶ 94(f)(iii)), McConnaughy lacks of independence. Like the plaintiff in *Orman v. Cullman,* 794 A.2d 5, 26 (Del.Ch.2002), Plaintiffs "apparently conceded" Bagalay and McConnaughy's independence by choosing not to revisit these allegations in their brief opposing Defendants' motion to dismiss. However, in their most recent memorandum, Plaintiffs claim they have "particularly pled facts establishing a reasonable doubt as to the lack of independence of ... Gilder ... Bagalay ... Bushnell and Sprague arising from a web of entanglements." (Dkt. No. 42, Pls.' Resp. Defs.' Mot. to Cite Suppl. Authority 3 (emphasis added).) Suffice it to say, the allegation that board members enjoy close ties with one another is "hopelessly vague," *In re Paxson Communication Corp. S'holders Litig.,* No. Civ. A. 17568, 2001 WL 812028, at *10 (Del.Ch. July 12, 2001), and



does not excuse the failure to make a demand.

FN10. Christopher Byron, *Tech Guru Reboots--Internet Evangelist's Stock Picks in Peril, Sparks Lawsuits*, N.Y. Post, Aug. 9, 2004, at 31. According to the author:
With the Company's Nasdaq-traded stock selling for about $1.88 per share, [Gilder] championed a man named Steven Sprague to become the Company's president and chief operating officer.
Saying of Sprague, "I have spent the last 20 years of my life interviewing and observing technology CEO's and I believe Sprague has the potential to be the best of the bunch."
In fact, Steven is the son of Wave Systems founder and Chairman of the Board, Peter Sprague. Other than that, Steven possessed no notable credentials for the job, at all.
*Id.*

FN11. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 980 (Del.Ch.2003), *aff'd by* 845 A.2d 1040 (finding that, absent specific allegations to the contrary, a director had a greater "material interest" in his reputation as "a careful fiduciary" than he did in maintaining a relationship with an interested director).

FN12. In fact, according to Defendants, a Wave Proxy Statement from April 29, 2004, cited by Plaintiffs in their amended complaint, belies allegations of the Sprague family's voting control. (Dkt. No. 30, Defs.' Mem. Supp. Mot. Dismiss 18 n. 12; *see also id.* at 18-19 (noting that "any alleged 'domination and control' must have existed at the time the action was commenced, *i.e.* in [February 2004], not in October 2004 as alleged) (citations omitted).)
Because the Proxy Statement is a document of public record, this court is not necessarily confined to the amended complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993) ("[C]ourts have made narrow exceptions ... for official public records ... or for documents sufficiently referred to in the

complaint."). However, since the Proxy Statement does not reflect the distribution of Wave shares in February 2004, the court will assume *arguendo* that the Spragues maintained voting control "at the time the original complaint[s] [were] filed." *Rattner*, 2003 WL 22284323, at *8.

FN13. Defendants assert that while "a derivative plaintiff may rely on the truthfulness of reports published by *reputable media*," *White v. Panic*, 793 A.2d 356, 365 (Del.Ch.2000) (emphasis added), " 'Free Republic' is not the Wall Street Journal," (Dkt. No. 36, Defs.' Reply Mem. Supp. Mot. Dismiss 9 n. 9.) During oral argument, Plaintiffs' counsel also conceded that *Free Republic* might not carry the same weight as "the Wall Street Journal or the Globe or the New York Times." (Dkt. 39, Tr. Hr'g 50:4-14.) For the record, before finding its way onto the internet blog known as *Free Republic, A Wave of Delusion* originally appeared in *SmartMoney.com*--a *Wall Street Journal* publication. Because this court "may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference," *Rattner*, 2003 WL 22284323, at *12 n. 67, it may take note of the facts set forth in the article in question.

FN14. Specifically, the article quotes Sprague as saying: "Put yourself in the shoes of any board of directors that has to make that call against somebody who probably hired all the people that are on the board.... [Complying] was the right thing to do." (Dkt. No. 24, Am.Compl.¶ 94(g) (citation omitted).)

FN15. For example, Counts II through VI fail to provide the individual Defendants with the requisite notice. *See Stratus*, 1992 WL 73555, at *9 (citation omitted) ("[Failing] to delineate among the defendants their participation or responsibilities in the activities which are the subject of th[e] suit ... does not give the defendants the notice required of either Rule 8(a) or Rule 9(b)."). In addition,



--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)
**(Cite as: 2005 WL 3116592 (D.Mass.))**

Plaintiffs' claims alleging intentional breaches of fiduciary duties are subject to the heightened pleading requirements of Rule 9(b), *see Isanaka v. Spectrum Technologies USA Inc., 131 F.Supp.2d 353, 361-62 (N.D.N.Y.2001),* and claims alleging negligence are clearly barred by the exculpatory clause in Wave's Certificate of Incorporation, *see Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del.2001).*

--- F.Supp.2d ----, 2005 WL 3116592 (D.Mass.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE: SONUS NETWORKS, INC.          )
SECURITIES LITIGATION                )     C.A. No. 02-11315-MLW
                                     )

ORDER

WOLF, D.J.                                          October 5, 2005

The court has today, as requested by plaintiffs, dismissed the individual actions of plaintiffs Gary Roberts and Anthony Scibelli. Accordingly, pursuant to defendants' September 30, 2005 report, it is hereby ORDERED that:

1.  Defendants shall, by October 21, 2005, either file a motion for attorneys fees and/or sanctions or a statement that they do not intend to do so.

2.  If a motion is filed, plaintiffs shall respond by December 5, 2005.

                                    /s/ MARK L. WOLF
                                    UNITED STATES DISTRICT JUDGE

Westlaw.

389 F.Supp.2d 648                                                                      Page 1
389 F.Supp.2d 648
**(Cite as: 389 F.Supp.2d 648)**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
Ronald Jeffrey NEER, derivatively on behalf of Stonepath
Group, Inc.,
v.
Dennis L. PELINO, et al.
**No. CIV.A. 04-4791.**

Sept. 27, 2005.

**Background:** Shareholder brought shareholder derivative action against company and its officers and directors alleging violation of Sarbanes-Oxley Act by breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Defendants moved to dismiss.

**Holding:** The District Court, <u>Dalzell</u>, J., held that Sarbanes-Oxley Act provision allowing for disgorgement of bonuses and profits by corporate officers did not create a private right of action.
Motion granted.

West Headnotes

**[1] Action** ☜3
<u>13k3 Most Cited Cases</u>
There was no private right of action under provision of Sarbanes-Oxley Act which provided for forfeiture of certain bonuses and profits by corporate officers if corporation was required to prepare accounting restatement due to company's noncompliance with financial reporting requirements of securities law, if noncompliance arose from misconduct; Congress explicitly created private right of action in another section of Act making it unlawful for directors to buy or sell securities during pension fund blackout period, both sections addressed wrongdoing by officers and only one created private right of action, and legislative history indicated that Securities and Exchange Commission (SEC) alone had right to seek disgorgement. Sarbanes-Oxley Act of 2002, §§ 304, 306, <u>15 U.S.C.A. §§ 7243, 7244</u>.

**[2] Action** ☜3
<u>13k3 Most Cited Cases</u>

**[2] Constitutional Law** ☜70.3(13)
<u>92k70.3(13) Most Cited Cases</u>
When assessing whether Congress intended to create a private right of action, a court may find such a right implied only where it can confidently conclude Congress so intended; finding a private right of action under a lesser standard might alter the remedial scheme devised by Congress for the enforcement of statutory programs and place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.
**\*648** <u>Marc M. Umeda</u>, Robbins, Umeda & Fink, LLP, San Diego, CA, Steven A. Schwartz, Chimicles & Tikellis, LLP, Haverford, PA, for Plaintiff.

<u>Howard D. Scher</u>, <u>Steven E. Bizar</u> and <u>Thomas P. Manning</u>, Buchanan Ingersoll, PC, Philadelphia, PA, for Defendants.

*MEMORANDUM*
<u>DALZELL</u>, District Judge.

Plaintiff Ronald Jeffrey Neer, a shareholder in Stonepath Group, Inc. ("Stonepath"), here sues nominal defendant Stonepath and fourteen of its current and former officers and directors in this shareholder derivative action. He alleges violations of the Sarbanes-Oxley Act of 2002, breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that happened between January 1, 2001 and now. Stonepath allegedly suffered large losses and damages.

Defendants move to dismiss for lack of subject matter jurisdiction, lack of standing, time-barred claims, and lack of personal jurisdiction. We now address that motion. [FN1]

> FN1. The Court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



389 F.Supp.2d 648                                                Page 2
389 F.Supp.2d 648
**(Cite as: 389 F.Supp.2d 648)**

whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief"). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). We shall review factual background for plaintiff's claims with these principles in mind.

**\*649** *Factual Background*

Stonepath is said to be "a non-asset based third-party logistics services company." Am. Compl. ("Compl.") ¶ 5. It is incorporated in Delaware and maintains its headquarters in Philadelphia. *Id.* ¶ 26. The company derives income primarily from freight forwarding, customs brokerage, and warehousing and other valueadded services. *Id.* ¶¶ 1, 7. As a freight forwarder, Stonepath does not own or lease any significant equipment. *Id.* ¶ 7. It generates most revenues "by purchasing transportation services from direct (asset-based) carriers" to transport the property of Stonepath's customers. *Id.*

Stonepath is said to have issued four restatements--in August and November of 2003, January, 2004 and January, 2005--that modified financial statements earlier filed with the Securities and Exchange Commission ("SEC" or "Commission"), and further restatements are said to be expected.

Specifically, on August 28, 2003, Stonepath issued its first restatement, which corrected previously reported financial data that had been obtained using improper methods to account for depreciation and amortization. *Id.* ¶¶ 11, 97.

This restatement covered fiscal years ("FY") 2001 and 2002 and the first two quarters of 2002 and 2003. *Id.* ¶¶ 10, 97. Net income was reduced by $262,667 (27%) for the first quarter of FY 2001, $1,185,389 (33%) for the second quarter of FY 2002, $267,223 (97%) for the first quarter of FY 2003, and $290,066 (52%) for the second quarter of FY 2003, for a combined reduction of about two million dollars. [FN2] *Id.* ¶¶ 11, 97, 118.

> FN2. While the amended complaint alleges that figures for the first and second quarters of 2002 were restated, it does not provide the numbers for these quarters as it does for the other periods.

On November 17, 2003, Stonepath filed a Form 10-Q with the SEC for the third quarter of 2003, and this form also restated financial information for the second quarter of 2003. *Id.* ¶¶ 10, 104. Net income for the second quarter of 2003 was reduced by $350,834 (15%). [FN3] *Id.* ¶ 12.

> FN3. The amended complaint twice states that the November 2003 restatement was for the third quarter of 2002. *See* Am. Compl. ¶¶ 10, 104. However, when providing the figures for this restatement, it states that "[i]n November 2003, the Company restated its Q3:03." *Id.* ¶ 12. We assume this was a typographical error and that paragraph 12 should read "Q3:02." We thus use the amount provided in paragraph 12 to describe the second restatement.

On January 20, 2004, Stonepath issued a third restatement, this one for fiscal year 2002 and the first, second and third quarters of 2003. *Id.* ¶¶ 10, 109. This restatement corrected an overstatement of total revenue and a corresponding overstatement **\*650** of transportation costs in the same amount. *Id.* ¶¶ 13, 105. It did not alter reported net income. *Id.*

Stonepath issued a fourth restatement in January of this year, correcting information for the first and third quarters of 2003. [FN4] *Id.* ¶¶ 10, 20, 125. The need for this restatement had been announced on September 20, 2004, when Stonepath reported that it would restate financial statements for fiscal year 2003 and the first and second

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



quarters of 2004. *Id.* ¶¶ 15, 126. An internal review of Stonepath's Logistics Domestic Services ("Domestic Services") subsidiary revealed the "trend analysis" method used to estimate costs of purchased transportation did not accurately account for the differences between the estimates of freight costs and the actual freight costs. *Id.* ¶ 120. As a result, actual costs were underreported. *Id.* Costs were understated for 2003 in the range of $4.0 to $6.0 million, and in the range of $500,000 to $1.0 million for the first six months of 2004. *Id.* Stonepath stated it expected the reported earnings before interest, taxes and depreciation ("EBITDA") to be reduced to the range of $2.6 to $4.6 million for 2003, and $200,000 to $700,000 for the first six months of 2004. *Id.*

> FN4. Paragraph 10 only states that the third quarter of 2003 was covered by the January 2005 restatement, but according to paragraphs 20, 125 and 127, on January 6, 2005, Stonepath restated results for the first and third quarters of 2003. We assume that paragraph 10 inadvertently omitted the first quarter of 2003 in its description of the January 2005 restatement.

The day of this announcement, on a trading volume of 4,830,200 shares, Stonepath stock closed at $0.86 per share, down 46% from the September 19, 2004 closing price. *Id.* ¶¶ 18, 123.

After the September 20, 2004 announcement, Stonepath disclosed two additional process errors concerning Domestic Services' revenue transactions. [FN5] *Id.* ¶¶ 19, 124. First, revenues were overstated because of a billing error. Second, an accounting error affected revenue recognition and depreciation in the second quarter of 2004. *Id.*

> FN5. The complaint does not provide the date of this disclosure.

In the January 6, 2005 press release that announced that the restatement for the first and third quarters of 2003 had been filed, Stonepath also disclosed that, because of the accounting problems identified in its September 20, 2004 announcement, it would be reducing net income results for

fiscal years 2001, 2002 and 2003, and the first six months of 2004 by $0.4 million, $2.0 million, $7.8 million and $6.1 million, respectively. *Id.* ¶¶ 21, 127. Accordingly, in future restatements, the aggregate reduction in previously reported income will be about $16.3 million for 2001 through the first six months of 2004. *Id.* ¶¶ 21, 22, 127.

From January 1, 2001 to now, Stonepath has allegedly undergone several changes in structure and personnel. First, the senior financial representatives within the Domestic Services and International Services units now report directly to the Chief Financial Officer ("CFO"). *Id.* ¶¶ 23, 130. Second, the Chief Executive Officer ("CEO") and CFO were replaced and the new position of President was created. *Id.* Third, Stonepath announced it would move the corporate headquarters to Seattle, Washington in the first half of 2005. *Id.* ¶¶ 24, 130.

On October 12, 2004, plaintiff initiated this action, and on January 19, 2005 he filed an amended complaint. The amended complaint asserts six counts, all against the fourteen Individual Defendants [FN6] except **\*651** for the first count: (1) violation of Section 304 of the Sarbanes-Oxley Act ("SarbOx") by defendants Dennis L. Pelino and Bohn H. Crain; (2) breach of fiduciary duty; (3) abuse of control; (4) gross mismanagement; (5) waste of corporate assets; and (6) unjust enrichment.

> FN6. In addition to nominal defendant Stonepath, the defendants are Dennis L. Pelino ("Pelino"), Bohn H. Crain ("Crain"), Thomas L. Scully ("Scully"), J. Douglass Coates ("Coates"), Robert McCord ("McCord"), David R. Jones ("Jones"), Aloysius T. Lawn ("Lawn"), John H. Springer ("Springer"), Andrew P. Panzo ("Panzo"), Lee C. Hansen ("Hansen"), Darr Aley ("Aley"), Stephen George ("George"), Michela O'Connor Abrams ("O'Connor Abrams"), Stephen M. Cohen ("Cohen") and Frank Palma ("Palma"). Defendant Pelino was Stonepath's Chief Executive Officer ("CEO") from June 21, 2001 to October 14, 2004, and its Chairman of the Board of Directors from June 21, 2001 to the present. Compl. ¶ 27. Defendant Crain served as Chief Financial Officer ("CFO") from January 10, 2002 to October 14,



2004, as Treasurer from May 30, 2002 to October 14, 2004, and as a consultant in fiscal year 2005. *Id.* ¶ 28. Defendant Scully was Vice-President, Controller and Principal Financial and Accounting Officer from November 19, 2001 to the present, and he was also named CFO on October 14, 2004. *Id.* ¶ 29. Defendant Coates has served as a Director from August, 2001 to the present. Defendant McCord has served as a Director from March, 2001 to the present, and was a member of the Audit Committee during fiscal year 2001 and resumed the position in March 2003. *Id.* ¶ 31. Defendant Jones is and has been throughout the Relevant Period a Director and a member of the Audit Committee and the Compensation Committee. *Id.* ¶ 32. Defendant Lawn has been a Director, a member of the Audit Committee and a member of the Compensation Committee from February, 2001 to the present. *Id.* ¶ 33. Defendant Springer has served as a Director and a member of the Compensation Committee from May, 2003 to the present. *Id.* ¶ 34. Defendant Panzo was Chairman and CEO of Stonepath from January, 1999 through June, 2001 and continued as a Director through December, 2001. *Id.* ¶ 35. Defendant Hansen was President of Stonepath from October 1, 1999 until about June 22, 2001, and was a Director from April, 2000 until about June 22, 2001. *Id.* ¶ 36. Defendant Aley served as a Director from July, 1999 until at least March 15, 2001. *Id.* ¶ 37. Defendant George was a Director from July, 1999 until at least March 15, 2001. *Id.* ¶ 38. Defendant O'Connor Abrams was a member of the Board of Advisors from January, 2000 until she was appointed as a Director in September, 2000 and then served as a Director, member of the Audit Committee and member of the Compensation Committee from September, 2000 until approximately October 9, 2001. *Id.* ¶ 39. Defendant Cohen was Managing Director, General Counsel and Secretary from April, 2000 until about October 9, 2001. *Id.* ¶ 40. Defendant Palma was a Director from August, 2001 until about August 28, 2003, and he was a member of the Audit Committee and the Compensation Committee for

fiscal years 2001 and 2002. *Id.* ¶ 41.

Defendants move to dismiss on four grounds: (1) lack of subject matter jurisdiction because plaintiff cannot bring suit under Section 304 of the SarbOx; (2) lack of standing due to failure to make a pre-suit demand upon the directors; (3) time-barred claims against certain Individual Defendants; and (4) lack of personal jurisdiction over certain Individual Defendants.

Because it touches on the federal question that is the keystone of this action, we first consider the SarbOx claim.

*Section 304 of the Sarbanes-Oxley Act*

[1] Plaintiff asserts federal jurisdiction under 28 U.S.C. § 1331, claiming that we may infer that Section 304 of SarbOx ("the Act") provides a private cause of action against defendants Pelino and Crain. He invokes our supplemental jurisdiction under 28 U.S.C. § 1367(a) to assert his five other claims.

Defendants contend that this Court does not have subject matter jurisdiction. They argue that Section 304 does not provide a private cause of action, and without the presence of a federal question, this Court should not entertain the remaining state law claims.

Section 304 provides for forfeiture of certain bonuses and profits by CEOs and CFOs when a restatement is required due **\*652** to an issuer's noncompliance with any financial reporting requirements of the securities law, if the noncompliance arises from misconduct. In its entirety, Section 304 states:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for--

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12-month period.

(b) Commission exemption authority

The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

15 U.S.C. § 7243 (2002).

Section 304 does not explicitly afford a private right of action, [FN7] and no court has ruled on whether this section creates an implied private right of action. *See Karpus v. Borelli (In re Interpublics Secs. Litig.),* 2004 WL 2397190, at *9, 2004 U.S. Dist. LEXIS 21429, at *26 (S.D.N.Y. Oct. 26, 2004) (approving derivative class action settlement and noting that plaintiff's claims were "perilously weak," including his assertion that he had standing to bring a claim under Section 304); *In re Cree, Inc. Secs. Litig.,* 333 F.Supp.2d 461, 478 (M.D.N.C.2004) (granting leave to amend a complaint and explicitly deferring the question of whether Section 304 can be enforced through a private cause of action); *In re AFC Enters., Inc. Derivative Litig.,* 224 F.R.D. 515 (N.D.Ga.2004) (denying motion to dismiss in diversity case without discussing whether shareholders who raised a Section 304 claim had a right to do so).

FN7. The Act's general enforcement provision states:
A violation by any person of this Act, any rule or regulation of the Commission issued under this Act, or any rule of the Board shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) or the rules and regulations issued thereunder, consistent with the provisions of this Act, and any such person shall be subject to the same penalties, and to the same extent, as for a violation of that Act or such rules or regulations.
15 U.S.C. § 7202(b)(1). As discussed in detail below, Congress chose to treat enforcement rights differently throughout the Act. Therefore, we cannot rely on this general provision to answer the specific question of what Congress intended regarding Section 304's enforcement.

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court crafted a four-part test to determine "whether a private remedy is implicit in a statute not expressly providing one." The *Cort* test asks four questions:

First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to *653 state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. 2080 (citations omitted).

Since *Cort,* the Supreme Court has explained that the "central inquiry" of the test is "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Even if a court believes that an implied remedy is "necessary to make effective the congressional purpose expressed by a statute," it cannot imply a remedy based on this consideration. *Alexander v. Sandoval,* 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)). Regardless of whether implying a private right of action effectuates the purposes of a statute, "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15-16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Moreover, we need not "trudge through all four of the factors when the dispositive question of legislative intent has been resolved." *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (quoting *Cal. v. Sierra Club,* 451 U.S. 287, 302, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981)

Westlaw.

389 F.Supp.2d 648                                                                                                                          Page 6
389 F.Supp.2d 648
**(Cite as: 389 F.Supp.2d 648)**

(Rehnquist, J., concurring)).

[2] When assessing whether Congress intended to create a private right of action, our Court of Appeals has cautioned that "a court may find such a right implied only where it can *confidently conclude* Congress so intended." *Dep't of Envtl. Protection & Energy v. Long Island Power Auth., 30 F.3d 403, 421 (3d Cir.1994)* (emphasis added). Finding a private right of action under a lesser standard might "alter the remedial scheme devised by Congress for the enforcement of statutory programs and ... place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.' " *Id.* (quoting *American Tel. & Tel. Co. v. M/V Cape Fear, 967 F.2d 864, 866 (3d Cir.1992)*).

Guided by this jurisprudence, we examine whether Congress intended to create a private right of action by looking first to the text and structure of the Act. *See Alexander, 532 U.S. at 288, 121 S.Ct. 1511.*

Despite the absence of specific language conferring upon private parties a cause of action, plaintiff argues that in two ways Section 304's plain language demonstrates Congress' intent to grant such a right. First, he contends that Congress, by creating a reimbursement benefit for issuers like Stonepath, intended for private plaintiffs to enforce that right in court. Defendants argue that plaintiff is not a member of a benefited class because disgorgement is not a remedy designed to protect a class, but instead is designed to punish wrongdoers.

Congress created a federal right in favor of issuers by specifying they would receive the proceeds of officers' benefits, but at the same time Congress selected a remedy--disgorgement--which "is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir.1997)* (quoting *SEC v. First City Fin. Corp., 281 U.S.App. D.C. 410, 890 F.2d 1215, 1230 (D.C.Cir.1989)*). Although Congress created a remedy that would indirectly benefit Stonepath shareholders, "whether Congress intended additionally that [this] provision[ ] would be enforced through private litigation is a different question."

*Transamerica, 444 U.S. at 18, 100 S.Ct. 242; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002)* ("[E]ven where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.' ") (quoting *Alexander, 532 U.S. at 286, 121 S.Ct. 1511*).

In a second textual argument, plaintiff points to subsection (b), which allows the SEC to exempt a CEO or CFO from disgorgement when it deems such an exemption to be "necessary and appropriate." Plaintiff contends this subsection would be unnecessary unless Congress had contemplated someone other than the SEC initiating the action. This argument assumes that after a private party brings suit, the SEC would make an exemption assessment.

At least two factors weigh against plaintiff's interpretation. First, subsection (b) can be read as giving the SEC discretion to consider factors-- such as the type of misconduct or the persons involved--when deciding whether it should exempt someone from an SEC disgorgement action. Such an exemption determination would not require as a predicate the involvement of any private litigant. Second, Congress provided no guidance for private parties or the SEC as to what form SEC exemption determinations would take, or even whether such determinations would be mandatory. Given these problems, we do not see why subsection (b) must be read to require a implied private right of action.

Since the text of Section 304 does not resolve the issue, we turn to examine the Act as a whole to see how Congress addressed private rights of action. Congress explicitly created a private right of action in only one place, and that is in Section 306. This section makes it unlawful for directors or executive officers to buy or sell any of the issuer's equity securities during a pension fund blackout period if such securities were acquired in connection with the director or executive officer's employment. [FN8] 15 U.S.C. § 7244. If the issuer fails to bring an action to recover profits within sixty days of a request to do so, "[a]n action ... [under] this subsection may be instituted ... by the owner of any *655 security of the issuer in the name and in behalf of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

389 F.Supp.2d 648                                                                              Page 7
389 F.Supp.2d 648
**(Cite as: 389 F.Supp.2d 648)**

issuer." 15 U.S.C. § 7244(a)(2)(B). No suit can be brought more than two years after the profit was realized. *Id.*

> FN8. Section 306 provides, in relevant part: (a) Prohibition of insider trading during pension fund blackout periods.
> (1) In general.
> Except to the extent otherwise provided by rule of the Commission pursuant to paragraph (3), it shall be unlawful for any director or executive officer of an issuer of any equity security (other than an exempted security), directly or indirectly, to purchase, sell, or otherwise acquire or transfer any equity security of the issuer (other than an exempted security) during any blackout period with respect to such equity security if such director or officer acquires such equity security in connection with his or her service or employment as a director or executive officer.
> (2) Remedy.
> (A) In general.
> Any profit realized by a director or executive officer referred to in paragraph (1) from any purchase, sale, or other acquisition or transfer in violation of this subsection shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such director or executive officer in entering into the transaction.
> (B) Actions to recover profits.
> An action to recover profits in accordance with this subsection may be instituted at law or in equity in any court of competent jurisdiction *by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer* if the issuer fails or refuses to bring such action within 60 days after the date of request, or fails diligently to prosecute the action thereafter, except that no such suit shall be brought more than 2 years after the date on which such profit was realized.
> 15 U.S.C. § 7244 (emphasis added).

The contrast between Sections 304 and 306 is apparent. Both address wrongdoing of officers and both provide for the issuer's reimbursement, yet only Section 306 expressly

creates a private remedy, and one with a statute of limitations. Section 306 shows that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross,* 442 U.S. at 572, 99 S.Ct. 2479 (deciding not to imply private remedy when provision silent on the matter was flanked by provisions explicitly providing for private causes of action). Because Congress explicitly created a private right of action in Section 306 and did not do so in Section 304, the natural inference is that Congress did not intend to create a private right of action in Section 304. *Expressio unius est exclusio alterius.*

Two other provisions in the Act demonstrate the care and precision Congress gave to affording remedies and identifying enforcers. Section 303 makes it unlawful for officers or directors to "fraudulently influence, coerce, manipulate, or mislead" independent auditors, and that Section provides that "[i]n any civil proceeding, the Commission shall have exclusive authority to enforce this section." 15 U.S.C. § 7242(a), (b). Section 804, which extends the statute of limitations for claims in particular securities fraud cases, states that "[n]othing in this section shall create a new, private right of action." 28 U.S.C. § 1658(c).

To sum up, Sections 303 and 804 do not grant private parties a new cause of action, Section 306 specifically grants one, and Section 304 is silent on the matter. Notably, Sections 304 and 306 share an important characteristic in that each provides for issuers to be reimbursed with wrongdoing officers' profits, a subject neither Section 303 nor 804 addresses. [FN9] Given the similarity of Sections 304 and 306, a comparison of these two sections' enforcement language is more telling than comparisons with Sections 303 and 804. Congress was at pains in Section 306(a)(2)(B) to spell out who could enforce that section and how long the enforcer had to do it. Since Section 304 is silent on both subjects, it is fair to say that implying a private right would, at least in this context, require us to rewrite Congress's statute. This we cannot do.

> FN9. It will be recalled that Section 303 does not expressly create a right benefiting issuers, and Section 804 merely extends a statute of limitations.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



As neither the text nor the Act's structure demonstrates that Congress intended to create a private remedy, we consider, as the jurisprudence may still require, legislative history. [FN10] The Conference Report submitted with the Act does not discuss **\*656** who can bring a claim under Section 304, *see* H.R.Rep. No. 107-610 (2002) (Conf.Rep.), but Committee Reports submitted with earlier drafts of the Act specifically mention enforcers. On April 22, 2002, the Committee on Financial Services reported out a draft to the House of Representatives. [FN11] This draft required the Commission to analyze whether any officer or director should be required to disgorge funds during the six months preceding the filing of a restatement, and then prescribe a disgorgement rule if "necessary and appropriate." The issuers would receive any disgorged profits, and enforcement of the rule would "lie solely with the Commission." H.R. Rpt. No. 107-414, at 12 (2002).

> FN10. We are unsure whether such an inquiry survives *Alexander v. Sandoval*. Compare Justice Stevens's dissent (stating that "the Court today adopts a methodology that blinds itself to important evidence of congressional intent"), 532 U.S. at 313, 121 S.Ct. 1511 (Stevens, J., dissenting op.), *with* Justice Scalia's opinion for the Majority (responding to Justice Stevens's criticism and asserting that under well-established methodology interpretive inquiries begin and end with a statute's text and structure when these do not make clear that Congress intended to create a cause of action), *id.* at 289 n. 7, 121 S.Ct. 1511. In any event, we entirely share Justice Scalia's oft-expressed skepticism about such an enterprise. *See, e.g., Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J. concurring) (describing "the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

> FN11. This draft was called the Corporate and Auditing Accountability, Responsibility, and Transparency Act of 2002, and states, in relevant part:

SEC. 12. DISGORGING INSIDERS [sic] PROFITS FROM TRADES PRIOR TO CORRECTION OF ERRONEOUS FINANCIAL STATEMENTS.

(a) ANALYSIS REQUIRED.--The Commission shall conduct an analysis of whether, and under what conditions, any officer or director of an issuer should be required to disgorge profits gained, or losses avoided, in the sale of the securities of such issuer during the six month period immediately preceding the filing of a restated financial statement on the part of such issuer.

(b) DISGORGEMENT RULES AUTHORIZED.--If the Commission determines that imposing the requirement described in subsection (a) is necessary or appropriate in the public interest or for the protection [of] investors, and would not unduly impair the operations of issuers or the orderly operation of the securities markets, the Commission shall prescribe a rule requiring the disgorgement of all profits gained or losses avoided in the sale of the securities of the issuer by any officer or director thereof. Such rule shall--

(1) describe the conditions under which any officer or director shall be required to disgorge profits, including what constitutes a restatement for purposes of operation of the rule;

(2) establish exceptions and exemptions from such rule as necessary to carry out the purposes of this section;

(3) identify the scienter requirement that should be used in order to determine to impose the requirement to disgorge; and

(4) specify that the enforcement of such rule shall lie solely with the Commission, and that any profits so disgorged shall inure to the issuer.

(c) NO PREEMPTION OF OTHER LAW.--Unless otherwise specified by the Commission, in the case of any rule promulgated pursuant to subsection (b), such rule shall be in addition to, and shall not supersede or preempt, the Commission's authority to seek disgorgement under any other provision of law. H.R.Rep. No. 107-414, at 12 (2002).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A vocal minority of Representatives criticized this section for failing faithfully to implement President Bush's post-Enron ten-point plan to restore accountability among corporate officers. The plan called for the disgorgement of incentive-based compensation from officers and directors who made false or misleading statements requiring a restatement. Critics of the House draft were troubled that the draft provision was ineffectual.

> Instead of attempting to implement [President Bush's] straightforward and common sense proposal, the Committee simply tasked the SEC to study the question of disgorgement. Additionally, the report language attempts to raise the bar to use of this remedy by stating that it should be used only where *the Commission can prove* "extreme misconduct". Establishing such a high standard will make it very difficult, if not impossible, for *the Commission to obtain disgorgement* of millions of dollars that executives have earned from stock sales at the same time they were committing securities fraud.
>
> We, however, believe that Congress should act quickly to *provide the SEC with the power to require disgorgement* ***657** of compensation in an administrative proceeding....
>
> In addition, the bill should have included a provision that provides in *any action or proceeding brought or instituted by the Commission* under the securities laws against any person who made or caused to be made the filing of financial statements that were at the time false or misleading ... may be required to disgorge salaries, commissions, fees, bonuses and other incentive-based compensation.

H.R. Rpt. No. 107-414, at 50-51 (Minority Views) (emphasis added).

The majority wanted the SEC to analyze whether disgorgement would be wise and, if it did, to prescribe a rule. A minority wanted Congress to immediately empower the SEC to seek disgorgement. Yet one point is clear: neither supporters nor opponents of the House draft wanted to give private parties the right to seek disgorgement under this provision. The House Report thus reflects a consensus that the SEC alone would have the right to seek disgorgement.

On July 3, 2002, the Senate Committee on Banking, Housing, and Urban Affairs reported on and recommended passage of its draft, entitled the Public Company Accounting Reform and Investor Protection Act of 2002. *See* S. Rpt. 107-205 (2002). Like the House, the Senate pointed to the President's plan when explaining the need for a disgorgement provision pertaining to restatements.

> The President has recommended that 'CEOs or other officers should not be allowed to profit from erroneous financial statements,' and that 'CEO bonuses and other incentive-based forms of compensation [sh]ould be disgorged in cases of accounting restatement and misconduct.'
>
> Title III includes provisions designed to prevent CEOs or CFOs from making large profits by selling company stock, or receiving company bonuses, while management is misleading the public and regulators about the poor health of the company.

*Id.* at 26.

The Senate Report does not discuss who should enforce this. The text the Senate proposed, however, and which Congress eventually adopted as Section 304 of the Act, directly responded to the criticisms voiced in the House. The Senate made disgorgement immediately available without requiring the SEC to analyze the matter before prescribing a rule. At the same time, it permitted the SEC some discretion by allowing for exemptions.

The legislative history thus reveals that Representatives in the House agreed that the SEC would bring disgorgement actions. Two and a half months after expressing this House understanding, the Senate submitted language that empowered the SEC to seek immediate disgorgement. If the intent had been to create a new private right of action, we would expect to see *some* comment to that effect in one or both of the Committee Reports. There is none.

Thus, we are left with the core reality that Congress expressly granted a private right of action in Section 306, a provision sharing important features with Section 304, yet elected not do so in Section 304. We will not disturb that election.

*Conclusion*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

389 F.Supp.2d 648
389 F.Supp.2d 648
**(Cite as: 389 F.Supp.2d 648)**

In light of the text and structure of the Act and its legislative history, we find that Congress did not intend to create an implied cause of action in Section 304 of SarbOx. Having found that plaintiff does not present a federal claim, we do not reach defendants' other grounds for dismissal.

**\*658** Furthermore, absent a federal claim under SarbOx, we believe the Delaware state courts are far better suited than we are to consider plaintiff's remaining state law based claims. We therefore elect not to exercise our supplemental jurisdiction over them.

Accordingly, we dismiss plaintiff's complaint without prejudice. An appropriate order follows.

### ORDER

AND NOW, this 27th day of September, 2005, upon consideration of defendants' second motion to dismiss plaintiff's amended shareholder derivative complaint (docket entry # 30), plaintiff's memorandum of law in opposition to defendants' motion (docket entry # 31), defendants' reply memorandum in support of defendants' motion (docket entry # 33), and plaintiff's motion to compel a Rule 26(f) conference of parties (docket entry # 37), and in accordance with the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion is GRANTED;

2. Plaintiff's motion is DENIED AS MOOT;

3. Count I of the Amended Complaint is DISMISSED, and Counts II--VI are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c); and

4. The Clerk shall CLOSE this case statistically.

389 F.Supp.2d 648

**Motions, Pleadings and Filings (Back to top)**

• 2:04cv04791 (Docket) (Oct. 12, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.